UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x
J.T., Individually and On Behalf Of D.T.;
K.M., Individually and On Behalf Of M.M. and S.M.;
J.J., Individually and On Behalf Of Z.J.;
C.N., Individually and On Behalf Of V.N.; and,
All Others Similarly Situated,

                                   **CASE NO.: 20 – CV -**

            Plaintiffs,

                                   **CLASS ACTION
COMPLAINT FOR
DECLARATORY AND
<u>INJUNCTIVE RELIEF</u>**

        -against-

BILL de BLASIO, in his official capacity as the
Mayor of New York City; RICHARD
CARRANZA, in his official capacity as the
Chancellor of New York City Department of
Education; the NEW YORK CITY DEPARTMENT
OF EDUCATION; the SCHOOL DISTRICTS IN
THE UNITED STATES; and STATE
DEPARTMENTS OF EDUCATION IN THE
UNITED STATES,

            Defendants.
------------------------------------------------------------------------x

        PLAINTIFFS (*See* Appendix A) are parents and/or natural guardians ("Plaintiff-Parent") of students who are classified under federal law as being disabled and having an educational disability, and the Students themselves ("Plaintiff-Student"), brings this action on their own behalf and on the behalf of all others similarly situated against BILL de BLASIO, in his official capacity as the Mayor of New York City, RICHARD CARRANZA, in his official capacity as the Chancellor of New York City Department of Education, the NEW YORK CITY DEPARTMENT OF EDUCATION, the SCHOOL DISTRICTS IN THE UNITED STATES (*See* Appendix B), and STATE

DEPARTMENTS OF EDUCATION IN THE UNITED STATES (*See* Appendix C) (collectively "Defendants"), and allege the following upon information and belief:

**INTRODUCTION**

1. In 2019, a novel coronavirus, ("COVID-19") began to spread throughout Wuhan, China[1], and the first known transmission of COVID-19 in the United States occurred in January 2020[2].

2. The Individuals with Disabilities Education Act, 20 U.S.C. §1400, et seq. ("IDEA")[3], the regulations of the United States Department of Education, which were promulgated pursuant to authority granted by the statute (34 C.F.R. Part 300) and the corresponding statutes and regulations of each State, guarantees students with disabilities a free appropriate public education ("FAPE"). The term FAPE[4] refers to special education and related services that are designed to meet a child's unique needs and that will prepare the child for further education, employment, and independent living. For example, the regulations of the New York State Commissioner of Education Part 200 Students with Disabilities and Part 201 Procedural Safeguards for Students with Disabilities[5], pursuant to Sections 207, 3214, 4403, 4404 and 4410 of the New York Education Law guarantees students with disabilities a FAPE.

---

[1] "The Coronavirus: What Scientists Have Learned So Far". The New York Times. Sheikh, Knvul; Rabin, Roni Caryn (March 10, 2020). https://www.nytimes.com/article/what-is-coronavirus.html
[2] First known person-to-person transmission of severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2) in the USA. Lancet. (April 4-10, 2020). https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7158585/
[3] https://sites.ed.gov/idea/
[4] IDEA § 602 (9) The term `free appropriate public education' means special education and related services that--
(A) have been provided at public expense, under public supervision and direction, and without charge;
(B) meet the standards of the State educational agency;
(C) include an appropriate preschool, elementary school, or secondary school education in the State involved; and
(D) are provided in conformity with the individualized education program required under section 614(d).
[5] http://www.p12.nysed.gov/specialed/lawsregs/documents/regulations-part-200-201-oct-2016.pdf

3. As defined by 20 U.S.C. §§ 1401(14) and 1414(d), the vehicle for the provision of FAPE is the Individualized Education Program ("IEP"), the document which embodies the school district's recommendations for a particular child. *Bd. Of Educ. v. Rowley*, 458 U.S. 176, 181 (1982). Once drafted, the IEP is essentially a contract and bears the imprimatur of the State, regardless of the Local Educational Agency ("LEA") that created it, and carries a presumption of correctness. See *Letter to Rieser*, EHLR 211:403 (July 17, 1986).

4. Pursuant to Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, et seq. ("Section 504), disabled students who receive special education are entitled to have their educational needs met as adequately as the needs as non-disabled students are met. Section 504 prohibits discrimination against individuals with disabilities and prohibits discrimination to the full range of state and local government services, programs, and activities (including public schools) regardless of whether they receive Federal financial assistance.

5. Pursuant to Title II of the Americans with Disabilities Act, 42 U.S.C. § 12101, et seq. ("ADA")[6], no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity (State or local government), or be subjected to discrimination by any such entity.[7],[8] This includes disabled students who receive special education.

---

[6] It should be noted that July 26, 2020, was the 30th Anniversary of the Americans with Disabilities Act.
[7] Pub. L. 101–336, title III, § 302, July 26, 1990, 104 Stat. 355.
[8] According to the American With Disabilities Act ("ADA"), a plaintiff must demonstrate that he: "(1) has a disability; (2) was otherwise qualified to participate in a school program; and (3) was denied the benefits of the program or was otherwise subject to discrimination because of his disability." *S.H. ex rel. Durell v. Lower Merion Sch. Dist.*, 729 F.3d 248, 260 (3d Cir. 2013).

6.     During the month of March 2020, Governors across the United States unilaterally closed school buildings and required all students and school staff to remain home in order to prevent the hospital systems from becoming overloaded[9].  For example, on March 16, 2020, New York State Governor Andrew Cuomo ("Governor Cuomo") issued an Executive Order closing all school buildings across the State of New York for a two week period.[10]  Subsequently, Governor Cuomo announced all school buildings would remain closed for the remainder of the 2019-2020 school year.[11]  It should be noted that Governor Cuomo included physical therapists, occupational therapists and other related services providers as essential workers to be excluded from his Executive Order.  See Appendix D for a complete list of every Governor's Executive Orders unilaterally closing school buildings.

7.     During the month of March 2020, school districts across the United States unilaterally closed school buildings and required all students and staff to remain home and changed in-person instruction to "remote learning," if any.  For example, March 13, 2020, was the last day of classes in New York City schools due to New York City Mayor Bill de Blasio[12] ("Mayor de Blasio") and the Chancellor of New York City Department of Education Richard Carranza[13] ("Chancellor Carranza") unilaterally moving all instruction to "remote learning" where students and staff would remain at their homes until April 20, 2020.

---

[9] "U.S. states scramble to slow virus spread, prevent hospital collapse". Reuters. (March 12, 2020). https://www.reuters.com/article/us-health-coronavirus-usa-mitigation/u-s-states-scramble-to-slow-virus-spread-prevent-hospital-collapse-idUSKBN20Z3QM

[10] Executive Order 202.4 by New York Governor Andrew Cuomo on March 16, 2020: https://www.governor.ny.gov/sites/governor.ny.gov/files/atoms/files/EO%20202.4.pdf

[11] Executive Order 202.26 by New York Governor Andrew Cuomo on May 1, 2020: https://www.governor.ny.gov/sites/governor.ny.gov/files/atoms/files/EO_202.26_Final_Elections.pdf

[12] https://www.nytimes.com/2020/03/15/nyregion/nyc-schools-closed.html

[13] Messages from New York City Department of Education Chancellor, Richard Carranza: https://www.schools.nyc.gov/learn-at-home/chancellor-s-message-for-families

Subsequently, on April 11, 2020, Mayor de Blasio and Chancellor Carranza announced schools would remain closed and all services would continue to be provided through "remote learning" for the remainder of the 2019-2020 school year.[14]

8. On March 15, 2020, the United States Centers for Disease Control and Prevention ("CDC") issued guidelines and recommendations on school closures which stated the impact on COVID-19 for school closures lasting more than 2 weeks would be: a) Longer closures may result in more students congregating outside of school (e.g., other students' homes, shopping malls); and b) Will increase risk to older adults or those with co-morbidities, as almost 40% of U.S. grandparents provide childcare for grandchildren. School closures will likely increase this percentage.[15]

9. School districts across the country requested the Secretary of Education to grant waivers from IDEA requirements and providing FAPE during the coronavirus crisis.[16] While the United States Department of Education ("USDOE") provided great flexibility in the provision of educational services during the coronavirus crisis, there has been no change in federal or state law. On April 27, 2020, the USDOE presented a Report to Congress from United States Education Secretary Betsy DeVos ("Secretary DeVos") which specifically did not recommend giving school districts the option to bypass major parts of federal special education law.[17] "While the Department has provided extensive flexibility

---

[14] https://www.nbcnews.com/news/us-news/new-york-city-mayor-says-schools-will-stay-closed-rest-n1181856
[15] Recommendations on school closure based on available science, reports from other countries and consultation with school health experts. CDC. March 15, 2020. https://www.cdc.gov/coronavirus/2019-ncov/downloads/considerations-for-school-closure.pdf
[16] https://edsource.org/2020/disability-rights-groups-school-administrators-spar-over-possible-changes-to-special-education-laws/628376
[17] https://www2.ed.gov/documents/coronavirus/cares-waiver-report.pdf?utm_content=&utm_medium=email&utm_name=&utm_source=govdelivery&utm_term=

to help schools transition, there is no reason for Congress to waive any provision designed to keep students learning," Education Secretary Betsy DeVos said in a statement.[18]

10. As recently as July 8, 2020, Secretary DeVos reaffirmed the position of the USDOE during a briefing of the White House Coronavirus Task Force: "[t]here were a number of schools and districts across the country that did an awesome job of transitioning this spring. And there were a lot in which I and state school leaders were disappointed in that they didn't figure out how to continue to serve their students. Too many of them just gave up. The Center for Reinventing Public Education [CRPE] said that only 10 percent across the board provided any kind of real curriculum and instruction program."[19]

11. <u>Federal funding for FAPE under IDEA and Medicaid:</u>  The purpose of IDEA Part B (20 USCS § 1415) grants is to assist in the provision of special education and related services to children with disabilities, including that children with disabilities have access to a free appropriate public education (FAPE).   In general, IDEA Part B funds ***must be used only to pay the excess costs of providing FAPE to children with disabilities,*** such as costs for special education teachers and administrators; related services providers (speech therapists, psychologists, etc.); materials and supplies for use with children with disabilities; professional development for special education personnel; professional development for regular education teachers who teach children with disabilities; and specialized equipment or devices to assist children with disabilities. Generally, IDEA funds cannot be used for core instruction in the general education classroom, instructional materials for use with non-disabled children, or for professional development of general

[18] https://www.ed.gov/news/press-releases/secretary-devos-reiterates-learning-must-continue-all-students-declines-seek-congressional-waivers-fape-lre-requirements-idea
[19] https://www.whitehouse.gov/briefingsstatements/press-briefing-vice-president-pence-members-coronavirus-task-force-july-8-2020/.

education teachers not related to meeting the needs of students with disabilities. Many IDEA-eligible children are covered by the Medicaid program, a federal program managed through the Centers for Medicare & Medicaid Services ("CMS"), whose Early and Periodic Screening, Diagnosis and Treatment mandate requires Medicaid agencies to provide eligible children under 21 years old with the services necessary to meet their medical needs. In many cases, a Medicaid-eligible child's IEP under IDEA includes health-related services such as audiology, nursing and therapies that are medical in nature and covered by Medicaid. Medicaid spending on school-based health accounts for about $4.5 billion[20] of the of the entire Medicaid budget of approximately $400 billion.[21] The 2019 IDEA funding is approximately $13.5 billion.[22] In New York State the amount of Medicaid spending in the schools was $273,563,018, of which $136,781,511 came from federal funds.[23]

12. Defendant State Education Departments ("SEDs") throughout the United States began issuing guidance to school districts within their states, otherwise known as local educational agencies ("LEAs"), about how to provide proper educational services to students during the coronavirus shutdown. For example, the New York State Education Department Office of Special Education issued an April 27, 2020, memo by Christopher Suriano, which stated school districts are not absolved of their responsibilities under the IDEA and *"must ensure that, to the greatest extent possible, each student with a disability is provided the special education and related services identified in the student's IEP."*

[20] https://www.medicaid.gov/medicaid/financial-management/state-expenditure-reporting-for-medicaid-chip/expenditure-reports-mbescbes/index.html
[21] Congress of the United States Congressional Budget Office. (2019.) The Budget and Economic Outlook 2019 – 2029. Retrieved from: https://www.cbo.gov/system/files?file=2019-01/54918-Outlook.pdf
[22] United State Department of Education. (2018.) Department of Education Fiscal Year 2019 Congressional Action. Retrieved from: https://www2.ed.gov/about/overview/budget/budget19/19action.pdf
[23] https://www.cbpp.org/research/health/medicaid-helps-schools-help-children

(emphasis added).[24]    See Appendix E for a complete list of every State Education Department's COVID-19 Guidance and Memos.

13.    Some school districts gave additional direction to teachers, therapists and other staff.  For example, NYC DOE instructed all related services providers they could ONLY offer therapies via "remote learning" and NOT in-person while the students were home without any supplemental support staff at the home. (See Appendix H, March 31, 2020, Memo by Michael van Biema, Executive Director, NYC DOE Office of Related Services).

14.    In addition, labor unions provided their teacher and therapist members specific direction during the coronavirus situation.  For example, the United Federation of Teachers ("UFT"), the sole bargaining agent for most non-supervisory educators who work in the New York City public school system, represents approximately 75,000 teachers, 19,000 classroom paraprofessionals, along with related service providers, such as occupational therapists, physical therapists and speech therapists.[25]  Despite the clear guidance from the New York State Education Department and the New York State Health Department about providing live, synchronous instruction[26], UFT advised its members, "synchronous instruction ***is not required*** at this time."[27] (emphasis added).

15.    On July 23, 2020, Dr. Robert R. Redfield, Director of the Centers for Disease Control and Prevention ("CDC"), stated that "**It is critically important for our public health to open schools this fall.**" Towards this goal, the CDC released new science-based resources and tools for school administrators, teachers, parents, guardians, and

---

[24] http://www.p12.nysed.gov/specialed/publications/2020-memos/special-education-supplement-1-COVID-qa-memo-4-27-2020.pdf
[25] https://www.uft.org/your-union/about-uft
[26] http://www.oms.nysed.gov/medicaid/medicaid_alerts/alerts_2020/20_02_Addendum.html
[27] https://www.uft.org/your-rights/safety-health/coronavirus/guidance-on-remote-learning

caregivers. The CDC's guidance document stated that as of July 21, 2020, 6.6% of reported COVID-19 cases and less than 0.1% of COVID-19-related deaths are among children and adolescents less than 18 years of age in the United States. "The best available evidence indicates that COVID-19 poses relatively low risks to school-aged children. "School closures have disrupted normal ways of life for children and parents, and they have had negative health consequences on our youth. CDC is prepared to work with K-12 schools to safely reopen while protecting the most vulnerable." Dr. Redfield added that the "CDC resources released today will help parents, teachers and administrators make practical, safety-focused decisions as this school year begins. [28]

## RESCINDING EXECUTIVE ORDERS TO REMAIN CLOSED

16.     By mid-April 2020, it became clear the hardest hit state, New York, had flattened the curve, which was the basis for school closings.[29] Further, Governors around the country rescinded their executive orders to allow school buildings to be reopened starting in July 2020 for extended school year ("ESY") special education students, as defined by 34 C.F.R. § 300.106.[30],[31] For example, on June 5, 2020, New York State Governor Cuomo issued Executive Order 202.37[32] permitting all school districts throughout New York State to reopen their school buildings to accommodate ESY special education starting July 1, 2020. See Appendix D for a complete list of all Governors' Executive Orders. These rescissions

---

[28] https://www.cdc.gov/media/releases/2020/p0723-new-resources-tools-schools.html

[29] https://www.nbcnewyork.com/news/local/COVID-19-hospitalizations-flatten-in-ny-amid-deadliest-week-yet/2370527/

[30] https://www.nj.com/coronavirus/2020/06/summer-school-returns-to-nj-on-july-6-and-it-can-be-in-person-murphy-says.html

[31] https://www.politico.com/states/new-jersey/story/2020/06/17/superintendents-call-out-murphy-administration-for-inappropriate-summer-school-guidance-1293344

[32] https://www.governor.ny.gov/news/no-20237-continuing-temporary-suspension-and-modification-laws-relating-disaster-emergency-0

of school closures for special education services eliminated any potential legal barrier to provide services.

17. School districts throughout the United States were aware they were not in compliance of the IDEA, Section 504 or the ADA, as law firms who represent these school districts were advising them in real time. Hence, the reason the Defendants sought a waiver from the Secretary of Education, which was denied.

18. In one example, the public school law firm, Sweet, Stevens, Katz & Williams LLP, publicly reinforced the requirements to abide by IDEA regulations for hundreds of Pennsylvania school districts:

"Why issue a NOREP (The Notice of Recommended Educational Placement)? Because the provision of "prior written notice" that fully informs parents of your plans, the reasons you are recommending them, and the reasons you rejected other options is the essence of the procedural requirements of the IDEA. While you might not be able to meet all of those requirements, the guidance we are receiving from both USDE and PDE certainly requires that we make every effort to comply where the circumstances allow."[33]

19. In another example, Attorney Michael P. McKeon of the law firm Pullman & Comley, which represents independent and public schools, posted the following legal advice:

"With respect to these federal obligations, it is informative to consider the Office of Special Education and Rehabilitative Services' November 20, 2012 Letter to Geary. OSERS' letter was issued in response to inquiries from the New York State Education Department requesting "flexibility in light of the damage caused to some New York School districts by Hurricane Sandy." The flexibility sought by New York included "timelines for

---

[33] http://www.sweetstevens.com/newsroom/coronavirus-and-schools-norep-language-for-interim-services-during-the-covi

. . . annual review meetings."  OSERS replied to that query by noting:  "In general, the [Department] does not have the authority to waive the requirements in Part B of the IDEA.  Therefore, the Department cannot extend timelines for the above requirements" (emphasis added).  Thus, despite the devastating consequences of Hurricane Sandy on New York City and surrounding communities, the United States Department of Education declined to waive school districts' obligations to adhere to IDEA timelines.

"In fact, in the course of noting one limited exception pertaining to Individualized Education Programs ["IEPs"], OSERS implicitly declined to waive timelines for convening PPT meetings.  Specifically, OSERS cited 34 C.F.R. §300.323(c), which provides that a PPT meeting to develop an IEP must be conducted within thirty days of the determination that a student qualifies for special education and related services, adding that such services are to be made available to the student "as soon as possible following development of the IEP."  OSERS construed Section 300.323(c)'s use of "as soon as possible" as allowing districts some leeway in the initial provision of services in "some isolated circumstances" resulting from catastrophic events, although it promptly advised that "once a school is open, the LEA must make every effort to make available special education and related services to the child in accordance with the child's IEP."

"It is probably safe to assume that the current COVID-19 public health crisis would qualify as one of the oddly labeled  isolated circumstances."  Nonetheless, while recognizing the consequent delay in the initiation of services, OSERS does not note any similar flexibility with respect to the actual holding of the PPT meeting.  On a related note, it would be ill-advised to take OSERS' reference to "once a school is open" literally; rather, it should more reasonably be read as meaning "once instruction resumes."   In short,

nothing in this language would permit a school district to unilaterally cancel or otherwise indefinitely postpone PPT meetings."[34]

20.    The Association of Educational Service Agencies ("AESA") surveyed a subset of its members in 28 states between May 20 and June 16, 2020.  Almost 4 out of 10 ESAs and 3 out of 10 school districts anticipated at least one due process complaint related to the inability to meet requirements in students with disabilities' individualized education programs (IEPs) during the pandemic. Further information includes:

    • Approximately three out of four school districts found that the most difficult educational service to provide during COVID-19 was equitable education and related services for students with disabilities.

    • About one in three school districts are most concerned about the costs of providing special education and related services during COVID-19. When asked how much they typically budget for each special education litigation, almost one in four ESAs indicated they would budget $50,000 or more— an amount that could be used to hire one experienced teacher.

    • More than half of the ESAs indicated that they would encounter complaints based on a child not receiving the same quantity of specialized instructional support services as indicated in the child's IEP during the pandemic. This could include having the same level of access to school personnel such as speech-language pathologists, school psychologists, and occupational or physical therapists. Specifically, 16% of the ESAs indicated

[34] https://schoollaw.pullcomblog.com/archives/how-about-never-COVID-19-school-closures-and-planning-and-placement-team-meetings/

forthcoming litigation against the district would be based on a child not meeting the IEP goals that were set forth at the beginning of the 2019-20 school year.[35]

21.    Some of the quotes from AESA Members included:

"Advocates and lawyers are already reaching out to parents of students with special needs; our budget is already compromised; services cannot be provided in the same manners as in the classroom; some parents are not making any connection with the school sites, and others are already asking for compensatory services; students will regress."

"In addition to expected litigation for current special education students, as parents have had months of instructing their children at home, we are expecting an onslaught of initial referrals due to learning gaps because of COVID-19."

"Given that this was not a student-specific denial of FAPE, but a school closure that impacted ALL students, this could spiral out of control quickly. If one parent 'wins' a complaint, it would essentially mean that all families can file and expect the same outcome."

22.    Even the Executive Director of AESA, Joan Wade has said: "We all agree that FAPE is important, but the legal understanding of FAPE during a pandemic cannot be the same thing as FAPE under normal educational circumstances."

23.    The School Superintendents Association ("AASA"), also surveyed school leaders nationwide on the school response to the coronavirus pandemic in May of 2020.  In the AASA survey, 78% of superintendents indicated that ensuring equitable access to special education and related services was a major challenge for their districts.  In summarizing the position of AASA in seeking liability protection, its Executive Director, Daniel

---

[35] https://aasa.org/policy-blogs.aspx?id=44802&blogid=84002

Domenech, stated that "Congress must act swiftly to provide liability protection to districts around IDEA. District leaders need to be focused on ***addressing learning loss***, not preventing litigation.  It is not a free pass for districts to stop serving students with disabilities appropriately. Instead, this is an opportunity to provide reasonable, temporary, litigation protection for the vast majority of districts that are doing everything feasible to meet IDEA during the pandemic, ***but simply cannot meet every requirement exactly as intended for every single child.***" (emphasis added).[36]

24.     School districts throughout the United States had knowledge of the harm that was occurring to Plaintiff-Students because of a denial or unilateral modification of special education and related services. Such harm was widely reported as well as the added economic, physical and mental burdens which such denials or unilateral modifications were causing to

[36] https://www.aasa.org/content.aspx?id=44803

Plaintiff-Parents.[37],[38],[39],[40],[41],[42],[43],[44],[45],[46],[47],[48],[49],[50],[51],[52],[53],[54] Requesting parents to execute releases or waivers, essentially giving districts a "pass" for failing to comply with IDEA requirements, is evidence that the districts did not have "clean hands" in failing to provide disabled students with a FAPE pursuant to their IEPs. [55] Some New Jersey schools have been forcing students with disabilities to sign waivers promising not to sue the district before giving them access to special education services.[56] The New Jersey Department of Education subsequently ruled that requiring such waivers was illegal under the IDEA and New Jersey Department of Education regulations. [57]

[37] https://abc7ny.com/health/families-of-kids-with-autism-plead-for-return-of-in-person-therapy/6231262/
[38] https://www.nj.com/education/2020/06/nj-gave-false-hope-to-parents-now-special-education-schools-will-stay-closed-leaders-say.html
[39] http://www.allusanewshub.com/2020/06/17/our-kids-had-been-forgotten-parents-of-special-education-kids-hope-for-summer-school/
[40] https://www.lohud.com/story/news/education/2020/06/18/in-person-summer-school-special-needs-kids/3208790001/
[41] https://thetablet.org/remote-learning-hard-students-special-needs/
[42] https://www.thecity.nyc/education/2020/6/17/21295189/nyc-special-education-students-remote-learning-struggles
[43] https://www.politico.com/news/2020/06/17/reopening-schools-coronavirus-327020
[44] https://www.thenation.com/article/society/schools-teachers-COVID/
[45] https://www.realcleareducation.com/articles/2020/06/22/closing_schools_was_a_grievous_error_110433.html
[46] http://queensledger.com/pages/full_story/push?article-Remote+learning+takes+toll+on+special+ed+families%20&id=27759043&instance=home_news_1st_left
[47] https://www.chalkbeat.org/2020/6/26/21304405/surveys-remote-learning-coronavirus-success-failure-teachers-parents
[48] https://www.democratandchronicle.com/story/news/politics/albany/2020/06/29/school-closures-ny-led-inequitable-online-learning-report-say/3275718001/
[49] https://www.wshu.org/post/schools-online-parents-children-special-needs-struggle
[50] https://www.weareiowa.com/article/news/education/we-are-not-ready-parents-of-special-education-students-feel-iowa-isnt-doing-enough-for-their-kids/524-53171a53-291b-46f6-a8d4-ea5429baeedd
[51] https://nypost.com/2020/07/01/nyc-teacher-rips-abandonment-of-live-teaching-at-top-school/
[52] https://www.binghamtonhomepage.com/reimagining-new-york/reimagining-ny-what-prolonged-online-learning-could-mean-for-parents-kids-and-teachers/amp/
[53] https://www.dailynews.com/parents-of-special-education-students-urge-lausd-to-improve-distance-learning
[54] https://www.silive.com/coronavirus/2020/03/parents-fear-lapse-in-special-ed-services-i-am-not-a-trained-therapist.html
[55] https://patch.com/massachusetts/beverly/beverly-schools-asked-special-education-parents-waive-rights
[56] https://www.huffpost.com/entry/new-jersey-special-education-online-services-waiver-coronavirus_n_5ea4637ec5b6d3763590790c
[57] https://www.huffpost.com/entry/nj-special-education_n_5eac232ac5b65156135c6963

25.    Thus, Defendants knowingly, willfully and deliberately violated the rights of Plaintiff-Students and Plaintiff-Parents by acting in bad faith.

26.    There have been school districts across the United States that have reopened for special education students as of July 2020, including Detroit[58],[59], Montana[60], Lakewood, NJ[61],[62],[63],[64], and Massapequa, Hauppauge, and Merrick on Long Island[65], among others.[66],[67]    Some schools never actually closed and continued providing services throughout.[68]  And many Catholic schools on Long Island aim to have all students return to class five days a week in September for live instruction.[69] Meanwhile day care centers remained open throughout the coronavirus crisis.[70] And the number of COVID-19 cases affecting children in daycares that stayed open is minimal.[71]

27.    With COVID-19 related school closures and the urgency for essential workers to report to work, many childcare centers remained open for the children of front-line workers. According to National Public Radio (NPR), YMCA of the USA and New York City's Department of Education have been caring for, collectively, tens of thousands of children

[58] https://detroit.chalkbeat.org/2020/7/13/21322447/summer-school-began-in-detroit-monday-protesters-blocked-some-students-attending-classes-in-person
[59] https://www.nbcnews.com/news/education/i-m-scared-detroit-city-hit-hard-COVID-19-reopening-n1233765
[60] https://www.cnn.com/2020/05/05/us/montana-schools-reopen/index.html
[61] https://www.app.com/story/news/local/jackson-lakewood/lakewood/2020/03/15/coronavirus-lakewood-nj-schools-open-unless-forced-close/5054302002/
[62] https://njleftbehind.org/2020/06/leaked-email-from-lakewood-schools-open/?fbclid=IwAR3PBY0_lHoGKDt7GmjZUyBtDWre5U7iUKUcWBzwu5Jn_2EUrALOY-65_tM
[63] https://www.thelakewoodscoop.com/news/2020/06/first-report-lakewood-school-district-to-open-extended-school-year-for-special-education-will-be-first-district-in-the-state-to-open.html
[64] https://njleftbehind.org/2020/06/a-conversation-with-lakewood-attorney-michael-inzelbuch/
[65] https://abc7ny.com/special-education-needs-autism-reopen-new-york/6256416/
[66] https://www.idahoednews.org/news/education-news-roundup-6-22-20-school-reopening-committee-plans-tight-deadline/
[67] http://wbng.com/2020/06/26/special-education-programs-prepare-for-in-person-services-this-summer/
[68] https://www.bostonherald.com/2020/07/13/16m-coronavirus-relief-package-for-special-education-residential-school-providers/
[69] https://www.newsday.com/long-island/education/catholic-schools-long-island-reopening-1.47258131
[70] https://www.silive.com/coronavirus/2020/03/will-first-responder-child-care-centers-offer-special-ed-services.html
[71] https://www.workingmother.com/in-545-daycares-that-stayed-open-less-than-2-percent-kids-got-covid-19

since March 2020. Both stated that they have had no reports of COVID-19 clusters or outbreaks. "The Y says that during the lockdowns it cared for up to 40,000 children between the ages of 1 and 14 at 1,100 separate sites, often in partnership with local and state governments. And in New York City, the pandemic's national epicenter in March and April, the city's Department of Education reports that it cared for more than 10,000 children at 170 sites." The article references a separate, unscientific survey of childcare centers produced by Brown University economist Emily Oster. The survey found that among 916 centers serving more than 20,000 children, just over 1% of staff and 0.16% of children were confirmed infected with the coronavirus. Citing an op-ed written by Elliot Haspel, education policy expert and childcare advocate, it is noted that children are far less susceptible to the virus and argued for the full reopening of schools. "There are cogent scientific explanations for why young children are such poor COVID-19 transmitters. Though nothing has been conclusively proven, children's relative shield may spring from some combination of immature ACE2 receptors that the virus uses to bind onto, and a better-calibrated immune system already primed to fight COVID-19 because of exposure to other common childhood virus," Haspel explained. The article continues by elaborating on procedures taken by the Y and Department of Education to ensure safety for children and staff during the COVID-19 outbreak. [72]  It has been reported that children under the age of 15 have a greater chance of being struck by lightning than dying of COVID-19.[73]

[72] https://www.npr.org/2020/06/24/882316641/what-parents-can-learn-from-child-care-centers-that-stayed-open-during-lockdowns?fbclid=IwAR0nnmh0BUex8cuAGAGYwh62dk7sugqRpqE7sWI1w67VVmZDFuLD0Ghv7GU

[73] https://www.telegraph.co.uk/politics/2020/06/09/school-age-children-likely-hit-lightning-die-coronavirus-oxbridge/?fbclid=IwAR0CjevkUPW3TFy8i_QPolumu_O-1ratcMUWJxP4I6EHr8EPFa3FFGB-gpw

28. However, even with the public health research and guidance and the success of schools around the world[74] and the United States reopening[75],[76],[77] most school districts remained closed to in-person services during the Summer 2020 and into Fall 2020.[78]

## TOP 50 LARGEST SCHOOL DISTRICTS SINCE JULY 2020

29. In New York State, Defendant New York City Department of Education (NYC DOE), the largest school district in the United States (more than 1 million students), will not have students return to class this summer[79],[80], but will open sites across the city to offer some one-on-one speech, physical, and occupational therapy services for special needs students. They will not provide transportation, even though special transportation is considered a related service under the IDEA.[81],[82] Attendance in September will be limiting in-person services to 1-3 days a week.[83] The United Federation of Teacher has stated reopening in September is premature and wants City Hall to also address the childcare crisis, and having a nurse in every building.[84] The city's principals' union has sided with the UFT in their objection to reopening schools in September. They sent the Department of Education a list of 141 questions it says the city must answer before reopening schools[85], "It is abundantly

[74] https://www.sciencemag.org/news/2020/07/school-openings-across-globe-suggest-ways-keep-coronavirus-bay-despite-outbreaks
[75] https://reason.com/2020/06/29/reopen-schools-coronavirus-COVID-19/
[76] https://www.bloomberg.com/opinion/articles/2020-07-12/the-greatest-teaching-techniques-don-t-compute-over-zoom?utm_source=url_link&utm_medium=news_tab&utm_content=algorithm
[77] https://www.edweek.org/ew/section/multimedia/school-districts-reopening-plans-a-snapshot.html?override=web

[78] https://www.nytimes.com/2020/06/26/us/coronavirus-schools-reopen-fall.html
[79] https://nypost.com/2020/06/19/nyc-needs-to-offer-in-person-summer-classes-for-special-ed-kids/
[80] https://ny.chalkbeat.org/2020/6/24/21302191/nyc-summer-school-students-with-disabilities
[81] https://www.edweek.org/ew/articles/2020/07/08/getting-students-with-disabilities-back-to-class.html
[82] https://nypost.com/2020/07/11/nyc-reopening-plan-could-leave-90000-students-stranded-with-no-buses/
[83] https://www.nytimes.com/2020/07/08/nyregion/nyc-schools-reopening-plan.html
[84] https://www.fox5ny.com/news/nyc-teachers-union-calls-de-blasios-plan-to-reopen-schools-premature
[85] https://nypost.com/2020/07/25/nyc-principals-union-lists-imperative-questions-on-school-reopening/

clear that the [Department of Education] has not provided you with the guidance and relevant information necessary for you to effectively plan for the opening of school buildings and offices in the fall," wrote Mark Cannizzaro, the head of the Council of School Supervisors and Administrators.[86]

30.    In California, which has four of the largest school districts, Defendant Los Angeles Unified (more than 633,000 students), Defendant San Diego Unified (more than 128,000 students), Defendant Long Beach Unified (more than 76,000 students), and Defendant Fresno Unified (more than 73,000 students), districts will not be reopening in the beginning of the school year.[87] The Los Angeles Teachers Union demands the implementation of a moratorium on private schools, defunding the police, increasing taxes on the wealthy, implementing Medicare for all, and passing the HEROES Act in order to reopen schools.[88] Further, schools may seek waivers to reopen, but only with union support.[89] The San Diego Teachers Union demands near zero COVID-19 cases, or a downward trajectory for two weeks, in addition to continuous frequent testing of students and faculty, and full funding of all necessary prevention measures in order to return to work.[90]

31.    The Defendant City of Chicago School District in Illinois is the third-largest school district (more than 378,000 students). The district has not made any announcements when they

[86] https://www.thecity.nyc/2020/7/23/21336379/nyc-school-reopening-plans-delay-union-student-remote-learning
[87] https://edsource.org/2020/schools-in-los-angeles-san-diego-wont-reopen-for-in-person-learning-next-month/635924
[88] https://www.kusi.com/a-los-angeles-teachers-union-says-public-schools-should-not-reopen-unless-their-demands-are-met/
[89] https://www.latimes.com/california/story/2020-07-23/covid-elementary-schools-reopening-waivers-la-county-teachers-unions
[90] https://www.sandiegonewsdesk.com/2020/07/local-teachers-union-successfully-sabotages-school-reopening/

will resume in-person services[91] even though the state has provided guidance on how to reopen.[92]

32.    Florida[93] has ten of the largest school districts, Defendant Miami-Dade County School District (more than 357,000 students), Defendant Broward County School District (more than 271,000 students), Defendant Hillsborough County School District (more than 214,000 students), Defendant Orange County School District (more than 200,000 students), Defendant Palm Beach County School District (more than 192,000 students), Defendant Duval County School District (more than 129,000 students), Defendant Pinellas County School District (more than 102,000 students), Defendant Polk County School District (more than 102,000 students), Defendant Lee County School District (more than 92,000 students), and Defendant Brevard County School District (more than 73,000 students). Lee, Brevard, Polk, Orange, Duval, and Hillsborough County school districts will reopen in August (no start date) for in-person learning five days a week with the option for remote learning.[94],[95],[96],[97],[98],[99] Pinellas County School District is giving three options – (1) continue face-to-face, (2) enroll in a 9-week virtual learning plan, or (3) enroll in an 18-week virtual learning plan.[100] Palm Beach will take a staggered approach, starting with

---

[91] https://www.nbcchicago.com/news/local/illinois-schools-reopening-districts-release-fall-plans-as-coronavirus-pandemic-continues/2304714/
[92] https://www.chicagotribune.com/coronavirus/ct-coronavirus-illinois-reopening-schools-20200623-c64n76ssijf6jccnaqoethe2ce-story.html
[93] https://nypost.com/2020/07/06/florida-schools-ordered-to-reopen-next-month-amid-coronavirus-spike/
[94] https://www.tampabay.com/news/gradebook/2020/07/15/hillsborough-will-delay-school-reopening-by-two-weeks/
[95] https://www.leeschools.net/parent_portal/COVID-19/school_reintroduction
[96] https://www.floridatoday.com/story/news/education/2020/07/15/brevard-school-board-approves-fall-reopening-plan-few-changes/5441664002/
[97] https://polkschoolsfl.com/newsrelease/pcps-expands-reopening-task-force-announces-options-for-2020-21-school-year/
[98] https://www.wesh.com/article/reopening-orange-county-schools/33351497#
[99] https://www.actionnewsjax.com/news/local/duval-county/duval-county-public-schools-reevaluating-reopening-plans-after-states-education-mandate/T6IUCCNGCVHGLDDFMQDL6OZMIE/
[100] https://www.pcsb.org/domain/11689

distance learning, and opening campuses as COVID-19 conditions improve.[101] Broward School District is discussing taking a hybrid approach, but has not made a decision.[102] Miami-Dade School District will not be able to reopen if they are still in Phase 1 by the start of the school year.[103]

33.   Defendant Clark County School District in Nevada (more than 326,000 students) plans to reopen starting August 24th with a hybrid learning model that will have students in class 2 days a week and virtual learning 3 days a week.[104]

34.   Texas has eight of the largest school districts, Defendants Houston ISD (more than 216,000 students), Dallas ISD (more than 157,000 students), Cypress-Fairbanks ISD (more than 114,000 students), Northside ISD (more than 106,000 students), Fort Worth ISD (more than 87,000 students), Austin ISD (more than 83,000 students), Katy ISD (more than 75,000 students) and Fort Bend ISD (more than 74,000 students). Most Texas school districts are pushing back their in-person start dates, and most schools will have to resort to 100% virtual learning for three to six weeks.[105]

35.   In Virginia, three of the largest school districts, Defendants Fairfax County School District (more than 187,000 students), Prince William County School District (more than 89,000 students), and Loudoun County School District (more than 78,000 students), are taking a

[101] https://www.palmbeachschools.org/news/what_s_new/july_2020/school_board_approves_2020-21_reopening_plan

[102] https://www.local10.com/news/local/2020/06/16/broward-county-school-board-to-announce-decisions-regarding-reopening-of-schools/#:~:text=BROWARD%20COUNTY%2C%20Fla.&text=The%20big%20news%20is%20that,to%20be%20the%20most%20popular.

[103] https://www.miamiherald.com/news/local/education/article244063802.html

[104] https://www.fox5vegas.com/news/ccsd-trustees-approve-school-district-reopening-plan/article_aeead170-c257-11ea-8598-ff480a0f65af.html#:~:text=LAS%20VEGAS%20(FOX5)%20--%20The,a%207%20to%200%20vote.&text=CCSD%20Superintendent%20Dr.,of%20Education%20for%20final%20approval.

[105] https://www.texastribune.org/2020/07/15/texas-schools-reopening-coronavirus/

hybrid approach to reopening, in that 50% will be in person, and 50% will be virtual learning.[106],[107],[108],[109]

36. The Defendant Hawaii Department of Education (more than 181,000 students) plans to reopen schools starting August 4, 2020, while following all health and safety guidelines, while also implementing a hybrid approach where it is needed.[110],[111]

37. Four of the largest school districts located in Georgia, Defendants Gwinnett County School District (more than 178,000 students), Cobb County School District (more than 113,000 students), DeKalb County School District (more than 101,000 students), and Fulton County School District (more than 96,000 students), are planning to have face-to-face learning as an option starting in August, but have since rolled back on those plans and are only holding virtual learning options until further notice.[112]

38. Two of the nation's largest school districts are in North Carolina, Defendants Wake County School District (more than 160,000 students) and Charlotte-Mecklenburg School District (more than 147,000 students). Wake County schools will reopen in August with students rotating to keep one-third capacity at all times, until social distancing restrictions become looser.[113] Charlotte-Mecklenburg Schools will reopen on August 17th for two weeks of in-person orientation, and will then return to remote learning indefinitely.[114]

[106] https://www.fcps.edu/return-school/reopening-schools-plan-complete-information/introduction
[107] http://www.pwcs.edu/news/what_s_new/preparing_for_the_2020-21_school_year
[108] https://www.wusa9.com/article/news/local/virginia/loudoun-county-school-board-votes-on-reopening-plan/65-97498f99-6c67-426f-bae2-c79fedc02ed5
[109] https://www.wsls.com/news/local/2020/07/09/special-education-concerns-in-virginia-during-coronavirus-reopening-of-schools/
[110] https://www.bizjournals.com/pacific/news/2020/06/29/hsta-reaches-reopening-deal-with-boe.html
[111] http://www.hawaiipublicschools.org/ConnectWithUs/MediaRoom/PressReleases/Pages/school-year-2020-21.aspx
[112] https://www.wsbtv.com/news/local/county-by-county-plans-returning-school-this-fall/QJAYLUB4TFBPBCJCIMVZXUQGFY/
[113] https://www.newsobserver.com/news/local/education/article243951922.html
[114] https://www.wfae.org/post/cms-surprise-school-reopening-plan-all-remote-twist#stream/0

39. Maryland has five of the largest school districts, Defendants Montgomery County School District (more than 159,000 students), Prince George's County School District (more than 130,000 students), Baltimore County School District (more than 112,000 students), Baltimore City School District (more than 82,000 students), and Anne Arundel County School District (more than 81,000 students). All districts are beginning with virtual learning until further notice, some as late as February.[115]

40. Defendant Philadelphia School District in Pennsylvania (more than 133,000 students) is planning on partially reopening schools in September, with most students in class only 2 days a week.[116],[117]

41. Tennessee has two of the largest school districts, Defendant Shelby County School District (more than 111,000 students) and Davidson County School District (more than 85,000 students). Shelby County School District will resume in-person learning starting August 31st, with the option for remote learning.[118] Davidson County School District will remain remote until at least Labor Day.[119]

42. Defendant Jefferson County School District in Kentucky (more than 99,000 students) is undecided on what to do for the coming school year. The district is deciding between 100%

---

[115] https://www.baltimoresun.com/coronavirus/bs-md-reopening-schools-fall-2020-list-20200710-o4htnjkfmrajplnrknb3fskg5u-story.html
[116] https://www.inquirer.com/education/philadelphia-schools-reopening-school-district-plan-released-20200715.html
[117] https://www.washingtontimes.com/news/2020/jul/15/philadelphia-schools-most-kids-in-class-2-days-per/
[118] https://www.fox13memphis.com/news/local/shelby-county-schools-leaders-outline-plans-reopen-schools/YMCTTR3SANHAVIVCSAAOTZQ3V4/
[119] https://www.newschannel5.com/news/many-tennessee-schools-announce-plans-to-reopen-at-highest-peak-of-pandemic

remote learning, and giving parents the choice between in-person and remote learning (leaning towards 100% remote learning).[120]

43.    Colorado has two of the largest school districts, Defendants Denver School District (more than 91,000 students) and Jefferson County School District (more than 86,000 students). Jefferson County School district plans on returning to 100% in-person learning five days a week, with the option for those who do not feel comfortable returning to continue with virtual learning. Denver Public Schools, however, plan on keeping students learning remotely at the start of the school year (August 24th), and will reconsider opening buildings and slowly reintroduction in-person learning after Labor Day.[121],[122]

44.    Defendant Albuquerque School District in New Mexico (more than 90,000 students) will reopen with a hybrid approach, keeping 50% capacity at all times.[123]

45.    Defendant Alpine School District in Utah (more than 78,000 students) will be reopening in August with face-to-face instruction for students, and an online learning option for those who choose not to return in-person.[124],[125]

46.    Defendant Greenville School District in South Carolina[126] (more than 76,000 students) is still weighing four options for the beginning of the school year. Two options involve a hybrid schedule, and the other two options are 100% in-person learning, or 100% remote learning.[127]

---

[120] https://www.courier-journal.com/story/news/education/back-to-school/2020/07/15/in-person-classes-too-risky-jcps-board-members-say/5438635002/
[121] https://www.jeffcopublicschools.org/restart_jeffco
[122] https://coloradosun.com/2020/06/26/colorado-schools-education-denver-public-schools-coronavirus-COVID-19/
[123] https://www.aps.edu/schools/reentry-plan/documents/COVID-19-operational-reopening-plan-for-albuquerque-public-schools-fall-2020/view
[124] https://alpineschools.org/wp-content/uploads/2020/07/ASD-Reopening-Plan-13July2020.pdf
[125] https://kutv.com/news/local/schools-need-reopening-plans-by-aug-1-as-gov-herbert-approves-k-12-school-requirements
[126] https://www.wrdw.com/2020/06/23/heres-the-plan-for-sc-kids-to-return-to-school/
[127] https://www.greenvilleonline.com/story/news/2020/07/10/greenville-county-schools-has-four-schedule-options-

47.     Defendant Milwaukee School District in Wisconsin (more than 76,000 students) unanimously decided to reopen starting August 17th with a three-phase plan. Phase 1 will be virtual learning, Phase 2 will be a hybrid approach, and Phase 3 will be in-person learning with the option for remote learning.[128]

48.     The Democratic Socialists of America have created a coalition of several teachers' unions (including Chicago, Boston, Los Angeles, Massachusetts, Milwaukee, Little Rock and Oakland) demanding the following BEFORE schools can reopen: 1) Ban new charter schools; 2) Ban private school choice; 3) Police-free schools; 4) Moratorium on standardized testing; and, 5) Moratorium on evictions/foreclosures, providing direct cash assistance to those not able to work or who are unemployed, and other critical social needs.[129]  Other local teachers' unions around the country are making additional demands wholly unrelated to the original purpose of closing the schools before they can reopen.[130] A Massachusetts teachers union is demanding the dismantling the system of institutionalized racism, eliminate the MCAS, and take police officers out of schools.[131]  A North Carolina teachers' union is demanding the implementation of universal health care and welfare benefits for illegal immigrants in order to reopen schools in the fall.[132] They are also demanding another statewide shutdown, and a suspension on mortgage

fall-response-coronavirus/5409131002/

[128] https://www.cbs58.com/news/milwaukee-public-schools-board-to-vote-on-reopening-plan#:~:text=MILWAUKEE%20(CBS%2058)%20%2D%2D%20Milwaukee,phase%20plan%20to%20reopen%20schools.&text=As%20the%20spread%20of%20COVID,virtual%20three%20days%20each%20week.

[129] https://www.demandsafeschools.org/

[130] https://nj1015.com/nj-teachers-union-and-lawmaker-say-schools-not-ready-to-reopen/

[131] https://www.bostonherald.com/2020/06/18/massachusetts-teachers-union-wants-to-abolish-mcas-and-take-police-out-of-schools-upon-reopening/

[132] https://freebeacon.com/2020-election/nc-teachers-union-demands-universal-health-care-welfare-for-illegal-immigrants-to-reopen-schools/

payments.[133]  Teachers unions across the country are demanding they work fewer hours and not be subject to fixed times for live online teaching, but rather have the students work on large projects until schools are safe to reopen.[134]  The Fairfax Education Association in Virginia is demanding a vaccine or widely available treatment for COVID-19 before schools fully reopen, which medical professionals have stated may never happen.[135]

49.    On June 24, 2020, at an emergency local school board meeting to discuss reopening schools, Dr. Mark McDonald, a psychiatrist who specialized in children and at-risk youth stated,

> "Children are not dying from Covid-19.  Children are not passing the disease on to adults.  So the only question is, "Why are we even having this meeting tonight?"  We're meeting because we adults are afraid.
>
> As parents, we will face many moments of anxiety: seeing our children off on their first day of kindergarten, their first day of camp, their first year of college.  We may want to keep them home to protect them from the world, which can indeed be a frightening place.  But let's be clear, when we do that, we are not really protecting our children.  We are only attempting to manage our own anxiety, and we do that at their expense.  We are acting as negligent parents.  We are harming our children.  We are failing them.
>
> We must agree to make decisions in the best interest of the children.  If we do not - if, paralyzed by fear, we continue to act purely out of self-interest - we will ensure

---

[133] https://www.google.com/amp/s/justthenews.com/politics-policy/education/nc-teachers-union-demands-complete-state-shutdown-suspended-mortgages%3famp

[134] https://www.goggle.com/amp/s/www.nytimes.com/2020/04/21/us/coronavirus-teachers-unions-school-home.amp.html

[135] https://www.foxnews.com/media/laura-ingraham-democrats-teachers-unions-ludicrous-reckless

and entire generation of traumatized young adults, consigned to perpetual adolescence and residency in their parents' garages, unable to move through life with independence, courage, and confidence. They deserve better - we owe it to them as parents."[136]

50. "What is truly driving the agenda to close schools," questions Daniel Horowitz, senior editor of *The Conservative Review*. Horowitz wrote an article that compares and contrasts the flu and COVID-19 in children while expounding on research that highlights the deadliness of the flu season to children. "The reality is that every flu season, many more children die from this common ailment than have from COVID-19," Horowitz claimed. He argued that unlike the flu, COVID-19 presents rare pediatric deaths and serious conditions among children. "Even those who suffer no serious consequences [of the flu] are often bedridden for a week or longer with high fever, muscle ache, and incessant coughing, unlike COVID-19, where almost every child who develops it is asymptomatic or very mildly symptomatic." Throughout the article, Horowitz cites specific severe cases of the flu in children and questions discrepancies in its overall treatment (specifically in school settings) compared with COVID-19. "… if we are going to limit or modify or schooling and mandate that kids wear suffocating masks all day, shouldn't this be done every year from November to April – by a factor of 10? And given that the flu does linger for all months of the year at least at the threat level of COVID-19 to children during the off months, if schools are closed for COVID-19, shouldn't they always be closed because of the flu?"[137]

---

[136] https://www.markmcdonaldmd.com/?s=09
[137] https://www.conservativereview.com/news/horowitz-panicmongers-consistent-wed-close-schools-every-flu-season/

## Science Supporting Reopening Schools

51. Extensive research has established and confirmed the safety and value of reopening schools.

52. Emerging epidemiologic reports on COVID-19 in children show that they are less likely than adults to be infected and have severe illness. In a large study published in *Pediatrics*, the official peer-reviewed journal of the American Academy of Pediatrics, researchers conducted the first retrospective epidemiologic analysis of disease spread and severity in 2,143 confirmed or possible pediatric COVID-19 infections reported to the Chinese Center for Disease Control and Prevention. The study analyzed children hospitalized in Wuhan, China (children were defined as being less than 18 years old). "Only one child died, and most cases were mild, with much fewer severe and critical cases than adult patients," the study reported. The findings suggest that compared with adult patients, clinical manifestations of children's COVID-19 may be less severe.[138]  In fact, only one child died with cerebral palsy during the initial COVID-19 outbreak in Wuhan, China.  Yan Cheng, a 16-year old boy, died because his father, and sole caregiver, contracted COVID-19 and was hospitalized, however, no one checked on his son who died due to neglect.[139]

53. The *New England Journal of Medicine*, one of the most prestigious peer-reviewed medical journals, published an article outlining the dubious nature of children contracting and transmitting COVID-19 to adults. The study tested people living in Iceland who were at high risk for infection along with a population screening that utilized two strategies: 1) open invitation to 10,797 people, 2) random invitations sent to 2283 people. A total of 1221 of 9119 people who were recruited for targeted testing had positive results. 87 people in

---

[138] https://pediatrics.aappublications.org/content/pediatrics/early/2020/03/16/peds.2020-0702.full.pdf
[139] https://www.bbc.com/news/world-asia-china-51362772

the open-invitation and 13 people in the random population screening tested positive for the virus. Children under 10 years of age were less likely to receive a positive result than were persons 1- years of age or older. Out of 564 children under the age of 10 years in the targeted group testing, 38 tested positive, in contrast to positive test results of 1183 of 8635 people who were 10 years of age or older. "In the population-screening group, the difference was even more marked: none of the 848 children under the age of 10 years tested positive…," the article stated. Based on the study's results, the article concluded that children are unrepresented among COVID-19 cases, especially amongst severe and fatal cases.[140]

54.     In late April 2020, scientists at France's Institute Pasteur, an international research and education institute founded in 1887, with the support of the Hauts-de-France Regional Health Agency and the Amiens Education Authority, carried out an epidemiological survey on 1,340 people linked to primary schools in Crépy-en-Valois, in the Oise department. "Overall, the results of this study are comparable to those of studies carried out in other countries, which suggest that children aged between 6 and 11 are generally infected in a family environment rather than at school. The main new finding is that the infected children did not spread the virus to other children or teachers or other school staff," commented Arnaud Fontanet, lead author of the study, Head of the Epidemiology of Emerging Diseases Unit at the Institute Pasteur and a Professor at the CNAM.[141]

55.     A report by McKinsey and Company, one of the largest management consultancies in the world, states that children have a much lower risk of contracting COVID-19. "The most

[140] https://www.nejm.org/doi/pdf/10.1056/NEJMoa2006100
[141] https://www.pasteur.fr/en/press-area/press-documents/COVID-19-primary-schools-no-significant-transmission-among-children-students-teachers

critical question is whether reopening schools will lead to a resurgence of infection among students, staff, and the broader community. The evidence here is still nascent. Children's risk of contracting COVID-19 appears to be lower than that of adults. In China and the United States, the countries with the largest number of confirmed COVID-19 cases, children represent 2 percent of cases. Emerging evidence also suggests that children are more likely to be asymptomatic, less likely to be hospitalized, and much less likely to die if they do develop COVID-19." The Report also underscored the importance of in-person schooling. "Every year, students in the United States lose a month's worth of learning over the summer, with the sharpest learning declines in math, seen especially in low-income students. One recent analysis project that students could return in the fall having progressed only 70 percent of a grade in reading and less than 50 percent of a grade in math during the 2019–20 school year. If closures extend beyond the fall, this shortfall could be even greater, with negative consequences for individual students and society. Beyond academics, schools provide important social support, especially to vulnerable students. Indeed, 19 percent of reports of child abuse or neglect in the United States come through education personnel, and school closures have resulted in a steep drop in such reports. This change suggests that school closures have shut down support sources for victims of abuse. Reports of domestic violence increased more than 30 percent in France, 50 percent in India, and 60 percent in Mexico. With such high stakes, systems that can consistently deliver remote student services—nutrition, safety, and mental-health support—can likely weather longer closures than those who cannot."[142]

[142] https://www.mckinsey.com/industries/social-sector/our-insights/safely-back-to-school-after-coronavirus-closures

56. *The Journal of Pediatrics*, the official peer-reviewed journal of the American Academy of Pediatrics, published a commentary that explores the scientific complexities of children transmitting COVID-19. The authors deduced that children infrequently transit COVID-19 to adults, basing their conclusions on a new study published in Pediatrics, "COVID-19 in Children and the Dynamics of Infection in Families," and four other recent studies that examine COVID-19 transmission by and among children. Referencing cases in China, Japan, France, and Australia, the authors further elaborate that children are not "driving the pandemic." For example, contact tracing of 40 children under 16 years of age with confirmed cases of SARS-CoV-2 at the Geneva University Hospital in Geneva, Switzerland from March 10 to April 10, were identified along with their infected household contacts. In only 3 of the cases did the child acquire symptoms onset preceding illness in their adult household contacts. In all other cases, the child acquired symptoms after or concurrent with their adult household contacts. This alludes to the notion that the child was not the primary source of the virus's transmission, therefore more often obtaining COVID-19 from adults, rather than being the transmitters themselves. This study coincides with investigations performed in China, where 68 children confirmed with COVID-19 were admitted into Qingdao Women's and Children's Hospital from January 20 to February 27, 2020. 65 of these infected cases were household contacts of previously affected adults, which amounts to 95.59% of the total number of cases. An understanding of these studies demonstrates that the transmission of SARS-CoV-2 in schools is not as much of a profound predicament than originally considered. As the authors state, "Almost 6 months into the pandemic, accumulating evidence and collective experience argue that children, particularly school-aged children, are far less important drivers of SARS-CoV-2

transmission than adults." School re-opening in the fall is imperative to the well-being and healthy development of children, the authors say. "Therefore, serious consideration should be paid toward strategies that allow schools to remain open, even during periods of COVID-19 spread. In doing so, we could minimize the potentially profound adverse social, developmental, and health costs that our children will continue to suffer until an effective treatment or vaccine can be developed and distributed or, failing that until we reach herd immunity," the article concludes.[143]

57.     The American Academy of Pediatrics ("AAP"), an organization with approximately 67,000 pediatricians, has advocated in-person schooling and published its guidelines to ensure the overall health of children, staff, and communities. The guidelines stated, "Schools are probably not greatly amplifying the spread of coronavirus and children are less likely to become extremely sick from the virus than adults". "The importance of in-person learning is well documented and there is already evidence of the negative impacts on children because of school closures in the spring of 2020. Lengthy-time away from school and the associated interruption of supportive services often result in social isolation, making it difficult for schools to identify and address important learning deficits as well as child and adolescent physical or sexual abuse, substance abuse, depression, and suicidal ideation." They also emphasized that "schools are fundamental not only for the well-being of children but also provide them key social and emotional skills." They also underscored the importance of schools in addressing racial and social equality. Dr. Sally Goza, the president of AAP, emphasized that remote learning hurts students with special needs. "Our

[143] https://pediatrics.aappublications.org/content/pediatrics/early/2020/07/08/peds.2020-004879.full.pdf

children with autism, some of them are starting to show signs of regression by not being in school and having that social and emotional interaction," she said.[144]

58. *The Lancet Global Health* medical journal published an article in March 2020 that investigates inequalities in school closure response to COVID-19. Cross-examining the Ebola epidemic, the authors stated, "School closures impede learning and compound inequities, disproportionately affecting disadvantaged children. School closures during the 2014–16 Ebola epidemic increased dropouts, child labor, violence against children, teen pregnancies, and persisting socioeconomic and gender disparities." In their call to action, the authors demand complete transparency in deciding whether or not schools should remain closed. "We call for transparent public discussion and research, incorporating the voices of children and their families on the feasibility, acceptability, and impact of closures to inform both our response now and future pandemic planning. We ask whether adequate evidence exists of transmission reduction due to school closures to outweigh the long-term risks of deepening social, economic, and health inequities for children. We must strike a balance, protecting those most at risk without sacrificing the next generation's future."[145]

59. *JAMA Pediatrics*, a monthly peer-reviewed medical journal published by the American Medical Association, issued an article written by medical professionals that highlights the challenges low-income children face during COVID-19. "The rate of serious illness among young children from the novel coronavirus is very low. Yet to slow the spread of the virus, all states have closed schools, disrupting routines critical to learning, nutrition, and social development. Directly and indirectly, low-income children have been forced to subordinate

[144] https://services.aap.org/en/pages/2019-novel-coronavirus-COVID-19-infections/clinical-guidance/COVID-19-planning-considerations-return-to-in-person-education-in-schools/
[145] https://www.thelancet.com/pdfs/journals/langlo/PIIS2214-109X(20)30116-9.pdf

their own well-being for the greater good." The authors assess that compounding the loss of educational time is the challenge of accessing school resources. "While school districts are engaging in distance learning, reports indicate wide variability in access to quality educational instruction, digital technology, and internet access. Students in rural and urban school districts are faced with challenges accessing the internet. In some urban areas, as many as one-third of students are not participating in online classes." The authors conclude by suggesting steps the government needs to take for the future success of low-income children in COVID-19.[146]

60.     *British Medical Journal*, one of the oldest general medical journals in the world, published an article in April 2020 emphasizing the need for children to return to school. The authors' fundamental argument is that children are not COVID-19 super spreaders. This argument is supported by data from China, South Korea, and Ireland on children and COVID-19. "Some regions have implemented widespread community testing, such as South Korea and Iceland. Both countries found children were significantly underrepresented. In Iceland, this is true both in targeted testing of high-risk groups compared with adults (6.7% positive compared with 13.7%) and in (invited) population screening, there were no children under 10 found to be positive for SARS-CoV-2 compared with 0.8% of the general population." Using their cumulated data, the authors deduce that "Governments worldwide should allow all children back to school."[147]

61.     *Eurosurvelliance*, Europe's journal on infectious disease surveillance, epidemiology, and control, published a study on the secondary transmission of COVID-19 from children attending school in Ireland. The study examined three pediatric cases and three adult cases

---

[146] https://jamanetwork.com/journals/jamapediatrics/fullarticle/2766115
[147] https://adc.bmj.com/content/105/7/618

of COVID-19 with a history of school attendance. The available epidemiological data for all cases indicated that they had not been infected with SARS-CoV-2 in the school setting. One pediatric case attended a primary school, while the other two cases attended secondary schools. One of the adult cases was a teacher, while the other adult cases conducted educational sessions in schools that were up to 2 hours in duration. A total of 1,155 contacts of these six cases were identified. They were exposed at school in the classroom, during sports lessons, music lessons and during choir practice for a religious ceremony, which involved a number of schools mixing in a church environment. Their findings show that among 1,001 child contacts of these six cases there were no confirmed cases of COVID-19. In the school setting, among 924 child contacts and 101 adult contacts identified, there were no confirmed cases of COVID-19. "The results moreover echo the experience of other countries, where children are not emerging as considerable drivers of transmission of COVID-19."[148]

62.     The National Center for Immunization Research and Surveillance (NCIRS) investigated all COVID-19 cases in New South Wales, Australia schools in April 2020. The report shows that from March to mid-April 2020, 18 individuals (9 students and 9 staff) from 15 schools were confirmed as COVID-19 cases. A total of 735 students and 128 staff were close contacts of these initial 18 cases. Of these, no teacher or staff member contracted COVID-19 from any of the initial school cases. The report concluded that "Our investigation found no evidence of children infecting teachers...SARS-CoV-2 transmission in children in schools appears considerably less than seen for other respiratory viruses."[149]

[148] https://www.eurosurveillance.org/content/10.2807/1560-7917.ES.2020.25.21.2000903#html_fulltext
[149] http://ncirs.org.au/sites/default/files/2020-04/NCIRS%20NSW%20Schools%20COVID_Summary_FINAL%20public_26%20April%202020.pdf

63.     The Public Health Agency of Sweden published a report comparing the effect of different approaches in regards to school closure in Sweden and Finland, as a response to the COVID-19 pandemic. Sweden is one of the very few countries that decided to keep daycare and primary schools open during the pandemic.  In Finland, on the other hand, all schools were closed on March 18th until May 13th with the exception of children in grades 1-3, who had the possibility to participate in regular on-site teaching if their caretakers were working in areas that were considered critical for the society. Primary schools were reopened between May 14 and May 31. During this reopening period, there were 23 primary school exposures (index cases) in 21 primary schools. Of the index cases, 16 were pupils and seven adults. There were 392 pupils and 54 adults placed under quarantine and the last quarantine ended on June 12. Primary school closure and re-opening did not have any significant impact on the weekly number of laboratory-confirmed cases in primary school-aged children. Chief Physician at the Finnish Institute for Health and Welfare stated, "Coronavirus infections with serious symptoms are rare among children and young people in both Finland and Sweden. Neither country has reported a single coronavirus-related death in the under-20 age group. According to current information children also pass on the virus less frequently than adults." The report concluded, "The negative effects of closing schools must be weighed against the possible positive indirect effects it might have on the mitigation of the COVID-19 pandemic."[150]

64.     In February and March 2020, a study published by the Oxford University Press, in correlation with the Infectious Diseases Society of America (IDSA) and the HIV Medicine Association (HIVMA), within the newly issued volume of Clinical Infectious Diseases,

---

[150] https://www.folkhalsomyndigheten.se/contentassets/c1b78bffbfde4a7899eb0d8ffdb57b09/COVID-19-school-aged-children.pdf

depicted the low risk of transmission in school settings. The study was achieved in Singapore as part of the country's public health strategy to undergo nationwide surveillance and contact tracing. The clinical and epidemiological data and the contacts of potential cases of SARS-CoV-2 within 3 separate educational settings were all obtained and analyzed. A 12-year-old student and a 5-year-old student were both diagnosed with COVID-19, and subsequently isolated, after acquiring symptoms for SARS-CoV-2. In both the secondary school and preschool #1, all close contacts were placed under quarantine 14 days from their last exposure, and subsequently examined and isolated if they experienced any respiratory symptoms or fevers. They were only discharged if they received at least 2 negative nasopharyngeal swabs taken on 2 individual days. Although schools were not closed during this period, they continued to take precautionary health measures. 8 students in secondary school and 34 students in preschool #1 became symptomatic, but all were tested negative for the virus. In preschool #2, the same measures were taken, except that schools were closed for 14 days following the detection of staff members with COVID-19, and a single NP swab for SARS-CoV-2 among asymptomatic children was also taken. Although 77 children became symptomatic, all were also tested as negative. Based on the study's results, there was no evidence of disease transmission, which entails that children may be more resistant at a cellular level. "Based on these findings, more targeted control measures for preschool settings such as keeping symptomatic children away from schools, instead of blanket closures, could be considered."[151]

65.    *GMS Hygiene and Infection Control*, an international journal that publishes information from the field of infection control and prevention, featured an article that discusses the

---

[151] https://academic.oup.com/cid/article/doi/10.1093/cid/ciaa794/5862649?searchresult=1

inconsequential role children play in the spread of COVID-19. The mounting evidence provided in the study shows that among children, infection, and severity of COVID-19 infection are low and the majority of children and adolescents with the virus show either no symptoms or else only mild symptoms. Thus, the authors postulate that schools and daycare center closures are likely to have only a narrow impact on the further spread of infection and that with concomitant examinations, daycare centers, and elementary schools "promptly should be reopened." "For children, this should be possible without excessive restrictions, such as clustering into very small groups, implementation of barrier precautions, maintaining appropriate distance from, or wearing masks." Moreover, the authors assert that children and adolescents can be taught basic rules of hygiene such as handwashing and careful hygiene behavior when coming into contact with others during mealtimes and/or when using sanitary facilities.[152]

66.     The American Psychological Association ("APA") is the largest scientific and professional organization of psychologists in the United States, with over 121,000 members, including scientists, educators, clinicians, consultants, and students. APA recently published a study on the effect of COVID-19 lockdown on parents. This study investigated the production of psychological distress and collateral concerns for parents in lockdown, due to unstable financial circumstances, school closures, and suspended educational services for children. Focusing on Italy as its case study, the writer's stated, "Although there have been few cases of children infected with this novel strain of coronavirus, childcare is one of the most serious collateral concerns for Italian parents. COVID-19 may be producing a stressful environment for parents in several ways." The authors go on to provide examples of ways

---

[152] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7273848/

in which parents experience psychological strain during COVID-19, "Parents may worry about the economic and physical health of their family; they may be concerned about their children's social isolation from peers and teachers; they may be preoccupied with the management, duration, and outcomes of homeschooling; they may have doubts about their ability to provide information to their children about COVID-19 in a reassuring and age-appropriate manner; and they may mistrust the government's intention to provide support for parents juggling childcare, home-based working, and/or summer holidays." Moreover, the study suggests that through preliminary data collected, parents of children diagnosed with a mental or physical disease are experiencing higher levels of parental burnout and perceiving less social support, than other parents are. Thus, it is important to consider the ramifications of at-home learning.[153]

67. The National Academies of Sciences Engineering and Medicine released an extensive report that concludes school districts should prioritize reopening schools full-time, especially for grades K-5 and students with special needs. "Keeping schools closed to in-person learning in Fall 2020 poses potential educational risks. Students of all ages benefit from in-person learning experiences in ways that cannot be fully replicated through distance learning," the report states. Furthermore, "Opening school buildings to some extent in Fall 2020 may provide benefits from families beyond educating children and youth. Working caregivers would have affordable, reliable childcare for school-age children, and families would be better able to access services offered through the school, such as the provision of meals and other family supports." The report also recommends schools and districts take certain precautions to protect staff and students such as providing

[153] https://doi.apa.org/fulltext/2020-41430-001.html

surgical masks and handwashing stations or hand sanitizer for everyone entering the school building.[154]

68.  *The Journal of Pediatrics and Child Care* published an article in June 2020 prefacing the French Pediatric Society, and various Societies of pediatric specialties support on children returning to school. The authors concluded that there is no scientific evidence in the role children play in the transmission of COVID-19. "Children today are paying a heavy price for the initial assumption that they were the primary vector for the circulation of the COVID-19 virus, by analogy with other viruses. We now know that this is not the case and that almost all of the children who were infected with COVID-19 were in contact with adults. Finding your playmates should not be considered as exposing them to particular risks. It is urgent to recall that communities of children, nurseries or classes, continued to exist during confinement, especially for the children of nursing staff. No epidemic was noted in these groups of children, while viral circulation was high among adults."[155]

69.  *JAMA Pediatrics* published another research letter approved by the Ethics Committee of Tongji Medical College and Huazhong University of Science and Technology. Using Hubei Province, China as its case study, this research investigated the mental health status of children in home confinement during COVID-19. Depression and anxiety symptoms were two of the driving health risks identified among students in Hubei Province, China. A total of 2330 students in grades 2 through 6 in 2 primary schools in Hubei province, of whom 845 were from Wuhan and 1485 were from Huangshi, were invited to complete a survey between February 28 and March 5, 2020. The information included sex, school grade, optimism about the epidemic, whether they worried about being infected by

---

[154] https://www.nap.edu/read/25858/chapter/1
[155] https://www.sciencedirect.com/science/article/pii/S0987798320300438?via%3Dihub

COVID-19, and depressive and anxiety symptoms measured by the Children's Depression Inventory–Short Form (CDI-S) and the Screen for Child Anxiety Related Emotional Disorders, respectively. The study concluded: "22.6% of students reported having depressive symptoms, which is higher than other investigations in primary schools of China (17.2%). During the outbreak of COVID-19, the reduction of outdoor activities and social interaction may have been associated with an increase in children's depressive symptoms. Our study found that 18.9% of students reported anxiety symptoms, which is higher than the prevalence in other surveys."[156]

70. The Official Journal of the American Academy of Pediatrics published an article written by pediatricians advocating for children during the COVID-19 school closures. The article underscored the imminent threat COVID-19 school closures pose to child health and well-being, particularly for children with disabilities and those living in poverty. Referencing students with disabilities, the authors stated that "Thirteen percent of public students have a disability requiring an individual education plan, with nearly two-fold higher rates in low-income communities. Of children with mental and behavioral health needs, 80% rely on school-based services. School closure means loss of critical resources for children with disabilities, including engagement with specialized educators and structured learning environments. Parents of children with high learning needs are unlikely to be equipped with resources to maintain remote learning. To offset worsening educational disparities in this population, we must prioritize strategies to safely resume in-person education for children with disabilities and advocate for resources to support expansion of assistive technologies for home (e.g., tools for visually or hearing impaired)." At-home learning for

[156] https://jamanetwork.com/journals/jamapediatrics/fullarticle/2765196

children from low-income families also proves to pose challenges. "Although remote learning presents a challenge for all families, those in poverty are at a greater disadvantage and thus at increased risk for widening educational disparities. One in seven children lacks home internet access, with a two-fold higher rate among low-income communities. Parents in poverty are facing their own pandemic-related stressors (e.g., unemployment, at-risk jobs) and may lack the time or resources to support remote learning."[157]

71.     "Teachers are a young population in the United States. K-12 teachers, half of them are under 41, 82% are under 55[158], these are not high-risk age groups,"[159] said Dr. Scott Atlas, former Stanford Neurology chief. In an interview, Dr. Atlas voiced his concern for school closure in the United States stating that closures have "nothing to do with the children's risk." "The harms to the children for closing schools, this is the biggest problem of all." He goes on to discuss the imminent consequences of distance learning such as significant drops in math and reading ability. Referencing data from countries that have opened schools, Atlas stressed the fact that children do not significantly transmit the disease to adults. "You can't insist that you believe in the science and then act contrary to science," he concluded.[160]

72.     "What children lose by not being in school is enormous; school attendance is a life-defining experience that is critical for educational, social, and emotional development," said Ruth Faden, founder of Johns Hopkins Berman Institute of Bioethics. Johns Hopkins University unveiled a re-opening policy tracker for K-12 schools that contains an interactive map and

[157] https://pediatrics.aappublications.org/content/pediatrics/early/2020/06/15/peds.2020-1440.full.pdf
[158] https://nces.ed.gov/surveys/sass/tables/sass1112_2013314_t1s_002.asp
[159] https://www.cdc.gov/nchs/nvss/vsrr/COVID_weekly/index.htm#AgeAndSex
[160] https://www.foxnews.com/media/dr-atlas-kids-back-school-distance-learning-failure?fbclid=IwAR3pMXWjF7U8U9NyERxPujkqehGbkXdhfJtgint6f9SWXSJesgl0E4t8bXc

resource guides that compare and analyze reopening plans for schools nationwide. The policy tracker offers solutions for safe education during COVID-19 and includes examples of equity-oriented reopening policies, a biweekly e-newsletter, a COVID-19 school reopening checklist, and a guidance document titled "The Ethics of K-12 School Reopening" Identifying and Addressing the Values at Stake."[161]

73. *The Indian Journal of Pediatrics* published a scientific letter that assesses the intricacies of transmission of COVID-19 in children. The authors affirmed that a notable feature of the COVID-19 pandemic is that children account for only less than 2% of total cases and most develop only mild illness. "Even when children with comorbidities are being reported at risk of severe disease, mortality was very rare. Many asymptomatic infections were noted. Most acquired infection from close contact with adults in family clusters. However, transmission from children to others was rare," the letter stated. Pulling data from cases in China, Spain, and Sweden, the authors conclude that "it might be prudent to anticipate an optimistic scenario when schools open."[162]

74. *The Lancet Child & Adolescent Health* journal featured a story on the mental health effects of school closures during COVID-19 underscoring its dire effect on children with mental health needs. Referencing a survey taken by the mental health charity Young Minds, the author brings attention to the crippling number of problems students with disabilities face with remote learning. "... 2111 participants up to age 25 years with a mental illness history in the UK, 83% said the pandemic had made their conditions worse. 26% said they were unable to access mental health support; peer support groups and face-to-face services have been canceled, and support by phone or online can be challenging for some people." School

---

[161] https://equityschoolplus.jhu.edu/reopening-policy-tracker/
[162] https://link.springer.com/article/10.1007/s12098-020-03401-0#author-information

closures inevitably lead to a lack of resources that children usually have in school. This point is further explained by the author, "School routines are important coping mechanisms for young people with mental health issues. When schools are closed, they lose an anchor in life and their symptoms could relapse." The author concludes that there is an urgent need to monitor young people's mental health status over the long term and to study how prolonged school closures affect the wellbeing of children and adolescents.[163]

75.     *The Lancet Child & Adolescent Health* journal published an article outlining child health issues exacerbated by the COVID-19 pandemic. "By mid-April, 86% of the world's children - more than 1.4 billion in total - were out of school," the author states. Subsequently, remote learning only benefited some students, while 60% of primary school-aged students worldwide and 86% in low-HDI countries were effectively out of education. Poverty and deprivation disproportionately affect children. "Education, especially in the early years, must be prioritized, given its clear benefits in child development and reducing social inequalities." The author concludes that remote learning produces inequalities for learning and that schools should be reopened in order to foster equal opportunities for children.[164]

76.     *Nature Medicine*, a monthly peer-reviewed journal, published an article riddled with age-structured epidemic data from China, Italy, Japan, Singapore, Canada and South Korea that concludes individuals under 20 years of age are less susceptible than adults to become infected with COVID-19. Moreover, the authors found that interventions aimed at children might have a relatively small impact on reducing COVID-19 transmission. "Understanding the role of age in transmission and disease severity is critical for determining the likely

[163] https://www.thelancet.com/journals/lanchi/article/PIIS2352-4642(20)30109-7/fulltext?mod=article_inline
[164] https://www.thelancet.com/journals/lanchi/article/PIIS2352-4642(20)30172-3/fulltext

impact of social-distancing interventions on SARS-CoV-2 transmission, especially those aimed at schools, and for estimating the expected global disease burden." To explore the effects of school closure, the authors simulated three months of school closures with varying infectiousness of subclinical infections. Their study found that school closures in response to COVID-19 did not have a substantial effect on cases. "...There were more clinical cases per capita projected in cities with older populations, and more subclinical infections projected in cities with younger populations. Among the three cities analyzed here, school closures had the least impact in Bulawayo, which has both the youngest population and the fewest contacts in school relative to the other cities (19% of contacts for 0- to 14-year-olds occurring in school, compared with 39% in Birmingham and 48% in Milan)." Based on their simulation, the authors conclude, "In countries with younger population structures—such as many low-income countries—the expected per capita incidence of clinical cases would be lower than in countries with older population structures."[165]

77. On July 9, 2020, the CDC Director, Dr. Robert Redfield, made a statement proposing that he considers closing schools a more extensive health issue than reopening schools. He stated, "I'm of the point of view as a public health leader in this nation, that having the schools actually closed is a greater public health threat to the children than having the schools reopen. I think really people underestimate the public health consequences of having the schools closed on the kids. I'm confident we can open these schools safely, work in partnership with the local jurisdictions." In addition, he addressed the fact that the virus does not detrimentally affect younger individuals, continuing, "I don't think we

---

[165] https://www.nature.com/articles/s41591-020-0962-9

should go overboard in trying to develop a system that doesn't recognize the reality that this virus really is relatively benign to those of us that are under the age of 20." He added that the CDC is ready to collaborate with each school or each school district to safely reopen schools.[166]

78.     The National Institute of Allergy and Infectious Diseases ("NIAID") Director, Anthony S. Fauci, M.D., has said, describing the lack of any data to support excluding children from normal activities: "One interesting feature of this novel coronavirus pandemic is that very few children have become sick with COVID-19 compared to adults."[167]

79.     *CityNews*, a news and current affairs program in Canada, makes reference to The Hospital for Sick Children, Canada's most research-intensive hospital dedicated to improving children's health, whose physicians and researchers recommend that children return to school in September. The seemingly minimal risks of infection and transmission of COVID-19 in children needs to be balanced with the risks of the deterioration of children's physical and mental health brought by school closure. These risks include behaviors, such as depression, exposure to domestic violence, child abuse, neglect, and suicide. The President and CEO of SickKids, Dr. Roland Cohn, declares that there are methods to lessening the risks of transmission, even when continuing daily activities, such as schooling. He states, "Not opening schools in September would continue to have a negative impact on the mental, behavioral and developmental health of children. We hope these recommendations help provide a framework to keep everyone safe when school doors reopen." To further the case of reopening schools, it should be noted that children make up

---

[166] https://bongino.com/cdc-director-keeping-schools-closed-is-greater-public-health-risk-than-reopening/

[167] https://www.nih.gov/news-events/news-releases/study-determine-incidence-novel-coronavirus-infection-us-children-begins

less than 5-10 percent of the global quantity of COVID-19 cases, and in Canada, as of June 15, individuals up to 19 years of age make up only 7 percent of all cases. The associate pediatrician-in-chief at SickKids, Dr. Jeremy Friedman, says that there were only 30 positive cases out of the 5,000 symptomatic children that were tested for COVID-19 with a nasal swab. Among the 1,5000 asymptomatic children tested with the nasal swab, there were zero positive cases. Also, once schools reopen, there are actions they can undertake to mitigate risks. These include screening students for coronavirus symptoms before going to school, enacting a routine schedule for hand hygiene, and promoting more outdoor or physical education classes activities to eliminate the need for physical distancing. [168]

80. There are many other public health concerns such as increases in child abuse and neglect[169],[170], malnutrition[171],[172], mental health[173], [174] as well as increases in alcohol and drug use[175],[176], associated with keeping kids out of school.[177],[178], [179]

[168] https://toronto.citynews.ca/2020/06/17/sickkids-report-recommends-children-return-to-school-in-september/

[169] https://www.nytimes.com/2020/06/09/nyregion/coronavirus-nyc-child-abuse.html
[170] https://www.usatoday.com/story/news/nation/2020/05/13/hospitals-seeing-more-severe-child-abuse-injuries-during-coronavirus/3116395001/
[171] https://www.nejm.org/doi/full/10.1056/NEJMp2005638
[172] https://www.forbes.com/sites/alexandrasternlicht/2020/05/06/the-number-of-mothers-reporting-food-insecurity-has-jumped-more-than-200-since-start-of-pandemic/amp/?__twitter_impression=true
[173] https://www.washingtonpost.com/health/2020/05/04/mental-health-coronavirus/
[174] https://www.today.com/parents/mental-load-coronavirus-pandemic-means-moms-take-more-t179021
[175] https://www.cdc.gov/coronavirus/2019-ncov/daily-life-coping/stress-coping/alcohol-use.html
[176] https://www.shatterproof.org/blog/why-covid-19-perfect-storm-addiction-world
[177] https://www.mckinsey.com/industries/public-sector/our-insights/covid-19-and-student-learning-in-the-united-states-the-hurt-could-last-a-lifetime
[178] https://www.today.com/parents/parents-children-disabilities-discuss-remote-school-t187677
[179] https://www.nbcnews.com/business/consumer/what-do-working-parents-do-when-coronavirus-closes-local-schools-n1150671

## CHANGE IN STATUS QUO – STAY-PUT – PENDENCY

81. The IDEA contains a so-called "stay put" or "pendency" provision that provides as follows: "during the pendency of any proceedings conducted pursuant to this section, unless the State or local educational agency and parent otherwise agree, the child shall remain in the then-current educational placement of the child . . . until all such proceedings have been completed." 20 U.S.C. § 1415(j); *see also* 34 C.F.R. § 300.518(a) and in New York State, N.Y. Educ. L. § 4404(a).

82. This pendency provision evinces Congressional intent that all disabled children, "regardless of whether their case is meritorious or not, are to remain in their current educational placement until the dispute with regard to their placement is ultimately resolved." *Mackey v. Board of Educ.,* 386 F.3d 158, 160 (2d Cir. 2004).

83. "The purpose of this provision is 'to maintain the educational status quo while the parties' dispute is being resolved.'" *Avaras v. Clarkstown Central School District, et al.*, 18-CV-6964 (NSR), Docket Entry No. 30 (S.D.N.Y. August 27, 2018); *Doe v. East Lyme Board of Ed.*, 790 F.3d 440, 452 (2d Cir. 2015)(quoting *T.M. v. Cornwall Central School District*, 752 F.3d 145, 152 (2d Cir. 2014)).

84. This "stay put" provision codifies a student's right to a stable learning environment during what may become a lengthy administrative and/or judicial proceeding. *Avaras, supra*, ; *Murphy v. Arlington*, 297 F.3d 195, 199 (2d Cir. 2002). And, as alleged above, this "stay put" operates in a due process challenge "regardless of whether the [underlying] case is meritorious or not." *Avaras, supra; Doe, supra*, 790 F.3d at 453; *E.Z.-L. v. N.Y.C. Dep't of Educ.*, 763 F. Supp.2d 584, 598-99 (S.D.N.Y. 2011).

85.   The IDEA's "stay put" provision is essentially an automatic preliminary injunction requiring the school district to maintain the student's educational placement. *Murphy v. Arlington Cent. Sch. Dist. Bd. of Educ.,* 297 F.3d 195 (2d Cir. 2002). In this regard, the IDEA:

> substitutes an absolute rule in favor of the status quo for the court's discretionary consideration of the factors of irreparable harm, and either a likelihood of success on the merits or a fair ground for litigation and a balance of hardships.

*See, Board of Educ. v. J.P.,* 2018 U.S. Dist. LEXIS 105102at *7 (E.D.N.Y. June 21, 2018) (citing *Zvi D. v. Ambach,* 694 F.2d 904, 906 (2d Cir. 1982)); *see also* 34 C.F.R. § 300.518(a) and N.Y. Educ. L. § 4404(a).

86.   The IDEA's "stay-put" codified at 20 U.S.C. §1415(j) functions as an automatic preliminary injunction, without regard to factors such as irreparable harm or likelihood of success on the merits. *Drinker ex rel. Drinker v. Colonial Sch. Dist.*, 79 F.3d 859 (3d Cir. 1996); *Casey K. ex rel. Norman K. v. Saint Anne Cmty High Sch. Dist.*, 400 F.3d 508, 511 (7th Cir. 2005) (comparing a stay put injunction to an automatic stay in a bankruptcy case); *Wagner v. Bd. of Educ. of Montgomery County*, 335 F.3d 297, 301 (4th Cir. 2003) (noting that an "injunction is automatic").

87.   The "stay-put" interim relief also includes the requirement to continue funding of the disabled student's current educational placement until the proceedings are complete. *See Doe,* 790 F. 3d at 452; *T.M.,* 752 F.3d at 171; *E.Z.-L.*, 763 F. Supp. 2d at 599, *aff'd,* 694 F.3d 167 (2d Cir. 2012). "This provision aims to preserve public funding for an educational placement 'consented to by the parent before the parent requested a due process hearing. To cut off public funds would amount to a unilateral change in placement, prohibited by

the Act.'" *Mackey ex. rel Thomas M. v. Board of Educ. Arlington Central School Dist.*, 386 F.3d 158, 163 (2d Cir. 2004) (quoting *Zvi D. v. Ambach*, 649 F.2d 904, 906 (2d Cir. 1982)).

88.     A disabled student's right to a "stay put" or "pendency placement" arises when that student's parent initiates a due process complaint with the local school district. *See, Doe,* 790 F. 3d at 452. This statutory right exists to prevent school districts from unilaterally modifying a disabled student's educational placement during the pendency of a due process dispute.

89.     A disabled student's "then current educational placement," which must be maintained during the pendency of a due process challenge under the IDEA (related to the identification, evaluation or placement of the student) and subsequent administrative and/or judicial proceedings, is not defined by statute or regulation.  Nevertheless, such educational placement has been interpreted to mean either: (1) the educational placement set forth in the disabled student's most recently implemented Individualized Education Program ("IEP") (also referred to as the "last agreed upon" IEP); (2) the operative placement actually functioning at the time that the due process proceeding was commenced; or, (3) the educational placement at the time of the previously implemented IEP.  *See, Dervishi v. Stamford Board of Educ.,*653 Fed. App'x 55, 57-58 (2d Cir. 2016); *T.M., supra,* 752 F.3d at 170-71; *Mackey, supra,* 386 F.3d at 163.

90.     Although the IDEA has an "exhaustion" requirement, the Plaintiffs herein are not required to exhaust administrative remedies by alleging a violation of 20 U.S.C. § 1415(j). An action alleging the violation of the stay-put provision falls within one or more of the exceptions to the exhaustion prerequisite. *Murphy v. Arlington Cent. Sch. Dist. Bd. of Educ.*, 297 F.3d 195, 199 (2d Cir. 2002); *Doe,* 790 F.3d at 445; *Digre v. Roseville Schs. Indep. Dist.*, 841

F.2d 245, 250 (8th Cir. 1988) (holding federal courts have authority to enter injunctions [**25] regarding placement during pendency of state administrative proceedings); s*ee also N.D. v. Hawaii Dept. of Educ*, 600 F.3d 1104, 1111 (9th Cir. 2010) (concluded that "exhausting the administrative process would be inadequate because the stay-put provision (and therefore the preliminary injunction) is designed precisely to prevent harm while the proceeding is ongoing.").[180]

91.    The term "educational placement" encompasses at least three components." *See Letter to Rieser*, EHLR 211:403 (July 17, 1986).[181]  The first involves the type of placement – in the instant case, a self-contained classroom; the second is the "educational program contained in the IEP including annual goals, short-term objectives and related services;" and, the "third and final component is the specific school or facility which the child attends." *Id. Letter to Rieser* continued that "these are all ingredients in the 'status quo' which the courts interpreting the statute have required be maintained during the pendency of proceedings."

92.    "To allow a new LEA to place the child in a regular education program or provide an interim IEP *without parental consent would defeat the purpose of the statutory provision –* 'to guarantee a coherent educational experience for a disabled child until conclusion of review of a contested IEP [emphasis added].'" *Letter to Rieser.*

93.    Over the course of several decades, the Second Circuit has consistently defined "educational placement" as meaning the student's "educational program." *T.M., supra*, 752 F.3d at 171 ("Under our precedent, the term 'educational placement' refers only to the

---

[180] See *Honig v. Doe*, 484 U.S. at 326-27 (noting that because "parents may bypass the administrative process where exhaustion would be futile or inadequate . . . we have no reason to believe that Congress meant to require schools alone to exhaust in all cases, no matter how exigent the circumstances").
[181] See *Honig v. Doe*, 484 U.S. 305, FN 8 (1988) (deferring and adopting OSEP's construction of the term "change in placement" for purposes of pendency, finding that OSEP is the agency "charged with monitoring and enforcing the statute").

general type of educational program in which the child is placed.") (quoting *Concerned Parents v. NYC Dep't of Educ.*, 629 F.2d 751, 753 (2d Cir. 1980)) (emphasis added); *T.Y. v. N.Y.C. Dept. of Educ.*, 584 F.3d 412, 419 (2d. Cir. 2009) ("'Educational placement' refers to the general educational program - such as the classes, individualized attention and additional services a child will receive...").

94.     A student's educational placement does not mean the "bricks and mortar" of the school location, but rather the elements of a student's educational program. *T.Y., supra,* at 419. Thus, it has been held that a change from one school building to another (i.e., a change in location), without more, does not necessarily constitute a change in educational placement (*Concerned Parents, supra,* 629 F.2d at 753-54).

95.     In *Letter to Fisher*, 21 IDELR 992 [OSEP 1994], the United States Department of Education's Office of Special Education Programs ("OSEP") specifically addressed the question of what constitutes a "change in educational placement" and opined that consideration should be given to whether a change in educational placement has occurred on a case-by-case basis, as it is a very fact specific inquiry (*Letter to Fisher*, 21 IDELR 992 [OSEP 1994]).  OSEP concluded that whether a change in educational placement has occurred turns on "whether the proposed change would substantially or materially alter the child's educational program" (*Id.*).  OSEP set forth the following factors to be considered in determining whether a change in educational placement has occurred: whether the educational program set out in the child's IEP has been revised; whether the child will be able to be educated with nondisabled children to the same extent; whether the child will have the same opportunities to participate in nonacademic and extracurricular services; and

whether the new placement option is the same option on the continuum of alternative placements (*Letter to Fisher*, 21 IDELR 992).

96.    The "then-current educational placement" more generally refers to the educational program, which is a point along the continuum of placement options and, in many instances, does not refer to a particular institution or building where the program is implemented (*see T.Y. v. New York City Dep't of Educ.*, 584 F.3d 412, 419-20, *cert. denied,* 130 S. Ct. 3277 (2010); *L.M. v. Pinellas County Sch. Bd.*, 2010 WL 1439103 at *1-*2 (M.D. Fla. Aug. 11, 2010)).

97.    Specifically in New York State, it is noted in SRO Decision 14-098, "In this regard I note that a change from a BOCES-operated class in a public school to a district-operated class in a public school constitutes a "change in program" per New York State regulations (see 8 NYCRR 200.1[g]),[9] and a BOCES is also a different placement on the "continuum of placement options" in the State (see, e.g., "Continuum of Special Education Services for School-Age Students with Disabilities," Office of Special Educ. Memo [Nov. 2013], at p. 3, available at http://www.p12.nysed.gov/specialed/publications/policy/continuum-schoolage-revNov13.pdf)."

98.    A "change in program" is defined as a "change in any one of the components of the [IEP] of a student as described in [8 N.Y.C.R.R.] section 200.4(d)(2)." (8 N.Y.C.R.R. 200.1[g][9].  This includes a change in a student's placement (8 NYCRR 200.4[d][2][xii]). As noted in New York State Education Department ("SED") guidance, an assignment to a BOCES-operated classroom in a public school is considered a different "placement" than an assignment to a district-operated classroom (see "Guide to Quality Individualized Education Program (IEP) Development and Implementation," Office of Special Educ.

Mem. [Dec. 2010], at p. 57, available at http://www.p12.nysed.gov/specialed/publications/iepguidance/IEPguideDec2010.pdf; "Questions and Answers on Individualized Education Program (IEP) Development, the State's Model IEP Form and Related Requirements," Office of Special Educ. Mem. [Apr. 2011], at p. 47, available at http://www.p12.nysed.gov/specialed/formsnotices/IEP/training/QA-411.pdf ).

99.     Courts have held that if a student's then current educational placement becomes unavailable, then a district is required to provide a "similar" educational placement (*Knight v. District of Columbia*, 877 F.2d 1025, 1028 [D.C. Cir 1989]; *McKenzie v. Smith*, 771 F.2d 1527, 1533 & n.13 [D.C. Cir. 1985]; *see also Wagner v. Bd. Of Educ.*, 335 F.3d 297 at 301-02 (4th Cir. 2003) (holding that it is not appropriate to direct a district to provide an "alternative placement" if the task at hand is to identify a student's then current educational placement).  Other courts have stated that a change in educational placement has been defined as a "fundamental change in, or elimination of, a basic element of the educational program" (*see Sherri A.D. v. Kirby*, 975 F.2d 193, 206 (5th Cir. 1992); *see also Erickson v. Albuquerque Public Schools*, 199 F.3d 1116, 1121 (10th Cir. 1999).

100.    District Courts have the equitable power to review and enjoin administrative "stay-put" orders immediately, notwithstanding the fact that they are interim orders.  *See M.K. v. Roselle Park Bd. of Educ.*, 2006 WL 3193915 *9 citing *Murphy v. Arlington Cent. Sch. Dist. Bd. of Educ.*, 297 F.3d 195, 199 (2d Cir. 2002).

101.    The IDEA permits disabled children to vindicate their educational rights through other statutes, including 42 U.S.C. § 1983.  *See* 20 U.S.C. §1415(l).

## COMPENSATORY AND PUNITIVE MONETARY DAMAGES

102.   The Supreme Court clarified the difference between the availability of a private right of action with the availability of various remedies. "Although we examine the text and history of a statute to determine whether Congress intended to create a right of action, we presume the availability of all appropriate remedies unless Congress has expressly indicated otherwise." *Franklin v. Gwinnett County Pub. Sch.*, 503 U.S. 60, 66, 112 S. Ct. 1028 (1992) (citation omitted) (monetary damages available as remedy in action to enforce Title IX). The Court went on to announce the "general rule" that "absent clear direction to the contrary by Congress, the federal courts have the power to award any appropriate relief in a cognizable cause of action brought pursuant to a federal statute." *Id.* 503 U.S. at 70-71.

103.   The Second Circuit in *Polera v. Bd. of Educ.*, 288 F.3d 478, 491 (2d Cir. 2002), has reaffirmed, "We have held that monetary damages are available in claims brought pursuant to 42 U.S.C. § 1983 for denial of access to administrative remedies under the IDEA's predecessor statute, the EHA. *Quackenbush v. Johnson City Sch. Dist.*, 716 F.2d 141, 148 (2d Cir. 1983), *cert. denied*, 465 U.S. 1071, 79 L. Ed. 2d 750, 104 S. Ct. 1426 (1984). District courts in this Circuit have followed *Quackenbush*, holding that damages are available on claims brought under Section 1983 for violations of the IDEA. See, e.g., *M.H. v. Bristol Bd. of Educ.*, 169 F. Supp. 2d 21, 29-30 (D. Conn. 2001); *R.B. v. Bd. of Educ. of the City of New York*, 99 F. Supp. 2d 411, 418 (S.D.N.Y. 2000); *Cappillino v. Hyde Park Cent. Sch. Dist.*, 40 F. Supp. 2d 513, 515-16 (S.D.N.Y. 1999)."   Other Circuits have approved § 1983 actions to enforce IDEA rights. *See Angela L. v. Pasadena Independent Sch. Dist.*, 918 F.2d 1188, 1193 n.3 (5th Cir. 1990) (§ 1983 and § 504 "permit parents to obtain relief which otherwise is unavailable from the EHA"); *Digre v. Roseville Sch.*

*Independent Dist.*, 841 F.2d 245, 250 (8th Cir. 1988) (injunctive relief); *Mrs. W. v. Tirozzi*, 832 F.2d 748, 753 (2d Cir. 1987) (declaratory and injunctive relief); *Jackson v. Franklin County Sch. Bd.*, 806 F.2d 623, 631-32 (5th Cir. 1986) (compensatory damages or remedial education). *See also Hunt v. Bartman*, 873 F. Supp. 229, 245 (W.D.Mo. 1994) (injunctive relief).

104.    The Eighth Circuit has concluded that "money damages are available under §504." *Rodgers v. Magnet Cove Public Schools*, 34 F.3d 642, 645 (8th Cir. 1994). *See also Lue v. Moore*, 43 F.3d 1203, 1205 (8th Cir. 1994) (same). The Eighth Circuit reasoned that the Rehabilitation Act incorporates the remedies of Title VI of the Civil Rights Act of 1964, Title IX is also modeled after Title VI, and thus "the Court's holding on Title IX in *Franklin* applies equally to Title VI and Section 504 cases." *Rodgers,* 34 F.3d at 644. *See* 29 U.S.C. § 794(a)(2).

105.    The Third Circuit in *W.B. v. Matula*, 67 F.3d 484 (3d Cir. 1995), examined monetary damages solely through IDEA and concluded, "even were we to limit our focus to IDEA itself, we discern nothing in the text or history suggesting that relief under IDEA is limited in any way, and certainly no "clear direction" sufficient to rebut the presumption that all relief is available. The expansive language of § 1415(f), which was enacted in the shadow of Smith and tracks the broad grant of remedial power allowed a district court reviewing a direct IDEA appeal, see 20 U.S.C. § 1415(e)(2), contains no restrictions on forms of relief. Nor does the legislative history of § 1415(f) suggest a congressional intent that damages be unavailable. In fact, Congress expressly contemplated that the courts would fashion remedies not specifically enumerated in IDEA. See House Report at 7 (excusing § 1415(f) exhaustion requirement where "the hearing officer lacks the authority to grant the relief

sought")." While not recommending monetary damages in *W.B.,* the Court concluded, "However, we do not preclude the awarding of monetary damages and leave to the district court in the first instance the task of fashioning appropriate relief."

106. The Fifth Circuit, in *Salley v. St. Tammany Parish School Board*, 57 F.3d 458 (5th Cir. 1995), affirmed a damages award for a procedural violation of the IDEA, but the damages were merely nominal because it concluded the "violations did not affect Salleys' decisions regarding the education of Danielle." The clear indication is if the procedural violations had impacted the student's education, then the award would have been greater than nominal.

107. In *Stellato v. Bd. of Educ. of the Ellenville Cent. Sch. Dist.*, 842 F. Supp. 1512, 1516-17 (N.D.N.Y. 1994), the court identified the two "exceptional circumstances" whereby damages are available solely under the IDEA: where there is a danger to the physical health of the child or ***where the school district acts in bad faith.*** Both exceptions are present herein.

108. As the Supreme Court stated in *Honig v. Doe*, 484 U.S. 305, 108 S. Ct. 592 (1988), the court has the equitable power to order a change in placement upon a sufficient showing. *id.* at 327-28 (interpreting the "stay put" provision of the EHA – former name of the IDEA).

## JURISDICTION AND VENUE

109. The instant case arises under a federal statute, the Individuals with Disabilities Education Act, 20 U.S.C. § 1400, et seq. ("IDEA") and the regulations of the United States Department of Education, which were promulgated pursuant to authority granted by the statute (34 C.F.R. Part 300), Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §794,

et seq. ("Section 504"); and the Americans with Disabilities Act, 42 U.S.C. § 12101, et seq. ("ADA").

110.  This Court has subject matter jurisdiction of this matter under 28 U.S.C. §1331, in that claims arise under federal law (IDEA, Section 504 and ADA), 28 U.S.C. §1343(a), in that the claims herein arise under laws providing for the protection of civil rights, and under 42 U.S.C. § 1983.

111.  This Court has diversity subject-matter jurisdiction over this class action pursuant to the Class Action Fairness Act of 2005, Pub. L. No. 109-2, 119 Stat. 4 ("CAFA"), which, *inter alia*, amends 28 U.S.C. § 1332, at new subsection (d), conferring federal jurisdiction over class actions where, as here: (a) there are more that 100 or more Members in the proposed Class and subclass; (b) at least some Members of the proposed Class have a different citizenship from Defendants; and (c) the claims of the proposed Members of the Class exceed the sum or value of five million dollars ($5,000,000) in the aggregate. *See* 29 U.S.C. § 1332(d)(2) and this Court has personal jurisdiction over the Plaintiffs because they submit to the jurisdiction of this Court.

112.  To the extent, if any, that this case involves questions of special education rights under a particular state constitution, law or regulation, this Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.  For example, New York State's Constitution Article XI, Section 1, states, "A system of free common schools, wherein all the children of this state may be educated."[182]  For a complete list of each state's laws or regulations regarding the right to education, see Appendix F.

---

[182] https://www.dos.ny.gov/info/constitution.htm

113. Pursuant to 28 U.S.C. §1391(b), venue is properly placed within the Southern District of New York because at least one of the Defendants resides or transacts business in the Southern District, specifically, Bill de Blasio ("Mayor de Blasio"), in his official capacity as Mayor of New York City, Richard Carranza ("Chancellor Carranza"), in his official capacity as Chancellor of the New York City Department of Education, City of New York, and the New York City Department of Education ("NYC DOE"), maintain business offices in New York County.

114. Plaintiffs are entitled to costs and attorneys' fees under 42 U.S.C. §1988(b) and 20 U.S.C.§1415(i), if determined to be a prevailing party.

## PARTIES

115. Plaintiff #1, J.T. [183] is the parent/guardian of D.T. who is classified as a student with a disability as per the IDEA, 20 U.S.C. § 1401(3), and a resident of Middletown, New Jersey. As such, the LEA, Middletown Township Public School District, is obligated to provide D.T. a Free Appropriate Public Education ("FAPE") pursuant to IDEA for every school year. Pursuant to both Section 504 and the ADA, D.T. is a qualified individual with a disability who was denied benefits as per their IEP from the LEA solely because of their disability. Such denial of educational benefits was in bad faith or a gross misjudgment. The Plaintiff-Student's most recently agreed upon IEP is attached in Appendix G.

116. Plaintiff #2, K.M. is the parent/guardian of M.M. and S.M., both of whom are classified as a student with a disability as per the IDEA, 20 U.S.C. § 1401(3), and a resident of Staten Island, New York. As such, the LEA, the NEW YORK CITY DEPARTMENT OF EDUCATION, is obligated to provide both M.M. and S.M. a Free Appropriate Public

---

[183] Pursuant to the federal Family Educational Rights and Privacy Act ("FERPA"), 20 U.S.C. §1232g (and 34 C.F.R. Part 99), Counsel is using the initials of the parent/guardian and student to protect the student's privacy.

Education ("FAPE") pursuant to IDEA for every school year. Pursuant to both Section 504 and the ADA, both M.M. and S.M. are qualified individuals with a disability who were denied benefits as per their IEP from the LEA solely because of their disability. Such denial of educational benefits was in bad faith or a gross misjudgment. The Plaintiff-Students' most recently agreed upon IEPs are attached in Appendix G.

117. Plaintiff #3, J.J. is the parent/guardian of Z.J. who is classified as a student with a disability as per the IDEA, 20 U.S.C. § 1401(3), and a resident of Meriden, Connecticut. As such, the LEA, Meriden School District, is obligated to provide Z.J. a Free Appropriate Public Education ("FAPE") pursuant to IDEA for every school year. Pursuant to both Section 504 and the ADA, Z.J. is a qualified individual with a disability who was denied benefits as per their IEP from the LEA solely because of their disability. Such denial of educational benefits was in bad faith or a gross misjudgment. The Plaintiff-Student's most recently agreed upon IEP is attached in Appendix G.

118. Plaintiff #4, C.N. is the parent/guardian of V.N. who is classified as a student with a disability as per the IDEA, 20 U.S.C. § 1401(3), and a resident of Leander, Texas. As such, the LEA, Leander Independent School District, is obligated to provide V.N. a Free Appropriate Public Education ("FAPE") pursuant to IDEA for every school year. Pursuant to both Section 504 and the ADA, V.N. is a qualified individual with a disability who was denied benefits as per their IEP from the LEA solely because of their disability. Such denial of educational benefits was in bad faith or a gross misjudgment. The Plaintiff-Student's most recently agreed upon IEP is attached in Appendix G.

119. The complete list of Plaintiffs herein is attached as Appendix A.

120.   Defendant BILL de BLASIO ("Mayor de Blasio") in his official capacity as Mayor of the City of New York, directs the New York City Department of Education through the appointment of the Chancellor of the New York City Department of Education.  Mayor DeBlasio's principal place of business is located at City Hall, New York, New York 10007.

121.   Defendant NEW YORK CITY DEPARTMENT OF EDUCATION ("NYC DOE") is the official body (local educational agency or "LEA") charged with the responsibility of developing and enforcing policies with respect to the administration and operation of the public schools in the City of New York, including programs and services for students with disabilities. *See* 20 U.S.C. § 1401(19), 34 C.F.R. § 300.28 and N.Y. Educ. Law § 2590, 2590-g. NYC DOE's principal place of business is located at 52 Chambers Street, New York, New York 10007.

122.   Defendant RICHARD CARRANZA ("Chancellor Carranza") is the Chancellor of the NYC DOE, and as such is entrusted with the specific powers and duties set forth in N.Y. Educ. Law § 2590-h, including oversight of the DOE's provision of education and services to students with disabilities under the IDEA.  The Chancellor's principal place of business is located at 52 Chambers Street, New York, New York 10007.

123.   Defendant SCHOOL DISTRICTS IN THE UNITED STATES (See Appendix B) are the official bodies charged with the responsibility of developing and enforcing policies with respect to the administration and operation of the public schools in their respective geographic areas, including programs and services for students with disabilities, as defined as the "local educational agency" ("LEA") in 20 U.S.C. § 1401(19) and 34 C.F.R. § 300.28.

124.  Upon information and belief, all States and Territories of the United States are the recipient of funding under the IDEA, 20 U.S.C. § 1400-1487, and as such, have the responsibility to "establish and maintain procedures . . . to ensure that children with disabilities and their parents are guaranteed procedural safeguards with respect to the provision of free appropriate education." 20 U.S.C. § 1415(a). Defendant STATE DEPARTMENTS OF EDUCATION IN THE UNITED STATES (See Appendix C) are the State Educational Agencies ("SEA") which exercise general supervision over all programs in the State that provide educational services to disabled students, and must ensure that all such meet State education standards. *Michael C. ex rel. Stephen C. v. Radnor Tp. School Dist.*, 202 F.3d 642, 648 (3d Cir. 2000).

125.  One of the most important procedural safeguards provided to parents under the IDEA is the opportunity for an impartial due process hearing to present complaints with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child. The administrative hearing shall be conducted by the SEA or by the LEA, as determined by State law. 20 U.S.C. § 1415(f).

## CLASS ACTION ALLEGATIONS

126.  Plaintiffs brings this class action on behalf of themselves and all others similarly situated pursuant to Rules 23(a) and 23(b)(2) of the Federal Rules of Civil Procedure, on behalf of all parents and/or guardians of students classified with a disability "Plaintiff-Parent" and the students themselves "Plaintiff-Student" against whom Defendants have violated their federal rights under IDEA, ADA, Section 504 and State Constitutions or Statutes.

127. During the 2018–2019 school year, the number of students ages 3–21 who received special education services in the United States under the Individuals with Disabilities Education Act (IDEA) was 7.1 million, or 14 percent of all public school students.[184]

128. Plaintiff-Parent is defined as a parent or legal guardian of a student, aged 3-21, who was receiving or was entitled to receive special education services under IDEA as of March 2020 and/or through the 2020-2021 school year, however, Defendants failed to provide a FAPE to the Plaintiff-Students. In addition, Plaintiff-Parents were required to do the job and satisfy the responsibilities the Defendants were legally obligated to do and had received federal funds to do. Many such Plaintiff-Parents were required to pay out-of-pocket expenses to arrange and provide educational or related services for their child, and many such Plaintiff-Parents lost their employment so as to be able to provide said services or supervision to their children for "remote" services.[185]

129. Plaintiff-Student is defined as a student who was 3 to 21 years of age between March 2020 and July 2020, and who is classified as having a disability as defined by IDEA (20 U.S.C. § 1401(3)), who have qualifying disabilities under Section 504, and who are afforded protection under Section 504 and the Americans with Disabilities Act, and who were denied these rights because of their disability by the Defendants. Plaintiff-Students are also entitled to receive educational benefits from the LEAs as per their respective State Constitutions or statutes.

130. <u>Numerosity:</u> The class described above is so numerous and geographically dispersed that joinder of all individual members in one action would be impracticable. While the exact number of Class Members is unknown to Plaintiffs at this time, Plaintiffs believe in good

---

[184] The National Center for Education Statistics. https://nces.ed.gov/programs/coe/indicator_cgg.asp
[185] https://www.today.com/parents/worried-about-going-back-work-here-s-what-legal-protections-t186475

faith that the Class includes hundreds of thousands, and likely millions, of persons. Class Members are easily identifiable from records maintained by Defendants. The disposition of the individual claims on the respective class members through this class will benefit both the parties and this Court, and will facilitate judicial economy.

131. <u>Typicality:</u>  Plaintiffs' claims are typical of the claims of the prospective Members of the Class.  The claims of the Plaintiffs and Members of the Class are based on the same legal theories and rise from the same unlawful conduct committed by Defendants.

132. <u>Common Questions of Fact and Law:</u>  There is a well-defined community of interest and common questions of fact and law which predominate over any questions affecting individual Members of the Class.  All Members of the Class have been and/or are being denied their civil rights by Defendants. Questions of law and fact common to the Class include, but are not necessarily limited to, the following: All Plaintiff-Students are classified as a student with a disability pursuant to the IDEA; All Plaintiff-Students are qualified disabled persons under Section 504 and the ADA; All Plaintiff-Students are entitled to educational benefits pursuant to State Constitutions or Statutes; All Plaintiff-Students were denied a valid pendency program and placement by their LEA pursuant to IDEA; All Plaintiff-Students were subject to an unlawful change in their educational program and placement by their LEA in violation of the IDEA; All Plaintiff-Students are qualified disabled persons who were denied the educational benefits of their IEP from the LEA pursuant to Section 504; All Plaintiff-Students are qualified disabled persons who were discriminated against by their LEA because of their disability pursuant to the ADA; All Plaintiff-Parents are the parents and/or guardians of Plaintiff-Students; All Plaintiff-

Parents were injured as a result of the unlawful and/or discriminatory actions taken by the LEAs as a result of violations of the IDEA, Section 504 and ADA.

133. <u>Adequacy of Representation:</u> Plaintiffs are adequate representatives of the Class because their interests do not conflict with the interests of the Members of the Class. Plaintiffs will fairly, adequately, and vigorously represent and protect the interests of the members of the class and have no interests antagonistic to the Members of the Class. Plaintiffs have retained counsel who are competent and experienced and who possess specific expertise in the context of litigation under IDEA, Section 504, the ADA, and State law.

134. <u>Ascertainability:</u> The proposed Class meets the requirement of ascertainability based on the Supreme Court's determination that certification of a class for injunctive relief is only appropriate where 'a single injunction . . . would provide relief to each member of the class.'" *Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70, 80 (quoting *Wal-Mart Stores, Inc. v. Dukes*, 131 S.Ct. at 2557). Also, "[i]t is appropriate for the court to consider the 'inability of the poor or uninformed to enforce their rights and the improbability that large numbers of class members would possess the initiative to litigate individually.'" *Betances v. Fischer*, 304 F.R.D. 416, 426-27 (S.D.N.Y. 2015) (quoting *Labbate-D'Alauro v. GC Servs. Ltd. Pshp.*, 168 F.R.D. 451, 458 (E.D.N.Y. 1996) (alteration in original). Whereas, in 2018-2019 school year, the percentage of students served under IDEA was highest for American Indian/Alaska Native students (18 percent), followed by Black students (16 percent), White students and students of Two or more races (14 percent each), Hispanic students (13 percent), Pacific Islander students

(11 percent), and Asian students (7 percent).[186]   In addition, low-income students are disproportionately assigned to special education. [187]

135.   <u>Class Certification:</u>  Class certification is appropriate pursuant to Fed. R. Civ. P. 23(b)(2) because Defendants have acted or refused to act on grounds generally applicable to the Class, making appropriate both declaratory and injunctive relief with respect to Plaintiffs and the Class as a whole.  Furthermore, as the damages suffered by individual Class Members may vary, the expense and burden of individual litigation makes it impossible to Members of the Class to individually regress the wrongs done to them.  The advantages of maintaining the lawsuit as a class action far outweigh the expense of hundreds of thousands of separate adjudications and would create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct.  The financial cost of a due process proceeding may run as high as $50,000 per hearing, with an average cost running between $8,000 and $12,000[188].  Adjudications with respect to the rights of the individual class members, would, as a practical matter, be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.

**FACTUAL ALLEGATIONS**

136.   During the month of March 2020, Defendants unilaterally closed its schools and required students and staff to remain home, thereby altering the educational program status quo of the Plaintiffs.  The Defendants essentially failed to provide Plaintiff-Students with the

---

[186]
https://nces.ed.gov/programs/coe/indicator_cgg.asp#:~:text=In%202018%E2%80%9319%2C%20the%20number,percent%20had%20specific%20learning%20disabilities
[187] https://www.gse.harvard.edu/news/uk/19/02/low-income-students-and-special-education-mismatch
[188] https://journals.sagepub.com/doi/full/10.1177/2158244015577669

special education and related services set forth in their IEPs.  Due to the actions of Defendants, they have denied Plaintiffs a FAPE under IDEA.[189]

137.    The Defendants unilaterally, substantially, and materially altered the Students' "status quo" educational program as it relates to the Plaintiff-Students' pendency rights.  The IDEA includes a number of procedural safeguards "that guarantee parents both an opportunity for meaningful input into all decisions affecting their child's education and the right to seek review of any decisions they think inappropriate." *Honig v. Doe*, 484 U.S. 305, 311-12, 108 S. Ct. 592, 98 L. Ed. 2d 686 (1988).[190]  For example, in New York City, therapists were instructed to alter the students' educational program *WITHOUT* parental participation.[191]

138.    The USDOE issued updated guidance for special education students in June 2020, reaffirming previous guidance about including parents in the decision-making process: "Timely communication between *parents and* public agency staff can often help resolve disagreements that may arise regarding the educational services provided to a child with a disability during the pandemic," according to the Q&A.  "However, when those informal efforts prove unsuccessful, IDEA's three dispute resolution mechanisms — mediation,

---

[189] The maximum amount of time a school district can displace a student and change the educational program without triggering a violation of 20 U.S.C. § 1415(j) is 10 school days based on *Honig v. Doe,* 484 U.S. 305, 325, 325-26 n.8, 98 L. Ed. 2d 686, 108 S. Ct. 592 (1987).  However, this unilateral action of a suspension by the school district may create a "change in placement," and by the terms of the IDEA, a change in placement can only occur with the consent of the parents, or after written notice, and the opportunity for a hearing.  However, not all suspensions constitute a prohibited "change in placement."  "Where a student poses an immediate threat to the safety of others, officials may temporarily suspend him or her for [**11] up to 10 schooldays." Id. at 325.  The Supreme Court adopted the ten-day limit from the Office of Civil Rights ("OCR") of the Department of Education, which decided that "a suspension of up to 10 school days does not amount to a 'change in placement.'" Id. at 325 n.8.  Based on this cut-off, the Court found that suspensions of twenty and thirty days' duration were impermissible. Id.
[190] *Susquenita Sch. Dist. v. Raelee S.*, 96 F.3d 78, 82, 83 (3d Cir. 1996). Accordingly, the stay-put provision "protect[s] handicapped children and their parents during the review process," by "block[ing] school districts from effecting unilateral change in a child's educational program."
[191] https://www.uft.org/news/news-stories/teletherapy-guidance-speech-otpts

state complaint and due process complaint procedures — are available."[192] The Defendants blatantly disregarded these procedural safeguards and simply failed to comply with these long-established federal laws and regulations with Plaintiff-Parents.

139. First, the Defendants unilaterally, substantially and materially altered the location of where the Plaintiff-Students were to receive services, from a school classroom to the most restrictive environment along the continuum of service: at the Plaintiff-Students' home. A unilateral change from a classroom to total isolation at home, would further violate the Supreme Court's express preference for educating students in the least restrictive environment and with their typically developing peers. *Honig*, 484 U.S. 305, 313 (1988).

140. *Concerned Parents v. NYC Board of Educ*., 629 F.2d 751, 753 (2d Cir. 1980) clearly demonstrates a change from a school-based program to home instruction is a material and substantive change to the educational program, "45 C.F.R. § 121a.551 Continuum of alternative placements: (a) Each public agency shall insure that a continuum of alternative placements is available to meet the needs of handicapped children for special education and related services, and (b) The continuum required under paragraph (a) of this section must: (1) Include the alternative placements listed in the definition of special education under § 121a.13 of Subpart A (instruction in regular classes, special classes, special schools, home instruction, and instruction in hospitals and institutions). . . ."

141. Second, the Defendants unilaterally, substantially and materially altered the delivery of these services by precluding the Plaintiff-Students from receiving any in-person services by special education teachers or related service providers, including any supplemental support as documented in the Plaintiff-Students' IEP.

---

[192] https://www.disabilityscoop.com/2020/06/23/ed-department-new-guidance-special-education-pandemic/28517/

142.     This unilateral, substantial, and material change in the delivery of academic and related

services constitutes an improper change of educational program as discussed in *T.Y. v.*

*N.Y.C. Dept. of Educ.*, 584 F.3d 412, 419 (2d. Cir. 2009): "The United States Department

of Education ("USDOE") expressly considered this question in its commentary to the 1997

amendments to the IDEA. In that commentary, the USDOE noted, that some commenters

requested that the term "location" be defined as the placement on the continuum and not

the exact building where the IEP service is to be provided . . . . Other commenters similarly

stated that a note be added clarifying that "location" means the general setting in which the

services will be provided, and not a particular school or facility. Assistance to States for

the Education of Children with Disabilities and the Early Intervention Program for Infants

and Toddlers with Disabilities, 64 Fed. Reg. 12406, 12594 (Mar. 12, 1999). In resolving

this issue, the USDOE concluded that "[t]he location of services in the context of an IEP

generally refers to the *type of environment that is the appropriate place* for provision of

the service. For example, is the related service to be provided in the child's regular

classroom or resource room?" *Id.*  This conclusion comports with the Senate's commentary,

which states that "[t]he location where special education and related services will be

provided to a child influences decisions about the nature and amount of these services and

when they should be provided to a child." S. Rep. No. 105-17, at 21 (1977). "For example,

the appropriate place for the related service may be the regular classroom, so that the child

does not have to choose between a needed service and the regular educational program."

*Id*. "For this reason," the commentary continues, "in the bill the committee has added

'location' to the provision in the IEP that includes 'the projected date for the beginning of

services and modifications, and the anticipated frequency, location, and duration of those services.'" *Id.* (emphasis omitted). We interpret these statements to indicate that the term "location" does not mean the specific school location, but the general environment of the overall program."

143. Third, no Plaintiff-Students' IEP provides for the remote provision of special education or related services. Rather, the Plaintiff-Students' IEPs require these services to be provided as a direct service to the Plaintiff-Students. In most instances, Defendants also unilaterally, substantially and materially altered the frequency and duration of Plaintiff-Students' related services, if they provided them at all.

144. There is no "pandemic exception" to the IDEA[193] and if a student's educational program becomes unavailable, then the school district must find a comparable alternative placement. See *Knight v. District of Columbia*, 278 U.S. App. D.C. 237, 877 F.2d 1025, 1028 (D.C. Cir. 1989) ("This court has held that if a student's 'then current educational [*301] placement' becomes unavailable, [the school board] must provide him with a 'similar' placement pending administrative and judicial approval of its eventual plans."). When a student's educational program becomes unavailable, the stay-put provision requires that a similar program be found for the student. *See McKenzie v. Smith*, 771 F.2d 1527-33 (D.C. Cir. 1985); *F.S. v. District of Columbia*, 2007 U.S. Dist. LEXIS 27520, 2007 WL 1114136 (D.D.C. 2007).

145. Pursuant to the IDEA, Plaintiff-Parents sent statutory Ten Day notices to their respective LEAs advising that the LEA improperly modified Plaintiff-Students' IEPs, denied their

---

[193] https://www.disabilityscoop.com/2020/05/29/school-groups-want-flexibility-on-special-ed-spending-due-to-COVID-19/28387/

pendency rights under Section 1415(j) of the IDEA, and requesting relief for such violations.

146. Pursuant to the IDEA, Plaintiff-Parents filed due process complaints with their LEAs alleging violations of the IDEA and Section 504 by unilaterally modifying the Plaintiff-Students' IEPs and failing to maintain their pendency programs and placements.

147. As a result of the violations committed by the Defendants, during the adjudication of the due process complaints, Plaintiffs seek either an immediate reopening of the schools to implement a substantially similar educational program as outlined in Plaintiff-Students' IEPs or alternatively have a "Pendency Voucher" issued to Plaintiff-Parents to provide an opportunity to self-cure the violations of the Defendants. This outcome is consistent with the legal advice school district law firm, Sweet, Stevens, Katz & Williams LLP, advised to their clients on their website:

> "A hearing officer, moreover, could not order an LEA to maintain a pre-closure brick-and-mortar program in violation of the governor's school closure and social distancing orders. The hearing officer could, presumably, order a different array of virtual services than those the LEA has proposed, although he or she would not likely issue any such order much before the current school year closes."[194]

148. While Plaintiffs disagree in the above legal analysis that a governor's school closure order supersedes the federal laws (IDEA, Section 504, ADA) protecting the rights of Plaintiff-Students, this is no longer a legal issue since governors have rescinded those orders relating to special education students as of July 2020. (See Appendix D)

---

[194] http://www.sweetstevens.com/newsroom/coronavirus-and-schools-parent-rejection-of-continuity-of-education-noreps

149. As a result of the violations committed by the Defendants, Plaintiff-Parents seek independent evaluations for the purpose of determining the extent to which the Plaintiff-Students exhibit regression and/or loss of competencies and abilities due to the loss of, or substantial change to, the Plaintiff-Students' educational program. As described by the Illinois State Board of Education (ISBE), "Addressing the impact of remote learning. Under *Endrew F.[v. Douglas Cnty. Sch. Dist. RE-1, 580 U.S. 137 S. Ct. 988 (2017)]* and Department of Education guidance, IEP teams ***should convene if a student is not making expected progress and changes to the IEP may be warranted.*** Upon return to in-person instruction, teams should convene if the student is not on track to meet IEP goals. Revisions related to goals, services, placement, or methodology may be considered to ensure the student is receiving FAPE."[195] (emphasis added).

150. As a result of the violations committed by the Defendants, Plaintiff-Parents seek to have their respective LEAs' Committee on Special Education promptly convene after the completion of the requested independent evaluations for the purpose of ascertaining the Plaintiff-Students' current needs and abilities to develop modified IEPs reflecting the loss or substantial and material alterations of Plaintiff-Students' special education and/or related services.

151. As a result of the gross violations committed by the Defendants, Plaintiff-Parents seek compensatory damages from their respective LEAs. Compensatory education is an award of educational services designed to remedy a deprivation in the child's education. *Doe v. E. Lyme Bd. Of Educ.*, 790 F.3d 440, 445 (2d Cir. 2015). An award of compensatory

---

[195] https://www.jdsupra.com/legalnews/cheat-sheet-for-isbe-s-faq-for-special-47954/#:~:text=Under%20Endrew%20F.,the%20IEP%20may%20be%20warranted.&text=Revisions%20related%20to%20goals%2C%20services,the%20student%20is%20receiving%20FAPE.

education serves to correct a violation of the IDEA that resulted in the child's regression. Regression refers to the failure to maintain an acquired skill in an identified goal area of concern as a result of an interruption of special education instruction or support services.

152.     Due to the intentional and willful actions of the Defendants, Plaintiff-Parents were required to fill in and compensate for the failure of their school district (LEA) and either lost income, incurred out-of-pocket expenses, and/or experienced loss of employment. As a result of the intentional and willful violations committed by the Defendants, Plaintiff-Parents shall seek both compensatory damages as well as punitive damages.

153.     Defendants discriminated against Plaintiff-Students, who are qualified individuals under the ADA, by prohibiting the provision of in-person academic and related services the opportunity to participate or benefit from such services. "Remote learning" is not "equal" to the "aid, benefit or service" nor is it as effective as in-person services that were provided to other special education students.[196]

154.     Plaintiff-Parents shall also seek other relief as equitable 20 U.S.C. § 1415(i)(2)(C)(iii), §1439(a)(1).

## **FIRST CLAIM**

Violations of the Civil Rights Act

(42 U.S.C. § 1983)

(All Plaintiffs against all Defendants)

155.     The Plaintiffs realleges and incorporates by reference all of the allegations and the paragraphs above as is fully set forth herein.

---

[196] Title II of the American with Disabilities Act ("ADA"), 42 U.S. Code § 12182

156. The Defendants' failure to maintain Plaintiff-Students' educational program, as per their IEPs deprived Plaintiff-Students of their rights to a free appropriate public education and due process under IDEA and the regulations promulgated thereunder, and thus deprives them of rights secured by federal law in violation of 42 U.S.C. § 1983.

157. Plaintiff-Students are entitled to declaratory relief, temporary, preliminary, and permanent injunctive relief, to restore their educational programs and related services.

## SECOND CLAIM

Violations of the Civil Rights Act

(42 U.S.C. § 1983)

(All Plaintiffs against all Defendants)

158. The Plaintiffs realleges and incorporates by reference all of the allegations and the paragraphs above as is fully set forth herein.

159. The Defendants' failure to maintain Plaintiff-Students' educational program, as per their IEPs deprived Plaintiff-Students of their rights to a free appropriate public education and without due process of law, as secured by their State Constitution or Statute, in violation of their Due Process Clause of the Fourteenth Amendment of the United States Constitution.  Such actions by Defendants deprives Plaintiffs of rights secured by federal law in violation of 42 U.S.C. § 1983.

160. Plaintiffs-Students are entitled to declaratory relief, temporary, preliminary, and permanent injunctive relief, to restore their educational programs and related services.

## **THIRD CLAIM**

Violations of the Individuals with Disabilities Education Act (IDEA)

(20 U.S.C. § 1401, et seq., 34 C.F.R. Part 300)

(All Plaintiffs against all Defendants)

Failure to Comply with Procedural Requirement of IDEA

161. The Plaintiffs realleges and incorporates by reference all of the allegations and the paragraphs above as is fully set forth herein.

162. Defendants failed to comply with the procedural requirements of IDEA, including, but not limited to, notice of a change in the Plaintiff-Students' educational program and placement and the unilateral, substantial and material modification of the Plaintiff-Students' educational program and placement.

163. Defendants failed to ensure that procedural requirements guaranteeing parental participation and due process were used or provided.

164. Defendants failed to comply with the procedural requirements of IDEA and denied Plaintiff-Students a free appropriate public education as required by law.

165. Based on the foregoing, Plaintiff-Parents rights and those of their Plaintiff-Students were violated under IDEA, 20 U.S.C. § 1401, et seq., 34 C.F.R. part 300.

## **FOURTH CLAIM**

Violations of the Individuals with Disabilities Education Act (IDEA)

(20 U.S.C. § 1401, et seq., 34 C.F.R. Part 300)

(All Plaintiffs against all Defendants)

Failure to Provide Pendency Under IDEA

166.	The Plaintiffs realleges and incorporates by reference all of the allegations and the paragraphs above as is fully set forth herein.

167.	Defendants violated Plaintiffs' pendency rights pursuant to 20 U.S.C. § 1415(j), by failing to provide an educational program and placement that maintained the Plaintiff-Students' educational program and placement during the pendency of the due process complaint.

168.	Based on the foregoing, Plaintiff-Parents rights and those of their Plaintiff-Students were violated under IDEA, 20 U.S.C. § 1401, et seq., 34 C.F.R. part 300.


## FIFTH CLAIM

Violations of the Individuals with Disabilities Education Act (IDEA)

(20 U.S.C. § 1401, et seq., 34 C.F.R. Part 300)

(All Plaintiffs against all Defendants)

Failure to Provide a Free Appropriate Public Education Under IDEA

169.	The Plaintiffs realleges and incorporates by reference all of the allegations and the paragraphs above as is fully set forth herein.

170.	Defendants failed to provide a FAPE pursuant to a proper Individualized Education Program (IEP) for the Plaintiff-Students that was reasonably calculated to enable the Plaintiff-Students to receive educational benefit as required by IDEA, 20 U.S.C. § 1401, et seq., 34 C.F.R. part 300.

171.	Defendants failed to comply with the substantive requirements of IDEA and denied Plaintiff-Students a free appropriate public education as required by law.

172. Defendants violated Plaintiffs rights for a FAPE when the Defendants unilaterally, materially and substantively modified the Plaintiff-Students' educational program by substituting remote services for in-person services, constituting an unlawful change in the program and placement.

173. Based on the foregoing, Plaintiff-Parents rights and those of their Plaintiff-Students were violated under IDEA, 20 U.S.C. § 1401, et seq., 34 C.F.R. part 300.


## SIXTH CLAIM

Violations of the Plaintiffs' State Laws and Regulations

(All Plaintiffs against all Defendants)

Failure to Provide a Free Appropriate Public Education as per Plaintiffs' State Laws and Regulations

174. The Plaintiffs realleges and incorporates by reference all of the allegations and the paragraphs above as is fully set forth herein.

175. Defendants failed to ensure that procedural requirements guaranteeing parental participation and due process were used or provided.

176. Defendants failed to comply with Plaintiffs' respective state procedural requirements denied the Plaintiff-Student a FAPE as required by Plaintiffs' respective state law.

## SEVENTH CLAIM

Violations of Section 504 of the Federal Rehabilitation Act (Section 504)

(29 U.S.C. § 794, et seq.)

(All Plaintiffs against all Defendants)

Failure to Provide a FAPE

177.   The Plaintiffs realleges and incorporates by reference all of the allegations and the paragraphs above as is fully set forth herein.

178.   Defendants discriminated against Plaintiff-Students' by failing to provide access to a FAPE pursuant to their IEPs. By denying services pursuant to the students' IEPs, the LEAs unlawfully denied access to appropriate educational services as compared to the educational services received by non-disabled students.

179.   Based on the foregoing, Plaintiff-Parents rights and those of their Plaintiff-Students were violated under Section 504, 29 U.S.C. §794, et seq.


## EIGHTH CLAIM

Violations of Section 504 of the Federal Rehabilitation Act (Section 504)

(29 U.S.C. § 794, et seq.)

Compensatory Damages

180.   The Plaintiffs realleges and incorporates by reference all of the allegations and the paragraphs above as is fully set forth herein.

181.   Due to the Defendants' failure to provide the Plaintiff-Students with a FAPE, the Plaintiff-Parents were forced to pay out-of-pocket expenses for educational services, special education related services (including paraprofessional and nursing services) that were cut off by Defendants.

182.   Additionally, and due to the Defendants' failure to provide the Plaintiff-Students with a FAPE, some Plaintiff-Parents lost income or employment when in order to fill the void in

providing their children with educational and/or related services that were cut off by Defendants, personally provided or supervised such services for their disabled children.

183. Based on the foregoing, Plaintiff Parents rights and those of their Plaintiff-Students were violated under Section 504, 29 U.S.C. §794, et seq.

## NINTH CLAIM

Violations of Section 504 of the Federal Rehabilitation Act (Section 504)

(29 U.S.C. § 794, et seq.)

(All Plaintiffs against all Defendants)

Punitive Damages

184. The Plaintiffs realleges and incorporates by reference all of the allegations and the paragraphs above as is fully set forth herein.

185. Due to the Defendants' intentional and willful failure to provide the Plaintiff-Students with a FAPE, the Plaintiff-Parents and Plaintiff-Students were injured in fact.

186. Based on the foregoing, Plaintiff-Parents rights and those of the Plaintiff-Students were violated under Section 504, 29 U.S.C. §794, et seq.

## TENTH CLAIM

Violations of Title II of the Americans with Disability Act (ADA)

(42 U.S. Code § 12101, et seq.)

(All Plaintiffs against all Defendants)

Failure to Provide Aid, Benefit, or Service Based on Plaintiff-Students' Disability

187.    The Plaintiffs realleges and incorporates by reference all of the allegations and the paragraphs above as is fully set forth herein.

188.    Defendants failed to provide in-person academic special education and related services that have been provided to other special education students, thereby violating the civil rights of the Plaintiff-Students as per Title II of the Americans with Disabilities Act ("ADA"), 42 U.S. Code § 12101, et seq.

189.    Due to the Defendants' failure to provide the Plaintiff-Students with a FAPE, the Plaintiff-Students were subjected to unlawful discrimination solely on the basis of their disability. Essentially, the Plaintiff-Students were denied the opportunity to participate in or benefit from the special education program and services as per their IEPs, or was otherwise discriminated against solely because of their disability.

190.    Based on the foregoing, Plaintiff-Parents rights and those of their Plaintiff-Students were violated under the ADA, 42 U.S.C. §12101, et seq.

**ELEVENTH CLAIM**

Violations of State Constitution or Statutes

(See Appendix F)

(All Plaintiffs against all Defendants)

Failure to Provide Educational Benefits

191.    The Plaintiffs realleges and incorporates by reference all of the allegations and the paragraphs above as is fully set forth herein.

192.    Defendants failed to provide in-person academic special education and related services to the Plaintiff-Students, thereby violating the rights of the Plaintiff-Students to receive educational benefits as per their respective State Constitution or Statute.

193.    Due to the Defendants' failure to provide the Plaintiff-Students with educational benefits, the Plaintiff-Students were denied their rights to receive educational benefits.

194.    Based on the foregoing, Plaintiff-Parents rights and those of their Plaintiff-Students were violated under their respective State Constitutions or Statutes.


**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that judgment be entered in their favor and against Defendants as follows:

a.    An order and judgment declaring that the Defendants violated the Equal Protection Clause and the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution; Individuals with Disabilities Education Act (20 U.S.C. § 1400, et seq.); Title II of the Americans with Disabilities Act (42 U.S.C. § 12101, et seq.); Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794, et seq.); and, State Constitutions or Statutes; and

b.    An order for a Preliminary Injunction directing Defendants to either immediately reopen the schools for the purpose of providing Plaintiff-Students with their educational programs, placements and services as per their current IEP; or in the alternative, an order directing Defendants to immediately issue "Pendency Vouchers" for Plaintiff-Parents to self-cure as much as possible of the Plaintiff-Students educational programs, placements and services; and

c.      An order directing Defendant School Districts to immediately conduct extensive independent evaluations of Plaintiff-Students for the purpose of ascertaining their current levels of educational performance; and

d.      An order directing Defendant School Districts to establish and provide compensatory education plans for Plaintiff-Students based upon the extensive independent evaluations and because of the educational regression caused by the failure to provide a FAPE; and

e.      An order directing Defendants to reimburse, as compensatory damages, Plaintiff-Parents for employment loss or out-of-pocket expenses incurred as a result of the failure to provide Plaintiff-Students with their educational programs, placements, and services as per their current IEPs; and

f.      An order directing Defendants to pay Plaintiff-Parents, a sum in the amount to be determined, as punitive damages, based on the intentional and willful violations of Section 504, ADA, State Constitutions and Statutes, IDEA, and Section 1983; and

g.      An award of costs and attorney's fees pursuant to 29 U.S.C. § 794(a)(b); 42 U.S.C. § 12205, 34 C.F.R. § 330.517 and Federal Rules of Civil Procedure 23(h); and

h.      Awarding such other and further relief as this Court deems just and proper.

Dated: July 27, 2020

Respectfully submitted,

/ s: Peter G. Albert /

Peter G. Albert, Esq.
Brain Injury Rights Group, LTD.
300 E. 94th Street – Suite 130
New York, New York 10128
(646) 850-5035


/ s: Patrick B. Donohue /

Patrick B. Donohue, Esq.
Patrick Donohue Law Firm PLLC
55 W. 116th Street – Suite 159
New York, New York 10026
(917) 359-4556