UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------x

**J.T.**, Individually and on behalf of D.T.;
**K.M.**, Individually and on behalf of M.M. and S.M.;
**J.J.**, Individually and on behalf of Z.J.;
**C.N.**, Individually and on behalf of V.N.; and,
All Others Similarly Situated,

                                    Plaintiffs,                        **20-cv-5878 (CM)**

        -    against -

**BILL de BLASIO**, in his official capacity as the
Mayor of New York City; **RICHARD CARRANZA**,
in his official capacity as the Chancellor of the New
York City Department of Education; the **NEW YORK
CITY DEPARTMENT OF EDUCATION**; the **SCHOOL
DISTRICTS IN THE UNITED STATES**; and the
**STATE DEPARTMENTS OF EDUCATION IN THE
UNITED STATES,**

                                    Defendants.

-------------------------------------------------------------------x

## CIVIL RICO CASE STATEMENT

## 18 U.S.C. §§ 1961 - 1968

Peter G. Albert, Esq.
Brain Injury Rights Group, Ltd.
Attorneys for Plaintiffs
300 East 95th Street – Suite 130
New York, New York 10128
(646) 850-5035

1

## CIVIL RICO CASE STATEMENT

Pursuant to this Court's civil RICO Case Standing Order and 18 U.S.C. §§ 1961-1968, Plaintiffs provide the following information in support of their RICO claims based on the previously filed Complaint and the Memorandum of Law in Support of the Order to Show Cause. Plaintiffs reserve the right to amend this Statement, and/or change assertions stated herein after the benefit of discovery.

## INTRODUCTION

The Individuals with Disabilities Education Act, 20 U.S.C. §1400 ("IDEA")[1], the regulations of the United States Department of Education, which were promulgated pursuant to authority granted by the statute (34 C.F.R. Part 300), guarantees students with disabilities a free appropriate public education ("FAPE").  The term FAPE[2] refers to special education and related services that are designed to meet a child's unique needs and that will prepare the child for further education, employment, and independent living.

As previously described in the Complaint (ECF #1) and the Memorandum of Law in Support of the Order to Show Cause (ECF # 90-7), and detailed further below, the Defendants' activities involve fraud against the federal government, their respective States, the Plaintiffs and Class Members.  First, the Defendants fraudulently created Individualized Education Programs ("IEPs") for special education students knowing they could not implement these IEPs, thereby knowingly denying each student a FAPE.  Second, the Defendants fraudulently claimed they were

---

[1] https://sites.ed.gov/idea/
[2] IDEA Section 602 (9) The term `free appropriate public education' means special education and related services that--
(A) have been provided at public expense, under public supervision and direction, and without charge;
(B) meet the standards of the State educational agency;
(C) include an appropriate preschool, elementary school, or secondary school education in the State involved; and
(D) are provided in conformity with the individualized education program required under Section 614(d).

providing special education and related services as outlined in the students' IEPs and billed and/or were reimbursed by the federal government and their respective States for services that were not performed or were established fraudulently.

As a result of Defendants' multi-faceted scheme of fraud against the government, Defendants have collected hundreds of millions of dollars, if not billions of dollars, to which they were never entitled.

But beyond this massive financial fraud perpetrated on the government, the ultimate victims here are millions of students with disabilities and their parents, the Plaintiffs and Class Members, who were relying on the Defendants to provide the services Defendants were obligated to provide through the IDEA.

The Defendants failed to provide the services outlined in each student's IEP since March 2020 (including live synchronous services) and then fraudulently stated that these students were continuing to be properly serviced remotely.  In addition, the Defendants fraudulently created IEPs for the 2020-2021 school year for these students which Defendants knew they could not implement during the Covid-19 pandemic.

The Defendants unilaterally closed its schools and required students and staff to remain home, thereby altering the status quo of the educational programs of the Plaintiff-Students.  As a result, the Defendants failed to provide Plaintiff-Students with the special education and related services set forth in their IEPs.  Due to these actions of the Defendants, Defendants have denied Plaintiffs and Class Members their pendency rights pursuant to the IDEA.[3]

---

[3] The maximum amount of time a school district can displace a student and change the educational program without triggering a violation of 20 U.S.C. § 1415(j) is 10 school days based on *Honig v. Doe,* 484 U.S. 305, 325, 325-26 n.8, 98 L. Ed. 2d 686, 108 S. Ct. 592 (1987).  However, this unilateral action of a suspension by the school district may create a "change in placement," and by the terms of the IDEA, a change in placement can only occur with the consent of the parents, or after written notice, and the opportunity for a hearing.  However, not all suspensions constitute a prohibited "change in placement."

The IDEA includes a number of procedural safeguards "that guarantee parents both an opportunity for meaningful input into all decisions affecting their child's education and the right to seek review of any decisions they think inappropriate." *Honig v. Doe*, 484 U.S. 305, 311-12, 108 S. Ct. 592, 98 L. Ed. 2d 686 (1988).[4] The Defendants unilaterally, substantially, and materially altered the Students' "status quo" educational programs as they relate to the Plaintiff-Students' IDEA-based pendency rights.   For example, in New York City, therapists were instructed to alter the students' educational program *without* parental participation.[5]

The United States Department of Education ("USDOE") issued updated guidance for special education students in June 2020, reaffirming previous guidance about including parents in the decision-making process: "Timely communication between **parents and public agency** staff can often help resolve disagreements that may arise regarding the educational services provided to a child with a disability during the pandemic," according to the Q&A (emphasis added). "However, when those informal efforts prove unsuccessful, IDEA's three dispute resolution mechanisms — mediation, state complaint and due process complaint procedures — are available."[6]   The Defendants blatantly disregarded these procedural safeguards and simply failed to comply with these long-established federal laws and regulations with Plaintiff-Parents.

---

"Where a student poses an immediate threat to the safety of others, officials may temporarily suspend him or her for [**11] up to 10 schooldays." Id. at 325.  The Supreme Court adopted the ten-day limit from the Office of Civil Rights ("OCR") of the Department of Education, which decided that "a suspension of up to 10 school days does not amount to a 'change in placement.'" Id. at 325 n.8.  Based on this cut-off, the Court found that suspensions of twenty and thirty days' duration were impermissible. Id.

[4] *Susquenita Sch. Dist. v. Raelee S.*, 96 F.3d 78, 82, 83 (3d Cir. 1996). Accordingly, the stay-put provision "protect[s] handicapped children and their parents during the review process," by "block[ing] school districts from effecting unilateral change in a child's educational program."

[5] https://www.uft.org/news/news-stories/teletherapy-guidance-speech-otpts

[6]        https://www.disabilityscoop.com/2020/06/23/ed-department-new-guidance-special-education-pandemic/28517/

4

First, the Defendants unilaterally, substantially, and materially altered the setting and locations of where the Plaintiff-Students were to receive services, from a school classroom to the most restrictive environment along the continuum of services: the Plaintiff-Students' homes. A unilateral change from a classroom to total isolation at home contravenes the Supreme Court's express preference for educating students in the least restrictive environment and with their typically developing peers. *Honig*, 484 U.S. at 313 (1988).

*Concerned Parents v. NYC Board of Educ*., 629 F.2d 751, 753 (2d Cir. 1980), clearly demonstrates that a change from a school-based program to home instruction is a material and substantive change to the educational program," 34 C.F.R. § 121a.551 Continuum of alternative placements: (a) Each public agency shall insure that a continuum of alternative placements is available to meet the needs of handicapped children for special education and related services, and (b) The continuum required under paragraph (a) of this section must: (1) Include the alternative placements listed in the definition of special education under § 121a.13 of Subpart A (instruction in regular classes, special classes, special schools, home instruction, and instruction in hospitals and institutions). . . ."

Second, the Defendants unilaterally, substantially, and materially altered the delivery of these services by precluding the Plaintiff-Students from receiving any in-person services by special education teachers or related service providers, including any supplemental support as documented in the Plaintiff-Students' IEPs.

This unilateral, substantial, and material change in the delivery of academic and related services constitutes an improper change of an educational program. *See, e.g., T.Y. v. N.Y.C. Dept. of Educ*., 584 F.3d 412, 419 (2d. Cir. 2009). As held in *T.Y.*:

"The United States Department of Education ("USDOE") expressly considered this question in its commentary to the 1997 amendments to the IDEA. In that commentary, the USDOE noted, that some commenters requested that the term 'location' be defined as the placement on the continuum and not the exact building where the IEP service is to be provided . . . . Other commenters similarly stated that a note be added clarifying that 'location' means the general setting in which the services will be provided, and not a particular school or facility. Assistance to States for the Education of Children with Disabilities and the Early Intervention Program for Infants and Toddlers with Disabilities, 64 Fed. Reg. 12406, 12594 (Mar. 12, 1999). In resolving this issue, the USDOE concluded that '[t]he location of services in the context of an IEP generally refers to the *type of environment that is the appropriate place* for provision of the service. For example, is the related service to be provided in the child's regular classroom or resource room?' *Id.* This conclusion comports with the Senate's commentary, which states that '[t]he location where special education and related services will be provided to a child influences decisions about the nature and amount of these services and when they should be provided to a child.' S. Rep. No. 105-17, at 21 (1977). 'For example, the appropriate place for the related service may be the regular classroom, so that the child does not have to choose between a needed service and the regular educational program.' *Id*. 'For this reason,' the commentary continues, 'in the bill the committee has added 'location' to the provision in the IEP that includes 'the projected date for the beginning of services and modifications, and the anticipated frequency, location, and duration of those services.'' *Id.* (emphasis omitted). We interpret these statements to indicate that the term 'location' does not mean the specific school location, but the general environment of the overall program."

Third, no Plaintiff-Students' IEP provides for the remote provision of special education or related services. Rather, the Plaintiff-Students' IEPs require these services to be provided as a direct service to the Plaintiff-Students. In most instances, Defendants also unilaterally, substantially, and materially altered the frequency and duration of Plaintiff-Students' related services, if they provided them at all.

There is no "pandemic exception" to the IDEA[7] and if a student's educational program becomes unavailable, then the school district must find a comparable alternative placement. *See Knight v. District of Columbia*, 278 U.S. App. D.C. 237, 877 F.2d 1025, 1028 (D.C. Cir. 1989) ("This court has held that if a student's 'then current educational [*301] placement' becomes unavailable, [the school board] must provide him with a 'similar' placement pending administrative and judicial approval of its eventual plans."). When a student's educational program becomes unavailable, the stay-put provision requires that a similar program be found for the student. *See McKenzie v. Smith*, 771 F.2d 1527-33 (D.C. Cir. 1985); *F.S. v. District of Columbia*, 2007 U.S. Dist. LEXIS 27520, 2007 WL 1114136 (D.D.C. 2007).

## PRELIMINARY STATEMENT

For the reasons set forth below, Plaintiffs are entitled to an order requiring Defendants to provide them with various forms of relief, including but not limited to: 1) the issuance of new IEPs for the Students by their respective school districts; 2) reimbursement for Plaintiff-Parents' out-of-pocket expenses or loss of income and/or employment; and 3) punitive damages based upon the Defendants' willful and deliberate neglect and abandonment of the educational and medical

---

[7]   https://www.disabilityscoop.com/2020/05/29/school-groups-want-flexibility-on-special-ed-spending-due-to-COVID-19/28387/

needs of Plaintiff-Students as evidenced by Defendants' unjustified termination of the implementation of Plaintiff-Students' IEPs.

### IDEA PART B Funding

The purpose of IDEA Part B (20 U.S.C. §1415) grants is to assist States, outlying areas, freely associated States, and the Secretary of the Interior in providing special education and related services to children with disabilities, including that children with disabilities have access to a free appropriate public education (FAPE). In general, IDEA Part B funds *must be used **only** to pay the excess costs of providing FAPE to children with disabilities,* such as costs for special education teachers and administrators; related services providers (speech therapists, psychologists, etc.); materials and supplies for use with children with disabilities; professional development for special education personnel; professional development for regular education teachers who teach children with disabilities; and specialized equipment or devices to assist children with disabilities. Generally, IDEA funds cannot be used for core instruction in the general education classroom, instructional materials for use with non-disabled children, or for professional development of general education teachers not related to meeting the needs of students with disabilities. Two exceptions to these guidelines exist when IDEA Part B funds are used for coordinated early intervening services[8] (CEIS) or are consolidated in a Title I schoolwide school (under ESEA).

LEAs may use up to 15 percent of their IDEA Part B funds for CEIS to assist students in grades K through 12 (with an emphasis on K through 3) who are not currently identified as needing special education and related services but who need additional academic and behavioral support to succeed in a general education environment.[9]  CEIS funds can be used to provide professional

---

[8] Individuals with Disabilities Education Improvement Act of 2004, Pub. L. No. 108-446, § 618(d)(2)(B); Note: The calculation for the maximum CEIS funds is based on the total of the regular IDEA, Part B allocations.
[9] IDEA Section 613(f).

development [10] to educators who are responsible for helping children who need additional academic and behavioral support succeed in a general education environment or to provide direct interventions to children who need academic and behavioral support. CEIS funds may be used in coordination with ESEA funds but ***must supplement, and not supplant,*** ESEA funds for those activities.[11]

A Title I schoolwide school may use, to carry out the schoolwide project, an amount of IDEA funds that is the same proportion of the total cost of the project as the number of children with disabilities benefiting from the program is to the total school population participating in the program. In a Title I schoolwide school that consolidates Federal funds (e.g., ESEA, IDEA, etc.), a school may use those funds for any activity in its schoolwide plan without accounting separately for the funds.[12]  The schoolwide school ***needs to ensure that children with disabilities continue to receive FAPE,*** but would not need to show that IDEA funds were spent only on allowable special education and related services expenditures.[13]

## MEDICAID Funding

A public school must offer all children a FAPE regardless whether or not it receives federal funds under IDEA.  Many IDEA-eligible children are covered by the Medicaid program, a federal program managed through the Centers for Medicare & Medicaid Services ("CMS"), whose Early and Periodic Screening, Diagnosis and Treatment mandate requires Medicaid agencies to provide eligible children under 21 years old with the services necessary to meet their medical

---

[10] IDEA Section 613(f)(2)(A)
[11] IDEA Section 613(f)(5).
[12] ESEA Section 1114.
[13] IDEA Section 613(a)(2)(D)

needs. In many cases, a Medicaid-eligible child's IEP under IDEA includes health-related services such as audiology, nursing and therapies that are medical in nature and covered by Medicaid.[14]

In 1988, federal law was amended, through the passage of the Medicare Catastrophic Coverage Act of 1988, to allow Medicaid payment for services provided to children under IDEA. Recognizing that schools provide medically necessary services and IDEA funding typically covers less than 20 percent of the average per student costs for special education, the US Congress amended federal law in 1988 expressly to forbid Medicaid from restricting or prohibiting payment for covered services authorized in a child's IEP.[15] This amendment was enacted to require Medicaid to be primary to the Department of Education for payment of the health-related services provided under IDEA and the school districts must follow strict reporting requirements to secure this federal funding.[16] Even prior to the amendment in 1988, the school districts had strict reporting requirements.[17]

CMS tracks state expenditures through the automated Medicaid Budget and Expenditure System/State Children's Health Insurance Budget and Expenditure System (MBES/CBES). The MBES/CBES is a web-based application system that has been implemented nationwide. The system allows states to report budgeted and actual expenditures for Medicaid and the Children's Health Insurance Program (CHIP), by electronically submitting their Form CMS-64 directly to the CMS Data Center and the Medicaid data base. The amounts reported on and its attachments must

---

[14] In the late 1980s courts agreed that inclusion in an IEP did not automatically establish a service as educational rather than medical in nature. See Commonwealth of Massachusetts v. Heckler, 616F. Supp. 687 (D. Mass. 1985), Commonwealth of Massachusetts v. Bowen, 816F.2d 796 (1st Cir. 1987), and Bowen v. Massachusetts, 487 U.S. 879, 108 S.Ct. 2722 (1988).

[15] Section 411(k)(13) of the Medicare Catastrophic Coverage Act of 1988 - P.L. 100-360.

[16] CMS Medicaid School-based Administrative Claiming Guide (May 2003): https://www.cms.gov/Research-Statistics-Data-and-Systems/Computer-Data-and-Systems/MedicaidBudgetExpendSystem/Downloads/Schoolhealthsvcs.pdf

[17] CMS Medicaid and School Health: A Technical Assistance Guide (August 1997): http://paradigm-healthcare.com/news/medicaid-and-school-health-a-technical-assistance-guide/

be actual expenditures for which all supporting documentation, in readily reviewable form, has been compiled and is available immediately at the time the claim is filed. Form CMS-64 is a statement of expenditures for which states are entitled to Federal reimbursement under Title XIX and which reconciles the monetary advance made on the basis of Form CMS-37 filed previously for the same quarter. Consequently, the amount claimed on the Form CMS-64 is a summary of expenditures derived from source documents such as invoices, cost reports and eligibility records. All summary statements or descriptions of each claim must identify the claim and source documentation. Claims developed through the use of sampling, projections, or other estimating techniques are considered estimates and are not allowable under any circumstances. Where states are unable to develop and document a claim for expenditures on a current basis, they must withhold it until the actual amount, supported by final documentation, has been determined. The state must report that amount on a future Form CMS-64 as a prior period adjustment.[18]

There are six conditions that must be met for Medicaid to reimburse for IDEA-related services: 1) The child receiving the service must be enrolled in Medicaid; 2) The services are medically necessary; 3) The services must be covered in the state Medicaid plan or authorized by the federal Medicaid statute; 4) The services must be listed in the child's individualized education program (IEP); 5) The school district or local educational agency (LEA) must be authorized by the state as a qualified Medicaid provider; and 6) The LEA or school district must follow state guidance as to how claims are to be submitted for reimbursement.  School districts and providers are instructed to maintain proper documentation and follow the reporting requirements to avoid fraud.[19]

---

[18]        https://www.medicaid.gov/medicaid/financial-management/state-expenditure-reporting-medicaid-chip/index.html
[19] How to Obtain Medicaid Funding for School-Based Services: A Guide for Schools in System of Care Communities: http://www.rippleeffects.com/pdfs/MedicaidFunding.pdf

Various improper billing by states and school districts have occurred through Medicaid throughout the decades since the law was changed in 1988 and CMS has increased its oversight and regulations for school districts to continue to receive these federal dollars.[20]

Medicaid spending on school-based health accounts for about $4.5 billion[21] of the of the entire Medicaid budget of approximately $400 billion.[22]  The 2019 IDEA funding is approximately $13.5 billion.[23]

## NEW YORK STATE EXAMPLE OF MEDICAID FUNDING

In New York State, the amount of Medicaid spending in the schools was $273,563,018, and $136,781,511 of that came from federal funds[24] and CMS has increased oversight specifically in New York State.[25]  A whistleblower filed a federal lawsuit in 1998 and the federal audit found the program to be out of compliance with federal guidelines and that New York State school districts did not maintain adequate documentation to support Medicaid billing.  The lawsuit was settled for $540 million in or about 2009, and a new state plan amendment was approved in April 2010.  The biggest difference between the old claiming methodology and the new methodology is the old methodology was based on a minimum number of services per month *while the new methodology requires school districts to* <u>*prove*</u> *a session occurred in order to bill for it.*[26]  The School Supportive Health Services Program (SSHSP) and the Preschool Supportive Health Services Program (PSHSP) were developed jointly by the New York State Education Department

---

[20]  https://www.cms.gov/newsroom/fact-sheets/hhs-issues-final-rules-protect-medicaid-improper-payments-school-based-claiming

[21]  https://www.medicaid.gov/medicaid/financial-management/state-expenditure-reporting-for-medicaid-chip/expenditure-reports-mbescbes/index.html

[22] Congress of the United States Congressional Budget Office. (2019.) The Budget and Economic Outlook 2019 – 2029. Retrieved from: https://www.cbo.gov/system/files?file=2019-01/54918-Outlook.pdf

[23] United State Department of Education. (2018.) Department of Education Fiscal Year 2019 Congressional Action. Retrieved from: https://www2.ed.gov/about/overview/budget/budget19/19action.pdf

[24] https://www.cbpp.org/research/health/medicaid-helps-schools-help-children

[25] https://oig.hhs.gov/oas/reports/region2/20301008.pdf

[26] https://www.uft.org/files/attachments/medicaid-speech.pdf

(NYS SED) and the New York State Department of Health (NYS DOH). SSHSP applies to the 5-21 year old population and PSHSP applies to the preschool 3-4 year population pursuant to §4410 of the Education Law. SSHSP and PSHSP were established to assist school districts and counties in obtaining Medicaid Reimbursement for certain diagnostic and health support services provided to students with disabilities.[27]  SSHSP and PSHSP created a handbook in 2014, to provide specific guidelines for LEAs to follow in order to receive Medicaid funding.[28]  NYC DOE has an entire department within its bureaucracy to maximize its Medicaid funding.[29]

SSHSP provided specific guidance to all service providers about proper and improper Medicaid billing during the Covid-19 situation in a June 5, 2020, memorandum.  In the memorandum SSHSP specifically stated, "**There must be live interaction between the therapist and the student or <u>Medicaid cannot be billed</u>**. There is no Medicaid reimbursement for videos, material packets, activities that are not completed during a live interaction between the therapist and the student." (emphasis added); "No, text messaging and email contact with students or parents will not be reimbursable by SSHSP Medicaid."; "No, sending activities for a student to complete will not be reimbursable by SSHSP Medicaid."; "No, providing consultation to parents is not a reimbursable SSHSP service"; and "No, asynchronous "store and forward" services are not reimbursable by Medicaid under the SSHSP."[30]

The United Federation of Teachers ("UFT") is the sole bargaining agent for most of the non-supervisory educators who work in the New York City public schools. UFT represents approximately 75,000 teachers, 19,000 classroom paraprofessionals, along with related service

---

[27] http://www.oms.nysed.gov/medicaid/
[28] http://www.oms.nysed.gov/medicaid/handbook/sshsp_handbook_8_nov_25_14.pdf
[29] https://infohub.nyced.org/working-with-the-doe/special-education-providers/medicaid#jump-to-heading-21
[30] http://www.oms.nysed.gov/medicaid/medicaid_alerts/alerts_2020/20_02_Addendum.html

providers, such as occupational therapists, physical therapists and speech therapists.[31]  Despite the clear guidance from the New York State Education Department and the New York State Health Department about providing live, synchronous instruction, UFT advised its members, "...synchronous instruction ***is not required*** at this time."[32] (emphasis added)

## CIVIL RICO ALLEGATIONS

## DEFENDANTS, THEIR MISCONDUCT & RELATED BASES OF LIABILITY

This civil RICO matter concerns the actions and omissions of BILL de BLASIO, in his official capacity as the Mayor of New York City, RICHARD CARRANZA, in his official capacity as the Chancellor of New York City Department of Education, the NEW YORK CITY DEPARTMENT OF EDUCATION, the SCHOOL DISTRICTS IN THE UNITED STATES (*See* Appendix B of Complaint ECF # 1), and the STATE DEPARTMENTS OF EDUCATION IN THE UNITED STATES (*See* Appendix C of Complaint ECF # 1) (collectively "Defendants"). (*See* Par. 2-5, Complaint ECF # 1). Through their collective conduct, Defendants have wrongfully extract from the United States and their respective States hundreds of millions, if not billions, of dollars, in payments by knowingly presenting, or causing to be presented, false or fraudulent claims for payment or approval; knowingly making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim; knowingly making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim; knowingly making, using, or causing to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly concealing or knowingly and improperly avoiding or decreasing an obligation to pay or transmit money or property to the

---

[31] https://www.uft.org/your-union/about-uft
[32] https://www.uft.org/your-rights/safety-health/coronavirus/guidance-on-remote-learning

Government; and conspiring to commit the above acts, all in violation of 31 U.S.C. § 3729(a)(1)(A),(B),(C) & (G).

Defendant BILL de BLASIO ("Mayor de Blasio") in his official capacity as Mayor of the City of New York, directs the New York City Department of Education through the appointment of the Chancellor of the New York City Department of Education.

Defendant NEW YORK CITY DEPARTMENT OF EDUCATION ("NYC DOE") is the official body (local educational agency or "LEA") charged with the responsibility of developing and enforcing policies with respect to the administration and operation of the public schools in the City of New York, including programs and services for students with disabilities. *See* 20 U.S.C. § 1401(19), 34 C.F.R. § 300.28 and N.Y. Educ. Law § 2590, 2590-g.

Defendant RICHARD CARRANZA ("Chancellor Carranza") is the Chancellor of the NYC DOE, and as such is entrusted with the specific powers and duties set forth in N.Y. Educ. Law § 2590-h, including oversight of the DOE's provision of education and services to students with disabilities under the IDEA.

Defendant SCHOOL DISTRICTS IN THE UNITED STATES (*See* Appendix B of Complaint ECF # 1) are the official bodies charged with the responsibility of developing and enforcing policies with respect to the administration and operation of the public schools in their respective geographic areas, including programs and services for students with disabilities, as defined as the "local educational agency" ("LEA") in 20 U.S.C. § 1401(19) and 34 C.F.R. § 300.28.

Upon information and belief, all States and Territories of the United States are the recipients of funding under the IDEA, 20 U.S.C. § 1400-1487, and as such, have the responsibility to "establish and maintain procedures . . . to ensure that children with disabilities and their parents

are guaranteed procedural safeguards with respect to the provision of free appropriate education."

20 U.S.C. § 1415(a). Defendant STATE DEPARTMENTS OF EDUCATION IN THE UNITED

STATES (*See* Appendix C of Complaint ECF # 1) are the State Educational Agencies ("SEA")

which exercise general supervision over all programs in the State that provide educational services

to disabled students, and must ensure that all such meet State education standards. *Michael C. ex*

*rel. Stephen C. v. Radnor Tp. School Dist.*, 202 F.3d 642, 648 (3d Cir. 2000).

One of the most important procedural safeguards provided to parents under the IDEA is

the opportunity to appear at an impartial due process hearing to present complaints with respect to

any matter relating to the identification, evaluation, or educational placement of the child, or the

provision of a free appropriate public education to such child. The administrative hearing must be

conducted by the SEA or by the LEA, as determined by State law.  20 U.S.C. § 1415(f).

As the novel coronavirus ("Covid 19") began spreading across the United States during the

month of March 2020, state Governors around the nation unilaterally closed school buildings and

required all students and school staff to remain home in order to prevent the hospital systems from

becoming overloaded due to the coronavirus crisis. (*See* Par. 6, Complaint ECF #1) During the

month of March 2020, Defendant School Districts across the United States unilaterally closed

school buildings and required all students and staff to remain home and changed in-person

instruction to "remote learning," if any. (*See* Par. 7, Complaint ECF # 1)

Defendant State Education Departments ("SEDs") throughout the United States began

issuing guidance to school districts within their states, otherwise known as local educational

agencies ("LEAs"), about how to provide proper educational services to students during the

coronavirus shutdown. (*See* Par. 12, Complaint ECF # 1)  *See* Appendix E, Complaint ECF #1 for

a complete list of every State Education Department's COVID-19 Guidance and Memos.

Defendant State Education Departments had a legal, fiduciary and moral obligation to Plaintiffs, Class Members, the federal government and their respective States to administer and enforce these policies, procedures, regulations and laws, and not simply to issue memoranda or other forms of alleged guidance.

School districts across the country requested the Secretary of Education to grant waivers from IDEA requirements and from providing FAPE ("free appropriate public education") during the coronavirus crisis.[33]  While the United States Department of Education ("USDOE") provided great *flexibility* in the provision of educational services during the coronavirus crisis, *there has been no change in federal or state law*.

On March 12, 2020, USDOE offered guidance to Defendants reinforcing the Plaintiffs' and Class Members' rights during the coronavirus crisis.  "If a [local educational agency, typically a school district (LEA)] continues to provide educational opportunities to the general student population during a school closure [i.e. by providing online learning], the school must ensure that students with disabilities also have equal access to the same opportunities, including the provision of [free appropriate public education (FAPE)]. (34 CFR §§ 104.4, 104.33 (Section 504) and 28 CFR § 35.130 (Title II of the ADA)). [State Educational Agencies (SEAs)], LEAs, and schools must ensure that, to the greatest extent possible, each student with a disability can be provided the special education and related services identified in the student's [individualized education program (IEP)] developed under [the Individuals with Disabilities Education Act (IDEA)], or a plan developed under Section 504. (34 CFR §§ 300.101 and 300.201 (IDEA), and 34 CFR § 104.33 (Section 504))."[34]

---

[33]   https://edsource.org/2020/disability-rights-groups-school-administrators-spar-over-possible-changes-to-special-education-laws/628376

[34] March 12, 2020, Fact Sheet by USDOE: https://www.isbe.net/Documents/qa-covid-19-03-12-2020.pdf

On March 21, 2020, USDOE reinforced its previous guidance.  "At the outset, OCR [Office for Civil Rights] and OSERS  [Office of Special Education and Rehabilitative Services] must address a serious misunderstanding that has recently circulated within the educational community. As school districts nationwide take necessary steps to protect the health and safety of their students, many are moving to virtual or online education (distance instruction). Some educators, however, have been reluctant to provide any distance instruction because they believe that federal disability law presents insurmountable barriers to remote education. This is simply not true. We remind schools they should not opt to close or decline to provide distance instruction, at the expense of students, to address matters pertaining to services for students with disabilities. Rather, school systems must make local decisions that take into consideration the health, safety, and well-being of all their students and staff.  To be clear: ensuring compliance with the Individuals with Disabilities Education Act (IDEA), Section 504 of the Rehabilitation Act (Section 504), and Title II of the Americans with Disabilities Act should not prevent any school from offering educational programs through distance instruction." [35]

On April 27, 2020, the USDOE presented a Report to Congress from United States Education Secretary Betsy DeVos ("Secretary DeVos") which specifically did not recommend giving school districts the option to bypass major parts of federal special education law.[36] "While the Department has provided extensive flexibility to help schools transition, there is no reason for

---

[35]     March     21,     2020,     Supplemental     Fact     Sheet     by     USDOE: https://www2.ed.gov/about/offices/list/ocr/frontpage/faq/rr/policyguidance/Supple%20Fact%20Sheet%2 03.21.20%20FINAL.pdf

[36]                                                                     https://www2.ed.gov/documents/coronavirus/cares-waiver-report.pdf?utm_content=&utm_medium=email&utm_name=&utm_source=govdelivery&utm_term=

Congress to waive any provision designed to keep students learning," Education Secretary Betsy DeVos said in a statement.[37]

On July 8, 2020, Secretary DeVos reaffirmed the position of the USDOE during a briefing of the White House Coronavirus Task Force: "[t]here were a number of schools and districts across the country that did an awesome job of transitioning this Spring. And there were a lot in which I and state school leaders were disappointed in that they didn't figure out how to continue to serve their students. Too many of them just gave up. The Center for Reinventing Public Education [CRPE] said that only 10 percent across the board provided any kind of real curriculum and instruction program."[38]

On July 23, 2020, Dr. Robert R. Redfield, Director of the Centers for Disease Control and Prevention ("CDC"), stated that "**It is critically important for our public health to open schools this fall.**" Towards this goal, the CDC released new science-based resources and tools for school administrators, teachers, parents, guardians, and caregivers. The CDC's guidance document stated that as of July 21, 2020, 6.6% of reported COVID-19 cases and less than 0.1% of COVID-19-related deaths are among children and adolescents less than 18 years of age in the United States. "The best available evidence indicates that COVID-19 poses relatively low risks to school-aged children. School closures have disrupted normal ways of life for children and parents, and they have had negative health consequences on our youth. CDC is prepared to work with K-12 schools to safely reopen while protecting the most vulnerable."  Dr. Redfield added that the "CDC

---

[37]        https://www.ed.gov/news/press-releases/secretary-devos-reiterates-learning-must-continue-all-students-declines-seek-congressional-waivers-fape-lre-requirements-idea

[38]        https://www.whitehouse.gov/briefingsstatements/press-briefing-vice-president-pence-members-coronavirus-task-force-july-8-2020/.

resources released today will help parents, teachers and administrators make practical, safety-focused decisions as this school year begins." [39]

Governors around the country rescinded their executive orders to allow school buildings to be reopened starting in July 2020 for extended school year ("ESY") special education students, as defined by 34 C.F.R. § 300.106. (*See* Par. 16, Complaint ECF # 1)

School districts and State Education Departments throughout the United States were aware they were not in compliance of the IDEA, Section 504 or the ADA, as law firms who represent these school districts were advising them in real time. For this reason, Defendants sought a <u>waiver</u> from the Secretary of Education, which was denied.  In addition, Defendants were also aware of the harm their actions were causing to Plaintiffs and Class Members.  Thus, Defendants knowingly, willfully and deliberately violated the rights of Plaintiff-Students and Plaintiff-Parents by acting in bad faith.  (*See* Par. 17-25, Complaint ECF #1)

The maximum amount of time a school district can displace a student and change the educational program without triggering a violation of 20 U.S.C. § 1415(j) is <u>10</u> school days. *See Honig v. Doe,* 484 U.S. 305, 325, 325-26 n.11, 98 L. Ed. 2d 686, 108 S. Ct. 592 (1987).

Even counsel which represents independent and public schools throughout Connecticut and the northeast, Attorney Michael P. McKeon of the law firm Pullman & Comley posted the following legal advice related to school districts' obligations during the coronavirus crisis:

> "With respect to these federal obligations, it is informative to consider the Office of Special Education and Rehabilitative Services' November 20, 2012 Letter to Geary.  OSERS' letter was issued in response to inquiries from the New York State Education Department requesting "flexibility in light of the damage caused to some New York School districts by Hurricane Sandy."  The flexibility sought by New York included "timelines for . . . annual review meetings."  OSERS replied to that query by noting: "In general, the [Department] does not have the authority to waive the requirements in Part B of the IDEA.  Therefore, the Department cannot extend timelines for the above requirements" (emphasis added).

---

[39] https://www.cdc.gov/media/releases/2020/p0723-new-resources-tools-schools.html

Thus, despite the devastating consequences of Hurricane Sandy on New York City and surrounding communities, the United States Department of Education declined to waive school districts' obligations to adhere to IDEA timelines.

"In fact, in the course of noting one limited exception pertaining to Individualized Education Programs ["IEPs"], OSERS implicitly declined to waive timelines for convening PPT meetings.   Specifically, OSERS cited 34 C.F.R. §300.323(c), which provides that a PPT meeting to develop an IEP must be conducted within thirty days of the determination that a student qualifies for special education and related services, adding that such services are to be made available to the student "as soon as possible following development of the IEP."   OSERS construed Section 300.323(c)'s use of "as soon as possible" as allowing districts some leeway in the initial provision of services in "some isolated circumstances" resulting from catastrophic events, although it promptly advised that "once a school is open, the LEA must make every effort to make available special education and related services to the child in accordance with the child's IEP."

"It is probably safe to assume that the current COVID-19 public health crisis would qualify as one of the oddly labeled isolated circumstances."   Nonetheless, while recognizing the consequent delay in the initiation of services, OSERS does not note any similar flexibility with respect to the actual holding of the PPT meeting.   On a related note, it would be ill-advised to take OSERS' reference to "once a school is open" literally; rather, it should more reasonably be read as meaning "once instruction resumes."   In short, nothing in this language would permit a school district to unilaterally cancel or otherwise indefinitely postpone PPT meetings."[40]

There have been school districts across the United States that have reopened for special education students as of July 2020.   Meanwhile, some schools never closed and continued to provide services throughout the coronavirus crisis.   Furthermore, day care centers remained open across the United States without any noted outbreaks to the children or workers.   (*See* Par. 26-27, Complaint ECF # 1)

However, even with the public health research and guidance as well as the success of schools around the world, most United States school districts remained closed to in-person services during the Summer 2020 with such closures remaining in place as they approach Fall 2020.   In

---

[40]      https://schoollaw.pullcomblog.com/archives/how-about-never-COVID-19-school-closures-and-planning-and-placement-team-meetings/

fact, most of the top 50 largest school districts in the United States have not fully reopened for special education students, nor have plans to fully reopen for special education students in Fall 2020.  (*See* Par. 28-47, Complaint ECF # 1)

Extensive research from around the world has established the importance of reopening schools for special education students and has shown that schools can be reopened safely. Many leading public health officials, scientists, physicians and experts have publicly stated the need to reopen schools.  (*See* Par. 49-79, Complaint ECF # 1)

Since schools have been shuttered, there has been a noted increase in other public health concerns such as increases in child abuse and neglect, malnutrition, mental health, as well as increases in alcohol and drug use, associated with children remaining out of school.  (*See* Par. 80, Complaint ECF # 1)

Even prior to the Covid 19 pandemic more than half of Defendant-State Education Departments[41] and many Defendant-School Districts were already in violation of IDEA. As an example, Defendant-NYCDOE has repeatedly been in violation of federal law with "systemic failures" as documented in its annual state review.[42]

## <u>ADDITIONAL WRONGDOERS OTHER THAN DEFENDANTS</u>

The alleged wrongdoers (other than the Defendants listed above and state the alleged misconduct of each wrongdoer): Superintendents and other school administrators, school boards, school employees and contract workers.  State Education Directors and other state education and other state administrators, responsible for the oversight and enforcement of federal and state regulations and laws.

---

[41]   https://www.usatoday.com/story/opinion/voices/2020/08/08/disability-rights-states-fail-obligation-special-needs-students/3318292001/
[42]   https://ny.chalkbeat.org/2019/7/9/21108488/nyc-vows-to-address-special-education-failures-detailed-in-state-review-but-will-their-reforms-go-fa

## VICTIMS

The victims of the Defendants and other wrongdoers are the PLAINTIFFS (*See* Appendix A of Complaint ECF # 1) who are parents and/or natural guardians ("Plaintiff-Parent") of students who are classified under federal law as being disabled and having an educational disability, and the Students themselves ("Plaintiff-Student"), as well as all others similarly situated, ("Class Members", see Complaint, Appendix A, ECF #1)

The Plaintiff-Students and their respective Class Members were denied academic and related services they were legally entitled to and those services were fraudulently billed by Defendants, thereby, denying the ability of Plaintiff-Students from recouping those services. You cannot bill Medicaid for the same service twice.

As a result of the gross violations committed by the Defendants, Plaintiff-Parents seek compensatory damages for Plaintiff-Students from their respective LEAs. Compensatory education is an award of educational services designed to remedy a deprivation in the child's education. *Doe v. E. Lyme Bd. Of Educ.*, 790 F.3d 440, 445 (2d Cir. 2015). An award of compensatory education serves to correct a violation of the IDEA that resulted in the child's regression. Regression refers to the failure to maintain an acquired skill in an identified goal area of concern as a result of an interruption of special education instruction or support services.

Due to the deliberate indifference, intentional and willful actions of the Defendants, Plaintiff-Parents and their respective Class Members were required to fill in and compensate for the failure of their school district (LEA) and either lost income, incurred out-of-pocket expenses, and/or experienced loss of employment. As a result of the deliberate indifference, intentional and

willful violations committed by the Defendants, Plaintiff-Parents and respective Class Members shall seek both compensatory damages as well as punitive damages.

Defendants discriminated against Plaintiff-Students, who are qualified individuals under the ADA, by prohibiting the provision of in-person academic and related services the opportunity to participate or benefit from such services.  Remote learning is not equal to the "aid, benefit or service" of students nor is it as effective as in-person services that were provided to other special education students.[43]

"To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo,* 136 S. Ct. at 1548 (quoting *Lujan*, 504 U.S. at 560). Further, "the violation of a procedural right granted by statute can be sufficient in some circumstances to constitute injury in fact," where the violation "entail[s] a degree of risk sufficient" to indicate a resulting concrete harm. *Spokeo,* 136 S. Ct. at 1550; *see also Heldman v. Sobol,* 962 F.2d 148, 154 (2d Cir. 1992) ("Congress may create a statutory right the alleged violation of which constitutes injury in fact.").

In this regard, it is well-established that "[t]he denial of ... a procedural right created by the IDEA ... constitutes an injury sufficient to satisfy the standing requirement." *S.W. v. New York City Dep't of Educ.*, 646 F. Supp. 2d 346, 358 (S.D.N.Y. 2009); *see also Cruz v. New York City Dep't of Educ.*, 18-CV-12140 (PGG), Docket Entry No. 14 (S.D.N.Y., January 9, 2019).  The "stay put" provision of IDEA creates a procedural right.  *See A.S. ex rel. P.B.S. v. Bd. of Educ. for Town of W. Hartford*, 47 F. App'x 615, 616 n.2 (2d Cir. 2002) Thus, the violation of the "stay put" provision of IDEA creates an injury in fact that confers standing.

---

[43] Title II of the American with Disabilities Act ("ADA"), 42 U.S. Code § 12182

In addition, Defendant-School Districts have failed to provide the services Plaintiff-Students and their respective Class Members are entitled to as outlined in their IEPs.

The Defendants' violations of procedural safeguards are injuries to Plaintiff-Parents and Plaintiff-Students and Class Members.

Given the fact that pendency was intended to be an automatic injunction, Defendants have already harmed Plaintiff-Students by delaying the educational programming that is their right as per the Plaintiff-Students' pendencies. *See M.G. v. New York City Dep't of Educ.,* 982 F. Supp. 2d 240, 247 (S.D.N.Y. 2013) ("[p]endency has the effect of an automatic injunction, which is imposed without regard to such factors as irreparable harm, likelihood of success on the merits, and a balancing of the hardships.").

Also, courts have found "added risk" to be a form of irreparable harm. *See, e.g., Sierra Club v. Marsh*, 872 F.2d 497, 500-01 (1st Cir. 1989) (citing *Comm. of Mass. v. Watt*, 716 F.2d 946, 952 (1st Cir. 1983)). In *Sierra Club, supra*, the First Circuit explained that the added risk to the environment of governmental decision-makers making up their minds without prior public comment is potentially irreparable given the goal of NEPA being to minimize the risk of uninformed choice. Id. The court stressed that such "added risk," which is akin to the added risk of the regression and atrophy of the continued denial of Plaintiff-Students' and their respective Class Members' educational services, is not merely "procedural harm." Id. at 500. In short, Plaintiffs and their respective Class Members continue to suffer from irreparable harm in the form of a violation of Plaintiffs' and Class Members' procedural right pursuant to 20 U.S.C. §1415(j).

The federal and state governments as well as the general public are also victims of this massive racketeering scheme across every state.  As noted below, financial organizations who

provide credit, bonding and credit risk assessments, as well as their respective shareholders, are also victims of this massive racketeering activities.

## PATTERN OF RACKETEERING & PREDICATE ACTS

Also, upon information and belief, having received federal funds by electronic means and having failed to provide special education students in various school districts across the country with the services required by their Individualized Education Programs ("IEPs"), the Defendant-School Districts violated the civil section of the Racketeer Influenced and Corrupt Organization Act ("RICO"). *See* 18 U.S.C. §1964(a). Specifically, through their actions which caused, inter alia, False Certification Fraud, Implied Certification Fraud and Worthless Service Fraud, Defendant-School Districts violated the following statutes: 18 U.S.C.§ 1341.Frauds and swindles (mail fraud), 18 U.S.C. § 1343.Fraud by wire, radio, or television (wire fraud), 18 U.S.C. § 2314 (fraudulent transfer of money), 18 U.S.C. § 2315 (fraudulent receipt of money), and 18 U.S.C. § 1344.Bank fraud (financial institution fraud)

Defendant-State Education Departments had a fiduciary and oversight responsibility of Defendant-School Districts and were complacent in these activities.  Defendant-State Education Department were either fully aware of the activities of the Defendant-School Districts within their respective states or they should have been aware. They are the official bodies charged with the responsibility of developing and enforcing policies with respect to the administration and operation of the public schools in their respective geographic areas, including programs and services for students with disabilities, as defined as the "local educational agency" ("LEA") in 20 U.S.C. § 1401(19) and 34 C.F.R. § 300.28.

The Defendants engaged in these "prohibited activities" consisting of predicate acts which constitute a "pattern of racketeering activities" 18 U.S.C. §§ 1961-1968.  The Defendant-School

Districts are also subject to 31 U.S.C. § 3729(a) for those who receive federal funds fraudulently to civil liability.[44]  The United States Justice Department rely on this provision to curb the abuse of federal funds in programs ranging from Medicaid to disaster assistance.[45]  The FCA subjects those who receive federal funds fraudulently to civil liability.[46]  The United States Justice Department rely on the provision to curb the abuse of federal funds in programs ranging from Medicaid to disaster assistance.[47]

## FALSE CERTIFICATION FRAUD

The Defendants submitted a "false claim" when its representatives submitted fraudulent representations that A) the IEPs they created were knowingly not in compliance with IDEA and they could not implement these IEPs, thereby denying the students a FAPE, and B) when their service providers knowingly misrepresented they were providing related services in accordance with IDEA and Medicaid regulations.  These claims were legally false, since the provider knew it

---

[44] *See* 31 U.S.C. § 3729(a) (2012). Originally enacted during the Civil War, the Act served as the first widespread check on military contractors who defrauded the Union army. See Christopher L. Martin, Jr., Comment, *Reining in Lincoln's Law: A Call to Limit the Implied Certification Theory of Liability Under the False Claims Act*, 101 Calif. L. Rev. 227, 236 (2013). As the federal bureaucracy grew in the twentieth century, the scope and impact of the FCA grew as well. *See id.* at 229.

[45] *See* Press Release, U.S. Dep't of Justice, Justice Department Recovers Over $4.7 Billion from False Claims Act Cases in Fiscal Year 2016 (Dec. 14, 2016), https://www.justice.gov/opa/pr/justice-department-recovers-over-47-billion-false-claims-act-cases-fiscal-year-2016 [https://perma.cc/PEJ3-NW4B] ("The False Claims Act is the government's primary civil remedy to redress false claims for government funds and property under government programs and contracts relating to such varied areas as health care, defense and national security, food safety and inspection, federally insured loans and mortgages, highway funds, small business contracts, agricultural subsidies, disaster assistance, and import tariffs.").

[46] *See* 31 U.S.C. § 3729(a) (2012). Originally enacted during the Civil War, the Act served as the first widespread check on military contractors who defrauded the Union army. See Christopher L. Martin, Jr., Comment, *Reining in Lincoln's Law: A Call to Limit the Implied Certification Theory of Liability Under the False Claims Act*, 101 Calif. L. Rev. 227, 236 (2013). As the federal bureaucracy grew in the twentieth century, the scope and impact of the FCA grew as well. *See id.* at 229.

[47] *See* Press Release, U.S. Dep't of Justice, Justice Department Recovers Over $4.7 Billion from False Claims Act Cases in Fiscal Year 2016 (Dec. 14, 2016), https://www.justice.gov/opa/pr/justice-department-recovers-over-47-billion-false-claims-act-cases-fiscal-year-2016 [https://perma.cc/PEJ3-NW4B] ("The False Claims Act is the government's primary civil remedy to redress false claims for government funds and property under government programs and contracts relating to such varied areas as health care, defense and national security, food safety and inspection, federally insured loans and mortgages, highway funds, small business contracts, agricultural subsidies, disaster assistance, and import tariffs.").

was in violation of federal regulations at the time of submission.[48] The federal and state government only disbursed the money because the Defendants certified that they would comply with the relevant federal regulations. In other words, the Defendants made deliberately false affirmative representations when they accepted federal funds while simultaneously—and knowingly—breaking federal regulations. Specifically in *Hopper*, the Court stated, "It requires a false claim. Thus, some request for payment containing falsities made with scienter (i.e., with knowledge of the falsity and with intent to deceive) must exist."

## IMPLIED CERTIFICATION FRAUD

In some instances, the Defendants' representative may not have actually signed a form certifying compliance would still violate the FCA.[49]  By the provider submitting the claim, it is implied the provider affirmed that it was in compliance with the regulations, since violating those regulations would have made it ineligible to receive the funding. Put another way, the fact the provider submitted any claim at all when it knew or should have known it was ineligible to receive funds because of a violation is what makes the claim legally "false."

---

[48] Keith D. Barber et al., *Prolific Plaintiffs or Rabid Relators: Recent Developments in False Claims Act Litigation*, 1 Ind. Health L. Rev. 131, 137 (2004). Occasionally, courts will apply a limited version of this theory, "finding it applicable only 'when certification is a prerequisite to obtaining a government benefit.' " Id. (quoting United States ex rel. Hopper v. Anton, 91 F.3d 1261, 1266 (9th Cir. 1996)). For example, in *United States ex rel. Hopper v. Anton*, the Ninth Circuit concluded that under the FCA "the false certification of compliance . . . creates liability when certification is a prerequisite to obtaining a government benefit." 91 F.3d 1261, 1266 (9th Cir. 1996); see also United States ex rel. Thompson v. Columbia/HCA Healthcare Corp., 125 F.3d 899, 902 (5th Cir. 1997) ("[W]here the government has conditioned payment of a claim upon a claimant's certification of compliance with, for example, a statute or regulation, a claimant submits a false or fraudulent claim when he or she falsely certifies compliance with that statute or regulation.")

[49] See Barber et al., *supra* note 57, at 137; see, e.g., Universal Health Servs., Inc. v. United States, 136 S. Ct. 1989, 1995 (2016) ("We first hold that, at least in certain circumstances, the implied false certification theory can be a basis for liability."); United States ex rel. Augustine v. Century Health Servs., Inc., 289 F.3d 409, 416 (6th Cir. 2002) (stating that FCA claims brought under an implied certification theory can proceed as long as "the contractor knew, or recklessly disregarded a risk, that its implied certification of compliance was false" (quoting Shaw v. AAA Eng'g & Drafting, Inc., 213 F.3d 519, 533 (10th Cir. 2000))); Mikes v. Straus, 274 F.3d 687, 700 (2d Cir. 2001) ("[W]e think a medical provider should be found to have implicitly certified compliance with a particular rule as a condition of reimbursement in limited circumstances."); Shaw v. AAA Eng'g & Drafting, Inc., 213 F.3d 519, 531 (10th Cir. 2000) ("[T]he language and structure of the FCA itself supports the conclusion that, under 31 U.S.C. § 3729(a)(1), a false implied certification may constitute a 'false or fraudulent claim.' "); AbTech Constr., Inc. v. United States, 31 Fed. Cl. 429, 434 (1994) (finding the defendant liable under an implied certification theory).

The Sixth Circuit found a holding company for home health-care agencies liable under the FCA for implicitly certifying compliance. The holding company submitted a claim for reimbursements for payments made to its employee-benefits plan, even though those benefits were paid back to the provider the next day. The court concluded that the provider's signed statement accompanying its cost reports, which said that the reports were "true, correct, and complete" to the best of the signer's knowledge, was enough for the provider to be liable under the FCA. The court concluded that the company was liable even though the provider did not explicitly state that, when it signed the statement, it would not transfer the specific funds.[50]  The Supreme Court recently endorsed the Implied Certification Fraud theory in *Universal Health Services, Inc. v. United States*.[51]

In this context, the relevant regulations include keeping accurate attendance and providing special education services to all students.[52] Thus, the Defendants who did not keep close track of log-ins and attendance data would be liable since school officials implicitly certified that they would keep their data current when they made the claim for public funds.

## WORTHLESS SERVICES FRAUD

Under the Worthless Services Fraud understanding of false claiming, the Defendants are liable since the limited services they may have provided was so subpar as to be completely worthless.[53]  By claiming reimbursement for providing valueless care, the provider effectively has

---

[50] *Augustine*, 289 F.3d at 416
[51] 136 S. Ct. 1989 (2016).
[52]       *See*,       e.g.,       Clare       McCann,       IDEA       Funding,       EdCentral: Edcyclopedia,http://www.edcentral.org/edcyclopedia/individuals-with-disabilities-education-act-funding-distribution/ [https://perma.cc/YJ2U-AL4U] (discussing the requirement to provide services to students with special needs); see also Office of Elementary & Secondary Educ., U.S. Dep't of Educ., Non-Regulatory Guidance: Local Educational Agency Identification and Selection of School Attendance Areas and School and Allocation of Title I Funds       to       Those       Areas       and       Schools       (2003),       https://www2.ed.gov/programs/titleiparta/wdag.doc [https://perma.cc/N4KV-N3W6] (discussing the requirements for schools to receive Title I funds).
[53] Isaac D. Buck, *Caring Too Much: Misapplying the False Claims Act to Target Overtreatment*, 74 Ohio St. L.J. 463, 487–88 (2013); see, e.g., United States ex rel. Lee v. SmithKline Beecham, Inc., 245 F.3d 1048, 1053 (9th Cir.

forced the government to pay for nothing—making it so the provider submits a legally false claim

when it asks the government to reimburse it for services that have no value.[54]  These deceptive

practices are a prima facie case of fraudulent behavior. If a provider's services are so bad that they

in effect have no value, the provider might as well be selling snake oil.  The Defendants knew the

services they were claiming to provide were sub-par, if not worthless.[55]

In *United States ex rel. Lee v. SmithKline Beecham, Inc.*, the Ninth Circuit upheld the

concept of a Worthless Services Fraud theory by stating it was possible for plaintiffs to state a

claim for worthless services fraud.[56] There, a laboratory billed Medicare for tests it had completed

using control samples that it knew fell outside of the acceptable standard of error.[57] Likewise,

defendants in a Virginia FCA case settled after the plaintiffs alleged worthless services fraud where

the defendant nursing home had claimed Medicare benefits while neglecting patients.[58]

---

2001) ("In an appropriate case, knowingly billing for worthless services or recklessly doing so with deliberate ignorance may be actionable under § 3729, regardless of any false certification conduct."); Mikes v. Straus, 274 F.3d 687, 703 (2d Cir. 2001) ("We agree that a worthless services claim is a distinct claim under the Act. It is effectively derivative of an allegation that a claim is factually false because it seeks reimbursement for a service not provided.").

[54] Buck, *supra* note 73, at 487–88. This theory emerged after the U.S. Attorney's Office for the Eastern District of Pennsylvania successfully prosecuted a long-term care facility after one of its patients was sent to the emergency room and found to be suffering from "26 ulcers, a gangrenous leg and a series of other serious complications." Id. (quoting Devin S. Schindler, *Pay for Performance, Quality of Care and the Revitalization of the False Claims Act*, 19 Health Matrix 387, 396–97 (2009)).

[55] *Cf.* Ctr. for Research on Educ. Outcomes, Stanford Univ., Online Charter School Study 23 (2015), https://credo.stanford.edu/pdfs/Online%20Charter%20Study%20Final.pdf [https://perma.cc/74M4-N5SA] (finding that students in online charter schools lagged behind their peers in traditional schools in terms of academic achievement). In one Stanford University study, researchers found that students in online charter schools made academic gains in math that translated to the gains that the researchers would have expected to see if they had spent 180 fewer days—or an entire academic year—learning than their peers in a brick-and-mortar classroom. Id. Likewise, online charter school students' reading gains put them 72 school days behind their peers in traditional schools. Id.

[56] 245 F.3d at 1053.

[57] *Id.* at 1050

[58] Compare David R. Hoffman, *The Role of the Federal Government in Ensuring Quality of Care in Long-Term Care Facilities*, 6 Annals Health L. 147, 148 (1997), with Michael J. Davidson, *Governmental Responses to Elder Abuse and Neglect in Nursing Homes: The Criminal Justice System and the Civil False Claims Act*, 12 Elder L.J. 327, 344 (2004), for a discussion of *United States v. GMS Management-Tucker, Inc.*, a case that settled after federal prosecutors brought a suit against a Virginia nursing home that claimed Medicaid benefits while failing to provide adequate care, including allowing one patient to develop twenty-six bedsores, one of which was as large as a grapefruit.

## ANNUAL LOCAL SCHOOL BUDGETS

Each of the Defendant School Districts are required to develop and submit an annual local school budget based upon local, state and federal rules, regulations and laws. "The school budget involves many different individuals and entities across several levels of government. The budget—and accompanying process—provides school districts and their leaders with an opportunity to justify the collection and expenditure of public funds. School budget resources come from a combination of local, state and federal contributions. School budgets are spent continuously throughout the year. Federal dollars in school budgets are also spent throughout the school year, with the rule of 'first in, first out.' At the local/district level, budget discussions and work will involve school administrators, school boards, school employees and community members. At the state level, the governor, state legislators and state education agency are involved for their role in setting and managing state funding and state policy, including state equalization formulas. At the national level, the federal education department and members of Congress are involved for their work around education funding and federal policy, such as Title I or IDEA."[59]

School districts usually have 27 months ('Tydings period') to spend down their federal dollars. However, a school district cannot spend any of its Title I funds from a new school year until it has exhausted the previous school year. "Since the majority of school districts have to pass a balanced budget every year, school districts hesitate to assume or rely on federal dollars that may or may not come into fruition. Three federal funding streams are an exception to this rule and represent federal funding programs around which school districts do feel comfortable planning long-term. These programs are Title I, IDEA and Perkins. These three programs have extensive funding commitments and expenditures at the local level, especially related to personnel, programs

---

[59]     American     Association     of     School     Administrators,     "School     Budgets     101",
https://www.aasa.org/uploadedfiles/policy_and_advocacy/files/schoolbudgetbrieffinal.pdf

and equipment. Changes to the reliability of these programs would disrupt school budgeting in very profound ways, with jobs and critical equipment at stake.  Another reason districts separate federal funds from state and local funds is that federal funds often come with additional reporting and accountability requirements. As such, school districts treat federal funds separately, for ease of monitoring and tracking federal dollars within complex district budgets."[60]  Medicaid is the primary funding source to Defendant-School Districts for payment of the health-related services provided under IDEA.[61]

According to a 2010 study conducted by the National School Boards Association, the Thomas B. Fordham Institute and the Iowa School Boards Foundation, more than two-thirds of local school boards report that the budget and funding situation is extremely urgent, and nearly 90 percent think it is extremely or very urgent.  "Superintendents report that their boards have a substantial degree of autonomous authority. City or county councils have to approve school board budgets in only 9.3 percent of districts [Table 49]. Nearly two-thirds (65.8 percent) of boards have the authority to levy taxes, although such levies frequently require voter approval [Tables 50-51]. In 79.1 percent of cases, boards can independently choose to hold bond elections, which then go to the voters for an up or down vote [Table 52]."[62]

"In effect, special education is an underfunded mandate, forcing districts to provide some of their General Fund resources to make up the difference. This is a problem known as

---

[60] Id.
[61] CMS   Medicaid   School-based   Administrative   Claiming   Guide   (May   2003): https://www.cms.gov/Research-Statistics-Data-and-Systems/Computer-Data-and-Systems/MedicaidBudgetExpendSystem/Downloads/Schoolhealthsvcs.pdf
[62] "School Boards Circa 2010: Governance in the Accountability Era" by Frederick M. Hess and Olivia Meeks. Published by the National School Boards Association, the Thomas B. Fordham Institute, and the Iowa School Boards Foundation. https://files.eric.ed.gov/fulltext/ED515849.pdf

encroachment' – money spent on special education reduces or "encroaches" on the financial support intended for other students."

According to the National School Boards Association, the School Superintendents Association and the Association of Educational Service Agencies, "…during this unprecedented pandemic, FAPE comes with tremendous costs to budgets and additional burdens on personnel that challenge school districts trying their best under the circumstances to meet the requirements."[63]

Each Defendant School District *failed to revise* their 2019-2020 School Year budgets to indicate the fraudulent funds already collected and spent from the federal government and their respective States, as well as submitted annual budgets with projected fraudulent revenue from the federal government and their respective States.  As noted above, these budgets are relied upon by outside financial institutions for bonding, crediting and overall financial risk management.

## 18 U.S.C. § 1341. Frauds and Swindles (mail fraud)

As described in detail above, Defendants, as well as other wrongdoers, having devised or intending to devise a scheme or artifice to defraud, and for obtaining money by means of false or fraudulent pretenses, representations, or promises, placed in post offices or in authorized repositories matter and things to be sent or delivered by the Postal Service, caused matter and things to be delivered by private or commercial interstate carrier, and received matter and things from the Postal Service or and private or commercial interstate carriers, including but not limited to fraudulent invoices, correspondence, payments, and false written materials in furtherance of its fraudulent racketeering activities as detailed throughout this RICO Case Statement.

---

[63] "SCHOOL LEADER VOICES: Concerns and Challenges to Providing Meaningful IDEA-related Services During COVID-19" Report by National School Boards Association, The School Superintendents Association and Association of Educational Service Agencies. https://www.nsba.org/-/media/Files/nsba-aasa-aesa-IDEA-white-paper-july-14-20.pdf

**DATES OF THIS PREDICATE ACT RANGE:**  From March 2020 through present.

**SPECIAL NOTE:** If the violation occurs in relation to, or involving any benefit authorized, transported, transmitted, transferred, disbursed, or paid in connection with, a presidentially declared major disaster or emergency (as those terms are defined in section 102 of the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. 5122)), or affects a financial institution, such person shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

**CRIMINAL PROSECUTION:** As of this filing, there has been no criminal prosecution for the violation of these predicate acts.

### 18 U.S.C. § 1343. Fraud by wire, radio, or television (wire fraud)

As described in detail above, Defendants, as well as other wrongdoers, having devised or intending to devise a scheme or artifice to defraud, and for obtaining money by means of false or fraudulent pretenses, representations, or promises, transmitted or caused to be transmitted or received by wire in interstate commerce, things which include but are not limited to fraudulent emails, invoices, correspondence, payments, and false written materials in furtherance of its fraudulent racketeering activities as detailed throughout this RICO Case Statement.

**DATES OF THIS PREDICATE ACT RANGE**: From March 2020 through present.

**SPECIAL NOTE**: If the violation occurs in relation to, or involving any benefit authorized, transported, transmitted, transferred, disbursed, or paid in connection with, a presidentially declared major disaster or emergency (as those terms are defined in section 102 of the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. §5122)), or affects a financial institution, such person shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

**CRIMINAL PROSECUTION**: As of this filing, there has been no criminal prosecution for the violation of these predicate acts.

### 18 U.S.C. § 2314 (fraudulent transfer of money)

As described in detail above, Defendants, as well as other wrongdoers, transported, transmitted or transferred through interstate commerce goods, wares, merchandise, securities or money worth more than $5,000, knowing that it had been stolen, converted or taken by fraud.  The Defendants did not need to participate in the underlying scheme to defraud; the Defendant simply needed to cause the transport or transfer of the funds, goods or securities, knowing that they were procured by fraud. [64]  These predicate acts relate to the racketeering activities as detailed throughout this RICO Case Statement.

**DATES OF THIS PREDICATE ACT RANGE**: From March 2020 through present.

**CRIMINAL PROSECUTION**: As of this filing, there has been no criminal prosecution for the violation of these predicate acts.

### 18 U.S.C. § 2315 (fraudulent receipt of money)

As described in detail above, Defendants, as well as other wrongdoers, received through interstate commerce goods, wares, merchandise, securities or money worth more than $5,000, knowing that it had been stolen, converted or taken by fraud.  The Defendants did not need to participate in the underlying scheme to defraud; the Defendant simply needed to know they were procured by fraud. These predicate acts relate to the racketeering activities as detailed throughout this RICO Case Statement.

**DATES OF THIS PREDICATE ACT RANGE:** From March 2020 through present.

---

[64] See, e.g., United States v. Quintanilla, 2 F.3d 1469, 1474 (7th Cir. 1993); United States v. Schwab, 88 F. Supp. 2d 1275, 1280 (D. Wyo. 2000).

**CRIMINAL PROSECUTION**: As of this filing, there has been no criminal prosecution for the violation of these predicate acts.

### 18 U.S.C. § 1344. Bank fraud (financial institution fraud)

As described in detail above, Defendants, as well as other wrongdoers, knowingly executed, or attempted to execute, a scheme or artifice to defraud a financial institution; or to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises. These predicate acts relate to the racketeering activities as detailed throughout this RICO Case Statement.

**CRIMINAL PROSECUTION**: As of this filing, there has been no criminal prosecution for the violation of these predicate acts.

### RICO ENTERPRISE

The enterprise ("Enterprise") to defraud the federal government and their respective States, as well as Plaintiffs and Class Members, consists of three different levels consisting of Defendants, other wrongdoers, passive instruments, and victims. At the local School District level, budget, financing, reimbursements and development of IEPs involve Superintendents and other school administrators, school boards, school employees, contractors and community members, some of whom are employees or agents of Defendant School Districts. At the state level, the governor, state legislators, Defendant State Education Department, state Medicaid office as well as other administrators, employees, and contractors of these respective offices, are involved for their role in setting and managing state funding and state policy, including state equalization formulas as well as oversight and enforcement of these policies. At the national level, the Federal Education Department, the Federal Health and Human Service Department through Centers for

Medicaid and Medicare, the Federal Justice Department and members of Congress are involved for their work around education and Medicaid funding, federal policy and oversight and enforcement of federal rules, regulations and laws.  This Enterprise also consists of financial institutions as described above who are also victims of the Defendants' racketeering activities.

Notably, the racketeering activity blended into the usual and daily activities of the Enterprise and the Defendants used the presidentially declared major emergency as a pretense to commit this fraudulent scheme.

Further, the Defendants and others within the Enterprise in this action have conducted the racketeering activities and other business activities relevant to this action through interstate communications and financial transactions.  Defendants operates with financial transactions across various state jurisdictions within the United States.  Defendants' business and racketeering activities (involving mail and wire transactions, payment of wages and other interstate financial transactions within the United States) affect interstate commerce.

### 18 U.S.C. § 1962(a)

As detailed above, Defendant School Districts used the income from the racketeering activity to the detriment to the Plaintiffs, Class Members, federal government and their respective States.

### 18 U.S.C. § 1962(c)

None of the Defendants were, at any relevant time, employed by the Enterprise.  All Defendants are associated with the Enterprise. The liable Defendant "persons" are separate and distinct entities from the Enterprise alleged above.

### 18 U.S.C. § 1962(d)

As described above and as previously described in the Complaint (ECF #1) and the Memorandum of Law in Support of the Order to Show Cause (ECF #90-7), the Defendants' misconduct involves fraud against the federal government, their respective States, the Plaintiffs and Class Members.  First, the Defendants fraudulently created Individualized Education Plans ("IEPs") for special education students knowing they could not implement these IEPs, thereby knowingly denying each student a FAPE.  Second, the Defendants fraudulently claimed they were providing special education and related services as outlined in the students' IEPs and billed and/or were reimbursed by the federal government and their respective States for services that were not performed or were established fraudulently.

1.      **Injury to business or property**.

As detailed above, Plaintiffs and Class Members have suffered significant injuries to their business and/or property as a result of Defendants' racketeering activities including loss of services, lost and unpaid wages, out-of-pocket expenses, and lost work and professional opportunities.

In *Burlington School Committee v. Mass. Dept. of Educ.*, the Supreme Court held that a student who fails to receive appropriate services at any time in which he is entitle to them may be awarded compensation in the form of additional services "compensatory education" at a later time. As a result of the gross violations committed by the Defendants, Plaintiff-Parents and Class Members seek compensatory damages from their respective LEAs.  Compensatory education is an award of educational services designed to remedy a deprivation in the child's education.  *Doe v. E. Lyme Bd. Of Educ.*, 790 F.3d 440, 445 (2d Cir. 2015).  An award of compensatory education serves to correct a violation of the IDEA that resulted in the child's regression.  Regression refers to the failure to maintain an acquired skill in an identified goal area of concern as a result of an

interruption of special education instruction or support services.  In *Sabatini v. Corning-Painted Post Area Sch. Dist.*, 190 F. Supp. 2d 509 the Court granted a preliminary injunction directing a school district to pay compensatory education in the form of reimbursement for college tuition. Plaintiffs and Class Members seek a minimum award of compensatory education for all of the services as outlined in the Plaintiff-Students' IEP that the Defendant-School Districts failed to provide since March 2020.  However, based upon the results of the independent evaluations, additional services may be required.  For example, a Plaintiff-Student and respective Class Members may need more than simply the services missed, but may need an additional year of eligibility beyond 21 years of age.  In *Barnett v. Memphis City Schs*, 113 Fed. Appx. 124, the court held the student was entitled to compensatory education past the age of 21.

For any Plaintiff-Student who has turned 21 or graduated since the start of the new school year and may no longer be eligible to receive special education services, the courts across various circuits have upheld the proposition that compensatory education is a proper relief to remedy past violations of FAPE who are no longer enrolled in public school or have graduated. *See Pihl v. Massachusetts Dept. of Educ.*, 9 F.3d 184, 189 (1st Cir. 1993); *M.C. v. Cent. Reg'l Sch. Dist.*, 81 F.3d 389, 395 (3d Cir. 1996); *Hall v. Knott County Bd. of Educ.*, 941 F.2d 402, 407 (6th Cir. 1991); *Bd. of Educ. of Oak Park v. Ill. State Bd. of Educ.*, 79 F.3d 654, 660 (7th Cir. 1996); *Miener v. Missouri*, 800 F.2d 749, 753 (8th Cir. 1986).

2.    **Causal relationship between injury and RICO statute violation.**

All Defendants' acts of mail, wire and financial fraud effectuated the loss of services, lost and unpaid wages, out-of-pocket expenses and lost work and professional opportunities.

The traceability requirement for Article III standing requires the plaintiff "'demonstrate a causal nexus between the defendant's conduct and the injury.'" *Rothstein v. UBS AG*, 708 F.3d 82,

91 (2d Cir. 2013) (quoting *Heldman*, 962 F.2d at 156). A causal nexus is "most easily shown" by a direct relationship between the plaintiff and defendant, but indirectness is not fatal; indeed, the standard is less than the concept of proximate causation. *Id.* at 91. "The fact that there is an intervening cause of the plaintiff's injury may foreclose a finding of proximate cause but is not necessarily a basis for finding that the injury is not 'fairly traceable' to the acts of the defendant." *Id.* at 92.

Defendant SCHOOL DISTRICTS IN THE UNITED STATES (*See* Appendix B of Complaint ECF # 1) are the official bodies charged with the responsibility of developing and enforcing policies with respect to the administration and operation of the public schools in their respective geographic areas, including programs and services for students with disabilities, as defined as the "local educational agency" ("LEA") in 20 U.S.C. § 1401(19) and 34 C.F.R. § 300.28.

Upon information and belief, all States and Territories of the United States are the recipient of funding under the IDEA, 20 U.S.C. § 1400-1487, and as such, have the responsibility to "establish and maintain procedures . . . to ensure that children with disabilities and their parents are guaranteed procedural safeguards with respect to the provision of free appropriate education." 20 U.S.C. § 1415(a). Defendant STATE DEPARTMENTS OF EDUCATION IN THE UNITED STATES (*See* Appendix C of Complaint ECF # 1) are the State Educational Agencies ("SEA") which exercise general supervision over all programs in the State that provide educational services to disabled students, and must ensure that all such meet State education standards. *Michael C. ex rel. Stephen C. v. Radnor Tp. School Dist.*, 202 F.3d 642, 648 (3d Cir. 2000).

3. **Additional information**.

The Supreme Court clarified the difference between the availability of a private right of action with the availability of various remedies. "Although we examine the text and history of a statute to determine whether Congress intended to create a right of action, we presume the availability of all appropriate remedies unless Congress has expressly indicated otherwise." *Franklin v. Gwinnett County Pub. Sch.*, 503 U.S. 60, 66, 112 S. Ct. 1028 (1992) (citation omitted) (monetary damages available as remedy in action to enforce Title IX). The Court went on to announce the "general rule" that "absent clear direction to the contrary by Congress, the federal courts have the power to award any appropriate relief in a cognizable cause of action brought pursuant to a federal statute." *Id.* 503 U.S. at 70-71.

The Second Circuit in *Polera v. Bd. of Educ.*, 288 F.3d 478, 491 (2d Cir. 2002), has reaffirmed, "We have held that monetary damages are available in claims brought pursuant to 42 U.S.C. § 1983 for denial of access to administrative remedies under the IDEA's predecessor statute, the EHA. *Quackenbush v. Johnson City Sch. Dist.*, 716 F.2d 141, 148 (2d Cir. 1983), *cert. denied*, 465 U.S. 1071, 79 L. Ed. 2d 750, 104 S. Ct. 1426 (1984). District courts in this Circuit have followed *Quackenbush*, holding that damages are available on claims brought under Section 1983 for violations of the IDEA. See, e.g., *M.H. v. Bristol Bd. of Educ.*, 169 F. Supp. 2d 21, 29-30 (D. Conn. 2001); *R.B. v. Bd. of Educ. of the City of New York*, 99 F. Supp. 2d 411, 418 (S.D.N.Y. 2000); *Cappillino v. Hyde Park Cent. Sch. Dist.*, 40 F. Supp. 2d 513, 515-16 (S.D.N.Y. 1999)." Other Circuits have approved § 1983 actions to enforce IDEA rights. *See Angela L. v. Pasadena Independent Sch. Dist.*, 918 F.2d 1188, 1193 n.3 (5th Cir. 1990) (§ 1983 and § 504 "permit parents to obtain relief which otherwise is unavailable from the EHA"); *Digre v. Roseville Sch. Independent Dist.*, 841 F.2d 245, 250 (8th Cir. 1988) (injunctive relief); *Mrs. W. v. Tirozzi*, 832 F.2d 748, 753 (2d Cir. 1987) (declaratory and injunctive relief); *Jackson v. Franklin County Sch.*

*Bd.*, 806 F.2d 623, 631-32 (5th Cir. 1986) (compensatory damages or remedial education). *See also Hunt v. Bartman*, 873 F. Supp. 229, 245 (W.D.Mo. 1994) (injunctive relief).

The Eighth Circuit has concluded that "money damages are available under §504." *Rodgers v. Magnet Cove Public Schools*, 34 F.3d 642, 645 (8th Cir. 1994). *See also Lue v. Moore*, 43 F.3d 1203, 1205 (8th Cir. 1994) (same). The Eighth Circuit reasoned that the Rehabilitation Act incorporates the remedies of Title VI of the Civil Rights Act of 1964, Title IX is also modeled after Title VI, and thus "the Court's holding on Title IX in *Franklin* applies equally to Title VI and Section 504 cases." *Rodgers,* 34 F.3d at 644. *See* 29 U.S.C. § 794(a)(2).

The Ninth Circuit has concluded compensatory damages are available under the Rehabilitation Act using the deliberate indifference standard applying to show discriminatory intent, *see Ferguson v. City of Phoenix*, 157 F.3d 668, 674 (9th Cir. 1998); *Lovell v. Chandler*, 303 F.3d 1039, 1056 (9th Cir. 2002).

The Third Circuit in *W.B. v. Matula*, 67 F.3d 484 (3d Cir. 1995), examined monetary damages solely through IDEA and concluded, "even were we to limit our focus to IDEA itself, we discern nothing in the text or history suggesting that relief under IDEA is limited in any way, and certainly no "clear direction" sufficient to rebut the presumption that all relief is available. The expansive language of § 1415(f), which was enacted in the shadow of Smith and tracks the broad grant of remedial power allowed a district court reviewing a direct IDEA appeal, see 20 U.S.C. § 1415(e)(2), contains no restrictions on forms of relief. Nor does the legislative history of § 1415(f) suggest a congressional intent that damages be unavailable. In fact, Congress expressly contemplated that the courts would fashion remedies not specifically enumerated in IDEA. See House Report at 7 (excusing § 1415(f) exhaustion requirement where "the hearing officer lacks the authority to grant the relief sought")." While not recommending monetary damages in *W.B.,*

the Court concluded, "However, we do not preclude the awarding of monetary damages and leave to the district court in the first instance the task of fashioning appropriate relief."

The Fifth Circuit, in *Salley v. St. Tammany Parish School Board*, 57 F.3d 458 (5th Cir. 1995), affirmed a damages award for a procedural violation of the IDEA, but the damages were merely nominal because it concluded the "violations did not affect Salleys' decisions regarding the education of Danielle." The clear indication is if the procedural violations had impacted the student's education, then the award would have been greater than nominal.

In *Stellato v. Bd. of Educ. of the Ellenville Cent. Sch. Dist.*, 842 F. Supp. 1512, 1516-17 (N.D.N.Y. 1994), the court identified the two "exceptional circumstances" whereby damages are available solely under the IDEA: where there is a danger to the physical health of the child or ***where the school district acts in bad faith.*** Both exceptions are present herein.

As the Supreme Court stated in *Honig v. Doe*, 484 U.S. 305, 108 S. Ct. 592 (1988), the court has the equitable power to order a change in placement upon a sufficient showing. *id.* at 327-28 (interpreting the "stay put" provision of the EHA – former name of the IDEA).

In the instant matter, the Plaintiff-Parents are seeking compensatory damages due to the deliberate indifference, intentional and willful actions of the Defendants. Plaintiff-Parents were required to fill in and compensate for the failure of their school district (LEA) and either lost income, incurred out-of-pocket expenses, and/or experienced loss of employment.

Defendants discriminated against Plaintiff-Students and respective Class Memebrs, who are qualified individuals under the ADA, by prohibiting the provision of in-person academic and related services the opportunity to participate or benefit from such services. "Remote learning" is

not "equal" to the "aid, benefit or service" nor is it as effective as in-person services that were provided to other special education students.[65]

As a result of the deliberate indifference, intentional and willful violations committed by the Defendants, Plaintiff-Parents respectfully request both compensatory damages and punitive damages.

## MUNICIPAL LIABILITY

Can a School District have civil liability under RICO?

Yes. While the Second Circuit and district courts within have not generally permitted a school district or other municipal corporation to have civil liability imposed on them under RICO, because they have not allowed the application of *respondeat superior* or vicarious liability, there are theories under which the application of civil RICO liability is feasible. A municipal corporation has been accepted as a "person" within the RICO statute, 18 USC 161(3); however, there are several obstacles which currently shield a municipal corporation like a school district from civil RICO liability.

Obstacle #1: Can a School District meet the requirement of committing at least two predicate crimes?

The central components of this issue are:

A) Do the principles of *respondeat superior* apply to a municipal corporation?

Yes. In *Cullen v. Margiotta*, 1987 U.S. Dist. LEXIS 15298, cited in *In re CitiSource*, 694 F. Supp. 1069, the predicate acts of the municipal corporation were not within the scope of its corporate duty. However, the predicate acts alleged within this matter all are within its corporate

---

[65] Title II of the American with Disabilities Act ("ADA"), 42 U.S. Code § 12182

duty.  *See also* McQuillin, Law of Municipal Corporations § 49.88 (3d ed. 1982) ("To be indictable

for a nonfeasance the [municipal] corporation must have the power to do the act omitted, and for

a misfeasance, the act must come within the scope of its corporate duty."); *In re CitiSource, Inc.*

*Sec. Litigation*, 694 F. Supp. 1069.

B.) Can a municipal corporation commit predicate acts that do not require intent?

Yes. While intent is considered the "Achilles' heel of the plaintiff seeking to impose RICO

liability upon a municipal corporation" (*See In re CitiSource, Inc. Sec. Litigation*, 694 F. Supp.

1069, 1079), there are some predicate acts that *do not require intent*.  One of them is alleged to

have occurred by every Defendant in this matter many times, 18 U.S.C. § 2315, whereby the

Defendants need not have participated in the underlying scheme to defraud, *they simply needed to*

*know they were receiving <u>fraudulent</u> funds*.  This is a novel issue, perhaps of first impression before

this Court.

 Obstacle #2: Can a School District be held liable for damages under RICO?

Yes. In *Monell v. New York City Dept. of Social Services*, 436 U.S. 658 (1978), this Court

for the first time held that a local government was subject to suit as a "person" within the meaning

of 42 U. S. C. § 1983. Aside from concluding that a municipal body was not wholly immune from

civil liability, the Court had no occasion to explore the nature or scope of any particular municipal

immunity under the statute. 436 U.S., at 701. The question presented by this case is whether a

municipality may be held liable for punitive damages under § 1983." Newport v. Fact Concerts,

453 U.S. 247, 249  However, the Supreme Court concluded, "In sum, we find that considerations

of history and policy do not  [***635]  support exposing a municipality to punitive damages for

the bad-faith actions of its officials." *Newport v. Fact Concerts*, 453 U.S. 247, 271

However, the Supreme Court has emphasized that the treble damages allowed under RICO are not punitive, like those allowed under the Clayton Act upon which RICO is modeled, are "remedial in nature," given that they are designed to provide a remedy for economic injury suffered as a result of the prohibited conduct. *See PacifiCare Health Sys., Inc. v. Book*, 538 U.S. 401, 405-06 (2003).

Dated: New York, NY
    September 11, 2020

         Respectfully Submitted,

         /s: Peter Albert/
         Peter G. Albert, Esq.
         Brain Injury Rights Group, Ltd.
         Attorneys for Plaintiffs
         300 E. 95th Street, Suite 130
         New York, NY 10128
         (646) 850-5035