Civil Action No. 20 CV 5878 (CM)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

J.T., Individually and on behalf of D.T. *et al.*,

Plaintiffs,

-against-

BILL de BLASIO, in his official capacity as the Mayor of New York City *et al.,*

Defendants.

**NYC DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION AND IN SUPPORT OF THEIR MOTION TO DISMISS THE COMPLAINT**

***JAMES E. JOHNSON***
*Corporation Counsel of the City of New York*
*Attorney for the NYC Defendants*
*100 Church Street*
*New York, N.Y.  10007*

*Of Counsel:*
*Janice Birnbaum, Senior Counsel*
*(jbirnbau@law.nyc.gov)*
*Marilyn Richter, Senior Counsel*
*(mrichter@law.nyc.gov)*
*Mark Toews, Senior Counsel*
*(mtoews@law.nyc.gov)*
*LM #: 2020-027097*

## <u>TABLE OF CONTENTS</u>

**PRELIMINARY STATEMENT** ..............................................................................................1

**STATEMENT OF FACTS** .................................................................................................2

**LEGAL ARGUMENT**

    **POINT I**

    **PLAINTIFFS' APPLICATION FOR A TRO AND PRELIMINARY
    INJUNCTION SHOULD BE DENIED** ....................................................................10

       A. *Plaintiffs Do Not Have a Clear or Substantial Likelihood of Success on the
          Merits because States and Localities Have Broad Discretion to Consider
          Public Health and Safety in Determining When and How to Provide
          Services During an Emergency, including the Closure of School Buildings
          and the Provision of Remote Educational Services* ......................................................10

       B. *Plaintiffs' claims against the NYC Defendants are meritless because DOE
          has not changed the Special Educational Placement for any of its Students
          with Disabilities without Parental Consent* ............................................................14

       C. *To the Extent that a Student with a Disability enrolled in a NYC Public
          School is Currently Struggling or Believes that She was Denied a FAPE,
          that Student has Multiple Avenues for Redress and in any Event, is
          Required to Exhaust IDEA's Administrative Remedies Prior to Filing a
          Lawsuit* ..........................................................................................................15

       D. *Plaintiffs Have Not Shown That They Are Likely to Suffer Irreparable
          Injury Absent an Award of Preliminary Injunctive Relief* ........................................19

       E. *Both the Balance of the Equities and the Public's Interests Favor a Denial
          of Plaintiffs' Request for Preliminary Injunctive Relief* ..........................................20

    **POINT II**

    **PLAINTIFFS' COMPLAINT SHOULD BE DISMISSED BECAUSE
    THE COURT LACKS SUBJECT MATTER JURISDICTION AND THE
    COMPLAINT FAILS TO STATE A CLAIM UPON WHICH RELIEF
    CAN BE GRANTED**........................................................................................22

       A. *The Court Lacks Subject Matter Jurisdiction Because Plaintiffs Have
          Failed to Exhaust their Administrative Remedies*................................................22

B.  *The Complaint Should be Dismissed for Failure to State a Claim. The Claims in the Complaint are Meritless as a Matter of Law* ....................................................23

C.  *The Complaint Should be Dismissed for Failure to State a Claim Because the Claims against the NYC Defendants Are Not Plausible or Sufficiently Pled* .................................................................................................23

D.  *Neither Compensatory Nor Punitive Damages are Available under the IDEA* .............................................................................................................................25

**CONCLUSION** ........................................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

In re Abbott,
    954 F.3d 772 (5th Cir. 2020) ..................................................................................11

Ass'n of Jewish Camp Operators v Cuomo,
    2020 US Dist LEXIS 117765 (NDNY July 6, 2020, No. 1:20-CV-0687
    (GTS/DJS)) ...........................................................................................................21

Barbecho v Decker,
    2020 US Dist LEXIS 82978 (SDNY May 11, 2020, No. 20-cv-2821 (AJN)) ...................................20

Borey v. Nat'l Union Fire Ins. Co.,
    934 F.2d 30 (2d Cir. 1991)....................................................................................20

Cave v. E. Meadow Union Free Sch. Dist.,
    514 F.3d 240 (2d Cir. 2008)..................................................................................25

Connecticut Citizens Defense League, Inc. v Lamont,
    2020 US Dist LEXIS 99872 (D Conn June 8, 2020, No. 3:20-cv-00646
    (JAM)).................................................................................................................21

De Paulino v. N.Y.C. Dep't of Educ.,
    959 F.3d 519 (2d Cir. 2020)..................................................................................18

Doe v Arizona Dept. of Educ.,
    111 F3d 678 (9th Cir 1997) ...................................................................................17

Fry v. Napoleon Cmty. Sch.,
    137 S.Ct. 743 (2017)...........................................................................................15

Geller v. De Blasio,
    2020 U.S. Dist. LEXIS 87405 (SDNY, May 18, 2020, No. 20 CV 3566
    (DLC))................................................................................................................11

Hickox v. Christie,
    205 F. Supp. 3d 579 (D.N.J. 2016) .........................................................................11

Hoeft v. Tucson Unified Sch. Dist.,
    967 F.2d 1298 (9th Cir. 1992) ...........................................................................16, 17

South Bay United Pentecostal Church v. Newsom,
    140 S. Ct. 1613 (2020).........................................................................................11

iii

Ashcroft v. Iqbal,
    556 U.S. 662 ...................................................................................................23

J.S. v. Attica Cent. Sch.,
    386 F.3d 107 (2d Cir. 2004).............................................................................15

Jacobson v. Massachusetts,
    197 U.S. 11 (1905).................................................................................. passim

L.V. v. N.Y. City Dep't of Educ.,
    2020 U.S. Dist. LEXIS 120995 (SDNY July 8, 2020, No. 19 CV 5451
    (AT)(KHP))......................................................................................................24

New York v. Actavis PLC,
    787 F.3d 638 (2d Cir. 2015).............................................................................19

Polera v. Board of Educ.,
    288 F.3d 478 (2d Cir. 2002).......................................................................23, 25

Prince v. Massachusetts,
    321 U.S. 158 (1944)..........................................................................................11

Student A. v. San Francisco Univied Sch. Dist.,
    2020 U.S. Dist. LEXIS 19191 (N.D. Cal. February 5, 2020 No. 19 CV 3101)...................................16

Student X v. N.Y.C. Dep't of Educ.,
    2008 U.S. Dist. LEXIS 88163 (EDNY Oct. 30, 2008 07-CV-2316
    (NGG)(RER)) ...................................................................................................18

United States v. Chalk,
    441 F.2d 1277 (4th Cir. 1971) .........................................................................11

V.D. v New York,
    403 F Supp 3d 76 (EDNY 2019) .....................................................................21

## PRELIMINARY STATEMENT

Plaintiffs' 350-page complaint (with appendices) seeks to bring a nationwide class action on behalf of all students with disabilities (SWDs), against all school districts in the United States and all fifty State Education Departments. The Complaint essentially alleges that because of nationwide closures of school buildings in the wake of the COVID-19 pandemic, every public school district in the nation has denied every student with a disability in the nation a free, appropriate public education (FAPE) as defined by his or her individualized education plan (IEP) in violation of the Individuals with Disabilities Education Act (IDEA), the Americans with Disabilities Act (ADA), Section 504 of the Rehabilitation Act ("Section 504"), the Equal Protection and Due Process clauses of the Fourteenth Amendment of the United States Constitution, and unspecified provisions of every State Constitution.

The complaint alleges that the school closures were done in "bad faith" and seeks, *inter alia,* preliminary and permanent injunctive relief requiring schools to re-open for full-time in-person instruction for all SWDs, and compensatory and punitive damages, plus attorneys' fees. Plaintiffs' motion for a preliminary injunction seeks an order compelling schools to re-open for full-time in-person instruction for all SWDs immediately, in the middle of a global pandemic, or in the alternative, to issue "pendency vouchers" to all parents to engage in "self-cure" of alleged deprivations, and publicly-funded immediate, independent re-evaluations for all SWDs.

Defendants Bill de Blasio, in his official capacity as the Mayor of the City of New York, Richard Carranza, in his official capacity as the Chancellor of the New York City Department of Education, and the New York City Department of Education (DOE), collectively the "NYC Defendants," submit this memorandum of law in opposition to the motion for a preliminary injunction, and in support of their motion to dismiss the complaint, pursuant to Rule 12(b)(6) of the Federal Rules

of Civil Procedure, on the ground that the complaint fails to state a claim upon which relief can be granted and pursuant to Rule 12(b)(1) for lack of subject matter jurisdiction.

Plaintiffs have failed to satisfy the requirements for the granting of the extraordinary relief of a mandatory preliminary injunction. As to the complaint, there is no authority in the IDEA or any other cited law for the relief Plaintiffs seek. Moreover, the complaint fails to allege any facts about the 38 sets of parent and student Plaintiffs who reside in New York City that would support any claim. The complaint merely asserts that these Plaintiffs reside in New York City and that the students have been classified as disabled. In addition**,** Plaintiffs have failed to exhaust their administrative remedies and, accordingly, the Court lacks subject matter jurisdiction.

## STATEMENT OF FACTS

COVID-19 is a new and sometimes fatal viral infection. The COVID-19 pandemic is unprecedented in its scope, affecting nearly every country in the world. (Declaration of Demetre Daskalakis, Deputy Commissioner of the Division of Disease Control of the New York City Department of Health and Mental Hygiene (DOHMH), dated September 18, 2020 (hereafter "Health Decl."), ¶ 5). While there are some investigational treatments, at this time there is no known proven and effective treatment and no vaccine for COVID-19. (Health Decl. ¶ 9) In March 2020, New York City (the "City") became the epicenter of the COVID-19 pandemic in the U.S. and had one of the largest reported disease burdens in the world. By mid-May, there had been over 185,000 confirmed cases in the City, with over 20,000 confirmed or probable COVID-19 deaths. At that time, the City had the sixth highest number of reported COVID-19 deaths as compared to any *country* in the world. See COVID-19 Dashboard, Center for Systems Science and Engineering at Johns Hopkins University, https://www.arcgis.com/apps/opsdashboard/index.html#/bda7594740fd40299423467b48e9ecf6; (Health Decl.. ¶ 13). Beginning in mid-March, there was a surge in the number of individuals with

COVID-19 who were hospitalized with severe symptoms such as respiratory distress, requiring supplementary oxygen, mechanical ventilation and/or other life support. (Health Decl. ¶ 15)

Public health efforts in New York State (the "State") in response to the COVID-19 pandemic have been primarily focused on reducing spread in the community, which protects people from disease, especially people with increased risk of severe or fatal illness, and reduces the likelihood that health care facilities become overwhelmed with an influx of COVID-19 patients. (Health Decl. ¶__ 10) Mayor de Blasio and other City officials recognized that COVID-19 could spread rapidly through the City's dense population and worked with Governor Cuomo and other State officials to contain the spread. In response to the quickly developing COVID-19 outbreak in New York State, Governor Cuomo declared a formal State of Emergency on March 7, 2020.  See New York State Executive Order No. 202 at https://www.governor.ny.gov/sites/governor.ny.gov/files/atoms/files/EO_202.pdf.

On March 11, 2020, the World Health Organization characterized COVID-19 as a pandemic, the first ever pandemic caused by a coronavirus. See https://www.who.int/news-room/detail/29-06-2020-covidtimeline. On March 12, 2020, pursuant to his authority under New York State Executive Law § 24 ("Executive Law") and New York City Administrative Code ("Administrative Code") section 3-104, Mayor de Blasio issued Emergency Executive Order No 98, *inter alia*, declaring a state of emergency in the City. See https://www1.nyc.gov/assets/home/downloads/pdf/executive-orders/2020/eeo-98.pdf. By Executive Order 202.4, Governor Cuomo directed that all schools in New York State be closed by March 18, 2020. https://www.governor.ny.gov/sites/governor.ny.gov/files/atoms/files/EO%20202.4.pdf; Declaration of Christina Foti ("Foti Decl."), ¶ 5. On March 15, 2020, Mayor de Blasio announced that the New York City public school system would close due to the pandemic, effective March 23 and that DOE staff would use the week of March 16 to develop DOE's transition plan and train staff on remote learning,

which would begin the following week for all of the City's children attending DOE schools, including students with disabilities. See https://www1.nyc.gov/office-of-the-mayor/news/151-20/new-york-city-close-all-school-buildings-transition-remote-learning; Foti Decl ¶ 5. The Mayor further stated that the earliest the schools might reopen would be April 20, 2020, but that they might have to remain closed through the end of the school year. Id.

On Monday, March 23, 2020, DOE commenced remote instruction and began the process of providing remote devices, principally iPads, to all school-aged children in the City who needed such devices. To date, over 320,000 iPads have been distributed, including 96,400 to students with IEPs. Foti Decl. ¶ 6. DOE also provided and continue to provide data plans and internet access for these devices when needed. Id. DOE also created a Special Education Remote Learning Plan ("RLP") to tailor the remote instruction to each student's individual needs in light of the constraints imposed by the pandemic restrictions. Id. ¶ 8 RLPs were completed for more than 98.2% of students with IEPs. Id. Additionally, the DOE instituted teletherapy for the on-going provision of clinical and therapeutic related services. Id. DOE held IEP meetings remotely and updated over 98,000 IEPs. Id.

As the virus continued to spread rapidly through New York, Governor Cuomo issued Executive Order No. 202.10 which, *inter alia,* declared that all non-essential gatherings of individuals of any size for any reason be cancelled or postponed. See https://www.governor.ny.gov/sites/governor.ny.gov/files/atoms/files/EO_202.10.pdf. On March 25, 2020 Mayor de Blasio incorporated this gatherings ban into Executive Order No. 103 ("EO 103"):

> In order to avoid the mass congregation of people in public places and to reduce the opportunity for the spread of COVID-19 any non-essential gathering of individuals of any size for any reasons shall be cancelled or postponed.

See https://www1.nyc.gov/assets/home/downloads/pdf/executive-orders/2020/eeo-103.pdf.

By executive order dated March 18, 2020, Governor Cuomo directed the closure of all non-essential businesses:   https://www.governor.ny.gov/sites/governor.ny.gov/files/atoms/files/EO202.6.pdf.   On March 30, 2020, Mayor de Blasio issued Executive Order No. 104 extending the prohibition on gatherings promulgated in EO 103, incorporating Governor Cuomo's Executive Order. https://www1.nyc.gov/assets/home/downloads/pdf/executive-orders/2020/eeo-104.pdf.

The closing of schools and non-essential businesses and the banning of gatherings enabled most New Yorkers to undertake a key physical distancing measure—staying at home as much as possible. Other physical distancing measures include, when out of the home, staying at least six feet from others, and wearing a face covering when distance cannot be maintained. By mid-April, COVID-19 transmission had peaked in New York City, followed by a steady decrease in the number of new cases, hospitalizations and deaths. DOHMH attributes this decrease largely to physical distancing, because there is no other explanation for the significant reduction in disease transmission. (Health Decl. ¶¶ 15, 16)

As of September 16, 2020, there have been almost 234,000 cases of COVID-19 in New York City, with over 57,000 hospitalizations and over 23,000 deaths (over 19,000 confirmed and over 4,000 probable).   The reproduction number (the average number of people each infected person infects) has been in the range of one since the end of March and the percent positivity has been below two percent since July 12, and the 7-day rolling average has been in the range of one percent since early August.   https://www1.nyc.gov/site/doh/covid/covid-19-data.page. While these data show that New York City has been successful in reducing the spread of COVID-19, physical distancing efforts must continue if a resurgence is to be prevented. Even when precautions are taken, such as staying apart from others and wearing a face covering, in-person interactions carry some risk of disease transmission, particularly in enclosed indoor spaces.  (Health Decl. ¶ 16)

Children can get COVID-19. As of September 10, 2020, almost 550,000 children had tested positive for COVID-19 in the United States. This represents a 15% increase from August 27 to September 10, 2020. See https://services.aap.org/en/pages/2019-novel-coronavirus-covid-19-infections/children-and-covid-19-state-level-data-report/. In New York City, among persons 0-17 years of age, there have been 7,896 confirmed cases, 635 hospitalizations, and 12 deaths, as of September 15, 2020.   https://www1.nyc.gov/site/doh/covid/covid-19-data.page.  (Health Decl. ¶ 20)

While further studies are needed, the preponderance of the available evidence indicates that children are less likely to be symptomatic and less likely to develop severe symptoms than adults. However, a new health condition, multisystem inflammatory syndrome (MIS-C) associated with COVID-19, is appearing in children in New York City and elsewhere. Although rare, MIS-C is a serious inflammatory condition that can create problems with the heart and other organs that requires hospitalization. The symptoms of MIS-C often appear days or weeks after the child became infected with the virus that causes COVID-19.  As of September 16, 2020, there were 226 confirmed cases of MIS-C in New York City.  (Health Decl. ¶ 22)  Another concern is children with pre-existing medical conditions that make them more likely to develop severe symptoms if they contract COVID-19. Children who are medically complex, who have neurologic, genetic or metabolic conditions, or who have congenital heart disease, might be at increased risk for severe illness from COVID-19 compared to other children. (Health Decl. ¶ 23)

While there is still much to learn about COVID-19, there is a growing body of evidence that children may be efficient transmitters of the virus, especially older children.  The early results of a large study in South Korea, released in late July 2020 found that children over the age of 10 can transmit COVID-19 as effectively as adults. See https://wwwnc.cdc.gov/eid/article/26/10/20-1315_article. There is also emerging evidence that children may have high viral loads, even though they are generally less

symptomatic than adults.  A recent study released in August by the Harvard Medical School found that children of all ages carried significantly higher viral loads in their upper airways,  particularly early in infection, than hospitalized adults with severe disease. See  https://www.jpeds.com/article/S0022-3476(20)31023-4/fulltext. While additional research is needed, the potential for children to have high viral loads in the absence of symptoms has significant implications for community transmission. (Health Decl. ¶¶ 24, 25) Accordingly, it is a serious concern that if children attending school become infected, they may infect other children, school staff, and persons they live with, including children and adults at increased risk for severe illness. (Health Decl. ¶ 26)

On June 5, 2020, the Governor loosened some of the restrictions imposed on all New York schools, including City schools, for the summer. https://www.governor.ny.gov/sites/governor.ny.gov/files/atoms/files/EO202.37-new.pdf. After careful study of the pandemic epidemiology, including the extent to which New Yorkers had bent the pandemic curve downward, and balancing the potential benefit to SWDs of some in-person educational services with the public health risks inherent in such services, Mayor de Blasio and Chancellor Carranza permitted certain limited related services this summer for students with 12-month IEPs. Id. ¶¶ 10, 11.

After examining the summer experiences, DOE determined in August to offer parents of all DOE students the option to attend school through either 100% remote instruction (i.e., at home) or a combination of remote instruction and in-person instruction in public school buildings ("blended learning"). Id. ¶¶ 12, 13. Any plans had to account for the need to maintain a minimum of six feet of social distancing and cleaning of classrooms on a regular basis.  Id. The models are explained at https://www.schools.nyc.gov/school-year-20-21/return-to-school-2020/school-schedules.

Beginning in August, parents of all DOE students were contacted and afforded the opportunity to opt into full time remote instruction. Id. If a parent did not opt into full time remote instruction, the

student was scheduled for blended learning (a mix of in-person and remote instruction).   At this point, 42% of all families have opted for 100% remote instruction.  See id. The remaining families have been scheduled for blended learning.   See id. In terms of families of students with disabilities, 42.6% have opted for 100% remote instruction; and 57.4% have opted for or been assigned to blended learning. Id. ¶ 12. A child who is slated for blended learning can move at any time to 100% remote instruction, but the reverse can occur only at specified times during the school year. Id.

For those families of students with disabilities who opt for blended learning, DOE schools will be providing special education programs and services to these students according to the students' IEPs to the extent feasible through the DOE's blended learning models. Id. ¶ 13. These models include an in-person instructional component in school buildings and a remote component, generally composed of synchronous (i.e., in-person classroom instruction or live video instruction that permits interaction between the teacher and students) and asynchronous instruction (i.e., student directed projects, recorded lessons, etc.). Id. Related services will be provided both in–person and remotely. For students whose families have opted for remote learning only, DOE will provide special education programs through a combination of synchronous and asynchronous instruction. Id. Related services will largely be provided remotely, as they were done in the spring, although depending on demand and provider availability, some students may be able to receive in-person related services, if that is the family's preference. To ensure the health and safety of students with disabilities and those providing special education services, we have released detailed information concerning the protocols for delivery of in-person services and special education assessments. Id. In addition, all teachers will have daily office hours during which students and Parents may discuss school work, the student's progress, and other issues of concern. Information on how students with disabilities will be educated this fall can be found at:

https://www.schools.nyc.gov/learning/special-education/special-education-in-blended-and-remote-settings.

For certain students with more significant disabilities (e.g., students with severe autism with IEP recommendations for classes with particularly low student to staff ratios,  i.e., 6 students to 1 special education teacher to 1 paraprofessional), in District 75 schools, which service exclusively special education students who need the support of a specialized school, DOE recognized that the small class size afforded the possibility for these students to access more days of in-person learning. Id. ¶ 14. Where classrooms are large enough to permit social distancing by students and staff, schools may permit these students to attend in person for 100% of the school day in a school building. Id. Prioritizing a return to full-time, in person learning for these small, intensive classes makes sense because these students are among DOE's highest need students and may have greater difficulty continuing to make meaningful educational progress in a remote environment than their peers, disabled or otherwise. Id. Indeed, although the DOE has just announced a phased in approach for students to begin in-person blended learning, District 75 schools are included in the first cohort, to start in person instruction on Monday, September 21, 2020. Id.

DOE developed new forms to document and tailor the special education services offered to students with disabilities and capture parental preferences and input: the Program Adaptation Document (PAD) and the Related Services Adaptation Document (RAD), for special education and related services respectively. Id. at ¶¶ 16, 17. Families of SWDs are being contacted by DOE staff to discuss, *inter alia,* instructional service choices and ramifications, as well as the modes of service delivery that will be utilized. Id. The DOE continues to carefully weigh the needs of students, teachers, parents, and the community at large as it navigates its approach to the beginning the 2020-2021 school year, recognizing

that individual portions of the school system even individual school buildings, may require an individualized, tailored and flexible approach.  See, generally, Foti Decl.

## ARGUMENT

### POINT I

### PLAINTIFFS'   MOTION   FOR   PRELMINARY INJUNCTIVE RELIEF SHOULD BE DENIED

In all cases, "[a] preliminary injunction is an extraordinary remedy never awarded as of right." Winter v. NRDC, Inc, 555 U.S. 7, 24 (2008). In order to prevail, Plaintiffs must show (1) that they have a clear or substantial likelihood of success on the merits; (2) that they will likely suffer irreparable injury in the absence of the requested preliminary injunctive relief; (3) that the balance of equities tips in Plaintiffs' favor; and (4) that a preliminary injunction is in the public interest. See North Am. Soccer League, LLC v. United States Soccer Fed'n. 883 F.3d 32, 37 (2d Cir. 2018) (where Plaintiffs seek a mandatory preliminary injunction, altering the status quo, there is a heightened legal standard of "a clear or substantial likelihood of success on the merits."). Plaintiffs have not met any of these requirements.

A.  *Plaintiffs Do Not Have a Clear or Substantial Likelihood of Success on the Merits because States and Localities Have Broad Discretion to Consider Public Health and Safety in Determining When and How to Provide Services During an Emergency, including the Closure of School Buildings and the Provision of Remote Educational Services.*

It is well-settled that "a community has the right to protect itself against an epidemic of disease which threatens the safety of its members*." Jacobson,  v. Massachusetts*, 197 U. S. 11, 27 (1905) (internal quotation marks omitted).  As the Court further explained:

> [T]he liberty secured by the Constitution of the United States to every person within its jurisdiction does not import an absolute right in each person to be, at all times and in all circumstances, wholly freed from restraint. There are manifold restraints to which every person is necessarily subject for the common good. On any other basis organized society could not exist with safety to its members. *Id*. at 26.

Thus, states and localities may take action in response to a public emergency that "necessarily restricts activities that would normally be constitutionally protected…." United States v. Chalk, 441 F.2d 1277, 1281 (4th Cir. 1971) (judicial review of a mayoral executive order limited to whether an action was taken in good faith and whether some factual basis exists for the decision); see also Prince v. Massachusetts, 321 U.S. 158 (1944); In re Abbott, 954 F.3d 772, 772 (5th Cir. 2020); Hickox v. Christie, 205 F. Supp. 3d 579 (D.N.J. 2016). Courts review the use of emergency powers with deference, recognizing that the executive and legislative branches must be able to quickly and decisively respond to a public health crisis. Jacobson, 197 U.S. at 29; Abbott, 954 F.3d at 772.  Further, as the Jacobson Court directed, "[i]t is no part of the function of a court" to decide which measures are "likely to be the most effective for the protection of the public against disease." Id. at 30. As explained by the Supreme Court, a "court would usurp the functions of another branch of government if it adjudged, as a matter of law, that the mode adopted under the sanction of the state, to protect the people at large was arbitrary, and not justified by the necessities of the case." Geller v. De Blasio, 2020 U.S. Dist. LEXIS 87405, *8 (S.D.N.Y May 18, 2020) citing Jacobson.

Especially pertinent to the case at bar, in South Bay United Pentecostal Church v. Newsom, the Chief Justice succinctly explained why COVID-19-related issues are best left to the discretion of states and localities:

> The precise question of when restrictions on particular social activities should be lifted during the pandemic is a dynamic and fact-intensive matter subject to reasonable disagreement. Our Constitution principally entrusts the safety and the health of the people to the politically accountable officials of the States to guard and protect. When those officials undertake to act in areas fraught with medical and scientific uncertainties, their latitude must be especially broad. Where those broad limits are not exceeded, they should not be subject to second-guessing by an unelected federal judiciary, which lacks the background, competence, and expertise to assess public health and is not accountable to the people. 140 S. Ct. 1613, 1613, (2020) (internal citations omitted).

11

Furthermore, as recently explained in _McCarthy v. Cuomo_, 2020 U.S. Dist. LEXIS 107195 (E.D.N.Y. June 18, 2020), "courts across the country...have overwhelmingly upheld COVID-related state and local restrictions on gatherings over the last few months, citing _Jacobson_. [internal citations omitted].  Plaintiffs have presented no argument which would make their challenge likely to succeed where so many others have failed." _Id_. at *10.

Here, Plaintiffs ask the Court to direct the NYC Defendants to immediately re-open the City's school buildings for 100% in-person learning for SWDs in seeming disregard of the current public health crisis.  Plaintiffs effectively are asking this Court to supplant Governor Cuomo's and Mayor de Blasio's Executive Orders and declare that the interests of SWDs in receiving in-person instruction trumps the right of all other New Yorkers to remain safe. But the decision to close the school buildings was a considered, good-faith response to the imminent and deadly threat the COVID-19 pandemic poses.

The Mayor's and the Chancellor's decision to offer blended learning for the term commencing in September 2020, where students are in school on some days and engage in remote learning on other days, has a real and substantial relationship to public health. The COVID-19 pandemic is exactly the kind of public health crisis for which deference to the expert judgment of public health officials concerning the dangers of engaging in public activities with other people is essential under _Jacobson_ and _South Bay._  There is no vaccine or proven and effective treatment for COVID-19.  (Health Decl. ¶ 9).  Children do become infected with COVID -19.  (Health Decl. ¶ 20).  Recent studies have found that children can have very high viral loads even if they are asymptomatic and that children over the age of 10 transmit the virus as effectively as adults. (Health Decl. ¶¶ 24, 25). The danger is that if children become infected at school, they may transmit the virus to other children, staff and the people they live with. (Health Decl. ¶ 26).

In the opinion of the public health experts at DOHMH, New York City's success in going from the epicenter of the pandemic in the United States in March and April, to having low rates of new cases, hospitalizations and deaths, is the result of the physical distancing measures that were adopted by the City and State, including the closure of schools. (Health Decl. ¶ 15) However, the virus is still being transmitted, and the relaxation of physical distancing measures will almost certainly result in increases in the number of people infected. This has been the experience in other localities, states and countries. (Health Decl. ¶ 27.) The emergency occasioned by COVID-19 is on-going, and the NYC Defendants have an on-going responsibility to the public to contain the spread of the virus to prevent serious medical complications and death. It is necessary to limit the number of days students are in school to maintain physical distancing.  This is because most classrooms are not large enough to allow a full classroom of students to stay six feet apart.   Further, when all students are in school, hallways and other common spaces may become very crowded. (Health Decl. ¶ 19) Legal precedent and medical knowledge demonstrate that the City and State have acted appropriately within their emergency powers.

Plaintiffs essentially argue that the NYC Defendants have made an ill-informed policy judgment regarding the safety of in-person learning.  They cite to scientific studies and opinions that contradict the public consensus on the safety of in-person learning. As the Second Circuit made clear in Phillips v. City of New York, (775 F.3d 538 (2d Cir. 2015) those opinions are legally irrelevant where issues of public policy are squarely at issue. The Second Circuit found meritless Plaintiff's claims that a statute mandating vaccinations to attend any school in New York State was impermissible, and holding "Plaintiffs argue that a growing body of scientific evidence demonstrates that *vaccines* cause more harm to society than good, but as Jacobson made clear, that is a determination for the legislature, not the individual objectors."   *Id*. at 542. For all of these reasons, Plaintiffs' request for injunctive relief requiring the immediate resumption of full time in-person learning should be denied.

**B. Plaintiffs' claims against the NYC Defendants are meritless because DOE has not changed the Special Educational Placement for any of its Students with Disabilities without Parental Consent**

The nub of Plaintiffs' argument is that remote instruction by definition is a change in the educational placement of any SWD who was educated in a school building prior to the COVID-19 pandemic. This argument is controverted by the implementation guidance provided by the U.S. Department of Education and the State Education Department, both of which recognize remote instruction as an alternative mode of instructional delivery to provide FAPE to SWDs. Plaintiffs' claims are controverted by the undisputed fact that every NYC public school student – general education and SWD alike – was and continues to be offered the same educational opportunities during the pandemic. All were offered remote instruction this past spring, with DOE providing devices when needed (principally i-Pads and Chromebooks), along with internet access.  Beginning in August, all families have been offered the option to have their children receive either 100% remote instruction or blended instruction. Hence, all SWDs are being offered education that will provide them with the FAPE offered to them through their IEPs, which also constitutes their pendency placements, assuming that there are pending IDEA "proceedings" that trigger 20 U.S.C. § 1415(j), which mandates the maintenance of a student's current educational placement. Instead, the transition to remote learning for all students was a system-wide administrative decision. In N.D. v. State Dep't of Educ., 600 F.3d 1104 (9th Cir. 2010), the Ninth Circuit held that "Congress did not intend for the IDEA to apply to system wide administrative decisions" which affect all students, disabled and non-disabled alike. Accordingly, pendency is not applicable to such administrative decisions. Id. at 1116. Moreover, the FAPE offered is being provided in the least restrictive environments available during the pandemic.  Finally, it should be noted that had New York ceased to provide educational services altogether to stem the pandemic, which it did not, no student would have been entitled to educational services.

C. ***To the Extent that a Student with a Disability enrolled in a NYC Public School is Currently Struggling or Believes that She was Denied a FAPE, that Student has Multiple Avenues for Redress and in any Event, is Required to Exhaust IDEA's Administrative Remedies Prior to Filing a Lawsuit.***

The IDEA contains a mandatory exhaustion provision that requires exhaustion of administrative remedies before the filing of a civil action. 20 U.S.C. § 1415(i)(1)(A).   In addition, the IDEA's exhaustion requirement applies to non-IDEA claims that seek relief that is available under the IDEA.  20 U.S.C. § 1415(l).  The Second Circuit has expressly noted that "[i]t is well settled that the IDEA requires an aggrieved party to exhaust all administrative remedies before bringing a civil action in federal or state court[.]" *J.S. v. Attica Cent. Sch.*, 386 F.3d 107, 112 (2d Cir. 2004).

"The IDEA's administrative procedures test whether the school has met [its] obligation[s] – and so center[s] on the Act's FAPE requirement.  *Fry v. Napoleon Cmty. Sch.*, 137 S.Ct. 743, 754 (2017).  In this case, the complaint centers on the allegation that nationwide, SWDs were and continue to be provided remote instruction in the wake of the COVID-19 pandemic, which purportedly deprives them of FAPE, both by the remote instruction and the alleged exclusion of their Parents from the decision of school districts to move to remote instruction. This is evident from the face of the Complaint, even though many of Plaintiff's IDEA claims are styled as § 1983 claims. *See* Complaint, First Claim – 42 U.S.C. § 1983, ¶156 (FAPE deprivation); Second Claim – 42 U.S.C. § 1983,  ¶ 159 (FAPE deprivation without due process); Third Claim – IDEA, ¶¶162-64 (Violation of IDEA's procedures for parental participation resulting in FAPE deprivation); Fourth Claim – IDEA, ¶¶167-168 (IDEA Pendency violation); Fifth Claim – IDEA ¶170 (Failure to provide FAPE pursuant to proper IEPs); Sixth Claim – State Law ¶¶175-176 (Failure to follow state procedures denied FAPE to Plaintiff students); Seventh Claim – 29 U.S.C. § 794, ¶178 (Discrimination by failing to provide access to FAPE pursuant to Plaintiff students' IEPs); Eighth Claim – 29 U.S.C. § 794, ¶¶181-182 (Remote instruction resulted in FAPE deprivation, which in turn led Plaintiff Parents to pay for educational services and some lost

income or employment); Ninth Claim – 29 U.S.C. § 794, ¶185 (FAPE Deprivation); Tenth Claim – 42 U.S.C. § 12101, ¶¶ 188-189 (Discrimination on the basis of failure to provide FAPE via in-person special education services); Eleventh Claim – Violations of State Constitutions or Statutes, ¶¶192-194 (State law violations deprived Plaintiff-Students of educational benefits). Because the gravamen of the complaint concerns claims that allegedly constitute IDEA violations, they must be exhausted under the IDEA's administrative due process hearing system,  20 U.S.C. § 1415(l); *Fry, supra*, 137 S.Ct. at 756. Since Plaintiffs must exhaust their administrative remedies, and have failed to do so, the complaint must be dismissed.

The NYC Defendants anticipate that Plaintiffs will raise two arguments to avoid the exhaustion requirement.  First, they will likely argue that their claims are systemic and therefore exhaustion should be excused because the IDEA's administrative due process system (including New York's impartial due process system for adjudicating IDEA disputes) cannot redress their claims.  Second, they will likely argue that because they seek "pendency," their claims need not be exhausted.  Both of these arguments are without merit.

First, that claims are alleged to be systemic does not, standing alone, excuse Plaintiffs' failure to exhaust.  While an impartial hearing officer ("IHO") may not be able to order 100% in-person instruction to SWDs this fall, an IHO is empowered to order an individualized remedy based on the impartial hearing record when a student has been denied a FAPE. 8 NYCRR § 200.5(j)(4)(i). That the IHO does not have authority to order all of the relief requested does not excuse a Plaintiff's failure to exhaust. See Student A. v. San Francisco Univied Sch. Dist., 2020 U.S. Dist. LEXIS 19191 at *13 (N.D. Cal. 2020), citing Hoeft v. Tucson Unified Sch. Dist., 967 F.2d 1298, 1303-04 (9th Cir. 1992). Moreover, in this case exhaustion would be particularly appropriate because the nub of Plaintiffs' legal theory is the assumption that remote instruction is educationally inadequate.  Both the U.S. Department of Education

and the New York State Education Department have stated that remote instruction is just another mode of service delivery and does not, by itself, deprive an SWD of FAPE. Their interpretation of special education implementation is entitled to deference. Moreover, the IDEA's administrative hearing process is particularly well-suited to determining this issue for individual students. As explained in *Hoeft*:

> Exhaustion of the administrative process allows for the exercise of discretion and educational expertise by state and local agencies, afford full exploration of technical educational issues, further development of a complete factual record, and promotes judicial efficiency by giving these agencies the first opportunity to correct shortcomings in their educational programs for disabled children. *Hoeft* at 1303.

Here, as in *Hoeft,* there are myriad factual questions for a hearing officer to resolve—including the effects of a student's particular impairments in a remote learning environment and their ability to interact with technology— to determine whether an individual Plaintiff can receive a FAPE remotely. *See Doe v Arizona Dept. of Educ.*, 111 F3d 678, 683 (9th Cir 1997) (rejecting a class claim that exhaustion was not required where "the "court might have to resolve a number of factual issues within the Department's expertise" to determine whether individual students are receiving a FAPE and further holding that the fact that "the class might not get class-based or injunctive relief is not decisive.").

Moreover, given that Parents have two instructional options from which to choose for their children this fall – 100% remote instruction or blended instruction, which is composed of part-time in-person instruction in school buildings and part-time remote instruction – excusing Plaintiffs' failure to exhaust would deprive this Court of a factual basis and the expertise of the IHO in determining the legal sufficiency of these models in practice.  It would also deprive state and local agencies of the opportunity to correct shortcomings that are revealed through the administrative hearing process. Given that this endeavor is only months old, any determination by this court would be premature and would result in this Court substituting its judgment for those with the educational expertise and responsibility to implement the system. Hence, exhaustion is required.

Second, should Plaintiffs argue that pendency excuses exhaustion, they would be mistaken.  As explained above, the NYC SWDs are being offered their pendency placements –the educational programs set forth on their IEPs.  The fact that implementation will be either fully remote or blended learning, a choice made by the Parent, means that the Parent has had input into the decision.  Hence, assuming that this lawsuit is a proceeding that triggers IDEA's pendency provision, the last agreed-on placement is being offered to the NYC Plaintiff students.  _Student X v. New York City Dep't of Educ.,_ 2008 U.S. Dist. LEXIS 88163, at *61 (E.D.N.Y. Oct. 30, 2008).

Plaintiffs' self-cure proposal of pendency vouchers or a la carte publicly-funded services of the parents' choosing would change the student's placement and, in any event, has not been agreed to by DOE or by the State Education Department.  Thus, it is not a pendency placement.  Rather, Plaintiffs' proposal is an attempt to impose on DOE the cost of a Parent's unilateral placement of the child in private school or with private providers..  This proposal was rejected by the Second Circuit in _De Paulino v. N.Y.C. Dep't of Educ._, 959 F.3d 519, 531 (2d Cir. 2020).  It should be rejected by this Court now.

Finally, it should be noted that Parents have a number of available avenues if they believe that their child's special educational program is not working.  They can ask to have their child's IEP reviewed through an IEP meeting or they can ask DOE to reevaluate their child if they believe that their child's needs have significantly changed.  8 NYCRR § 204.  In either case, an IEP team that includes the Parent would be convened to review the child's IEP and, if warranted, revise the recommended program on the IEP. 8 NYCRR §§ 204(b), (e)(i), (g).  Under certain circumstances, DOE may agree to fund a private assessment of the child. As already discussed, a Parent may also file a Due Process Complaint to initiate IDEA administrative review. In New York, that review is a two-tier process composed of an initial impartial hearing with an administrative trial.  Any party who feels aggrieved by the impartial

hearing decision may appeal it to the Office of State Review in the State Education Department, whose decision is final in the administrative review process, and may be appealed by any aggrieved party to federal or state court.  20 U.S.C. §§ 1415(f)-(i).

### D.  Plaintiffs Have Not Shown That They Are Likely to Suffer Irreparable Injury Absent an Award of Preliminary Injunctive Relief

"Irreparable harm is 'injury that is neither remote nor speculative, but actual or imminent and that cannot be remedied by an award of monetary damages.'" New York v. Actavis PLC, 787 F.3d 638, 660 (2d Cir. 2015) (internal citations omitted). Here, the relief Plaintiffs seek—provision of full time, in-person learning—would change the *status quo*, not preserve it, in a manner that would threaten the health of the Plaintiffs by unnecessarily exposing them to an enhanced risk of contracting the COVID-19 virus. It cannot be credibly disputed that Plaintiffs have been provided with educational services, including those recommended on their IEPs, by comparable service delivery models to those provided to general education students. See generally Foti Decl. To the extent that in an individual case, a SWD may be struggling or has regressed (as compared to a general education student) – which is *not* shown in Plaintiffs' motion -- the SWD has a number of options to have her IEP program reviewed and changed if necessary. *See supra* at Point I.C. Finally, there is the possibility of compensatory services if warranted. However, all of these possibilities are speculative at this point, and can be better addressed, if needed, through readily available avenues.

Plaintiffs have failed to include facts sufficient to demonstrate that any individual Plaintiff has, in fact, regressed during the pandemic, which further dooms their application for injunctive relief. Counsel for Plaintiffs merely states in conclusory fashion that all students' IEPs have not been properly implemented because of the fact of remote learning, and draws from that assertion the dubious conclusion that all students have therefore been denied a FAPE. There is no mention whatsoever, for example, of the particular services that each purported class members did not receive or how the

transition to remote learning affected each individual student's ability to make educational progress, which is insufficient. See J.C. v. Fernandez, 2020 U.S. Dist. LEXIS 125951, *2 (TRO and PI denied where because "no substantial evidence" was submitted in support of the argument of irreparable harm; in its place was only counsel's argument that a failure to implement the IEPs in their entirety constitutes *per se* irreparable harm."); Contrariwise, the NYC Defendants *have* introduced evidence in admissible form outlining the steps the DOE has taken to minimize the disruption that the pandemic is causing, which is further reason to deny the request for injunctive relief. See id.

Further, the "self cure" remedies proposed by plaintiffs would circumvent the *Burlington/Carter* analysis and in any event, constitute a species of money damages. Under plaintiffs' proposed pendency voucher, Parents would get to unilaterally choose the privately-provided services to be provided to their children at public expense. They would not need to show that DOE has failed to offer a FAPE. They would not need to show that the unilateral services they have chosen provide an appropriate program. Moreover, Plaintiffs just assume the equities favor themselves given the pandemic. This turns on its head the *Burlington/Carter* test for tuition reimbursement of unilateral placements. It also brings into sharp focus the fact that the goal of this voucher is public funding of private services or tuition – it essence, money damages.  It is black letter law that money damages do not constitute irreparable injury. <u>Borey</u>, 934 F.2d at 34.  For this additional reason, plaintiffs are not likely to suffer irreparable harm in the absence of an injunction.

### E. Both the Balance of the Equities and the Public's Interests Favor a Denial of Plaintiffs' Request for Preliminary Injunctive Relief.

"Where the Government is the opposing party, the final two factors in the preliminary injunction analysis—the balance of the equities and the public interest—merge." *Barbecho v Decker*, 2020 US Dist. LEXIS 82978, at *17 (SDNY May 11, 2020). Here, there is no question that an injunction requiring DOE to provide immediate in-person instruction would *not* serve the public's interest.  First, it

should be noted that Plaintiffs devote only a single paragraph in their memorandum of law in support of the argument that the public would benefit from such an order. They do not offer any compelling rationale for their position. They instead cite to _Murphy v. Arlington Central School District BOE_, 297 F.3d 195 (2d Cir. 2002), which stands for the now well-settled proposition that if a school district unilaterally modifies a student's pendency placement, a parent may challenge that modification in federal court without first exhausting administrative remedies.. It is unclear what bearing this proposition has on the issue of whether in-person learning and the provision of a bank of funds to parents of SWD would work in favor of the public's interest. As noted above, Plaintiffs either misunderstand or mischaracterize the role that pendency plays in this case. In any event, that issue goes to the merits, and not to the question of equities and interests.

On the one hand, the government has a strong interest in protecting the public health and welfare. _See Connecticut Citizens Defense League, Inc. v Lamont_, 2020 US Dist. LEXIS 99872, at *30 (D Conn June 8, 2020) ("[T]here is no doubt that the Governor and the Commissioner have a compellingly important government interest: protection of …Connecticut residents generally from infection by the COVID-19 virus"); _V.D. v New York_, 403 F Supp 3d 76, 87 (EDNY 2019) (upholding exclusion from school for failure to obtain vaccinations noting "a state's strong interests in protecting the public health and welfare."). Given the current understanding of the virus and its transmission, viewed in the context of the enormous public health challenges it has created, there is no plausible argument that a mandate of immediate full in-person learning would serve the public's interest as a whole. _See_ Health Decl. ¶¶ 19, 26, 27; _Ass'n of Jewish Camp Operators v Cuomo_, 2020 US Dist. LEXIS 117765, at *61 (NDNY July 6, 2020) (denying request for injunctive relief in part due to public interest considerations and reasoning that "[g]iven the unprecedented nature of the COVID-19 pandemic, the deadly nature of the virus itself, the lack of a vaccine at the time of this writing, and lack of scientific agreement about its

transmission, the Court concludes that the issuance of an injunction is not in the public interest at this time."). On the other side of the equation, while many students would likely benefit from more in-person learning, Plaintiffs have not offered any compelling rationale for the proposition that the public as a whole would benefit, nor any explanation of why the potential for individualized benefits to a select group outweighs the obvious risks inherent in mandating the immediate resumption of full in-person learning to the public as a whole.

Neither is there any plausible, compelling argument that an immediate independent re-evaluation of all special education students' IEPs and an award of a bank of money to parents of SWD to prospectively fund additional special education services would serve the public's interests. As noted above, the City is in the midst of a financial crisis, with billions of dollars in budget deficits. The DOE is currently focusing all of its efforts and resources on school re-opening. See generally Foti Decl. While there may be an argument (unarticulated by Plaintiffs) that in-person learning and a bank of funds to pay for prospective services would be in the interest of these Plaintiffs, there is no compelling argument that this situation would benefit the public as a whole. *Id.* at *61. For all these reasons, the court should deny Plaintiffs' preliminary injunction application.

## POINT II

### PLAINTIFFS' COMPLAINT SHOULD BE DISMISSED BECAUSE THE COURT LACKS SUBJECT MATTER JURISDICTION AND THE COMPLAINT FAILS TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED.

#### A.  The Court Lacks Subject Matter Jurisdiction Because Plaintiffs Have Failed to Exhaust their Administrative Remedies

The Court is respectfully referred to Point I.C. above, for a complete discussion of the requirement that Plaintiffs exhaust their administrative remedies.  The failure to exhaust required administrative remedies deprives the Court of subject matter jurisdiction.  "A plaintiff's failure to

exhaust administrative remedies under the IDEA deprives a court of subject matter jurisdiction.  *See*

*Hope v. Cortines*, 69 F.3d 687, 688 (2d Cir. 1995)" *Polera v Bd. of Educ.*, 288 F.3d 478, 483 (2d Cir.

2002).   Accordingly, pursuant to Federal Rule of Civil Procedure 12(b)(1), the complaint should be

dismissed for lack of subject matter jurisdiction.

### B.  *The Complaint Should be Dismissed for Failure to State a Claim.*
   *The Claims in the Complaint are Meritless as a Matter of Law*

The Court is respectfully referred to Point I.A and Point I.B above, for a complete discussion of

the lack of legal merit in Plaintiffs' claims.

### C.  *The Complaint Should be Dismissed for Failure to State a Claim Because the Claims*
   *against the NYC Defendants Are Not Plausible or Sufficiently Pled.*

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as

true, to 'state a claim to relief that is plausible on its face.'" <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009)

(quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual

content that allows the court to draw the reasonable inferences that the defendant is liable for the

misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). "[D]etermining whether

a complaint states a plausible claim is a context-specific task that requires the reviewing court to draw

on its judicial experience and common sense." *Iqbal*, 556 U.S. at 664-65.

Although voluminous, the Complaint contains no allegations which, if true, would support a

finding that any of the NYC Plaintiffs has suffered a substantive educational deprivation as a result of

school closures – or that they will suffer such a deprivation in the upcoming school year under the two

instructional options being offered to families. Specifically, paragraphs 115 through 118 describe four

Plaintiffs (two from New York City as students with IEPs who were "denied benefits as per their IEP

from the LEA solely because of their disability. Plaintiffs allege that such denial of educational benefits

was in bad faith or a gross misjudgment." Appendix A describes 37 more students who are alleged to

reside in New York City using identical language. Nowhere does the Complaint describe a single IEP benefit that any Plaintiff did not receive due to the COVID-19-related closure of school buildings. Even if read indulgently, the Complaint does not assert any facts sufficient to support a finding that any of the Plaintiff students failed to receive a FAPE due to the school building closures. The allegations in the Complaint referencing Plaintiffs are cursory, and there are no facts from which a factfinder could conclude that their rights have been violated under any asserted causes of action– including their IDEA pendency rights, which the Complaint correctly notes, have been described by the U.S. Department of Education as requiring "a very fact specific inquiry." (Complaint, ¶ 95).

There is simply no authority in the IDEA for the relief Plaintiffs seek. Moreover, Plaintiffs have failed to provide even the most basic information necessary to assess each SWD's needs, rendering the Complaint fatally defective. Plaintiffs improperly invoke the "pendency" provision of the IDEA. Under this provision, a school district must "continue funding whatever educational placement was last agreed upon for the child until the relevant administrative and judicial proceedings are complete." *De Paulino*, 959 F.3d at 531; *see also* 20 U.S.C. § 1415(j); N.Y. Educ. Law § 4404(4)(a). What constitutes an "agreed on placement" is not defined in the IDEA. *Student X*, 2008 U.S. Dist. LEXIS 88163, at *61. It is clear, however, that the IDEA's pendency provision does not contemplate the type of relief sought here: a "pendency voucher" to be used for instruction and services of their choosing (essentially, prospective funding for a unilateral placement), an independent re-evaluation of their child, or monetary damages.

Moreover, the relief sought by plaintiffs would change the last agreed on placement which is ordinarily the special educational program set forth in the SWD's IEP.  Thus Plaintiffs' request for that relief must be evaluated under the above, tradition framework for a party seeking mandatory preliminary injunctive relief. See L.V. v. N.Y. City Dep't of Educ., 2020 U.S. Dist. LEXIS 120995, *9 (S.D.N.Y. R & R *adopted* July 17, 2020) ("Plaintiffs' request for a prospective funding account goes beyond the

IDEA's stay-put provision, and because Plaintiff' do not meet the standard for this emergency injunctive relief, it should not be granted at this time."). In sum, application of Fed. R. Civ. P. 12(b)(6) and the *Iqbal/Twombly* standard require dismissal of the Complaint against the NYC Defendants for failure to state a cognizable claim on behalf of any of the NYC Plaintiffs.

### D.  Neither Compensatory Nor Punitive Damages are Available under the IDEA

Plaintiffs' IDEA claims seeking compensatory and punitive damages fail because this relief is not recoverable under the IDEA.  *See Cave v. E. Meadow Union Free Sch. Dist.*, 514 F.3d 240, 247 (2d Cir. 2008) ("Compensatory and punitive damages, as we explained in *Polera*, are not available under the IDEA."). As the Second Circuit stated: "[t]he purpose of the IDEA is to provide educational services, not compensation for personal injury, and a damages remedy … is fundamentally inconsistent with this goal." Polera v. Bd. Of Educ., 288 F.3d 478, 486. Accordingly, plaintiffs' claims for compensatory and punitive damages must be dismissed.

## CONCLUSION

For the reasons set forth in this memorandum of law and the accompanying declarations, this Court should deny Plaintiffs' application for preliminary injunctive relief and dismiss the Complaint.

Dated: September 18, 2020
      New York, NY

                    JAMES E. JOHNSON
                    Corporation Counsel of the
                     City of New York
                    Attorney for *NYC Defendants*
                    100 Church Street, Room 2-113
                    New York, NY 10007
                    Tel: (212) 356-0871
                    mtoews@law.nyc.gov

By:    /s/ MGT
                    Mark G. Toews
                    Janice Birnbaum
                    Marilyn Richter