UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x

**J.T.,** Individually and On Behalf Of D.T.;
**K.M.,** Individually and On Behalf Of M.M. and S.M.;
**J.J.,** Individually and On Behalf Of Z.J.;
**C.N.,** Individually and On Behalf Of V.N.; and,
All Others Similarly Situated,

                        Plaintiffs,                                   **20 – CV - 5878 (CM)**

-   against –

**BILL de BLASIO**, in his official capacity as
the Mayor of New York City; **RICHARD CARRANZA**,
in his official capacity as the Chancellor of New York City
Department of Education; the **NEW YORK CITY
DEPARTMENT OF EDUCATION**; the **SCHOOL
DISTRICTS IN THE UNITED STATES;** and
**STATE DEPARTMENTS OF EDUCATION IN THE
UNITED STATES,**

                        Defendants.

-------------------------------------------------------------------x

## CIVIL RICO CASE STATEMENT SUPPLEMENT

## 18 U.S.C. §§ 1961-1968

Peter G. Albert, Esq.
Brain Injury Rights Group, Ltd.
Attorneys for Plaintiffs
300 East 95th Street – Suite 130
New York, New York 10128
(646) 850-5035

1

## CIVIL RICO CASE STATEMENT SUPPLEMENT

Pursuant to this Court's civil RICO Case Standing Order and 18 U.S.C. §§1961-1968, and the Order of Chief Judge McMahon, dated October 19, 2020 (ECF #183), Plaintiffs provide the following supplemental information in support of their RICO claims, based on the previously filed Complaint (ECF #1), the Memorandum of Law in Support of the Order to Show Cause (ECF #90) and the original RICO Case Statement (ECF #121), collectively "Plaintiffs Previous Submissions". While this supplement provides greater detail in relationship to the Defendants, Mayor de Blasio, Chancellor Carranza, New York City Department of Education and New York State Education Department ("NYC Defendants"), Plaintiffs also show how these specifics are transferrable to the remaining Defendants outlined in the Complaint. Upon the ability to subpoena documents and testimony of these Defendants and the benefit of additional discovery, the Plaintiffs reserve the right to amend the RICO Case Statement and/or modify the assertions stated herein.

The only defense that Defendants de Blasio, Chancellor Carranza and NYC DOE, raise in their Reply Memorandum of Law (ECF #157) to challenge the Plaintiffs RICO fraud allegations is the RICO Case Statement fails to meet the Ashcroft pleading standard nor the pleading standard of Rule 9(b), specifically, "a party must state with particularity the circumstances constituting fraud or mistake." Notably, what the Defendants have NOT done is deny the allege fraud occurred or presented any declaration or documentation to contradict the Plaintiffs' allegations. While the Plaintiffs' position is the Plaintiffs' Previous Submissions meet the requirements of the pleading standards, this supplemental document will not only enhance their pleading arguments, it will answer why the NYC Defendants have not denied the fraud. This supplemental document will also provide guidance on how this impacts the additional Defendants in this matter.

## INTRODUCTION

As previously described in the Plaintiffs' Previous Submissions, the Individuals with Disabilities Education Act, 20 U.S.C. §1400 ("IDEA")[1], the regulations of the United States Department of Education, which were promulgated pursuant to authority granted by the statute (34 C.F.R. Part 300), guarantees students with disabilities a free appropriate public education ("FAPE"). The term FAPE[2] refers to special education and related services that are designed to meet a child's unique needs and that will prepare the child for further education, employment, and independent living. The Plaintiffs' Previous Submissions go into detail on the statutory framework and subsequent case law which will not be repeated in this supplemental document.

## RICO DETAILS

1.   State whether the alleged unlawful conduct is in violation of 18 U.S.C. §§1962(a), (b), (c), and/or (d).

The Defendants and specifically, the NYC Defendants, violated 18 U.S.C. §§ 1962(a), (c), and (d).

2.   List each defendant and state the alleged misconduct and basis of liability of each defendant.

The NYC Defendants receive federal funding from the U.S. Department of Education and U.S. Department of Health and Human Services, through Centers for Medicare and Medicaid, as well as funding from the New York State government in order to educate and support children who qualify for special education services based on the IDEA. In order to receive this funding

---

[1] https://sites.ed.gov/idea/

[2] IDEA Section 602 (9) The term `free appropriate public education' means special education and related services that--
(A) have been provided at public expense, under public supervision and direction, and without charge;
(B) meet the standards of the State educational agency;
(C) include an appropriate preschool, elementary school, or secondary school education in the State involved; and
(D) are provided in conformity with the individualized education program required under section 614(d).

there are specific legal requirements which have been detailed in previous submissions by Plaintiffs. Similarly, the other Defendants also receive federal and state funding.

Primarily, in order to receive the federal and state funds, the NYC Defendants are required to provide a FAPE to each of these special education students. The other Defendants are also required to provide a FAPE to their respective special education students. As detailed in the previous submissions by Plaintiffs, in March 2020, the NYC Defendants unilaterally, substantively, and materially changed the educational program for each student as outlined in their respective IEPs. This is a prima facie denial of FAPE. The NYC Defendants submitted a Declaration by Christina Foti, its Deputy Chief Academic Officer. (See ECF #139). This declaration admits NYC Defendants did exactly what the Plaintiffs have alleged in unilaterally, materially, and substantively changing the educational programs of these students. While Ms. Foti claims NYC DOE created Special Education Remote Learning Plans ("RLP"), she admits these RLPs did NOT supersede or alter the actual IEPs for each student. Her declaration only provides generic language about "staff were instructed to reach out to parents of students with disabilities to obtain their input regarding the RLP for their child." While she claims RLPs "were completed for more than 98.2% of students with disabilities," she provides no details of the process by which these RLPs were developed nor details of the number of RLPs that were completed without the approval of the parents. In fact, therapists were instructed to alter the students' educational program *WITHOUT* parental participation.[3] The IDEA includes a number of procedural safeguards "that guarantee parents both an opportunity for meaningful input into all decisions affecting their child's education and the right to seek review of any decisions they think

---

[3] https://www.uft.org/news/news-stories/teletherapy-guidance-speech-otpts

inappropriate." *Honig v. Doe*, 484 U.S. 305, 311-12, 108 S. Ct. 592, 98 L. Ed. 2d 686 (1988).[4]

Since the NYC Defendants acknowledge these RLPs do not change the status quo of the students'

educational program, these RLPs would only be valid for the limited time the U.S. Supreme Court

has ruled school districts have to reinstate the status quo before they are in violation of the

pendency rights of these students.[5]

Ms. Foti's declaration in Paragraph 9 states NYC DOE has conducted over 98,000 new

IEP meetings since mid-March.  However, Ms. Foti does not refute the Plaintiffs' previous

allegations the NYC Defendants continued to develop IEPs as if in-person instruction was

available and schools were open.  In fact, the NYC Defendants created IEPs after March 2020 they

willfully and purposefully knew could not be implemented and therefore they knew they were not

providing a FAPE to these students.  (See Exhibit A).  These IEPs did not include a provision for

related services to be provided remotely or change the location of the provision of special

education services from a school-based environment to the most restrictive setting possible, i.e.,

at home, in complete isolation from any other student or school-based staff member.

Ms. Foti's declaration in Paragraph 11 highlights the unilateral, material, and substantive

change NYC Defendants made to Plaintiffs' educational program even after Governor Cuomo

---

[4] *Susquenita Sch. Dist. v. Raelee S.*, 96 F.3d 78, 82, 83 (3d Cir. 1996). Accordingly, the stay-put provision "protect[s] handicapped children and their parents during the review process," by "block[ing] school districts from effecting unilateral change in a child's educational program."

[5] The maximum amount of time a school district can displace a student and change the educational program without triggering a violation of 20 U.S.C. § 1415(j) is 10 school days based on *Honig v. Doe,* 484 U.S. 305, 325, 325-26 n.8, 98 L. Ed. 2d 686, 108 S. Ct. 592 (1987).  However, this unilateral action of a suspension by the school district may create a "change in placement," and by the terms of the IDEA, a change in placement can only occur with the consent of the parents, or after written notice, and the opportunity for a hearing.  However, not all suspensions constitute a prohibited "change in placement." "Where a student poses an immediate threat to the safety of others, officials may temporarily suspend him or her for [**11] up to 10 schooldays." Id. at 325.  The Supreme Court adopted the ten-day limit from the Office of Civil Rights ("OCR") of the Department of Education, which decided that "a suspension of up to 10 school days does not amount to a 'change in placement.'" Id. at 325 n.8.  Based on this cut-off, the Court found that suspensions of twenty and thirty days' duration were impermissible. Id.

lifted his restrictions on school buildings.  What Ms. Foti fails to deny is the NYC Defendants did not provide special transportation for these students in order for them to actual receive the in-person services.  As detailed in the Plaintiffs' Previous Submissions, special transportation is considered a related service as per IDEA.

As has been well-documented, the NYC Defendants knew, or should have known by mid-March, they were not providing a FAPE to its students and thereafter should not have billed or received any federal or state funds that required NYC Defendants to be providing FAPE.  In addition, the NYC Defendants should not have budgeted or represented to financial institutions, federal and state agencies and the public-at-large, or continued billing and receiving these federal and state funds for the new 2020-2021 school year knowing they were not providing FAPE.

Second, NYC Defendants fraudulently claimed they were providing special education and related services as outlined in the students' IEPs and billed and/or reimbursed by the federal government and New York State for services that were not performed, established fraudulently or were worthless.  The Plaintiffs' Previous Submissions detailed the process by which NYC Defendants are required to follow in order to bill federal and state government for School-based Medicaid claims.

There are six conditions that must be met for Medicaid to reimburse for IDEA-related services: 1) The child receiving the service must be enrolled in Medicaid; 2) The services are medically necessary; 3) The services must be covered in the state Medicaid plan or authorized by the federal Medicaid statute; 4) The services must be listed in the child's individualized education program (IEP); 5) The school district or local educational agency (LEA) must be authorized by the state as a qualified Medicaid provider; and 6) The LEA or school district must follow state guidance as to how claims are to be submitted for reimbursement.  School districts and providers

are instructed to maintain proper documentation and follow the reporting requirements to avoid fraud.[6]

In New York State, the amount of Medicaid spending in the schools was $273,563,018, and $136,781,511 of that came from federal funds[7] and CMS has increased oversight specifically in New York State.[8]  A whistleblower filed a federal lawsuit in 1998 and the federal audit found the program to be out of compliance with federal guidelines and that New York State school districts did not maintain adequate documentation to support Medicaid billing.  The lawsuit was settled for $540 million in or about 2009, and a new state plan amendment was approved in April 2010.  The biggest difference between the old claiming methodology and the new methodology is the old methodology was based on a minimum number of services per month ***while the new methodology requires the school districts to PROVE a session occurred in order to bill.***[9]  The School Supportive Health Services Program (SSHSP) and the Preschool Supportive Health Services Program (PSHSP) were developed jointly by the New York State Education Department (NYS SED) and the New York State Department of Health (NYS DOH). SSHSP applies to the 5-21 year old population and PSHSP applies to the preschool 3-4 year population pursuant to §4410 of the Education Law. SSHSP and PSHSP were established to assist school districts and counties in obtaining Medicaid Reimbursement for certain diagnostic and health support services provided to students with disabilities.[10]  SSHSP and PSHSP created a handbook in 2014, to provide specific

---

[6] How to Obtain Medicaid Funding for School-Based Services: A Guide for Schools in System of Care Communities: http://www.rippleeffects.com/pdfs/MedicaidFunding.pdf
[7] https://www.cbpp.org/research/health/medicaid-helps-schools-help-children
[8] https://oig.hhs.gov/oas/reports/region2/20301008.pdf
[9] https://www.uft.org/files/attachments/medicaid-speech.pdf
[10] http://www.oms.nysed.gov/medicaid/

guidelines for LEAs to follow in order to receive Medicaid funding.[11]  NYC DOE has an entire department within its bureaucracy to maximize its Medicaid funding.[12]

SSHSP provided specific guidance to all service providers about proper and improper Medicaid billing during the Covid-19 situation in a June 5, 2020, memorandum.  In the memorandum SSHSP specifically stated, "There must be live interaction between the therapist and the student or Medicaid cannot be billed. There is no Medicaid reimbursement for videos, material packets, activities that are not completed during a live interaction between the therapist and the student."; "No, text messaging and email contact with students or parents will not be reimbursable by SSHSP Medicaid."; "No, sending activities for a student to complete will not be reimbursable by SSHSP Medicaid."; "No, providing consultation to parents is not a reimbursable SSHSP service."; and "No, asynchronous "store and forward" services are not reimbursable by Medicaid under the SSHSP."[13]

The United Federation of Teachers ("UFT") is the sole bargaining agent for most of the non-supervisory educators who work in the New York City public schools. UFT represents approximately 75,000 teachers, 19,000 classroom paraprofessionals, along with related service providers, such as occupational therapists, physical therapists and speech therapists.[14]  Despite the clear guidance from the New York State Education Department and the New York State Health Department about providing live, synchronous instruction, UFT advised its members, "...synchronous instruction ***is not required*** at this time."[15] (emphasis added)

---

[11] http://www.oms.nysed.gov/medicaid/handbook/sshsp_handbook_8_nov_25_14.pdf
[12] https://infohub.nyced.org/working-with-the-doe/special-education-providers/medicaid#jump-to-heading-21
[13] http://www.oms.nysed.gov/medicaid/medicaid_alerts/alerts_2020/20_02_Addendum.html
[14] https://www.uft.org/your-union/about-uft
[15] https://www.uft.org/your-rights/safety-health/coronavirus/guidance-on-remote-learning

The pattern of unilateral decision-making and violation of explicit rules governing the delivery of related services was most prevalent when NYC Defendants directed all related service providers to NOT provide ANY in-person, live, services to special education students during the coronavirus pandemic which was detailed in a memo to all related service providers on March 31, 2020, by Michael van Biema, the Executive Director of NYC DOE Office of Related Services. (see Complaint Appendix #4).

While the specific documentation to prove the RICO fraud allegations are not publicly available, there is considerable publicly available information to demonstrate the NYC Defendants committed this fraud.[16]  The NYC Defendants outlines the summaries of special education budgeting for the 2018-2019 School Year, including memorandums to the senior leadership within NYC DOE.[17]  The NYC Defendants outlines the summaries of special education budgeting for the 2019-2020 School Year where the initial fraud began, including memorandums to the senior leadership within NYC DOE.[18]  As can be seen clearly, there was no modification of expected federal or state funds for the last quarter of the school year, even though the Plaintiffs case clearly demonstrates the NYC DOE was not entitled to certain federal or state funds.  And recently, the NYC Defendants outlines the budgeting for the current 2020-2021 School Year, for which there is no reduction, modification or adjustment in federal or state funding relevant to the provision of special education services.[19]  In fact, the NYC Defendants breakdown special education students attending District 75 schools[20] when the schools have only begun partial reopenings since

---

[16] https://infohub.nyced.org/reports/financial/financial-data-and-reports
[17] https://www.nycenet.edu/offices/finance_schools/budget/DSBPO/allocationmemo/fy17_18/am_fy18_osef1.html
[18] https://www.nycenet.edu/offices/finance_schools/budget/DSBPO/allocationmemo/fy18_19/am_fy19_osef1.htm
[19] https://www.nycenet.edu/offices/finance_schools/budget/DSBPO/allocationmemo/fy19_20/am_fy20_osef1.htm
[20]
https://www.nycenet.edu/offices/finance_schools/budget/DSBPO/allocationmemo/fy19_20/fy20_docs/fy2020_sam027_t02.xlsx

September 21, 2020.[21]   It is noteworthy, the NYC DOE executive that provided the only declaration, Ms. Christina Foti, is copied on most of these documents.  This is one reason Ms. Foti could not state under penalty of perjury, the NYC DOE has not billed and received the federal and state governments for these services.

Additional discovery, including reviewing the documentation submitted by NYC Defendants to state and federal departments to secure these funds will be the only additional evidence needed to prove the RICO fraud.

Defendant New York State Department of Education is the State Educational Agency ("SEA") which exercises general supervision over all programs in the State that provide educational services to disabled students, and must ensure that all such meet State education standards. *Michael C. ex rel. Stephen C. v. Radnor Tp. School Dist.*, 202 F.3d 642, 648 (3d Cir. 2000).

2a.   List the alleged wrongdoers, other than the defendants listed above and state the alleged misconduct of each wrongdoer.

The alleged wrongdoers (other than the Defendants listed above and state the alleged misconduct of each wrongdoer): Superintendents and other school administrators and executives who have primary fiduciary responsibility for the Defendant School Districts; those within the Defendants' Committees of Special Education who have primary responsibility for provision of providing FAPE to special education students, school boards and governing bodies who have oversight responsibilities, school employees and contract workers who have professional and legal

---

[21]   https://gothamist.com/news/most-in-person-classes-delayed-again-as-nyc-switches-to-staggered-reopening-of-schools

obligations to provide FAPE.  State Education Department Directors and others within the state

agency(ies), responsible for the oversight and enforcement of federal and state regulations and

laws.  National and local unions of these school-based or state education-based staffing, who either

directly or indirectly encouraged the denial of FAPE to these students.

3.      List the alleged victims and state how each victim was allegedly injured.


        The NYC victims are the Plaintiffs specified in the Appendix A of the Complaint (ECF #1)

who are parents and/or natural guardians ("Plaintiff-Parent") who reside in New York City as well

as all others similarly situated, ("Class Members", see Complaint, Appendix A, ECF #1).  The

NYC Defendants had specifically asked for detailed information about these NYC victims and was

provided such information (see ECF #106), therefore, NYC Defendants had all relevant

educational documentation and records available to them prior to their Memo of Law and Reply

Memo of Law.

        As was preciously detailed in the RICO Case Statement, the NYC victims and all Plaintiffs

suffered an injury in fact by the discrimination of the Defendants through the Americans with

Disabilities Act, the violation of procedural rights and safeguards created by IDEA, and the failure

of the Defendants to provide the services the Plaintiff-Students were entitled to receive as outlined

in their IEPs.  This is most egregious to these students, since the state and federal government only

allow for the one-time reimbursement of these services.  Therefore, unless the Plaintiffs are

successful in this matter, they will not be entitled to a "make-up" session for a session NYC

Defendants already got paid.  The violation of the pendency rights, which was intended as an

automatic injunction, has also harmed the Plaintiff-Students as well as the "added risk" detailed in the RICO Case Statement.

The specific services the NYC victims did not receive, whereas the NYC Defendants billed and received federal and state funds for the provision of these services are outlined in Exhibit  A .

As was detailed in the Plaintiffs Previous Submissions, the federal and respective states were also victims of this RICO fraud.

4.      Describe in detail the pattern of racketeering activity or collection of unlawful debts alleged for each RICO claim.

List the alleged predicate acts and the specific statutes that were allegedly violated:

18 U.S.C. § 1341. Frauds and swindles (mail fraud),

18 U.S.C. § 1343. Fraud by wire, radio, or television (wire fraud),

18 U.S.C. § 2314 (fraudulent transfer of money),

18 U.S.C. § 2315 (fraudulent receipt of money) and

18 U.S.C. § 1344.Bank fraud (financial institution fraud)

<u>18 U.S.C. § 1341. Frauds and Swindles (mail fraud)</u>

As described in detail above, NYC Defendants, as well as other wrongdoers, having devised or intending to devise a scheme or artifice to defraud, and for obtaining money by means of false or fraudulent pretenses, representations, or promises, placed in post offices or in authorized repositories matter and things to be sent or delivered by the Postal Service, caused matter and things to be delivered by private or commercial interstate carrier, and received matter and things from the Postal Service or and private or commercial interstate carriers, including but not limited

to fraudulent invoices, correspondence, payments, and false written materials in furtherance of its fraudulent racketeering activities as detailed throughout the RICO Case Statement as well as above and the attached Exhibits.

DATES OF THIS PREDICATE ACT RANGE: From March 2020 through present.

SPECIAL NOTE: If the violation occurs in relation to, or involving any benefit authorized, transported, transmitted, transferred, disbursed, or paid in connection with, a presidentially declared major disaster or emergency (as those terms are defined in section 102 of the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. §5122)), or affects a financial institution, such person shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

CRIMINAL PROSECUTION: As of this filing, there has been no criminal prosecution for the violation of these predicate acts.


18 U.S.C. § 1343. Fraud by wire, radio, or television (wire fraud)

As described in detail above, NYC Defendants, as well as other wrongdoers, having devised or intending to devise a scheme or artifice to defraud, and for obtaining money by means of false or fraudulent pretenses, representations, or promises, transmitted or caused to be transmitted or received by wire in interstate commerce, things which include but are not limited to fraudulent emails, invoices, correspondence, payments, and false written materials in furtherance of its fraudulent racketeering activities as detailed throughout the RICO Case Statement as well as above and the attached Exhibits.

DATES OF THIS PREDICATE ACT RANGE: From March 2020 through present.

SPECIAL NOTE: If the violation occurs in relation to, or involving any benefit authorized, transported, transmitted, transferred, disbursed, or paid in connection with, a presidentially declared major disaster or emergency (as those terms are defined in section 102 of the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. §5122)), or affects a financial institution, such person shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

CRIMINAL PROSECUTION: As of this filing, there has been no criminal prosecution for the violation of these predicate acts.


18 U.S.C. § 2314 (fraudulent transfer of money)

As described in detail above, NYC Defendants, as well as other wrongdoers, transported, transmitted or transferred through interstate commerce goods, wares, merchandise, securities or money worth more than $5,000, knowing that it had been stolen, converted or taken by fraud. The Defendants did not need to participate in the underlying scheme to defraud; the Defendant simply needed to cause the transport or transfer of the funds, goods or securities, knowing that they were procured by fraud.[22] These predicate acts relate to the racketeering activities as detailed throughout the RICO Case Statement as well as above and the attached Exhibits.

DATES OF THIS PREDICATE ACT RANGE: From March 2020 through present.

CRIMINAL PROSECUTION: As of this filing, there has been no criminal prosecution for the violation of these predicate acts.

---

[22] See, e.g., United States v. Quintanilla, 2 F.3d 1469, 1474 (7th Cir. 1993); United States v. Schwab, 88 F. Supp. 2d 1275, 1280 (D. Wyo. 2000).

18 U.S.C. § 2315 (fraudulent receipt of money)

As described in detail above, NYC Defendants, as well as other wrongdoers, received through interstate commerce goods, wares, merchandise, securities or money worth more than $5,000, knowing that it had been stolen, converted or taken by fraud. The Defendants did not need to participate in the underlying scheme to defraud; the Defendant simply needed to know they were procured by fraud. These predicate acts relate to the racketeering activities as detailed throughout the RICO Case Statement as well as above and the attached Exhibits.

DATES OF THIS PREDICATE ACT RANGE: From March 2020 through present.

CRIMINAL PROSECUTION: As of this filing, there has been no criminal prosecution for the violation of these predicate acts.


18 U.S.C. § 1344. Bank fraud (financial institution fraud)

As described in detail above, NYC Defendants, as well as other wrongdoers, knowingly executed, or attempted to execute, a scheme or artifice to defraud a financial institution; or to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises. These predicate acts relate to the racketeering activities as detailed throughout the RICO Case Statement as well as above and the attached Exhibits.

CRIMINAL PROSECUTION: As of this filing, there has been no criminal prosecution for the violation of these predicate acts.

5.      Describe the RICO Enterprise

The enterprise ("Enterprise") to defraud the federal government and their respective States, as well as Plaintiffs and Class Members, consists of three different levels consisting of Defendants, other wrongdoers, passive instruments, and victims. At the local School District level, specifically NYC Defendants, budget, financing, reimbursements and development of IEPs involve Superintendents and other school administrators and executives, school boards and governing bodies, school employees, contractors and community members, some of whom are employees or agents of Defendant School Districts. At the state level, the governor, state legislators, Defendant State Education Department, state Medicaid office as well as other administrators, employees, and contractors of these respective offices, are involved for their role in setting and managing state funding and state policy, including state equalization formulas as well as oversight and enforcement of these policies. At the national level, the Federal Education Department, the Federal Health and Human Service Department through Centers for  Medicaid and Medicare, the Federal Justice Department and members of Congress are involved for their work around education and Medicaid funding, federal policy and oversight and enforcement of federal rules, regulations and laws. In addition, national and local unions representing many of the employees listed above, either directly or indirectly contributed to this Enterprise.  This Enterprise also consists of financial institutions as described above who are also victims of the Defendants' racketeering activities.


6.      Describe the alleged relationship between the activities of the enterprise and how the pattern of racketeering activity differs from the usual and daily activities of the enterprise, if at all.

16

Notably, the racketeering activity blended into the usual and daily activities of the Enterprise and the Defendants used the presidentially declared major emergency as a pretense to commit this fraudulent scheme.

7.      Describe the effect of the activities of the enterprise on interstate or foreign commerce.

Further, the Defendants and others within the Enterprise in this action have conducted the racketeering activities and other business activities relevant to this action through interstate communications and financial transactions. Defendants operates with financial transactions across various state jurisdictions within the United States. Defendants' business and racketeering activities (involving mail and wire transactions, payment of wages and other interstate financial transactions within the United States) affect interstate commerce.

8.      18 U.S.C. § 1962(a)

As detailed above along with attached Exhibits, NYC Defendants used the income from the racketeering activity to the detriment to the Plaintiffs, Class Members, federal government and New York State.

9.      18 U.S.C. § 1962(b)

Not applicable.

10.     18 U.S.C. § 1962(c)

None of the NYC Defendants were, at any relevant time, employed by the Enterprise. All NYC Defendants are associated with the Enterprise. The liable Defendant "persons" are separate and distinct entities from the Enterprise alleged above.

11.     18 U.S.C. § 1962(d)

As described above and as previously described in the Plaintiffs Previous Submissions, the NYC Defendants' misconduct involves fraud against the federal government, New York State, the Plaintiffs and Class Members. First, the NYC Defendants fraudulently created Individualized Education Programs ("IEPs") for special education students knowing they could not implement these IEPs, thereby knowingly denying each student a FAPE. Second, the NYC Defendants fraudulently claimed they were providing special education and related services as outlined in the students' IEPs and billed and/or were reimbursed by the federal government and New York State for services that were not performed, established fraudulently or were worthless.

12.     Describe the alleged injury to business or property.

As detailed above, Plaintiffs and Class Members have suffered significant injuries to their business and/or property as a result of NYC Defendants' racketeering activities including loss of services, lost and unpaid wages, out-of-pocket expenses, and lost work and professional opportunities. In *Burlington School Committee v. Mass. Dept. of Educ.*, *supra,* the Supreme Court held that a student who fails to receive appropriate services at any time in which he is entitle to them may be awarded compensation in the form of additional services "compensatory education" at a later time. As a result of the gross violations committed by the NYC Defendants, Plaintiff-Parents and Class Members from New York City seek compensatory damages from the NYC Defendants. Compensatory education is an award of educational services designed to remedy a deprivation in the child's education. *Doe v. E. Lyme Bd. Of Educ.*, 790 F.3d 440, 445 (2d Cir. 2015). An award of compensatory education serves to correct a violation of the IDEA that resulted in the child's regression. Regression refers to the failure to maintain an acquired skill in an

identified goal area of concern as a result of an interruption of special education instruction or support services. In *Sabatini v. Corning-Painted Post Area Sch. Dist.*, 190 F. Supp. 2d 509 the Court granted a preliminary injunction directing a school district to pay compensatory education in the form of reimbursement for college tuition.

Plaintiffs and Class Members from New York City seek a minimum award of compensatory education for all of the services as outlined in the Plaintiff-Students' IEP that the NYC Defendants failed to provide since March 2020. However, based upon the results of the independent evaluations, additional services may be required. For example, a Plaintiff-Student and respective Class Members may need more than simply the services missed, but may need an additional year of eligibility beyond 21 years of age. In *Barnett v. Memphis City Schs*, 113 Fed. Appx. 124, the court held the student was entitled to compensatory education past the age of 21. For any Plaintiff-Student who has turned 21 or graduated since the start of the new school year and may no longer be eligible to receive special education services, the courts across various circuits have upheld the proposition that compensatory education is a proper relief to remedy past violations of FAPE who are no longer enrolled in public school or have graduated. See *Pihl v. Massachusetts Dept. of Educ.*, 9 F.3d 184, 189 (1st Cir. 1993); *M.C. v. Cent. Reg'l Sch. Dist.*, 81 F.3d 389, 395 (3d Cir. 1996); *Hall v. Knott County Bd. of Educ.*, 941 F.2d 402, 407 (6th Cir. 1991); *Bd. of Educ. of Oak Park v. Ill. State Bd. of Educ.*, 79 F.3d 654, 660 (7th Cir. 1996); *Miener v. Missouri*, 800 F.2d 749, 753 (8th Cir. 1986).

13.   Describe the direct casual relationship between the alleged injury and the violation of the RICO statute.

All NYC Defendants' acts of mail, wire and financial fraud effectuated the loss of services, lost and unpaid wages, out-of-pocket expenses and lost work and professional opportunities. The traceability requirement for Article III standing requires the plaintiff "'demonstrate a causal nexus between the defendant's conduct and the injury.'" *Rothstein v. UBS AG*, 708 F.3d 82, 4091 (2d Cir. 2013) (quoting *Heldman*, 962 F.2d at 156). A causal nexus is "most easily shown" by a direct relationship between the plaintiff and defendant, but indirectness is not fatal; indeed, the standard is less than the concept of proximate causation. Id. at 91. "The fact that there is an intervening cause of the plaintiff's injury may foreclose a finding of proximate cause but is not necessarily a basis for finding that the injury is not 'fairly traceable' to the acts of the defendant." Id. at 92.

Defendant SCHOOL DISTRICTS IN THE UNITED STATES (See Appendix B of Complaint ECF # 1) are the official bodies charged with the responsibility of developing and enforcing policies with respect to the administration and operation of the public schools in their respective geographic areas, including programs and services for students with disabilities, as defined as the "local educational agency" ("LEA") in 20 U.S.C. § 1401(19) and 34 C.F.R. § 300.28. Upon information and belief, all States and Territories of the United States are the recipient of funding under the IDEA, 20 U.S.C. § 1400-1487, and as such, have the responsibility to "establish and maintain procedures . . . to ensure that children with disabilities and their parents are guaranteed procedural safeguards with respect to the provision of free appropriate education." 20 U.S.C. § 1415(a). Defendant STATE DEPARTMENTS OF EDUCATION IN THE UNITED STATES (See Appendix C of Complaint ECF # 1) are the State Educational Agencies ("SEA") which exercise general supervision over all programs in the State that provide educational services to disabled students, and must ensure that all such meet State education standards. *Michael C. ex rel. Stephen C. v. Radnor Tp. School Dist.*, 202 F.3d 642, 648 (3d Cir. 2000).

14.  Provide any additional information that you feel would be helpful to the Court in trying the RICO claim.

The Supreme Court clarified the difference between the availability of a private right of action with the availability of various remedies. "Although we examine the text and history of a statute to determine whether Congress intended to create a right of action, we presume the availability of all appropriate remedies unless Congress has expressly indicated otherwise." *Franklin v. Gwinnett County Pub. Sch.*, 503 U.S. 60, 66, 112 S. Ct. 1028 (1992) (citation omitted) (monetary damages available as remedy in action to enforce Title IX). The Court went on to announce the "general rule" that "absent clear direction to the contrary by Congress, the federal courts have the power to award any appropriate relief in a cognizable cause of action brought pursuant to a federal statute." Id. 503 U.S. at 70-71.

The Second Circuit in *Polera v. Bd. of Educ.*, 288 F.3d 478, 491 (2d Cir. 2002), has reaffirmed, "We have held that monetary damages are available in claims brought pursuant to 42 U.S.C. § 1983 for denial of access to administrative remedies under the IDEA's predecessor statute, the EHA. *Quackenbush v. Johnson City Sch. Dist.*, 716 F.2d 141, 148 (2d Cir. 1983), cert. denied, 465 U.S. 1071, 79 L. Ed. 2d 750, 104 S. Ct. 1426 (1984). District courts in this Circuit have followed *Quackenbush*, holding that damages are available on claims brought under Section 1983 for violations of the IDEA. See, e.g., *M.H. v. Bristol Bd. of Educ.*, 169 F. Supp. 2d 21, 29-30 (D. Conn. 2001); *R.B. v. Bd. of Educ. of the City of New York*, 99 F. Supp. 2d 411, 418 (S.D.N.Y. 2000); *Cappillino v. Hyde Park Cent. Sch. Dist.*, 40 F. Supp. 2d 513, 515-16 (S.D.N.Y. 1999)."

Other Circuits have approved § 1983 actions to enforce IDEA rights. See *Angela L. v. Pasadena Independent Sch. Dist.*, 918 F.2d 1188, 1193 n.3 (5th Cir. 1990) (§ 1983 and § 504

"permit parents to obtain relief which otherwise is unavailable from the EHA"); *Digre v. Roseville Sch. Independent Dist.*, 841 F.2d 245, 250 (8th Cir. 1988) (injunctive relief); *Mrs. W. v. Tirozzi*, 832 F.2d 748, 753 (2d Cir. 1987) (declaratory and injunctive relief); *Jackson v. Franklin County Sch. Bd.*, 806 F.2d 623, 631-32 (5th Cir. 1986) (compensatory damages or remedial education). See  also *Hunt v. Bartman*, 873 F. Supp. 229, 245 (W.D.Mo. 1994) (injunctive relief).

The Eighth Circuit has concluded that "money damages are available under §504." *Rodgers v. Magnet Cove Public Schools*, 34 F.3d 642, 645 (8th Cir. 1994). See also *Lue v. Moore*, 43 F.3d 1203, 1205 (8th Cir. 1994) (same). The Eighth Circuit reasoned that the Rehabilitation Act incorporates the remedies of Title VI of the Civil Rights Act of 1964, Title IX is also modeled after Title VI, and thus "the Court's holding on Title IX in Franklin applies equally to Title VI and Section 504 cases." *Rodgers*, 34 F.3d at 644. See 29 U.S.C. § 794(a)(2). The Ninth Circuit has concluded compensatory damages are available under the Rehabilitation Act using the deliberate indifference standard applying to show discriminatory intent, see *Ferguson v. City of Phoenix*, 157 F.3d 668, 674 (9th Cir. 1998); *Lovell v. Chandler*, 303 F.3d 1039, 1056 (9th Cir. 2002).

The Third Circuit in *W.B. v. Matula*, 67 F.3d 484 (3d Cir. 1995), examined monetary damages solely through IDEA and concluded, "even were we to limit our focus to IDEA itself, we discern nothing in the text or history suggesting that relief under IDEA is limited in any way, and certainly no "clear direction" sufficient to rebut the presumption that all relief is available. The expansive language of § 1415(f), which was enacted in the shadow of Smith and tracks the broad grant of remedial power allowed a district court reviewing a direct IDEA appeal, see 20 U.S.C. § 1415(e)(2), contains no restrictions on forms of relief. Nor does the legislative history of § 1415(f) suggest a congressional intent that damages be unavailable. In fact, Congress expressly contemplated that the courts would fashion remedies not specifically enumerated in IDEA. See

House Report at 7 (excusing § 1415(f) exhaustion requirement where "the hearing officer lacks the authority to grant the relief sought")." While not recommending monetary damages in W.B., the Court concluded, "However, we do not preclude the awarding of monetary damages and leave to the district court in the first instance the task of fashioning appropriate relief."

The Fifth Circuit, in *Salley v. St. Tammany Parish School Board*, 57 F.3d 458 (5th Cir. 1995), affirmed a damages award for a procedural violation of the IDEA, but the damages were merely nominal because it concluded the "violations did not affect Salleys' decisions regarding the education of Danielle." The clear indication is if the procedural violations had impacted the student's education, then the award would have been greater than nominal. In *Stellato v. Bd. of Educ. of the Ellenville Cent. Sch. Dist.*, 842 F. Supp. 1512, 1516-17 (N.D.N.Y. 1994), the court identified the two "exceptional circumstances" whereby damages are available solely under the IDEA: where there is a danger to the physical health of the child or where the school district acts in bad faith. Both exceptions are present herein.

As the Supreme Court stated in *Honig v. Doe*, 484 U.S. 305, 108 S. Ct. 592 (1988), the court has the equitable power to order a change in placement upon a sufficient showing. id. at 327-28 (interpreting the "stay put" provision of the EHA – former name of the IDEA). In the instant matter, the Plaintiff-Parents are seeking compensatory damages due to the deliberate indifference, intentional and willful actions of the Defendants. Plaintiff-Parents were required to fill in and compensate for the failure of their school district (LEA) and either lost income, incurred out-of-pocket expenses, and/or experienced loss of employment.

Defendants discriminated against Plaintiff-Students and respective Class Members, who are qualified individuals under the ADA, by prohibiting the provision of in-person academic and related services the opportunity to participate or benefit from such services. "Remote learning" is

not "equal" to the "aid, benefit or service" nor is it as effective as in-person services that were provided to other special education students.[23]

As a result of the deliberate indifference, intentional and willful violations committed by the Defendants, Plaintiff-Parents respectfully request both compensatory damages and punitive damages.

Even prior to the Covid-19 pandemic more than half of Defendant-State Education Departments[24] and many Defendant-School Districts were already in violation of IDEA. NYC Defendants has repeatedly been in violation of federal law with "systemic failures" as documented in its annual state review.[25]

<u>CONCLUSION</u>

For all of the foregoing reasons, and inasmuch as the NYC Defendants never denied the substantive allegations of and predicate acts of civil RICO violations, it is respectfully submitted that the Plaintiffs sufficiently allege viable claims of civil RICO violations.


Dated: New York, New York
        October 29, 2020

/S: Peter G. Albert/
Peter G. Albert, Esq.
Brain Injury Rights Group, Ltd.
Attorneys for Plaintiffs
300 East 95th Street – Suite 130
New York, New York 10128
(646) 850-5035

---

[23] Title II of the American with Disabilities Act ("ADA"), 42 U.S. Code § 12182

[24]    https://www.usatoday.com/story/opinion/voices/2020/08/08/disability-rights-states-fail-obligation-special-needs-students/3318292001/

[25]    https://ny.chalkbeat.org/2019/7/9/21108488/nyc-vows-to-address-special-education-failures-detailed-in-state-review-but-will-their-reforms-go-fa