UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

J.T., Individually and On Behalf Of D.T.;
K.M., Individually and On Behalf Of M.M. and
S.M.; J.J., Individually and On Behalf Of Z.J.;
C.N., Individually and On Behalf Of V.N.;
and, All Others Similarly Situated,

                        Plaintiffs,

    -against-

BILL de BLASIO, in his official capacity as the
Mayor of New York City;  RICHARD
CARRANZA, in his official capacity as the
Chancellor of New York City Department of
Education; the NEW YORK CITY
DEPARTMENT OF EDUCATION;
the SCHOOL DISTRICTS IN THE UNITED
STATES; and, STATE DEPARTMENTS OF
EDUCATION IN THE UNITED STATES,

                        Defendants.

No. 20 Civ. 5878 (CM)

---

**OPINION & ORDER**

McMahon, C.J.:

    This case purports to be a class action brought by the parents and/or natural guardians ("Parents") of students who are classified under federal law as disabled or having an educational disability ("Students") (collectively, "Plaintiffs").

    The four plaintiff parents named in the caption of the complaint (Dkt. No. 1) ("Complaint") are from Staten Island, New York (K.M./M.M and S.M); Middletown, New Jersey (J.T./D.T.);

Meriden, Connecticut (J.J./Z.J.); and Leander, Texas (C.N./V.N.). An appendix to the Complaint identifies approximately 100 additional "named plaintiffs" located in sixty-two separate school districts around the country.[1] (*See* Dkt. No. 1-12.)

The defendants specifically named in the caption of the Complaint include Bill DeBlasio, in his official capacity as the Mayor of New York City ("Mayor DeBlasio"); Richard Carranza, in his official capacity as the Chancellor of New York City Department of Education ("Chancellor Carranza"); and the New York City Department of Education ("NYCDOE") (collectively, the "NYC Defendants" or the "City"). The caption also purports to sue "THE SCHOOL DISTRICTS IN THE UNITED STATES" – over 13,800 of them[2] – and "STATE DEPARTMENTS OF EDUCATION IN THE UNITED STATES" – which would encompass all 50 States, the District of Columbia and Puerto Rico – as listed in appendices to the Complaint. (*See* Dkt. No. 1-1 (School Districts); Dkt. No. 1-2 (State Departments of Education).)

Under the Individuals with Disabilities Education Act, 20 U.S.C. §1400, *et seq.* ("IDEA"), disabled students are entitled to a "free appropriate public education" ("FAPE"). To guarantee students receive a FAPE, each student with disabilities has an Individualized Education Program ("IEP") that lays out the terms of his or her special education and related services, supplementary aids and services, and program modifications or supports for school personnel that will be provided for the student. *See* 20 U.S.C. § 1414(d). Under the IDEA, a local educational agency ("LEA") – most often, a school district – cannot alter a student's IEP without complying with certain procedural requirements, including notifying parents of any change. If a parent initiates an IDEA

---

[1] As it turns out, not all of these "named plaintiffs" realized what they were getting into by signing on with Plaintiffs' counsel and more than a few have subsequently withdrawn from this lawsuit. (*See e.g.*, Dkt. No. 133; *compare* Dkt. No. 1-12 (all "named plaintiffs") *with* Dkt. Nos. 148-149 ("named plaintiffs" that attend NYCDOE schools).)

[2] Plaintiffs list 13,821 entities in their Appendix B of Defendant School Districts. (Dkt. No. 1-1.)

proceeding against an LEA, the IDEA's "stay put" or "pendency" provision requires that the child remain in his or her then-current educational placement until the proceedings are complete, unless the State or local agency and parent otherwise agree. 20 U.S.C. § 1415(j).

Plaintiffs allege that, when schools were shut down due to the public health emergency created by the COVID-19 pandemic, every school district in the United States that went from in-person to remote learning (1) automatically altered the pendency placement of every special education student in the United States; and (2) ceased providing every one of those students with a FAPE, in violation of IDEA's substantive and procedural safeguards.

Approximately one month after filing this lawsuit, Plaintiffs' counsel moved before the Part I judge for a temporary restraining order ("TRO") and a preliminary injunction. The application for an immediate TRO was denied, with the Part I judge expressing grave doubt about the ability of this case to go forward in the posture proposed by Plaintiffs. At about the same time, some of the defendants around the country who had received service of process (or at least attempted service of process) began filing motions to dismiss the case, or indicated by letter their intent to do so.

In an effort to manage so unwieldy a lawsuit, this Court issued a number of orders to show cause, which were designed to tease out some of the many defects that seemed apparent, first to my colleague in Part I and then to me, from the face of the Complaint. The Court allowed Plaintiffs' motion for a preliminary injunction to proceed only against the only defendants named in the actual caption of the complaint – the NYC Defendants – who not only opposed the motion but promptly moved to dismiss the Complaint as against them. The action as to all other defendants was stayed until the Court could address the potential pleading deficiencies that were immediately apparent.

This opinion explains the reasons for the Court's entry of the following orders:

(1)      An order dismissing the Complaint without prejudice as against all defendants located outside the State of New York – 49 State Departments of Education, D.C. State Board of Educations, Departamento De Educación Gobierno De Puerto Rico, and the over 13,000 school districts in states other than New York – for myriad reasons: (1) the Court lacks personal jurisdiction over any of those defendants, (2) venue does not lie against those defendants in this district; and (3) even if (1) and (2) were not the case, permissive joinder pursuant to Fed. R. Civ. P. 20 – the only applicable form of joinder, by Plaintiffs' admission – is so grossly inappropriate that severance and dismissal is the appropriate remedy. *See Nassau Cnty. Ass'n of Ins. Agents, Inc. v. Aetna Life & Cas. Co.*, 497 F.2d 1151, 1153–54 (2d Cir. 1974) ("The misjoinder here, resting on thousands of unrelated transactions, is such a gross abuse of procedure that dismissal under F[ed.] R. Civ. P. 41(b) for failure to comply with the federal rules is warranted.").

(2)      An order dismissing the Complaint as against all defendants except the NYC Defendants and the New York State Department of Education, on the ground that permissive joinder is not appropriate and that dismissal rather than severance is the appropriate remedy. *See Nassau Cnty.* 497 F.2d at 1153–54.

(3)      An order dismissing as plaintiffs all parents who do not have children enrolled in the New York City public schools (non-New York City Plaintiffs), on the ground that they lack standing to assert any claims against the NYC Defendants.

(4)      An order denying the New York City Plaintiffs' motion for a preliminary injunction and dismissing the Complaint as against the NYC Defendants without prejudice; and

(5)      An order *sua sponte* dismissing the claims against the only remaining Defendant in this case, which is the New York State Department of Education.

## BACKGROUND

*Schools Close in Response to COVID-19*

By March 2020, COVID-19 was quickly spreading across the United States. Plaintiffs allege that the governors of the several states directed Defendant School Districts to close school buildings and require that all students and school staff remain at home, with traditional in-person instruction changed to "remote learning." ("Compl." at ¶¶ 6-7, Dkt. No. 1.)

The Complaint is peppered with specifics about New York State and New York City, which Plaintiffs use as an "example" of how every other state and school district allegedly reacted to the pandemic. Plaintiffs specifically plead that New York State Governor Andrew Cuomo issued two executive orders closing schools, and refer to an appendix for a complete list of every other state's gubernatorial executive orders closing school buildings. (*Id.* ¶ 6.) They also plead that Mayor DeBlasio and Chancellor Carranza unilaterally moved all instruction to remote learning for the remainder of the 2019-2020 school year. (*Id.* ¶ 7.)

Plaintiffs allege that "many" School Districts asked Secretary of Education Betsy DeVos ("Secretary DeVos") for waivers from IDEA requirements during the crisis, and assert that Secretary DeVos did not recommend giving school districts the option to bypass major parts of federal special education law. (*Id.* ¶ 9.) Indeed, they allege that "there has been no change in federal or state law" relating to IDEA during the pandemic crisis (*Id*). Nonetheless, they acknowledge that, " . . . the United States Department of Education ('USDOE') provided great flexibility in the provision of educational services during the coronavirus crisis . . ." (*id.*), though they do not discuss any of the particulars about the "great flexibility" that USDOE afforded school districts when dealing with disabled students during the pandemic.

In fact, USDOE did provide school districts with considerable latitude in unprecedented circumstances. It published two guidance documents to school districts in March 2020, as soon as it became clear that the pandemic would lead to widespread school closures: a Questions and Answers document ("USDOE Q&A," Dkt. No. 139-1) and a Supplemental Fact Sheet ("USDOE Fact Sheet," Dkt. No. 139-2). Although Plaintiffs deliberately did not mention or quote from these documents in their Complaint, they can nonetheless be considered, both in response to the motion for a preliminary injunction and on motions to dismiss the Complaint, because (1) they are integral to the allegations of the Complaint, which affirmatively alleges that USDOE offered school districts "great flexibility" in the administration of IDEA during the pandemic, *see Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002); and (2) they are matters of public record that were published on an official government web site, which means a court can take judicial notice of them without converting any motion to dismiss into a motion for summary judgment. *Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC*, 127 F. Supp. 3d 156, 166 (S.D.N.Y. 2015) (collecting cases); *see Christa McAuliffe Intermediate Sch. PTO, Inc. v. de Blasio*, 364 F. Supp. 3d 253, 262 (S.D.N.Y.), *aff'd*, 788 F. App'x 85 (2d Cir. 2019) (taking judicial of information published by the NYCDOE – a governmental entity – published on a government website).[3]

To say that USDOE provided flexibility to school districts confronting how to educate disabled students during the pandemic is an understatement. In particular, the USDOE Fact Sheet straight-forwardly authorized the provision of distance instruction in bolded letters: "**To be clear: ensuring compliance with the Individuals with Disabilities Education Act (IDEA), Section 504 of the Rehabilitation Act (Section 504), and Title II of the Americans with Disabilities**

---

[3] The USDOE Q&A is available at: https://sites.ed.gov/idea/files/qa-covid-19-03-12-2020.pdf.
The USDOE Fact Sheet is available at:
https://www2.ed.gov/about/offices/list/ocr/frontpage/faq/rr/policyguidance/Supple%20Fact%20Sheet%203.21.20%20FINAL.pdf.

**Act should not prevent any school from offering educational programs through distance instruction.**" (USDOE Fact Sheet at 1 (emphasis original).) USDOE acknowledged that, "these exceptional circumstances may affect how all educational and related services and supports are provided, and the Department will offer flexibility where possible," and that "school districts must remember that the provision of FAPE may include, as appropriate, special education and related services *provided through distance instruction provided virtually, online, or telephonically*." (*Id.* at 1-2.) (emphasis added)

The Fact Sheet acknowledges the constraints of the pandemic, noting that:

> it may be unfeasible or unsafe for some institutions, during current emergency school closures, to provide hands-on physical therapy, occupational therapy, or tactile sign language educational services. Many disability-related modifications and services may be effectively provided online. These may include, for instance, extensions of time for assignments, videos with accurate captioning or embedded sign language interpreting, accessible reading materials, and many speech or language services through video conferencing.

(*Id.* at 2.)

Finally, the USDOE Fact Sheet emphasizes what the IDEA is all about – equal *access* to education for students with disabilities vis-à-vis their non-disabled peers:

> Finally, although federal law requires distance instruction to be accessible to students with disabilities, it does not mandate specific methodologies. Where technology itself imposes a barrier to access or where educational materials simply are not available in an accessible format, educators may still meet their legal obligations by providing children with disabilities *equally effective alternate access to the curriculum or services provided to other students*.

(*Id.* at 2 (emphasis added).) Plaintiffs admit that the law provides that, if a student's program becomes unavailable, a school district must find a "comparable alternative placement" or a "similar program." (Compl. ¶ 144).

The Q&A that USDOE issued supplements the Fact Sheet guidance by noting, in more than one place, that, "there may be exceptional circumstances that could affect how a particular

service is provided." (USDOE Q&A at 2, 3, 4.) Moreover, "If a child does not receive services after an extended period of time," the USDOE does not recommend the principal relief Plaintiffs seek in this lawsuit – that schools be forced to reopen in the middle of a pandemic – but rather, that the school "make an *individualized determination* whether and to what extent compensatory services may be needed, consistent with applicable requirements, including to make up for any skills that may have been lost." (*Id.* at 3, 4 (emphasis added); *see id.* at 2.)  Notably, the only time the USDOE requires an LEA to consider placement decisions regarding the continuum of alternative placements under the IDEA's procedural protections is when a child with a disability who is at high risk of severe medical complication is excluded from a school that remains open to other students – not a school that is closed to all students. (*Id.* at 4.)

What is clear from the foregoing is that USDOE would neither permit school districts to wash their hands of disability education because of the pandemic nor tie their hands about how to provide that education in light of the emergency confronting them.

In conformity with USDOE, the various State Education Departments began issuing guidance to the School Districts within their states on how to provide proper education services to students during coronavirus shutdowns. (Compl. ¶ 12.) While "a complete list of every State Education Department's COVID-19 Guidance and Memos" is appended to the Complaint (*id.*; *see* Dkt. No. 1-4), the pleading does not purport to assert, or even summarize, what all of those many documents said. The text of the Complaint discusses only the guidance provided to school districts in New York State by the Office of Special Education of the New York State Education Department ("NYSED"). (Compl. ¶ 12.) Fortunately, the NYC Defendants provided some of the missing details about the State's guidance in connection with their motion to dismiss and opposition to the motion for a preliminary injunction (a single document), by attaching NYSED's

March 27 letter regarding the provision of services to students with disabilities during statewide school closures to their motion to dismiss. (*See* Dkt. No. 139-3.)

Specifically, on March 27, NYSED sent New York State school districts a letter with Questions and Answers about the provision of IDEA-mandated special education services during the pandemic. ("NYSED Q&A," Dkt. No. 139-3.) NYSED's guidance – which can be found on a governmental web site[4] – echoes and reflects the guidance issued by USDOE. For example, it notes that the USODE's "guidance indicated the provision of FAPE may include, as appropriate, special education and related services provided through distance instruction provided virtually, online, or telephonically." (NYSED Q&A at 3.) It also stresses equal access, noting, "Where technology itself imposes a barrier to access or where educational materials simply are not available in an accessible format, educators may still meet their legal obligations by providing children with disabilities equally effective alternate access to the curriculum or services provided to other students." (*Id.*)

Importantly NYSED posed the following question: "If a school district is using virtual online learning during a school closure, will students' IEPs have to be amended?" (*Id.* at 5.) NYSED answered:

> No. Guidance provided by OSEP [USDOE's Office of Special Education Programs] during the March 13, 2020 Joint Webinar on COVID- 19 with OSEP, Council of Administrators of Special Education, Council of Chief State School Officers, National Association of State Directors of Special Education indicated that if online or virtual learning is part of a school closure recommendation, the school district would not be required to amend students' IEPs as online or virtual learning would be considered an alternate mode of instructional delivery.

---

[4] The NYSDE Q&A is available at: http://www.p12.nysed.gov/specialed/publications/2020-memos/nysed-covid-19-provision-of-services-to-swd-during-statewide-school-closure-3-27-20.pdf

(*Id.*) Additionally, NYSED advised that "During the time period the school district is closed pursuant to NYS Governor Executive Order, school districts are not required to amend students' IEPs if continuing the provision of related services via telepractice is part of a school closure recommendation." (*Id.*)

Plaintiffs omit this document from the appendix to their pleading. (*See* Dkt. No. 1-4.) Instead, they provide hyperlinks to each State Education Department's (live) website. (*See id.*)[5] They specifically plead only the contents of an April 27 memo by Christopher Suriano,[6] which stated school districts "must ensure that, to the greatest extent possible, each student with a disability is provided the special education and related services identified in the student's IEP." (Compl. ¶ 12.) As will be discussed later in this opinion, the guidance cited above bears significantly on Plaintiffs' motion for a preliminary injunction.

At the school district level, Plaintiffs identify a single memo issued by NYCDOE's Office of Related Services concerning the provision of special education services to disabled students during the pandemic school closures. (Compl. ¶ 13; Dkt. No. 1-11.) They emphasize that NYCDOE instructed its related services providers to offer therapies only remotely, not in-person. (Compl. ¶ 13.)

Plaintiffs ignore the rest of the memo, which outlines NYCDOE's rather robust plan for providing tele-therapy to students. (*See* Dkt. No. 1-11.)  That is because Plaintiffs take issue with the executive decision to close the schools in order to deal with the health crisis. Rather than

---

[5] The letter provided by the NYC Defendants is two clicks away from the NYSED homepage provided by Plaintiffs by selecting "P-12 School Guidance," and then clicking on the link to a PDF of "Memo: Provision of Services to Students with Disabilities During Statewide School Closures Due to Novel Coronavirus (COVID-19) Outbreak in New York State – March 27, 2020." *See Coronavirus (COVID-19)*, New York State Educ. Dep't, http://www.nysed.gov/coronavirus (last visited November 13, 2020).

[6] Plaintiffs cite to an online version of this memo (*see* Compl. ¶ 12, n.24), available at: http://www.p12.nysed.gov/specialed/publications/2020-memos/special-education-supplement-1-covid-qa-memo-4-27-2020.pdf.

acknowledge the steps New York State and New York City have taken to provide special education and related services to the greatest extent possible in an unprecedented emergency, Plaintiffs allude to advice from labor unions, law firms, and doctors from the Center of Disease Control (the "CDC") about how best to serve students during the pandemic. (*See* Compl. ¶¶ 14-15, 17-19.) They cite to surveys discussing the undoubted difficulties inherent in providing services to students with disabilities during a pandemic. (*See id.* ¶¶ 20-23) And they discuss articles in scientific literature and reports from various doctors who took the position that, health and safety risks notwithstanding, public schools should not have been closed and/or should be reopened. (*See id.* ¶¶ 49-80.) Plaintiffs clearly believe that the Governors, State Education Departments and School Districts made the wrong policy decision by closing schools in the early, frantic days of the pandemic's outbreak in the United States; they allege that this potentially life-saving decision violated the IDEA.

Plaintiffs allege that, because opinions questioning or disagreeing with school closure decisions were published, State Education Departments and school districts became "aware they were not in compliance of [*sic*] the IDEA, Section 504 or the ADA," (*id.* ¶ 17) and "had knowledge of the harm that was occurring to Plaintiff-Students because of a denial or unilateral modification of special education and related services," (*id.* ¶ 24) thereby rendering the decision to close the schools a "knowing[], willful[] and deliberate[] violat[ion of] the rights of Plaintiff-Students and Plaintiff-Parents" that was taken "in bad faith." (*Id.* ¶ 25.)

*Schools Re-Open As the Pandemic Continues*

By mid-April, at least the Governor of New York had begun the process of modifying his original executive order, in order to permit school buildings to reopen during the summer in order to provide in-person education to special education students who were entitled to receive services

during the extended school year ("ESY"). (*Id.* ¶ 16.) Plaintiffs specifically plead Governor Cuomo's executive order, and append a list of supposedly similar orders from the governors of other states, in yet another appendix to the complaint. (*Id.*; *see* Dkt. No. 1-3.) Plaintiffs emphasize that these modifications "eliminated any potential legal barrier" to the provision of in-person special education services. (Compl. ¶ 16.) Plaintiffs acknowledge that some of the defendant school districts began to reopen their buildings, but assert, in conclusory fashion, that "most" School Districts remained closed to in-person services through the summer and into the fall. (*Id.* ¶ 28.) They do not identify which of the 13,821 school districts reopened and which remained closed.[7]

Insofar as New York City is concerned, the Complaint pleads that NYCDOE devised a plan to opening sites where one-on-one speech, physical, and occupation therapy services for students with special needs would be offered, albeit without providing bus transportation. (*Id.* ¶ 29.) Plaintiffs also allege that, in September, NYCDOE planned to offer in-person services would be offered 1-3 days a week. (*Id.* ¶ 29.)

The Complaint, which was filed on July 28, does not indicate what actually happened in New York City in September 2020. For that information, we must look to the NYC Defendants' response to Plaintiffs' motion for a preliminary injunction and their motion to dismiss. (*See* "Health Decl.," Dkt. No. 138; "Foti Decl.," Dkt. No. 139.) Most facts are drawn from the September 18 declaration of Christian Foti, Deputy Chief Academic Officer of NYCDOE's Division of Specialized Instruction and Student Support. NYCDOE's public-facing website is

---

[7] The Complaint does include a summary of the plans made for in-person provision of special education services in the "top 50 largest school districts since July 2020" – those districts being located in states from Hawaii to New York, Wisconsin to Texas, Illinois to Florida. (*See id.*, ¶¶ 24-27). The discussion in this opinion will focus on the plans of the NYCDOE because NYCDOE's situation is what the Complaint actually pleads.

regularly updated to provide parents with information about the provision of special education programs, services, and supports. (*See* Foti Decl. ¶ 21.)

Beginning in September 2020, NYCDOE reopened its schools to all students, abled and disabled. It provided all parents a choice between two ways of "going to school:" 100% remote learning, or a blended model where students attend school several days a week and engage in remote learning other days. (Health Decl. ¶ 18.) The blended model, which provided for several days of in-person education each week, was the default option; but all parents in the system (whether their children were abled or disabled) were contacted and afforded the opportunity to opt into full-time remote instruction. (Foti Decl. ¶ 12.)

As of September 18, 42.6% of all families of students with disabilities had opted not to send their children back into school buildings, but instead chose 100% remote instruction for their children. (*Id.*) Under this model, special education programs are being provided to disabled students remotely, though both synchronous and asynchronous instruction. (*Id.* ¶ 13.) Related services are for the most part provided remotely, though some students may be able to receive in-person related services, depending on demand and provider availability. (*Id.*)

Students, both abled and disabled, who did not opt into remote learning were automatically scheduled for the blended learning model. (*Id.* ¶ 12.) Under this model, students attend school in person for five days out of every ten or fifteen days, depending on classroom capacity. (*Id.* ¶ 12.) On the remaining school days, students receive remote learning, with a mix of synchronous and asynchronous instruction. (*Id.*) Students with disabilities are provided with in-person general instruction, as well as the program and services in their IEP "to the extent feasible." (*Id.* ¶ 13.) Those related services are provided both in-person and remotely. (*Id.*)

Yet another model was developed for District 75, NYCDOE's citywide district that provides highly specialized support for students with disabilities with significant challenges. Because students assigned to District 75 are in smaller classes, social distancing is easier, so severely disabled students have the option to attend classes more frequently – some even full-time, five days a week. (*Id.* ¶¶ 3, 12, 14.) As far as the record shows, the option of full-time in person instructions is not offered to any non-disabled students in the New York City School District. District 75 schools were slated to recommence in-person instruction on September 21. (*Id.* ¶ 14.)

Additionally, NYCDOE developed new forms relating to "adaptations" in the provision of special education programs and related services – including how these services with be provided in-person and remotely, and the delivery of related services, assistive technology, and paraprofessional support. (*Id.* at ¶¶ 16-17.) Its staff has been reaching out to families of students with disabilities to discuss each family's instruction service choice (remote or blended) and the mode of service delivery to implement the child's program. (*Id.*) Finalization of these "adaptations" require a discussion between NYCDOE and parents, or three documented attempts to reach the family on at least two different days. (*Id.*) This tracks, and in fact exceeds the IDEA's standards, which allows an IEP team meeting to proceeding without a parent who cannot be contacted after two attempts. *See* IDEA § 300.322(c). (*Id.*)

*How School Closures Allegedly Violated Plaintiffs' Rights*

Plaintiffs' allege that the closure of schools in response to the COVID pandemic violated disabled students' rights under IDEA in three ways.

*First*, Plaintiffs allege that, in March 2020, Defendants' "unilateral" decision to close schools altered the educational program status quo of Students. (Compl. ¶ 136.) By closing schools, Defendants "essentially failed" to provide Students with the special education and related

14

services set forth in their IEPs. Plaintiffs assert that Students' IEPs provide for "direct" rather than remote services (*Id.* ¶ 143), and note that, prior to the pandemic, disabled students "generally" received in-person services in a school classroom. Plaintiffs further plead that, "in most instances," Defendants also unilaterally, substantially and materially altered the frequency and duration of Students' services, while in some cases failing to provide services at all. (*Id.*) Therefore, by closing the schools, Defendants "unilaterally, substantially and materially" altered both the location where Students were to receive services and the manner in which those services were delivered (*id.* ¶¶ 139-42) – and the closure orders, thought by policymakers to be necessitated by a public health emergency, denied the Plaintiff Students a FAPE under IDEA. (*Id.*)

These allegations are all pleaded at a level of high generality; no specific student in any specific district for whom this allegation is true is identified.

*Second*, when Defendants made these changes by closing schools, they did so unilaterally – i.e., without first obtaining  parental input or consent. According to Plaintiffs, this constituted a failure to comply with the IDEA's procedural safeguards – specifically those provisions of the IDEA that guarantee parents an opportunity for meaningful input into all decisions affecting their child's education. (*Id.* ¶¶ 137-38.)

*Third*, Plaintiffs allege that the defendant school districts failed to keep the Named Students (i.e., the five students whose initials appear in the caption and those listed in Appendix A) in their "then current" education placement (pendency) when they closed the schools during the pandemic. The Complaint alleges that the parents of these students sent "Ten Day" notices to their LEAs (i.e., school districts), advising that the LEA had improperly modified Students' IEPs and denied their pendency rights, and requesting relief (*id.* ¶ 145.); and then filed due process complaints with their LEAs alleging violations of the IDEA and Section 504, both by unilaterally modifying the

Students' IEPs and failing to maintain their pendency programs and placements. (*Id.* ¶ 146.) There is no allegation that any impartial hearing has yet been held, or that the decision of any Impartial Hearing Officer ("IHO") has been reviewed by any State Review Officer ("SRO"), although Plaintiffs assert that some impartial hearing requests have been assigned to IHOs. (*See* Dkt. No. 148 ¶ 17.)

*Relief Sought*

In a prolix complaint of eighty-three pages and one hundred and ninety-four paragraphs and six appendices, Plaintiffs assert eleven separate causes of action against all defendants, arising under 42 U.S.C. § 1983; the IDEA; Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §794 *et seq.* ("Section 504"); Title II of the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.* ("ADA"); and state constitutions, statutes, laws, and regulations. (Compl. ¶¶ 155-94.)

Ten of Plaintiffs' eleven claims allege a denial of FAPE. The remaining claim (Count IV) alleges a failure to keep students in their pendency placement.

Count I and II plead that Defendants' failure to maintain in person education for the Plaintiff students as per their IEPs deprived Students of their rights to a FAPE and due process under (I) the IDEA and the regulations promulgated thereunder and (II) the Due Process Clause of the Fourteenth Amendment. These counts are brought pursuant to 42 U.S.C. § 1983

Counts III, IV, and V are brought under the IDEA. They claim that Defendants' (III) failed to comply with various procedural requirements of the IDEA and provide Students a FAPE, (IV) failed to maintain Students' educational program and placement during the pendency of their due process complaints in violation of 20 U.S.C. § 1415(j), and (V) failed to comply with the substantive requirements of the IDEA, denied Students a FAPE, and unilaterally modified Students' educational programs.

Plaintiffs bring Count VI under state law. Specifically, Plaintiffs allege that Defendants (VI) failed to comply with state procedural requirements and thereby denied Students a FAPE as required by each state's laws and regulations.

Plaintiffs bring Counts VII, VIII, and IX under Section 504 of the Federal Rehabilitation Act ("Section 504"), 29 U.S.C. § 794, *et seq.* They claim that Defendants (VII) discriminated against Students by failing to provide access to a FAPE pursuant to their IEPs, and unlawfully denied Students access to appropriate educational services as compared to the access provided to non-disabled students, (VIII) failed to provide Students with a FAPE such that Parents are entitled to compensatory damages for out-of-pocket expenses for special education and related services as well as lost income or employment when required to provide or supervise the provision of educational and/or related services, and (IX) intentionally and willfully failed to provide students with a FAPE such that Plaintiffs and Students are entitled to punitive damages.

Plaintiffs bring Count X under Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.* They claim that Defendants (X) failed to provide in-person special education and related services that have been provided to other special education students, subjected Students to discrimination solely on the basis of their disability by their failure to provide Students with a FAPE, and denied Students the opportunity to participate in or benefit from the special education services in their IEPs.

Finally, Plaintiffs bring Count XI, alleging violations of various state constitutions and statutes. They claim that Defendants (XI) violated Students' rights to receive educational benefits as per their respective state constitution or statute by failing to provide Students in-person educational and related services.

The Named Plaintiffs purport to sue on behalf of "all similarly situated persons," which is classic class action pleading. They define two classes:

> Plaintiff-Parent is defined as a parent or legal guardian of a student, aged 3-21, who was receiving or was entitled to receive special education services under IDEA as of March 2020 and/or through the 2020-2021 school year, however, Defendants failed to provide a FAPE to the Plaintiff-Students. In addition, Plaintiff-Parents were required to do the job and satisfy the responsibilities the Defendants were legally obligated to do and had received federal funds to do. Many such Plaintiff-Parents were required to pay out-of-pocket expenses to arrange and provide educational or related services for their child, and many such Plaintiff-Parents lost their employment so as to be able to provide said services or supervision to their children for "remote" services

(Compl. ¶ 128.) The second class is the students themselves:

> Plaintiff-Student is defined as a student who was 3 to 21 years of age between March 2020 and July 2020, and who is classified as having a disability as defined by IDEA (20 U.S.C. § 1401(3)), who have qualifying disabilities under Section 504, and who are afforded protection under Section 504 and the Americans with Disabilities Act, and who were denied these rights because of their disability by the Defendants. Plaintiff-Students are also entitled to receive educational benefits from the LEAs as per their respective State Constitutions or statutes.

(*Id.* ¶ 129.)

As pleaded, all claims are asserted by all plaintiffs against all of the defendants – even though it is perfectly obvious that no student or his/her parents has a claim against any school district other than the one in which s/he is enrolled, or against any State Education Department located in a state other than the student's state of residence. No class allegations are lodged against all of the purported defendants.

As a result of these alleged violations of law, Plaintiffs seek either (1) the immediate reopening of every school in the United States, notwithstanding the public health emergency, or (2) the issuance of "pendency vouchers" (i.e., money), which Parents can use to "self-cure," presumably by enrolling their children in some private school or program that is not open for in-person instruction notwithstanding the COVID pandemic. They also seek ask for independent

evaluations of Students to determine regression and/or loss of competencies and abilities because of the shutdown; the immediate convening of each student's Committee on Special Education ("CSE") to develop modified IEPs to deal with the pandemic; and a variety of forms of damages, including a compensatory education award (an award of educational services designed to remedy a deprivation in a student's education), damages for out-of-pocket expenses incurred by the parents due to school closure (including, apparently, damages for any loss of parental employment occasioned thereby) and punitive damages (again, on the theory that because some people thought the schools should have remained open, the decision to close the schools constituted a knowing, willful and bad faith violation of the Students' rights). (*Id.* ¶¶ 147-154.)

Plaintiffs also assert claims under the Racketeering Influenced and Corrupt Organizations Act ("RICO"), although that occurred after the filing of the complaint, and solely as a transparent (and futile) effort to manufacture jurisdiction over all defendants in this court. The RICO aspect of the case will be discussed below.

*Procedural History*

The Complaint in this action was filed on July 28, 2020. Summonses began to issue and service to be effected.

On August 22, 2020, plaintiffs presented an *ex parte* application for a TRO and preliminary injunction to the Hon. Gregory H. Woods, sitting in Part I. Judge Woods ordered all "above-named Defendants" – which included the NYC Defendants, as well as "the School Districts in the United States" and "the State Departments of Education in the United States" – to show cause why the Court should not grant Plaintiffs' application, and directed plaintiffs to serve all defendants or their counsel on or before August 24 and to retain proof of service. (Dkt. No. 29.)

Plaintiffs' counsel commenced serving Judge Woods' order across the country (although I have no proof that he served everyone in the two days allotted to him, and no belief that he did or could have done so – indeed, the Clerk of Court complained to me that she had no idea how to issue summonses to THE SCHOOL DISTRICTS IN THE UNITED STATES, especially as there were no addresses listed in the pleading or any appendix thereto for all 13,821 of them). But some districts were served, because this Court was quickly inundated with letters from school districts across the country, complaining that Plaintiffs had not properly served either their Complaint or the application for a TRO and preliminary injunction; that this Court lacked both personal and subject matter jurisdiction over the various school districts; and that venue was improper. Several school districts made formal motions on these and other grounds. Additionally, certain districts also advised the court that Plaintiffs' counsel had not obtained the consent of some of the families listed as plaintiffs in Appendix A to file due process complaints and request impartial hearings on behalf of those children, and indicating that those parents wanted nothing to do with Plaintiffs' counsel or with this lawsuit. (*See* Dkt. No. 110 (Eastchester Union Free School District); Dkt. No. 120 (Clarkston Area Schools); Dkt. No. 132 (Leander Independent School District); Dkt. No. 136 (Hicksville Union Free School District); Dkt. No. 146 (Bristol Board of Education); Dkt. No. 155 (Cherry Hill, NJ School District)).

This court quickly concluded that the matter would be unmanageable if it were handled in the ordinary course. Aside from the number or purported parties, the rolling nature of service and appearance made it impossible to set realistic motion schedules. I also concluded that it would be inappropriate to put stressed states, and over 13,800 school districts, to the trouble and expense of filing individual responses to a pleading that appeared in many respects deficient on its face. Therefore, pursuant to Fed. R. Civ. P. 1, this Court issued an Order to Show Cause on September

2 (the "OTSC"), directing Plaintiffs to address several threshold procedural issues. ("OTSC," Dkt. No. 84.) Specifically, this Court ordered Plaintiffs to show cause (1) why the Complaint should not be dismissed as against all school districts from states other than New York; (2) why venue is proper in this district as to any school district located in the Eastern, Western or Northern Districts of New York; and (3) why all Defendants other than the NYC Defendants should not be severed, and the complaint dismissed against them without prejudice to the institution of individual actions against any district that is allegedly refusing to comply with IDEA during the pandemic. (*Id.*) I did not issue any sort of temporary restraining order. I allowed Plaintiff's motion for a preliminary injunction to continue as against the NYC Defendants, but stayed the action as to all other Defendants.

Plaintiffs responded to each of this Court's inquiries (*see* Dkt. Nos. 121, 122, 123, 124) and NYCDOE, Mayor DeBlasio, and Chancellor Carranza filed a motion to dismiss and in opposition to the application for a preliminary injunction. (Dkt. No. 137, 140.)

## DISCUSSION

Rule 1 of the Federal Rules of Civil Procedure provides as follows:

These rules . . . should be construed, administered, and employed by the court and the parties to secure the just, speedy, and inexpensive determination of every action and proceeding.

This lawsuit presents unusual challenges in complying with Rule 1.

Although only four plaintiffs are named in the caption of the case, the Complaint purports to be brought on behalf of a nationwide class consisting of what must be literally hundreds of thousands of learning disabled children and their parents, only 104 of whom are identified by name. Each of those children has his or her own individualized education plan ("IEP"), which was developed by a CSE in the child's home school district (of which there are well over 13,000 in the

United States, according to Plaintiffs' Appendix B). Although only three identified individuals and entities are named as defendants in the caption, the eleven causes of action are alleged against fifty-two[8] Departments of Education and every school district in the United States. While the Complaint explicitly purports to be brought on behalf of a plaintiff class,[9] it does not purport to be brought against a defendant class – there are no defendant class allegations in the pleading, and any injury that was caused to an individual student and his/her parents was not caused by all defendants collectively, but by the school district where the student attends school and the State Education Department in the student's state of residence. Yet as pleaded, all claims are lodged against all defendants by all plaintiffs.

It is obvious that this is no class action at all, but rather tens of thousands of individual cases that Plaintiffs' counsel has tried to amalgamate into a single lawsuit. Issues of subject matter jurisdiction, *in personam* jurisdiction, misjoinder and failure to state a claim are apparent from the face of the Complaint. Simply allowing the action to proceed as though it were a normal lawsuit would present unprecedented and insurmountable case management issues, if thousands of defendant school districts and States were forced – during a pandemic, when resources, both human and financial, are strained – to try to figure out who was suing whom and file individual motions to deal with the manifold obvious defects in the pleading. And this does not take into account mention the strain it would place – indeed, has already placed – on the resources of the

---

[8] Although I will use the term "State Departments of Education" to refer to all 52 Departments, Washington D.C. and Puerto Rico are not states; Washington is a special federal district and Puerto Rico is a Commonwealth. Nonetheless, their Departments of Education are the ranking educational authority in their respective geographic territories, just as the fifty State Departments of Education are.

[9] Were there any doubt on that score, the retainer letter entered into between Plaintiffs' counsel and his putative clients specifically states Plaintiffs' counsel is "seeking national class action status for the claims associated with [his] representation." (Dkt. No. 176-2 at 2; Dkt. No. 176-3 at 1 (amended retainer agreement).)

court, especially the Office of the Clerk of Court, at a time when those resources are desperately needed elsewhere.

An unorthodox pleading demands unorthodox response. For that reason, in a series of orders to show cause, the court identified issues that were either apparent from the face of the Complaint or were raised by those few defendants who moved to dismiss the Complaint before the court stayed this action as to all defendants other than the NYC Defendants. In those orders to show cause, I in essence required Plaintiffs to explain (1) why States other than the State of New York and out-of-state school districts can or should be sued here, and (2) why it was appropriate – even for students located in New York, and in this district – to join what appeared to be individual claims against individual defendants into a single massive action.

Plaintiffs' responses to the court's questions demonstrate that this action should – indeed, must – be dismissed in significant part, before the thousands of defendants are burdened with the need to respond to a patently deficient complaint. Fortunately, several of the school district defendants, both in New York City and out of state, have, by motion or by letter, assisted the court in formulating the issues to be addressed.

## I.     All Claims Against the Out of State Defendants Are Severed and Dismissed Without Prejudice To their Assertion in an Appropriate Forum

For purposes of this discussion, the term "out-of-state" defendants refers to any school district located outside the State of New York, and the State Departments of Education in the District of Columbia, Puerto Rico and the 49 States other than the State of New York.

Between motions to dismiss (Dkt. Nos. 74, 92, 94, 96, 98, 181)[10] and letters to the court indicating an intent to move to dismiss (*see, e.g.*, Dkt. Nos. 35, 40, 63), the court's attention has

---

[10] Four Georgia school districts – Clayton County Public Schools, the Cobb County School District, the DeKalb County School District, and Marietta City Schools – filed motions to dismiss, as did the County School Board of York County, Virginia and the Omaha Public School District.

been called to several reasons why the complaint as against these defendants would have to be dismissed in its entirety: lack of subject matter jurisdiction due to the failure to exhaust administrative remedies; lack of *in personam* jurisdiction over these entities – none of which had any reason to believe they would be haled into a court in New York City to answer allegations relating to issues of local education in their respective jurisdictions; improper venue; insufficient service of process; and failure to state a claim.

Additionally, insofar as the out-of-state defendants are arms of the state of their respective states, they enjoy Eleventh Amendment immunity, which means that they cannot be sued under Section 1983. *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989); *Bd. of Educ. of Pawling Ctr. Sch. Dist. v. Schutz*, 290 F.3d 476, 480 (2d Cir. 2002). This argument would appear to apply to every out-of-state Department of Education, plus Puerto Rico, but not the District of Columbia, *See Lunceford v. D.C. Bd. of Educ.*, 745 F.2d 1577, 1579 (D.C. Cir. 1984); *J.T. v. D.C.*, 2020 WL 5865243 (D.D.C. Oct. 1, 2020) (IDEA case). It appears also to apply to the school districts themselves in some, but not all, states. (*Compare Sato v. Orange Cnty. Dep't of Educ.*, 861 F. 3d 923, 934 (9th Cir. 2017) (under California law, school districts are arms of the state), *with Mt. Healthy Cnty. Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 280 (1977) (under Ohio law at the time, school districts were not arms of the State).

For the following reasons, plaintiffs' effort to sue the out of state defendants in the Southern District of New York must end today.

A.  *The Court Lacks* In Personam *Jurisdiction Over the Out of State Defendants For the Claims Asserted in this Lawsuit*

Jurisdictional arguments should be addressed first, and the easiest basis on which the court can dismiss all claims against the out-of-state defendants is that the court lacks *in personam* jurisdiction over them.[11]

"[S]*ua sponte* dismissal for lack of personal jurisdiction is generally only resorted to upon a motion for default judgment." *Hewes v. Alabama Sec'y of State*, No. 19-cv-9158, 2020 WL 4271708, at *4 (S.D.N.Y. July 23, 2020) (collecting cases). However, at least six defendants have moved to dismiss for want of personal jurisdiction, and "it is in the power of the Court to order Plaintiff to show cause why all of the claims against [any] Non-Moving Defendants should not be dismissed for lack of personal jurisdiction." *Id.* at *5 (citing *Sinoying Logistics Pte Ltd. v. Yi Da Xin Trading Corp.*, 619 F.3d 207, 213 (2d Cir. 2010)). The Court has given Plaintiffs an opportunity to show cause why the claims against the out of state defendants should not be dismissed on that ground.

Plaintiffs have not come close to showing that this Court has personal jurisdiction over the out-of-state School Districts – or the out of state Departments of Education. The most efficient

---

[11] The out of state defendants who have moved or indicated an intention to move to dismiss the complaint as against them raised as their primary ground lack of subject matter jurisdiction/failure to exhaust administrative remedies, and ordinarily subject matter jurisdiction would be the first issue addressed. However, at least some of the out of state plaintiffs assert that they have filed due process complaints, which might make it impossible to dismiss Count IV of the Complaint (which asserts a pendency claim) as against at least some out of state defendants *for lack of subject matter jurisdiction* (as opposed to for lack of personal jurisdiction, improper venue, or failure to state a claim, the last of which being the basis on which the pendency claim will be dismissed against the New York City Defendants later in this opinion). Therefore, in dealing with the out of state defendants, I have chosen to move directly to *in personam* jurisdiction and venue, both of which mandate the dismissal without prejudice of all claims against all out of state defendants.  It would appear, however, that as to all out of state defendants, all claims other than those asserted in Count IV would have to be dismissed without prejudice for failure to exhaust administrative remedies, 20 U.S.C. §§ 1415(i)(2)(A), 1415(l) – which, under Second Circuit precedent, deprives this court of subject matter jurisdiction over those claims. *Polera v. Bd. of Educ. of Newburgh Enlarged City Sch. Dist.*, 288 F.3d 478, 483, 488 (2d Cir. 2002). Because the IDEA's exhaustion requirement implicates the Court's subject matter jurisdiction, the Court may address it *sua sponte* with respect to moving and non-moving Defendants alike. *See Wenegieme v. U.S. Bank Nat'l Ass'n*, No. 16 -cv-6548, 2017 WL 1857254, at *8 (S.D.N.Y. May 4, 2017), *aff'd*, 715 F. App'x 65 (2d Cir. 2018) (internal citations omitted).

resolution is for the Court to dismiss the claims against all out-of-state Defendants, without prejudice. *See Sinoying Logistics*, 619 F.3d at 214.

     1.   <u>The Court Lacks Long-Arm Jurisdiction Under New York Law</u>

In federal question cases, courts first determine whether the defendant is subject to jurisdiction under the law of the forum state – here, New York. *Sonera Holding B.V. v. Cukurova Holding A.S.*, 750 F.3d 221, 224 (2d Cir. 2014) (citing *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 168 (2d Cir. 2013)). This requires analysis of New York C.P.L.R. §§ 301 and 302.

New York's general jurisdictional statute simply states that, "A court may exercise such jurisdiction over persons, property, or status as might have been exercised heretofore." N.Y. C.P.L.R. 301. Courts previously held that C.P.L.R. § 301 "confers jurisdiction where a company has engaged in such a continuous and systematic course of 'doing business' in New York that a finding of its 'presence' in New York is warranted." *Sonera Holding B.V. v. Cukurova Holding A.S.*, 750 F.3d 221, 224 (2d Cir. 2014) (internal quotations and citations omitted).

However, as the United States Supreme Court has recently made clear, an assertion of general jurisdiction requires that a defendant "corporation's affiliations with the State are so 'continuous and systematic' as to render it essentially at home in the forum State." *Daimler AG v. Bauman*, 571 U.S. 117, 139 (2014) (internal quotations and citations omitted). "*Daimler* established that, except in a truly exceptional case, a corporate defendant may be treated as essentially at home only where it is incorporated or maintains its principal place of business." *Chufen Chen v. Dunkin' Brands, Inc.*, 954 F.3d 492, 498 (2d Cir. 2020) (quoting *Brown v. Lockheed Martin Corp.*, 814 F.3d 619, 627 (2d Cir. 2016)). The old "doing business" test for

general jurisdiction was effectively abolished by *Daimler*, making it much harder to sue an out-of-state entity in New York for conduct that has no connection to New York.

The out-of-state defendants in this case are not subject to general jurisdiction in New York. The Departments of Education, as arms of the several states, are sovereign entities. The out-of-state school districts are generally understood to be quasi-municipal corporate entities created under the laws of the states in which they are located. *See Mt. Healthy Cty. Sch. Dist. Bd. of Educ.*, 429 U.S. at 280; *Woods v. Rondout Valley Ctr. Sch. Dist. Bd. of Educ.*, 466 F.3d 232, 236–37 (2d Cir. 2006). They are not incorporated, chartered or located in New York. And the contacts Plaintiffs allege that defendants have with New York – the receipt of federal funding by those districts and the (alleged) fact that their pension funds are invested with New York-based entities – are, after *Daimler*, insufficient to render the School Districts "at home" in New York. *See Chen*, 954 F.3d at 500.

Neither are the out-of-state defendants subject to specific jurisdiction under New York's long arm statute, which governs when New York courts will exercise jurisdiction over non-domiciliaries.

"As to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any non-domiciliary . . . who . . . transacts any business within the state or contracts anywhere to supply goods or services in the state." N.Y. C.P.L.R. 302.

Plaintiffs assert that the various out-of-state defendants "transact business" in New York, both through their receipt of federal funding for IDEA and through their pension fund investments. But even assuming that were true (and it is not), that does not render them amenable to suit in this district for their local IDEA violations.

27

Plaintiffs claim that federal funding, including Medicare and Medicaid, is administered through the Center of Medicare and Medicaid Services ("CMS") – which, they assert, is "located here in New York." (P.I. Mem. at 9, Dkt. No. 122.) But CMS (an agency of the federal government) is headquartered in Baltimore, Maryland – which is perfectly clear on the very website to which plaintiffs cite. *Financial Alignment Initiative (FAI): New York*, Ctrs. for Medicare & Medicaid Servs. (Sept. 28, 2020), https://www.cms.gov/Medicare-Medicaid-Coordination/Medicare-and-Medicaid-Coordination/Medicare-Medicaid-CoordinationOffice/FinancialAlignmentInitiative/New-York. This court is not required to accept as true an allegation contradicted by Plaintiff's own evidence.

Moreover, the OSEP's guidance clearly explains that, under the IDEA's grant provision, federal Medicaid funds for the education of disabled students are provided to *states*, which then pass the money on to LEAs. *See Special Education--Grants to States*, U.S. Dep't of Educ. (May 5, 2016), https://www2.ed.gov/programs/osepgts/index.html. Therefore, out-of-state school districts receive their federal IDEA funding from the states in which they are located. Plaintiffs do not and cannot credibly allege that any out of state school district receives Medicaid funding under the IDEA from the State of New York.

Finally, plaintiffs specifically allege that IDEA funds are administered through *local* agencies. (Dkt. No. 122 at 9.) It should go without saying that a school district located in Omaha, Nebraska or in Cobb County, Georgia is not "locally administered" in the State of New York.

The fact that some of the out-of-state defendants (which ones are not identified) may have pension funds that are invested with New York-based financial institutions, or may have issued bonds through New York-based financial institutions, also does not give this court *in personam* jurisdiction over the claims asserted in this lawsuit. To establish specific, or transactional, personal

jurisdiction, Plaintiffs' causes of action must "aris[e] from" the School District's in-state transactions. N.Y. C.P.L.R. 302(a). The claims in this lawsuit, which arise out of the closure of school districts due to the COVID-19 pandemic and the alleged impact of those closures on the receipt of special education services pursuant to students' IEPs, do not arise out of or relate to any state's or school district's activities in the financial markets relating to their pension funds. *See Licci*, 732 F.3d at 168–69.

Thus, Plaintiffs have not and cannot established specific personal jurisdiction over any out-of-state School District under New York's long-arm statute.

2.   Plaintiffs Fail to Plead a Viable RICO Claim, and so Cannot Acquire *In Personam* Jurisdiction by that Gambit

Perhaps intuiting that his claim for long-arm jurisdiction was weak, Plaintiffs' counsel tried to manufacture personal jurisdiction where none existed by asserting that the over 13,000 out-of-state defendants could be sued in this district pursuant to the Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1968. That, too, fails, because Plaintiff's theory for relief under RICO is deficient in multiple respects.

RICO entered this case by the back door.

There is no RICO count in the pleading. However, when Plaintiffs' counsel appeared before the Part I judge, he filed an *ex parte* brief in support of his application for a temporary restraining order – subsequently filed on the public record at Docket #90-7 – in which he asserted that jurisdiction could be acquired over all defendants, wherever located in the United States, pursuant to the Racketeering Influence and Corruption Act (RICO), 18 U.S.C. §§ 1961-1968. Plaintiffs argues that Defendants violated RICO by receiving federal Medicare and Medicaid funds by electronic means while failing to provide special education students in various school districts with the services required by their IEPs during the pandemic. This alleged constituted mail and

wire fraud under 18 U.S.C. §§ 1341 and 1343, and gave this court so-called "ends of justice jurisdiction" over all Defendants.

Section 1965(b) of the RICO statute provides for national jurisdiction over "additional defendants of any kind," but only if the plaintiff shows "that the 'ends of justice' so require." *PT United Can Co. v. Crown Cork & Seal Co.*, 138 F.3d 65, 71 (2d Cir. 1998). Generally, "'ends of justice' jurisdiction is authorized where the RICO claim could not otherwise be tried in a single action because no district court could exercise personal jurisdiction over all of the defendants." *Elsevier Inc. v. W.H.P.R., Inc.*, 692 F. Supp. 2d 297, 315 (S.D.N.Y. 2010) (citations omitted). To comply with due process, any such additional defendant need only have minimum contacts with the United States. *See Hitachi Data Sys. Credit Corp. v. Precision Discovery, Inc.*, 331 F. Supp. 3d 130, 145 (S.D.N.Y. 2018) "If these requirements are satisfied, the Court may also be permitted to exercise personal jurisdiction over such defendants for other claims that arise out of the same operative facts as the civil RICO claim, even if personal jurisdiction would not otherwise be present as to those claims." *Id.* (citing *IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1056–57 (2d Cir. 1993)).

So Plaintiffs are correct about one thing: it is possible to obtain nationwide service of process in a civil action brought under the RICO statute as long as suit is brought "in a district court where personal jurisdiction based on minimum contacts is established as to at least one defendant." *Hitachi*, 331 F. Supp. 3d at 145 (quoting *PT United*, 138 F.3d at 71).

But that is all that Plaintiffs get right about RICO.

Counsel's reliance on RICO in the brief filed in support of the application for a TRO, naturally led this court to assume that a RICO claim was asserted somewhere in the prolix Complaint. Accordingly, when Plaintiffs were ordered to show cause why there was personal

jurisdiction over out-of-state Defendants, I directed Plaintiffs to address the RICO argument they had raised before Judge Woods.  (*See* Dkt. No. 84 at 2.)

Subsequent line-by-line analysis of the Complaint revealed that it did not assert any cause of action under RICO. Nonetheless, in conformity with my individual rules (RICO Case Standing Order, Sept. 8, 2010), Plaintiffs filed a RICO Case Statement in response to the court's Order to Show Cause (Dkt. No. 121), which automatically amended the complaint to include a RICO count. In that RICO Case Statement, Plaintiffs contended that Defendants had violated both Sections 1962(a) and (c), as well as engaged in a conspiracy to violate RICO under Section 1962(d).

Five days later, on September 16, 2020, Plaintiffs sought leave to amend their Complaint in a letter filed on September 16, 2020, both to add additional plaintiffs and defendants and to "include their Civil RICO claims." (Dkt. No. 133.) The court denied the request for leave to amend without prejudice – principally to avoid adding additional parties when orders to show cause why parties should not be dismissed were outstanding, but also noting that, under this court's individual rules, the contents of the RICO Case Statement would be deemed to amend the pleading in any event. (Dkt. No. 145 at 5; RICO Case Standing Order, Sept. 8, 2010.) Accordingly, for purposes of the instant omnibus opinion, I deem the complaint amended to assert the claims outlined in the RICO Case Statement of September 11, 2020.

When the NYC Defendants moved to dismiss the complaint on September 18, they did not initially move to dismiss any RICO claim, as the Complaint itself contained none. (*See generally* Dkt. No. 140.) However, in their opposition to the City's motion to dismiss, Plaintiffs found it "curious to note DOE failed to deny any of the allegations in the RICO Case Statement," since the Case Statement was deemed incorporated into their Complaint. (Dkt. No. 150 at 12.) This

prompted the City to respond to that argument by arguing in their reply papers that Plaintiffs had failed to plead an adequate RICO claim. (Dkt. No. 157 at 7-9.)

The usual rule is that arguments raised for the first time in reply are not to be considered. *See Dukes v. New York City Emps. Ret. Sys.*, 361 F. Supp. 3d 358, 369 n. 8 (S.D.N.Y. 2019) (citations omitted). However, rather than start the motion process all over again, I ordered Plaintiffs to respond to the City's argument, which they did. (Dkt. Nos. 183, 194.)[12]

After reading the RICO Case Statement, and with the benefit of everyone's input, it is perfectly apparent that Plaintiff has not and cannot plead a viable RICO claim. This "in terrorem" contention was introduced into this action as an afterthought, not *ab initio*, and solely to try to manufacture jurisdiction over parties who could not be sued on these claims in this court. I will, therefore, explain why Plaintiffs' effort to assert a RICO claim must be denied – and eliminate this gambit for acquiring jurisdiction over the out-of-state defendants. It is imperative that the issue be addressed now and in this context because, once a civil RICO claim is dismissed, the plaintiff can no longer rely upon the statute's authorization of national personal jurisdiction. *Hitachi*, 331 F. Supp. 3d at 145–46.

### *The RICO Case Statement Fails to Allege A Viable RICO Claim for Multiple Reasons*

To sustain a RICO claim, a plaintiff must show that the defendant has violated the substantive RICO statute in "(1) that the defendant (2) through the commission of two or more acts (3) constituting a 'pattern' (4) of 'racketeering activity' (5) directly or indirectly invests in, or maintains an interest in, or participates in (6) an 'enterprise,' (7) the activities of which affects interstate or foreign commerce." *Moss v. Morgan Stanley*, 719 F.2d 5, 17 (2d Cir. 1983), *cert. denied*, 465 U.S. 1025 (1984).

---

[12] None of the moving out-of-state defendants addressed RICO because, at the time they moved for dismissal, the RICO Case Statement had not been filed and they were unaware of this novel claim.

Courts generally approach RICO claims with caution and an understanding of Congress's goal in enacting the RICO statute: to prevent legitimate businesses from becoming infiltrated by organized crime – though the statute's reach is not limited to mobsters. *See United States v. Porcelli*, 856 F.2d 1352, 1362 (2d Cir. 1989). "Because the mere assertion of a RICO claim has an almost inevitable stigmatizing effect on those named as defendants, courts should strive to flush out frivolous RICO allegations at an early stage of the litigation." *Schimdt v. Fleet Bank*, 16 F. Supp. 2d 340, 346 (S.D.N.Y. 1998). Indeed, although plaintiffs often zealously pursue RICO claims, particularly in cases involving fraud, plaintiffs asserting RICO frequently miss the mark. *See Gross v. Waywell*, 628 F. Supp. 2d 475. 479–80 (S.D.N.Y. 2009) (conducting a survey of 145 civil RICO cases filed in the Southern District of New York from 2004 through 2007 and finding that all 36 cases that were resolved on the merits resulted in judgments against the plaintiffs, including 30 at the motion to dismiss stage). RICO claims premised on allegations of mail or wire fraud warrant particular scrutiny, "because of the relative ease with which a plaintiff may mold a RICO pattern from allegations that, upon closer scrutiny, do not support it." *Id.* at 493 (citing *Efron v. Embassy Suites (Puerto Rico), Inc.*, 223 F.3d 12, 20 (1st Cir. 2000)).

Here, Plaintiffs allege two substantive violations of RICO's prohibitions pursuant to Sections 1962(a) and (c), as well as conspiracy to violate RICO's substantive prohibitions pursuant to Section 1962(d). The violations are predicated on Defendants' alleged commissions of mail fraud under 18 U.S.C. § 1341, wire fraud under 18 U.S.C. § 1343, fraudulent transfer of money under 18 U.S.C. § 2314, fraudulent receipt of money under 18 U.S.C. § 2315, and financial institution fraud under 18 U.S.C. § 1344 – all of which qualify as predicate acts under Section 1961(1) of RICO.

Plaintiffs' RICO claim, as outlined in the RICO Case Statement, fails in every particular.

### a. No Standing

As a threshold issue, Plaintiffs cannot assert a viable RICO claim because they lack standing to sue under the RICO statute on the ground they have asserted.

RICO grants standing to sue to "Any person injured in his business or property by reason of a violation of section 1962."  18 U.S.C. § 1964(c) (1988).  "This language limits standing to plaintiffs whose injuries were both factually and proximately caused by the alleged RICO violation."  *In re American Express Co. Shareholder Litig.*, 39 F.3d 395, 399 (2d Cir. 1994) (collecting cases).  Thus, "To have standing, plaintiffs must show that they were the intended targets of the RICO violations."  *G-I Holdings, Inc. v. Baron & Budd*, 238 F. Supp 2d 521, 549 (S.D.N.Y. 2002) (internal quotation marks omitted); *see also Chandrat v. Navillus Tile*, No. 03 10093, 2004 WL 2186562 (S.D.N.Y. Sept. 28, 2004).  The success of this endeavor depends on the RICO plaintiff's ability to show that the injuries alleged were the "preconceived purpose" or the "specifically intended consequence" of the defendant's racketeering activities – if not, the injuries can be neither the "necessary result" or "foreseeable consequence" of the defendant's actions.  *See id.*; *see also Medgar Evers Houses Tenants Assoc. v. Medgar Evers Houses Assoc.*, 25 F. Supp. 2d 116, 122 (E.D.N.Y. 1998).

Simply put, a RICO plaintiff cannot establish standing if the alleged injury is the derivative result of a fraudulent scheme that targets another victim.  Yet that is precisely what Plaintiffs have alleged here.

The gravamen of Plaintiffs' case is that disabled students were not provided with a FAPE during the pandemic, due to school closures and the provision of remote services. But failure to provide a FAPE is not a RICO predicate act. So in the RICO Case Statement, plaintiffs allege that the Defendant school districts submitted false Medicaid claims to the federal government in order

to obtain federal funding to educate disabled children.  Those purportedly false submissions are the frauds, the "racketeering acts," that Plaintiffs have identified. Failure to provide a student with a FAPE does not constitute a racketeering act under the RICO statute.

But this alleged fraud was not perpetrated on Plaintiffs. Rather, the purported frauds targeted the United States, which disburses Medicaid funding on certain conditions that Plaintiffs claim were not met. Therefore, any claim for relief resulting from those frauds belongs, not to these plaintiffs, but to the United States (or to a civil relator suing on behalf of the United States in a *qui tam* action). As a result, the alleged frauds cannot form the basis for relief under the civil RICO statute in a case brought by disabled students and their parents, whose claim is that the children were not provided with a FAPE – not that they (the Plaintiffs) were defrauded in any way.

Additionally, Plaintiffs plead no facts tending to show that the injury they allege – denial of a FAPE – was either the "preconceived purpose" or "specifically intended consequence" of Defendants' alleged racketeering activities.  *See In re American Express. Co.*, 39 F.3d at 400.

Lack of standing to assert a RICO claim on the facts pleaded in the Case Statement is enough to compel dismissal of any RICO claim that Plaintiffs might try to assert. But even if Plaintiffs did have standing to assert a RICO claim against these defendants, based on the Medicaid frauds identified in the RICO Case Statement, the claim they outline in the RICO Case Statement is multiply deficient.

### b.  Failure to Allege an Enterprise

First and foremost, Plaintiffs' substantive RICO claims fail because the RICO Case Statement fails to allege the existence of any enterprise – a necessary element to any RICO claim.

Section 1961(4) defines "enterprise" as "any individual, partnership, corporation, association, or other legal entity, and any . . . group of individuals associated in fact." 18 U.S.C. §

1961(4). "[A]n association-in-fact enterprise is 'a group of persons associated together for a common purpose of engaging in a course of conduct.'" *Boyle v. United States*, 556 U.S. 938, 946 (2009) (quoting *United States v. Turkette*, 452 U.S. 576, 583 (1981)). Where a plaintiff alleges an association-in-fact enterprise, courts in this Circuit look to the "hierarchy, organization, and activities" of the association to determine whether "its members functioned as a unit." *First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 174 (2d Cir. 2004) (internal citations omitted).

At minimum, an association in fact must have "at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle*, 556 U.S. at 946. "To satisfy the first 'purpose' feature, the individuals that [compose] the enterprise 'must share a common purpose to engage in a particular fraudulent course of conduct and work together to achieve such purposes.'" *New York v. United Postal Serv., Inc.*, No. 15-cv-1136, 2016 WL 4203547, at *3 (S.D.N.Y. Aug. 9, 2016) (quoting *First Capital*, 385 F.3d at 174). To satisfy the second feature, "a plaintiff must demonstrate the relationships between the various members and their roles in the purported RICO scheme." *Id.* (collecting cases). And most importantly, "A plaintiff's conclusory naming of a string of entities does not adequately allege an enterprise." *First Capital*, 385 F.3d at 175.

With these requirements in mind, the Court turns to the specifics of the "enterprise" alleged by Plaintiffs.

The RICO Case Statement alleges an enterprise consisting of all of the thousands of Defendants as well as "other wrongdoers," (unidentified), together with "passive instruments and victims" (also unidentified) at three different levels: the local school district level, the state level, and the national level. (Dkt. No. 121 at 36.) At the local level, Plaintiffs claim that Superintendents and other school administrators, school boards, school employees, contractors, and community

members are involved in budgets, financing, reimbursements and development of students' IEPs. (*Id.*) At the state level, the governor, state legislators, state departments of education, state Medicaid offices, and other administrators, employees, and contractors are involved in setting and managing state funding and policy, as well as oversight and enforcement of these policies. (*Id.*) And at the national level, the federal Department of Education, the Department of Health and Human Services (including the Centers for Medicaid and Medicare), the Justice Department, and Members of Congress are involved in education and Medicaid funding, federal policy, and oversight and enforcement of federal rules, regulations and laws. (*Id.* at 36-37.) Plaintiffs allege that unnamed financial institutions that are "victims of Defendants' racketeering activities" are also members of the enterprise. (*Id.* at 37.)

In essence, Plaintiffs assert that the entire educational system throughout the United States is being run as a single massive "racketeering enterprise," and that everyone involved with the implementation of IDEA – from the individuals employed by individual schools to individual school districts to State Departments of Education to State Legislatures to Congress and regulators at the federal Department of Education – is acting together and in concert to deprive disabled students of their rights during the pandemic by committing Medicaid fraud.

Unfortunately for Plaintiffs, not a single factual allegation in either the Complaint or the RICO Case Statement tends to show that these manifold parties constitute an "association in fact;" that they bonded together with the singular purpose of depriving disabled students of the benefit of in-person education during the pandemic; or that they acted together as a unit to achieve that purpose. Nor could Plaintiffs plausibly so allege.

Indeed, allegations that every school district and State Education Department acted in concert to close schools so as to effectuate an illegal result would contradict allegations that *are*

made in the Complaint, which underscore and emphasize the separateness of school districts and

the states within which they are located. Plaintiffs allege, for example, that the School Districts

"are the official bodies charged with the responsibility of developing and enforcing policies with

respect to the administration and operation of the public schools *in their respective geographic*

*areas* . . . ." (Dkt. No. 121 at 15 (emphasis added).) Similarly, the Departments of Education "are

the State Educational Agencies ('SEA') which exercise general supervision over all programs *in*

*the State* that provide educational services to disabled students, and must ensure that all such meet

*State* education standards." (*Id.* at 16 (emphasis added).) This language renders Plaintiffs'

conclusory rhetoric about a "massive racketeering scheme across every state" utterly implausible.

(*See id.* at 25.) If hundreds of independent entities are alleged to have made "*local* decisions that

take into consideration the health, safety, and well-being of all their students and staff" (*id.* at 18

(emphasis added)) – and that is what Plaintiffs say in their Complaint – then they did not organize

themselves into a structured collective for the purpose of defrauding the government of Medicaid

funds and depriving their students of FAPEs.

Plaintiffs' allegations of an enterprise are, at best, "the conclusory naming of a string of

entities" coupled with legal conclusions. *See First Capital*, 385 F.2d at 175. The RICO Case

Statement alleges no facts concerning the "hierarchy" or "organization . . . of the alleged

association," let alone facts that support an inference that the various school boards, administrators,

and policymakers have any sort of relationship that forms a coherent entity. *Id.* at 174; *see also*

*Boyle*, 56 U.S. at 956.

Nor does the RICO Case Statement contain any concrete factual assertions supporting the

inference that the constituent institutions, including Congress and the USDOE, share a common

interest in the success of the so-called enterprise. *See Continental Petroleum Corp., Inc. v.*

*Corporation Funding Partners, LLC*, No. 11-cv-7801, 2012 WL 1231775, at *6 (S.D.N.Y. Apr.

12, 2012); *see also Abbot Laboratories v. Adelphia Supply USA*, No. 15-cv-5826, 2017 WL 57802,

at *4 (E.D.N.Y. Jan. 4, 2017) (holding that the plaintiff's factual allegations, which included few

details of the defendants' interactions, could not support "an inference than over 300 'disparate

defendants' formed an enterprise").  It is not plausible that all of the entities alleged to be part of

the "enterprise" want either to deprive special education students of their rights or want school

districts to misuse federal funds.

Plaintiffs assert that there must be a nationwide enterprise because – *mirabile dictum* – all

the states and districts reached the initial conclusion that schools needed to be closed last spring in

light of the pandemic. (Dkt. No. 121 at 16, 37.) But that is a classic example of *post ergo propter*

*hoc* illogic.  Yes, state and local school officials across the country reached the conclusion that,

for the safety of students and teachers alike, schools needed to be closed in the early and confusing

days of a pandemic that has thus far sickened millions and cost over 240,000 Americans their lives.

But no, it does not logically follow that they did so as part of a single unitary association in fact.

Plaintiffs' Case Statement contains no facts suggesting that the states and districts acted jointly in

deciding to order school closures, or that the districts across the country acted in concert with each

other, in associational fashion, to comply with those orders. They do not even allege that any States

or school districts consulted with any other. At best the contentions in the RICO Case Statement

and the Complaint add up to "conscious parallelism" of the sort that is insufficient to give rise to

any inference that there exists an association in fact.  *Bell Atlantic Corp. v. Twombly*, 550 U.S.

544, 553–54 (2007).

Plaintiffs thus have not and cannot plausibly allege the existence of the nationwide

enterprise that undergirds their RICO claim.

### c.   Plaintiffs Do No Allege the Existence of a Conspiracy

Plaintiffs also fail to plead the existence of a conspiracy among all the school administrators and districts in the fifty states – a necessary element of Plaintiffs' claim for RICO conspiracy under 18 U.S.C. § 1962(d). Their conclusory allegation of a conspiracy is contradicted by the same particulars of the Complaint and RICO Case Statement that led this Court to conclude that there was no enterprise. Even with all inferences drawn in Plaintiffs' favor, it is evident from the text of the pleading that the defendant school districts in each individual state were independently following the separate orders of their respective Governors and State Education Departments.  (*See* Dkt. No. 121 at 15-16, 18, 25.)

The mere fact that multiple defendants reached the same result acting independently is insufficient to plead conspiracy. When faced with the same scenario, the Supreme Court in *Twombly*, 550 U.S. at 555 – the quintessential case on pleading standards – held that, "An allegation of parallel conduct . . . gets the complaint close to stating a claim [for conspiracy], but without some further factual enhancement it stops short of the line between possibility and plausibility of entitlement to relief." (Internal citation and quotation marks omitted). Although *Twombly* arose in the antitrust context, its logic is applicable here. Indeed, numerous courts have held that allegations of parallel conduct alone cannot not support the inference that RICO defendants are joined together for a common purpose.  *See Gucci, Inc. Alibaba Grp. Holding Ltd.*, 15-cv-3784 (PKC), 2016 WL 6110565, at *6-7 (S.D.N.Y. Aug. 4, 2016) (collecting cases); *see also In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300 (3d Cir. 2010). Plaintiffs allege nothing more than parallel conduct.

They have thus failed to allege conspiracy in violation of 18 U.S.C. § 1962(d).

Additionally, the failure to allege the existence of an enterprise, without more, means that Plaintiffs have failed to plead any underlying substantive violations of RICO – which means that the RICO conspiracy claim alleged pursuant to Section 1962(d) and must be dismissed. *See First Capital Asset Mgmt.*, 385 F.3d at 182.

### d. Plaintiffs Do Not Plausibly Allege Predicate Acts

It is not necessary to go further in analyzing Plaintiffs' defective RICO claim; the lack of standing and the failure to allege the existence of either an enterprise or a conspiracy doom this misguided effort to manufacture nationwide jurisdiction. However, Plaintiffs' RICO Case Statement is equally deficient in identifying any RICO predicate acts. While the Case Statement throws around terms that might qualify as predicate acts if they were undergirded by any plausible factual allegations – wire fraud, mail fraud, fraudulent transfer of money, fraudulent receipt of money, and financial institution fraud – those plausible factual allegations are missing altogether.

Because Plaintiffs' RICO allegations are predicated on fraud, they are subject to the heightened pleading standards in Rule 9(b); the allegations "must adequately specify the statements it claims were false or misleading, give particulars as to the respect in which plaintiff contends the statements were fraudulent, state when and where the statements were made, and identify those responsible for the statements. *Lundy v. Catholic Health Sys. of Long Island*, 711 F.3d 106, 119 (2d Cir. 2013); Fed. R. Civ. P. 9(b); *see* RICO Case Standing Order, Sept. 8, 2010 at 2. Although knowledge of a defendant's fraud or intent to defraud may be averred generally under Rule 9(b), these allegations of scienter must be supported by facts "giving rise to a strong inference that defendant knew the statements to be false and intended to defraud the plaintiff" at the time they were made. *Ouaknine v. MacFarlane*, 897 F.2d 75 ,79-80 (2d Cir. 1990). "Where multiple defendants are accused of mail or wire fraud, plaintiffs must plead particularity as to each

defendant, unless such defendants are corporate insiders." *United States Fire Ins. Co. v. United Limousine Serv., Inc.*, 303 F. Supp. 2d 432, 444 (S.D.N.Y. 2004) (citing *Allen v. New World Coffee, Inc.*, No. 00-cv-2610, 2001 WL 293683, at *4 (S.D.N.Y. Mar. 27, 2001); *DiVittorio v. Equidyne Extractive Indus., Inc.*, 822 F.2d 1242, 1247 (2d Cir. 1987)).

The essence of the alleged frauds that constitute the RICO predicate acts in this case is the receipt of federal funds by the school district defendants for special education purposes without intending to abide by the IDEA and other federal regulations touching on the education of disabled students. But no facts asserted in the RICO Case Statement support a conclusion that *any* School District – let alone every one in the United States (and it would need to be alleged for each one, *see United States Fire Ins. Co.*, 303 F. Supp. 2d at 444) – accepted federal funds for special education purposes while knowing that (1) there was going to be a massive worldwide pandemic, resulting in millions of cases of illness and hundreds of thousands of deaths in this country alone; (2) in response to that pandemic, and in an effort to provide for physical safety of students and educators, states would issue emergency orders directing school districts to close down as a public health measure; or (3) in complying with those orders, school districts would necessarily and knowingly violate the IDEA's substantive and procedural requirements, including its stay-put rules. The utter implausibility of such a contention speaks for itself. No one knew that there was going to be a pandemic; it took the entire world by surprise. No one knew how fast or how far it would spread; no one knew what public health response it would require; no one knew how quickly emergencies would arise; no one knew how states would in fact respond to the imminent danger they confronted. Therefore, it cannot be plausibly alleged that the school districts took IDEA funds with the intent to defraud anyone.

Thus, Plaintiffs have failed to allege any facts – let alone allege them with the particularity required by Rule 9(b) – that would give rise to an inference of fraudulent intent by ANY defendant, let alone by all of them. *See First Capital Asset Mgmt.*, 385 F.3d at 178–79. That alone renders implausible the allegations of wire fraud, mail fraud, fraudulent transfer and receipt of money and financial institution fraud – of any fraud whatsoever – and means that Plaintiff has not asserted a viable RICO claim on that ground.

Finally, it bears noting that Plaintiff's "pattern of racketeering" allegations do not come close to meeting the pleading standards in this Circuit for "continuity" of a racketeering enterprise.

"[A] plaintiff in a RICO action must allege either an 'open ended' pattern of racketeering activity (*i.e.,* past criminal conduct coupled with a threat of future criminal conduct) or a 'closed-ended' pattern of racketeering activity (*i.e.,* past criminal conduct 'extending over a substantial period of time')." *GICC Capital Corp.* 67 F.3d at 466 (2d Cir. 1995). To satisfy a closed-ended continuity, a plaintiff must prove "a series of related predicates extending over a substantial period of time. Predicate acts extending over a few weeks or months . . . do not satisfy this requirement." *H.J., Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 242 (1989).

Here, even under the most liberal reading of the RICO statement, Plaintiffs have not and could not allege predicate extending over "a substantial period of time." The pandemic broke out about ten months ago. Widespread school closings did not begin until March 2020. No fact is alleged tending to show that anyone submitted a false Medicaid claim before the pandemic started, because no fact is alleged tending to show that anyone was aware, prior to the outbreak, that the pandemic was going to happen. This means any purported predicate acts of fraud took place over a period of less than eight months. That number is far less than the Second Circuit's benchmark of two years. *Cofacredit, S.A. v. Windsor Plumbing Supply Co., Inc.*, 187 F.2d 229, 242 (2d Cir.

43

1999) ("[T]his Court has never held a period of less than two years to constitute a 'substantial period of time.'").

"To satisfy open-ended continuity, the plaintiff need not show that the predicates extended over a substantial period of time but must show that there was a threat of continuing criminal activity beyond the period during which the predicate acts were performed." *Id.*  "[W]here the enterprise primarily conducts a legitimate business . . . there must be some evidence from which it may be inferred that the predicate acts were the regular way of operating that business, or that the nature of the predicate acts themselves implies a threat of continued criminal activity." *Id.*; *see also H.J. Inc.*, 492 U.S. at 230 ("Otherwise, it must be shown that the predicates establish a *threat* of long-term racketeering activity—for example, because the predicates themselves involve a distinct threat of such activity; because they are part of the regular way of doing business for an ongoing entity such as a criminal association or legitimate business; or because they are a regular means of conducting or participating in an ongoing RICO enterprise.").  Plaintiffs do not and cannot meet this standard because they plead no facts tending to show that submitting fraudulent Medicaid claims is the "regular way of operating" the business of any school district, let alone all of them, and because the inherent nature of a pandemic is such that activity that takes place in response to the emergency can be expected to end once the emergency ends.

Frankly, the RICO allegations here asserted reek of bad faith and contrivance. Plaintiffs have baldly asserted that every school district in the country, in trying to respond to an unprecedented nationwide health crisis,  has perpetrated a fraud on the federal government. They have not the slightest basis for so asserting. Their use of the phrase "on information and belief" does not save this patently defective pleading. *See First Asset Capital Mgmt.*, 385 F.3d at 179 ("Although it is true that matters peculiarly within a defendant's knowledge may be pled 'on

information and belief,' this does not mean that those matters may be pled lacking any detail at all.") (internal citation and quotation marks omitted). This effort to inject racketeering into what is simply an IDEA lawsuit is bad faith pleading writ large.

The RICO claim asserted in the RICO Case Statement is DISMISSED as against all Defendants in this lawsuit, with prejudice.

Plaintiffs' failure to assert a tenable RICO claim dooms their quest to obtain *in personam* jurisdiction over the out of state defendants. For that reason, the remainder of the complaint (Counts I through XI) is dismissed as against the out-of-state defendants, without prejudice.

### B. *The Claims Against the Out of State Defendants Should Be Dismissed Because Venue is Not Proper in this District*

Although this court did not issue an order to show cause directing plaintiffs to explain why venue was proper in this district as to the out of state defendants, it is perfectly obvious that venue is NOT proper in this district as to those defendants. Several School Districts located outside of New York have noted as much. For instance, on September 2, 2020, four school districts in Georgia filed a motion to dismiss for, *inter alia*, improper venue in the Southern District of New York. (Dkt. Nos. 93, 95, 97, 99.) They claim that, given the absence of any specific allegations against them, venue in this district was improper because they have absolutely no connection at all with the district, and litigation in New York would be extraordinarily inconvenient for them.

Venue "serves the purpose of protecting a defendant from the inconvenience of having to defend an action in a trial court that is either remote from the defendant's residence or from the place where the acts underlying the controversy occurred." *Detroit Coffee Co., LLC v. Soup for You, LLC*, No. 16-cv-9875 (JPO), 2018 WL 941747, at *4 (S.D.N.Y. Feb. 16, 2018) (citation omitted). In other words, it guards against the "risk that a plaintiff will select an unfair or inconvenient place of trial." *Leroy v. Great Western United Corp.*, 443 U.S. 173, 184 (1979).

Venue is governed by 28 U.S.C. § 1391(b), which states that it is proper in

> (1) a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located; (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated; or (3) if there is no district in which an action may otherwise be brought as provided in this section, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action.

Before the Court stayed the case, at least five out-of-state defendants moved to dismiss stating, *inter alia*, that venue was improper in the Southern District of New York as to their claims. (*See* Dkt. Nos. 74, 92, 94, 96, 98; motions to dismiss of York Cnty., VA public schools, Clayton Cnty., GA public schools, Cobb Cnty., GA public schools, Dekalb Cnty., GA public schools, Marietta City, GA public schools.) While those motions were never fully briefed and were administratively closed when the court stayed the litigation except as to the NYC Defendants, there can be no question that venue is improper as to these out-of-state defendants because no part of the events or omissions giving rise to the claims against them occurred in this district. Only if the Plaintiffs had pleaded a viable RICO claim could venue even arguably lie in the Southern District of New York for any associated failure-to-provide-a-FAPE claim against a school district in Georgia or Nebraska.  But the RICO claim Plaintiffs allege is not viable.

Moreover, it is appropriate to dismiss as against all of the thousands of non-moving out-of-state defendants for improper venue. While Second Circuit has held that "A district court may not dismiss a case *sua sponte* for improper venue absent extraordinary circumstances," *Gomez v. USAA Fed. Sav. Bank*, 171 F.3d 794, 796 (2d Cir. 1999), this case presents such extraordinary circumstances.  "[F]or venue to be proper, *significant* events or omissions *material* to the plaintiff's claim must have occurred in the district in question." *Gulf Ins. Co. v. Glasbrenner*, 417 F.3d 353, 357 (2d Cir. 2005). There is no way that any, let alone a substantial part, of the events leading to

the out-of-state plaintiffs' claims of failure to provide a FAPE, or to maintain pendency took place in the Southern District of New York.

### C. *Even If There Were* In Personam *Jurisdiction Over the Claims Against the Out of State Defendants, The Claims Against Them are Improperly Joined and Should be Severed and Dismissed Without Prejudice.*

Finally, even if all of the above were incorrect – if there were *in personam* jurisdiction over the out-of-state defendants and if and venue was properly laid in the Southern District of New York – the claims against the out-of-state defendants would and should be severed – and dismissed without prejudice, under Second Circuit precedent – because they are not properly joined in a single lawsuit.

In its Order to Show Cause #2, the Court asked plaintiffs to address whether the claims asserted against the various different School District Defendants should be severed and dismissed without prejudice to being brought in separate lawsuits. (Dkt. No. 84.) In that OTSC, the Court observed that, in its experience, individual school districts are autonomous entities that make decisions independently from one another. Plaintiffs acknowledge as much, for they allege that the School Districts "are the official bodies charged with the responsibility of developing and enforcing policies with respect to the administration and operation of the public schools *in their respective geographic areas* . . . ." (Dkt. No. 121 at 15 (emphasis added).)

Moreover, as noted above, there are no allegations in the complaint suggesting that the defendants are being sued as a defendant class – and properly so, for no such class could be certified without violating the law of standing. To have standing to sue an opposing party, a "plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016); *see also Lujan v. Defenders of Wildlife,* 504 U.S. 555, 559–60 (1992). As should go without saying, each individual child and his/her parents

has standing to bring a claim only against that child's school district and the State Education Department in the child's state of residence. Named Plaintiff J.T. and J.T.'s child D.T. have standing to assert a claim for violation of D.T.'s rights under IDEA, the Rehabilitation Act, Section 1983, the ADA, and state law against only one school district – the Middletown, New Jersey school district – and perhaps (and with the exception of claims under Section 1983) against the New Jersey State Department of Education. But the T. family has no claim against the NYC Defendants or the New York State Department of Education, because they suffered no injury that can be traced to the actions of the NYC Defendants or the New York State Department of Education, or that could be redressed by a judgment against those entities.  Similarly, J.J. and Z.J. have standing to sue the Meriden, Connecticut School District, and perhaps the Connecticut State Department of Education – but lack standing to pursue any claim against the NYC Defendants. Lastly, C.N. and V.N. have standing to sue the Leander, Texas Independent School District, and perhaps the Texas State Department of Education – but lack standing to pursue any claim against the NYC Defendants.

"[T]he Second Circuit has made clear that 'no class may be certified that contains members lacking Article III standing' and that any 'class must therefore be defined in such a way that anyone within it would have [Article III] standing.'" *In re LIBOR-Based Fin. Instruments Antitrust Litigation*, 299 F. Supp.3d 430, 459 (S.D.N.Y. 2018) (quoting *Denney v. Deutsche Bank AG*, 443 F.3d 253, 264 (2d Cir. 2006)). It is readily apparent to the Court that it is impossible for all Plaintiffs to currently be joined in a putative class action against *all* Defendants, because the Plaintiffs do not have claims against *all* Defendants. Therefore, what we have is not a class action at all, but an extraordinarily large number (probably hundreds of thousands) of discrete lawsuits that are properly brought only against different subsets of defendants (local and state), which have

been joined together in a single lawsuit. The question is whether that joinder should be allowed.
The obvious answer is no.

Two rules of civil procedure govern the joinder of individual claims in a single lawsuit.
Rule 19 of the Federal Rules sets out the rules for the compulsory joinder of two or more claims.

Under Rule 19(a), a party *must be joined* if feasible, if:

(A) in that person's absence, the court cannot accord complete relief among existing
parties; or (B) that person claims an interest relating to the subject of the action and
is so situated that disposing of the action in the person's absence may: (i) as a
practical matter impair or impede the person's ability to protect the interest; or (ii)
leave an existing party subject to a substantial risk of incurring double, multiple, or
otherwise inconsistent obligations because of the interest.

Plaintiffs do not argue that compulsory joinder is required here, and understandably so. Because
no individual parent/student plaintiff has standing to sue any school district except the student's
own school district, it is not necessary for ANY other district to be joined in order to accord any
individual plaintiff complete relief, and no one except that plaintiff and those defendants can claim
any interest relating to the subject of that particular dispute.

Instead, Plaintiffs rely on Federal Rule of Civil Procedure 20, which permits (but does not
require) the joinder defendants if "(A) any right to relief is asserted against them jointly, severally,
or in the alternative with respect to or arising out of the same transaction, occurrence, or series of
transactions or occurrences; *and* (B) any question of law or fact common to all defendants will
arise in the action." Fed. R. Civ. P. 20(a)(2) (emphasis added).

Because Rule 20 joinder is permissive, not required, a court is perfectly free to deny a
plaintiff permission to join claims against different defendants. And in this respect the plaintiff is
not the master of his complaint; Fed R. Civ. P. 21 allows a court, on its own motion and at any
time, to add or drop a party or to sever claims, on just terms. This means, "If a court concludes that
defendants have been improperly joined under Rule 20, it has broad discretion under Rule 21 to

sever parties or claims from the action." *Kalie v. Bank of Am. Corp.*, 297 F.R.D. 552, 556 (S.D.N.Y. 2013) (citation omitted); *see also T.S.I. 27, Inc. v. Berman Enterprises, Inc.*, 115 F.R.D. 252, 254 (S.D.N.Y. 1987) ("Courts may order a Rule 21 severance when it will serve the ends of justice and further the prompt and efficient disposition of litigation.").

The test for whether parties or claims should be joined under Rule 20 involves answering five questions:

> (1) whether the claims arise out of the same transaction or occurrence; (2) whether the claims present some common questions of law or fact; (3) whether settlement of the claims or judicial economy would be facilitated; (4) whether prejudice would be avoided if severance were granted; and (5) whether different witnesses and documentary proof are required for the separate claims.

*Kalie*, 297 F.R.D. at 556–57 (citations omitted).

As has already been discussed, no IDEA child or his/her parents has any claim or cause of action or right to relief except as against the school district in which that child resides. The mere fact that each district is alleged to have violated IDEA by closing its schools during the pandemic in response to a state order does not make permissive joinder appropriate. An allegation that "the defendants merely committed the same type of violation in the same way" is, by itself, insufficient to justify joinder; the Second Circuit has held that "the fact that a large number of people use the same method to violate the law does not authorize them to be joined as defendants in a single lawsuit." *Next Phase Distribution, Inc. v. John Does 1-27*, 284 F.R.D. 165, 169 (S.D.N.Y. 2012) (quoting *Digital Sins 245*, 2012 WL 1744838, at *2 (citing *Nassau Cnty. Assoc. of Ins. Agents, Inc. v. Aetna Life & Casualty*, 497 F.2d 1151, 1154 (2d Cir. 1974))).

For example, in *Next Phase*, my colleague the Hon. Victor Marrero exercised the court's discretion to sever, and dismissed, *sua sponte*, twenty-six Defendants from an action alleging that the Defendants had illegally downloaded one of Plaintiff's copyrighted films because "joining 27

defendants, a substantial number of whom may have no liability . . . could prove to be a costly and futile exercise[.]" *Id*. at 171. Likewise, in *Digital Sins, Inc. v. John Does 1-245*, No. 11 Civ. 8170 (CM), 2012 WL 1744838, at *3 (S.D.N.Y. May 15, 2012), this court exercised discretion to sever the claims against 244 John Doe defendants in a similar copyright action, observing that, "There are no litigation economies to be gained from trying what are in essence 245 different cases together, because each of the John Does is likely to have some individual defense to assert" and each one's guilt "will have to be proved separately and independently." *Ibid*.

Here, the complaint asserts that most of the 13,821 school districts in the United States closed their schools at more or less the same time because of the pandemic – albeit pursuant to the separate orders of fifty-two different sovereignties. It does not allege any facts tending to show that any individual state's or school district's decisions about how to handle special education during the pandemic was related to or dictated by the decision of any other district. Indeed, Plaintiffs acknowledge that some school districts actually remained open, even as most closed; that some districts re-opened earlier than others; that different districts provided different levels of special education during the pandemic; and that different school districts provided their special education teachers and staff with different levels of resources.  (Compl. at ¶¶ 13, 26, 28.)

The claim asserted by any student against his/her school district will require the presentation of unique evidence. Each child will have to exhaust administrative remedies as a predicate to bringing suit under IDEA, and the record in those administrative proceedings will be pertinent only to the claims asserted by that child against his/her district. In order to resolve the claims asserted by any student, that student's IEP and supporting documentation will have to be introduced and evaluated.  Each child's situation will require the testimony of different witnesses (CSE members, teachers, service providers), as well as the introduction of different reports,

evaluations and other documents. Different districts will not only call different witnesses, but a single district could and doubtless will assert different defenses as to individual children.

There is not the slightest possibility that joinder would facilitate settlement, since there is no possibility of the creation of a common fund – the Atlanta School District would only settle with Atlanta students, and the New Trier School District with its students. Nor would joinder facilitate the fashioning of a single order that could be applicable to the *individualized* educational plans of the various students.

In sum, Plaintiffs have identified no savings of time or effort that would result if these cases were severed and no prejudice that would result if the cases against the out of state defendant districts dismissed without prejudice. The lack of manageability of allowing these claims to remain joined almost dictates severance.

Plaintiffs argue that the "systemic violation of law" by all districts and states justifies joinder. But that precise argument was rejected by the Second Circuit long ago, in *Nassau Cnty. Ass'n of Ins. Agents, Inc. v. Aetna Life & Cas. Co.*, 497 F.2d 1151, 1153-54 (2d Cir. 1974). In that case, four unincorporated associations of insurance agents alleged antitrust violations against 164 insurance companies for threatening to terminate the contracts of insurance agents if the they did not meet certain minimum volume requirements, sell new lines of insurance, or maintain a low commission rate. *Id*. at 1152. However, the Second Circuit held – despite a blanket allegation that all 164 defendants had harmed plaintiffs – that the joinder of antitrust claims resting on thousands of separate transactions was, not just improper, but a " gross abuse of procedure," because there were no plausible allegations of conspiracy, nor an allegation that there was any "connection at all between the practices engaged in by each of the 164 defendants."[13] *Id*. at 1154.   Similarly, in

---

[13] The principal holding in *Nassau County* was that the plaintiffs lacked antitrust standing.

*Arista Records LLC v. Does 1–4*, 589 F. Supp. 2d 151, 155 (D. Conn. 2008), the district court exercised its discretion to dismiss all but one defendant from the case because, "Plaintiffs have not alleged that the Does conspired or acted jointly."

Plaintiffs also argue that their RICO claim warrants joinder, but that argument no longer works, since Plaintiffs have neither standing to assert a RICO claim nor any viable claim to assert.

The specific allegations in the complaint focus squarely on the policies of NYCDOE, with a modicum of detail about the pandemic policies (i.e., schools closing and then reopening at different times) in a few of the thousands of other defendant districts. There are, as noted above in the discussion of Plaintiffs' "Hail Mary" RICO claim, no facts alleged that tend to demonstrate either allegations of joint action or conspiracy – only conscious parallelism, as districts throughout the nation responded to the orders of various state Governors and Education Departments. Allegations that one or more defendants acted similarly, without more, do not justify permissive joinder of those defendants in a single action. *See Michaels Bldg. Co. v. Ameritrust Co., N.A.*, 848 F.2d 674, 682 (6th Cir. 1988) (affirming a severance of defendants because "the loan transaction forming the basis for the claims against the Ameritrust defendants was wholly unrelated to other matters," had "no relation to the loans made by the other defendants," and involved "different banks, different contracts and different terms.").

The purpose of permissive joinder is efficient litigation, but there is no way to handle this mish-mash of a case efficiently. A joint litigation with all School District Defendants, each likely with particularized facts pertinent to each district and quite possibly each child, renders the case unmanageable.

Ordinarily, the remedy for misjoinder is severance, not dismissal; indeed Fed. R. Civ. P. 21 so provides. However, in *Nassau County*, the Court of Appeals held that the litigation

constituted "such a gross abuse of procedure that dismissal under Fed. R. Civ. P. 41(b) for failure to comply with the federal rules is warranted." *Id.* at 1154. The court acknowledged that, "Although the usual remedy under Rule 21 [for misjoinder] is severance, that would be inadequate to remedy the present abuse . . . " *Ibid*.

Plaintiffs' lack of compliance with the federal rules is even more apparent here. And given the number of putative parties (many of whom have not been identified) and the pleading posture of the case, severance and transfer – which would be imperative, in light of the court's rulings on personal jurisdiction and venue – would be impossible to manage administratively.

Severance and dismissal here may well result in the bringing of numerous individual cases against the more than 13,800 school districts across the United States. But that is the nature of IDEA litigation involving individual students and their parents, each of whom has standing to bring claims against just one or two of the thousands of defendants purportedly sued here.  No one who was allegedly injured by these thousands of decisions will be denied a chance to obtain a remedy; any individual student who believes s/he is being denied a FAPE by virtue of the closure of schools during the pandemic and/or the provision of services remotely can bring a claim against his/her school district and state, in a federal or state court in that state, for redress. Plaintiffs have attempted to craft a one-size-fits all omnibus lawsuit. But that is not how IDEA cases can or should be handled.

*     *     *     *     *

For all of the above reasons – lack of personal jurisdiction, improper venue and improper joinder – the court severs and dismisses all of the out-of-state defendants from this lawsuit. This dismissal is without prejudice. Whether groups of parents from a single out of state district can band together to sue that district is not an issue I can or should address today; it is enough that the

54

claims asserted in this action can be brought against the out of state defendants in a more other forum.

The fact that the lawsuit is being dismissed as against the out of state defendants means that the out of state plaintiffs who are listed in Appendix A to the Complaint – those who have no child enrolled in a New York State schools and who are not suing any defendant located in the State of New York – should also be dismissed as parties. And so they are.

## II.    All Claims Against All New York State School Districts Outside New York City School District are Severed Pursuant to Rule 21 and Dismissed, the RICO Claim With Prejudice and All Other Claims Without Prejudice

Having disposed of the out-of-state defendants, the court next turns to the efficient management of claims against those defendants located in New York State.  Pursuant to Rules 20 and 21 and in the interest of efficient case management, the claims against all of the school districts in the State of New York other than the New York City Department of Education and the NYC Defendants are also severed and dismissed without prejudice.

The immediately preceding discussion informs this conclusion. This is not really a class action, but a large number of individual cases, brought by individual parents of disabled children against their child's individual school district and ONLY their child's school district, as well as the State of New York. No student or parent has standing to assert any of the claims pleaded in the complaint against a school district other than the one in which s/he is a student. The allegations of the complaint undermine any suggestion that the 688 school districts in New York State have acted collectively, or even uniformly, insofar as concerns the provision of services to disabled students during the pandemic, except in one respect: all obeyed Governor Cuomo's initial order to close the schools when this state was COVID-19's Ground Zero for the country and the globe. The complaint contains numerous allegations about how disability education is being handled or

mishandled in New York City, but not a single allegation that ties the City's response to the pandemic to anything that has happened in any other district in the state. In fact, the only allegation in the complaint that relate to a school district other than New York City is the fact that three school districts on Long Island – Massapequa, Hauppauge, and Merrick – reopened their schools over the summer for special education services, while other districts (only one of which – NYCDOE – is identified) did not. (Compl. ¶ 19.) Plaintiffs also allege that many Catholic schools on Long Island planned to have all students return to in-person classes five days a week beginning in September (*id.* ¶ 26.); but that has nothing to do with whether these individual lawsuits can be maintained jointly, because no Catholic schools are defendants – nor could they be, since IDEA requires *public school districts* to provide special education services to children with disabilities who are placed by their parents in (and accepted by) Catholic and other private schools. *See* 34 CFR § 300.132.

Otherwise, the complaint alleges, without any specificity, that some schools in New York State reopened for in person education and some did not; that some are open now and some are not; that some are open full time and some only part time; and that some are providing services at some level and others are not – all without in any instance identifying which school districts fall into which categories.   The only thing that is clear from the pleading is that it is every school district for itself.

The arguments in favor of severance applicable to the out-of-state defendants apply with equal force to the in-state school district defendants. This is not, as Plaintiffs admit, a case in which joinder is mandatory. There are no economies whatever to be realized from litigating claims asserted by various students against the Buffalo, Plattsburgh, Elmira, Albany, Arlington Central, Yorktown, Yonkers and Great Neck school districts (to name but a few of the 688 separate school

districts in the State of New York, *see* Ballotpedia.org) in a single lawsuit. Although all these districts were subject to the original gubernatorial order to close down at the height of the pandemic, no fact is alleged that would support any conclusion except the conclusion that each district, acting locally and individually, responded to school closure by coming up with its own way of handling disability education; made its own decision about when and how to reopen; and did whatever it chose to do with respect to (1) consulting the parents of disabled children, (2) following the guidance of federal and state officials, and (3) amending or standing on any individual child's IEP in light of that guidance. There is simply no basis to allow this lawsuit to proceed in the unwieldy manner chosen by Plaintiffs' counsel.

Again, it is not enough simply to sever these claims, because it is impossible to identify who is asserting claims against whom. There are 687 school districts outside of New York City, but 687 identified students have not asserted claims in this lawsuit, and there is no way to "sever" this complaint into individual actions. *Nassau County* dismissal, again without prejudice, is warranted here as well.

Whether groups of disabled students located in a single district outside of New York City can maintain a single action against that district or must all sue separately, and in what court any action against any district can (venue) or should (*forum non conveniens*) be filed are questions this court need not answer – and are, indeed, best answered when and if lawsuits are filed, individually or collectively, against particular school districts arising out of their particularized conduct of disability education during the continuing pandemic. For now it is sufficient to note, for all the reasons set forth at pages 45-52 above, that all claims against the 687 school districts outside the City of New York are hereby severed and dismissed without prejudice.[14]

---

[14] The discussion in footnote 11 concerning the lack of subject matter jurisdiction due to the failure of any identifiable plaintiff  to exhaust administrative remedies is equally apt as to the claims asserted against the 687 dismissed New

III.    **The New York City Plaintiffs' Motion for a Stay Put Preliminary Injunction Against the NYC Defendants is DENIED.**

The plaintiffs in this action are now the thirty-eight New York City parents identified in the caption of the Complaint (K.M.) and Appendix A to the Complaint (Dkt. No. 1-12), who represent the interests of a total of forty-three disabled students.[15] These parents are the applicants on the pending motion for a preliminary injunction to restore their children's pendency, under the IDEA's stay-put provision.

In order to trigger the IDEA's stay-put provision, a student's parent or guardian must have filed a due process complaint with the student's LEA (i.e., the child's school district). In the Complaint, Plaintiffs allege that "Plaintiff-Parents" – defined in the Complaint as including all parents named in Appendix A (see Compl. at 1) – allegedly filed due process complaints with their LEAs alleging violations of the IDEA and Section 504 by unilaterally modifying the Students' IEPs and failing to maintain their pendency programs and placements. (Id. ¶ 146.) Similarly, Plaintiffs' counsel stated in his declaration in support of Plaintiffs' application for a preliminary injunction – originally submitted ex parte in August (see Dkt. No. 29) – that "Parents subsequently filed due process complaints with their LEAs." ("Albert Decl." ¶ 19, Dkt. No. 90-1.) Plaintiffs' counsel reiterated in a September 3 letter that administrative due process complaints were filed with NYCODE on behalf of all New York City parents. (Dkt. No. 106.)

Plaintiffs never specifically allege when any particular parent filed a due process complaint with NYCDOE. Plaintiffs' counsel did, however, submit a declaration in response to this Court's

---

York State school districts. And lest the language at page 43, *supra*, not be sufficiently clear, the belatedly-asserted RICO claim that was dismissed as against the out of state defendants in order to defeat any suggestion of personal jurisdiction is dismissed with prejudice against the in state defendants as well -- because it is every bit as deficient as to them as it is to the out of state defendants.

[15] Plaintiffs #51-76, 78-88: M.R., D.R., E.I., L.P., M.B., A.D., C.M., K.M., J.O., B.A.B., L.B., K.M., R.N., M.B., K.T., D.G., D.G., S.G., B.H., S.L., M.P., N.B., R.B., M.M., K.P., C.F., C.G., B.H, B.S., A.R., E.P., N.K., S.C., J.L., H.D., L.W., and F.R. Plaintiffs #54 L.P., #58 K.M., #84 S.C., and #87 L.W. each bring claims on behalf of two students.

September 14 order to show cause (Dkt. No. 128), in which he stated that "Between June 1, 2020 and September 14, 2020, counsel filed 199 administrative due process complaints on behalf of Plaintiff-Parents" in the putative class. ("Albert OTSC Decl." ¶ 5, Dkt. No. 141.) Under seal, Plaintiffs filed a list of these 199 due process complaints. (*See* Dkt. No. 142-1.) Upon review, only twenty-five pairs of Student/Parent initials from the Complaint and Appendix A match the Student/Parent pairs on the due process list.[16]

However, I will assume, for purposes of this motion only, that all 43 students who are identified in the Complaint have requested due process hearings, and so have at this moment the right to assert pendency claims against the NYCDOE.[17]

The prayer for "preliminary" relief in the application that was presented in Part I sought mostly the sort of ultimate relief that Plaintiffs would be entitled to obtain only if they actually won this lawsuit on the merits: the issuance of  "pendency vouchers" (effectively, tuition reimbursement); the funding of evaluations (which may or may not be necessary, depending on whether Plaintiffs prevail on their claims on the merits); reimbursement for expenses incurred by the parents other than those relating directly to their children's education (apparently these parents believe that they, unlike any other parents of school children in New York City, are entitled to recover damages if they lost work due to the closure of the schools); and punitive damages.

---

[16] #2 K.M. (M.M. and S.M.), #54 L.P. (A.R. and O.R.), #55 M.B. (C.B.), #56 A.D. (A.F.), #57 C.M. (B.M.), #59 J.O (N.O.), #61 L.B. (L.B.), #65 K.T. (K.T.), #66 D.G. (A.R.), #67 D.G. (A.R.), #68 S.G. (S.G.), #69 B.H. (C.H.), #73 R.B. (G.B.), #75 K.P. (R.P.), #76 C.F. (Z.F.), #79 B.H. (E.H.), #82 E.P. (R.C.), #83 N.K. (S.H.), #84 S.C. (N.C. and S.C.), #86 H.D. (J.D.), #87 L.W. (J.W. and E.W.).

[17] In an appendix the court will file shortly, the court will explain the efforts we made to try to figure out who the plaintiffs were and to review their IEPs, which no party chose to discuss in any detail in moving or opposing papers. We finally gave up – which is why I will assume, for purposes of this motion, that all 43 students identified in the complaint have in fact requested due process hearings and are asserting pendency claims. As to anyone who has not requested an impartial hearing, the assertion of a pendency claim is premature.

The only aspect of Plaintiffs' motion that seeks appropriate *preliminary* injunctive relief is their claim that their children's pendency was altered by virtue of the shut down and the conversion to remote learning and the remote provision of services. I thus interpret Plaintiffs' request for a preliminary injunction requiring the New York City public schools to "reopen" as a prayer that their children be provided with in-person education and services pending the results of the impartial hearings they have requested, on the ground that in person education in open schools is their "pendency" placement. In other words, the motion for a preliminary injunction seeks the entry of a "stay-put" injunction *pendente lite*.

For a variety of reasons, Plaintiffs' application for a stay put injunction is DENIED.

### The Factual Record

"In deciding a motion for preliminary injunction, a court may consider the entire record including affidavits and other hearsay evidence." *Sterling v. Deutsche Bank Nat'l Tr. Co. as Trustees for Femit Tr. 2006-FF6*, 368 F. Supp. 3d 723, 725 n.2 (S.D.N.Y. 2019) (internal quotations omitted). Accordingly, in deciding Plaintiffs' application for a preliminary injunction, this Court will consider the declarations submitted by both sides, and the attachments thereto.

Before discussing the law, I will briefly summarize what the evidence – not the allegations, but the evidence – does or does not show.

The City of New York closed its schools on March 13. It did not stop providing special education services to its disabled students on that date. If anything, the record before this Court reveals the herculean efforts of NYCDOE to attend to the needs of those students despite the emergency unfolding around them.

The Complaint and the moving papers assert that as of March 13, 2020 Mayor DeBlasio and Chancellor Carranza unilaterally moved all instruction to "remote learning" where students

and staff would remain in their homes until April 20, 2020. On April 11, they announced that schools would remain closed for the remainder of the 2019-2020 school year. (Compl. ¶ 7.)

On the very day that they closed the schools, USDOE held a joint webinar between its Office of Special Education Programs ("OSEP"), the Council of Administrators of Special Education, the Council of Chief State School Officers, and the National Association of State Directors of Special Education, during which they issued guidance about the provision of special education services remotely during the pandemic. NYSED relayed this guidance to all New York schools. *See supra* pp. 8-9.

NYCDOE subsequently offered its own guidance. On March 31, 2020, Executive Director of NYCDOE Office of Related Services Michael van Biema issued a memo regarding NYCDOE's provision of related services to students during the shutdown. (*Id.* ¶ 13; "NYCDOE Memo," Dkt. No. 1-11.) As Plaintiffs point out, NYCDOE advised that service providers could "**NOT provide in-person services**." (NYCDOE Memo at 1 (emphasis original); Compl. ¶ 13.) However, the very next paragraph in this memorandum (conveniently not quoted by Plaintiffs) provides that "Per federal guidance, and where appropriate and feasible, students with disabilities will continue to receive their recommended special education programs and related services remotely during this time." (NYCDOE Memo at 1) The memo proceeds to outline a fairly robust plan for the provision of related services via tele-therapy. NYCDOE instructed its service providers to "make initial contact with each student's parent using the script in the consent form instructions, and obtain consent for tele-therapy by completing this on-line form. [The provider] must document [its] discussion with the parent, including a statement indicating whether consent was provided, denied, or withdrawn." (*Id.* at 2.)

And as noted previously, Plaintiffs also do not mention that USDOE, while refusing to waive any school district's obligations to its students with disabilities, also specifically indicated that, " . . . ensuring compliance with the Individuals with Disabilities Education Act (IDEA), Section 504 of the Rehabilitation Act (Section 504), and Title II of the Americans with Disabilities Act should not prevent any school from offering educational programs through distance instruction." (*See* P.I. Mem. at 13.)

Plaintiffs acknowledge that NYSED issued "clear guidance . . . about providing live, synchronous instruction" to students with disabilities. (Compl. ¶ 14.) And indeed, On April 27, 2020, the New York State Education Department ("NYSED") Office of Special Education issued a memo that school districts "must ensure that, to the greatest extent possible, each student with a disability is provided the special education and related services identified in the student's IEP." (*Id.* ¶ 12.)

While Governor Cuomo allowed school districts to reopen their buildings to accommodate extended school year ("ESY") special education starting July 1 (Comp. ¶ 16), NYCDOE did not permit students return to the classroom over the summer. (*Id.* ¶ 29.) Rather, it continued to provide them with remote educational services. It also opened sites across the City to offer some one-on-one or small group in-person speech, physical, and occupational therapy services for special needs students. (*Id.*; Foti Decl. ¶ 11.) The NYC Defendants did not provide transportation for students over the summer. (Compl. ¶ 29.)

As discussed above, the schools did reopen for in-person instruction in September, with the choice of whether to send a child into the school buildings resting squarely on the shoulders of the parents. Plaintiffs allege that September in-person schooling was be limited to in-person instruction 1-3 days a week (*Id.*), while NYCDOE claims to be offering in-person instruction either

five days out of every fifteen school days or five days out of every ten school days. (Foti Decl. ¶ 12.) In either event, except for District 75 students (some of whom may be Plaintiffs in this lawsuit, but this court has not been told one way or the other), in-classroom education is only available on a part-time basis, not on a full time basis.

As for what is occurring today, Plaintiffs allege precious little about the individual Students, the condition of their schools, the current educational services they are receiving – or even whether their parents are among the 42.6% of special education parents who have opted to keep their children at home this fall, notwithstanding the reopening of the New York City schools.[18] Instead, Plaintiffs (1) rest on the truism that each Student's "current educational placement" is his or her last agreed-upon IEP (*see* P.I. Mem. at 35, Dkt. No. 90-7), (2) allege that no student's IEP specifically provides for remote education (Albert Decl. ¶ 16) – an allegation that I am prepared to accept as true – and (3) reason, *ipse dixit*, that every student's pendency was altered by the closure of the schools and the provision of remote education. It is that pendency that Plaintiffs want restored.

The City, on the other hand, paints a more complete, if generalized, picture of its response to the COVID crisis.

*First*, as soon as the schools closed, NYCDOE created a Special Education Remote Learning Plan for 98% of students with disabilities. The parents of disabled students were consulted about the development of these plans. (Foti Decl. ¶ 8.) Significantly, not a single parent purportedly affected by this lawsuit has submitted an affidavit indicating that his or her

---

[18] Parents who opted for remote learning arguably amended their children's IEPs – whether or not it was reduced to a new IEP, and so would have no right to bring a pendency claim. *See Arlington Cent. Sch. Dist. v. L.P.*, 421 F. Supp. 2d 692, 697 (S.D.N.Y. 2006) (citing *Murphy v. Arlington Cent. Sch. Dist. Bd. of Educ.*, 86 F. Supp. 2d 354, 358 (S.D.N.Y. 2000), *aff'd*, 297 F.3d 195 (2d Cir. 2002)). Again, this court has no idea whether any of the 38 Named Plaintiff Parents affirmatively chose not to have their children resume in-person learning.

child/children did not have a Special Education Remote Learning Plan, or that they were not consulted about the creation of such a plan. Of course, the City has not submitted evidence that Special Education Remote Learning Plans were devised for the 199 students whose parents had filed due process complaints at the time the NYC Defendants filed their response to the preliminary injunction motion, or that any of those specific parents were in fact consulted. However, on this motion for a preliminary injunction, the burden rests with the plaintiffs, not the defendants.

*Second*, NYCDOE instituted teletherapy to provide students with clinical and therapeutic services. Ms. Foti reports that "where the DOE sought consent to provide services remotely via teletherapy, *parents overwhelmingly consented* (over 80%)." (*Id.* (emphasis added).) Again, there is no evidence from any parent who is either named in this lawsuit or who has filed a due process complaint that said parent's child was denied teletherapy services (assuming, of course, that some sort of therapy, such as speech or occupational therapy, was required by the student's IEP), or that the parent refused to consent to the provision of such services. However, the NYC Defendants offer no evidence that the parents mentioned in the pleading, or those who have filed due process complaints, are among the 80% who consented to the provision of remote therapy.

*Third*, Governor Cuomo loosened restrictions on the City's schools for the summer of 2020. (*Id.* ¶ 10.) Accordingly, NYCDOE was "able to provide in-person related services to students with IEP recommendations for extended school year services (i.e., 12-month educational programs) including related services, *where parents opted* for in-person related services." (*Id.* ¶ 11 (emphasis added).)

Nearly all of the IEPs we have been able to correlate with a Named Plaintiff provide for ESY services. Those IEPs, however, continue to list the "location" of services as if schools were open, and the record does not reflect one way or the other whether Parents were offered or

consented to in-person services over the summer; no parent has submitted any affidavit on the subject.

*Fourth*, beginning in September 2020, NYCDOE provided parents a *choice* between 100% remote learning and a blended model where students are in school some days and engage in remote learning other days. (Health Decl. ¶ 18; Dkt. No. 138.) All parents were contacted and afforded the opportunity to opt into full-time remote instruction; the default option was the blended model. (Foti Decl. ¶ 12.) As of September 18, 42.6% of all families of students with disabilities opted for 100% remote instruction. (*Id.*)  Unfortunately, neither side offers any evidence about what decision the plaintiff parents made on behalf of their children – if they made any decision at all. Moreover, Plaintiffs nowhere indicate that Students are presently being educated in the model chosen by their parents/guardians. In fact, Plaintiffs nowhere indicate what kind of model Students are currently enrolled in – all-remote, blended, or full-time in-person.

*Fifth*, different models were developed for District 75 – NYCDOE's citywide district that provides highly specialized support for students with disabilities with significant challenges – because the smaller class sizes could accommodate more students to attend school more frequently or full-time. (*Id.* ¶¶ 3, 12.) Where classrooms are large enough to permit social distancing, schools could permit students to attend in-person for 100% of the school day in a school building. (*Id.* ¶ 14.)  The IEPs provided to the court indicate that about half of the Named Plaintiff Students (for whom we have IEPs with matching initials) attend District 75 or an "NYC DOE specialized school" and the rest attend either a "NYC DOE School Non-Specialized (District 1-32)" or "NYSED-approved non public" school. (*See* the forthcoming appendix for further detail.)

However, as mentioned above, per USDOE's guidance, the switch to remote learning did not require any change to students' IEPs. Accordingly, when NYCDOE updated students' IEPs –

65

even post-shutdown – it did not alter the "location" of where students were to receive their services. For example, per M.M.'s IEP effective May 4, 2020, the "location" of M.M.'s special education was still "General Education Classroom" and the "location" of his related services was still "Separate Location – Therapy Room." (*See* Dkt. No. 1-8 at 10-12.) Thus, the IEPs alone – which is all the evidence Plaintiffs provide – do not indicate whether or not these Students were/are in fact receiving their educational program and related services in-person, remotely, or a blend of both.

*Sixth*, NYCDOE developed new forms relating its proposed "adaptations" to the provision of special education programs and related services. (*Id.* ¶ 17) Its staff has been reaching out to families of students with disabilities to discuss each family's instruction service choice (remote or blended) and the mode of service delivery to implement the child's program. (*Id.*) Finalization of these "adaptations" requires a discussion between NYCDOE and parents, or three documented attempts to reach the family on at least two different days. (*Id.*) Again, the Plaintiffs only argue – rather generally – that these changes were made "absent parental consent." (P.I. Reply at 14.) However, we know nothing of whether Parents were contacted.

In short, under exceedingly stressful circumstances, the City has plainly not ignored the needs of its special education students during the COVID crisis – although I have no doubt that it has not provided those students with everything their parents would have wished for them.

*Why Plaintiffs Are Not Entitled to Stay Put Injunctions*

Under the IDEA, "Parents are specifically entitled to request a due process hearing in order to present complaints as 'to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education.'" *Cave v. E. Meadow Union Free Sch. Dist.*, 514 F.3d 240, 245 (2d Cir. 2008) (quoting 20 U.S.C.

§ 1415(b)(6)(A)) (citing 20 U.S.C. § 1415(f)(1)(A), (g) and (h)). The IDEA's pendency provision provides, in relevant part, that "during the pendency of any proceedings conducted pursuant to this section, unless the State or local educational agency and the parents otherwise agree, the child shall remain in the then-current educational placement of the child." 20 U.S.C.A. § 1415(j). "[W]here the IDEA's stay-put provision is implicated, the provision triggers the applicability of an automatic injunction designed to maintain the child's educational status quo while the parties' IEP dispute is being resolved." *Ventura de Paulino v. New York City Dep't of Educ.*, 959 F.3d 519, 529 (2d Cir. 2020) (citing *Zvi D. by Shirley D. v. Ambach*, 694 F.2d 904, 906 (2d Cir. 1982)).

To the extent Plaintiffs are seeking an injunction applicable to a class consisting of all NYCDOE special education students, no such relief is available. "[T]he only stay-put relief that plaintiffs could theoretically obtain would be an order allowing the individual named plaintiffs' children to remain in their educational placement." *V.D. v. State*, 403 F. Supp. 3d 76, 91 n.8 (E.D.N.Y. 2019). This Court agrees with the Eastern District's assessment that the language of the statute – indeed, the very title of statute – only allows an *individual* parent to demand that a school maintain an individual student's education program after the parent has initiated an individual proceeding under the IDEA. *See id.*

This is consistent with a very recent opinion from the District of New Mexico, *Hernandez v. Grisham*, No. cv-20-0942, 2020 WL 6063799, at *60 (D.N.M. Oct. 14, 2020). In *Hernandez*, the district court concluded that it was not likely to certify a class of "the parents of the New Mexico school children who are or will be subject to the denial of a FAPE in violation of the IDEA without any administrative remedy that would not be futile" because the plaintiff could not establish a likelihood of success on commonality, typicality, or Rule 23(b)(2)'s requirements. *See id.* at *60–62. Specifically, under the facts of that case, "some students in the putative class . . . may

have been provided with in person instruction in accordance with their IEPs." *See id.* Thus, the plaintiff failed to identify a uniformly applicable policy that prohibits class members from attending school in person.

As this court has made abundantly clear, this lawsuit is nothing but a series of individual claims asserted against various school districts. Therefore I will address the issue of stay put relief with respect only to the forty-three students who are identified as plaintiffs in the Complaint and its Appendix A (Dkt. No. 1-12).

The City argues that, before a plaintiff enjoys the benefit of this "automatic injunction," the plaintiff must establish that the IDEA's stay-put provision is implicated. That is correct. The IDEA's pendency provision provides that during an IDEA challenge, "the child shall remain in the *then-current educational placement of the child*." 20 U.S.C.A. § 1415(j) (emphasis added). "The plain language of the IDEA clearly establishes that 'the stay-put provision only comes into play when a child's "educational placement" is changed or proposed to be changed.'" *V.D.*, 403 F. Supp. 3d at 91 (quoting *Roher v. D.C.*, No. cv- 89-2425, 1989 WL 330800, at *2 (D.D.C. Oct. 11, 1989)); *see also Concerned Parents & Citizens for the Continuing Education at Malcolm X (PS 79) v. New York City Board of Education*, 629 F.2d 751, 753–54 (2d Cir. 1980). Therefore, in order to obtain a stay put injunction, each of the 43 student plaintiffs must establish that his/her educational placement has been changed.

None has made the necessary showing.

In the Second Circuit, "the term 'educational placement' refers only to the general educational program in which the handicapped child is placed and not to all the various adjustments in that program that the educational agency, in the traditional exercise of its discretion, may determine to be necessary." *Concerned Parents*, 629 F.2d at 756. Subsequent Second Circuit

cases have noted that a "general educational program" includes "the same general level and type of services that the disabled child was receiving," *T.M. ex rel. A.M. v. Cornwall Cent. Sch. Dist.*, 752 F.3d 145, 171 (2d Cir. 2014) (citing *Concerned Parents*, 629 F.2d at 756) and "the classes, individualized attention and additional services a child will receive—rather than the 'bricks and mortar' of the specific school." *T.Y. v. New York City Dep't of Educ.*, 584 F.3d 412, 419 (2d Cir. 2009).

It is clear that the crux of Plaintiffs' stay-put claim rests with the school closures themselves. They argue that, "Defendants unilaterally closed its schools and required students and staff to remain home, thereby altering the status quo of the educational programs of the Plaintiff-Students." (P.I. Mem. at 17.) By doing so – Plaintiffs argue – Defendants denied Plaintiffs their pendency rights under the IDEA. (*Id.*)

If there were any doubt that the gravamen of the pendency claim asserted on behalf of every one of the plaintiff children is that the schools were closed due to the pandemic, Plaintiffs' counsel's declaration (Albert Decl. ¶ 11) lays it to rest:

> When the LEAs closed their doors effective on or about March 16, 2020, they unilaterally stopped providing the special education and related services set forth in Students' IEP. This cessation of the special education and related services, guaranteed to the Students through their respective IEPs, was effectuated without notice to the Students' Parents, the Plaintiffs herein. Such unilateral substantial and material modification of mandated education and related services was violative of the IDEA's due process requirements. Moreover, such unilateral substantial and material modification of mandated education and related services constituted an unlawful change of placement for each Student herein. And, in this regard, upon information and belief, each Student herein was adversely affected by this unilateral substantial and material modification of mandated education and related services.

Plaintiffs' argument is as follows: None of the IEPs for the forty-three New York City Students who are plaintiffs in this case says anything about providing services remotely – not even those IEPs that were updated *after* NYCDOE schools closed in March. (Albert Reply Decl. ¶ 16.)

Therefore, when schools closed in March due to the pandemic, and the City began providing services remotely, this worked a change in their pendency. Plaintiffs' counsel, Mr. Albert, states in his declaration, "When the DOE closed their doors effective on or about March 16, 2020, they unilaterally stopped providing the special education and related services set forth in Students' IEP." (Albert Reply Decl. ¶ 13.) In the following paragraph, he states "[NYC]DOE's unilateral change in the Students' educational program and placement was violative of the 'stay put' or 'pendency' provision of the IDEA, codified at 20 U.S.C. § 1415(j)." (*Id.* ¶ 14.)

The fair inference, from these statements and others, is that the provision of remote services to students as a result of the closure of the schools during the pandemic worked a change in the students' pendency.

But there are three reasons why the student Plaintiffs who have filed due process complaints have not established that the pandemic-induced closure of the schools wrought a change in their pendency.

First, the agency charged with administering the IDEA program has issued guidance indicating that the provision of remote services does not work a change in placement. This guidance – which would likely be entitled to *Skidmore* deference if plaintiffs were challenging the USDOE's informal interpretation of the IDEA, *see Christensen v. Harris Cty.*, 529 U.S. 576, 587 (2000) (citing *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)) – dooms Plaintiffs' pendency claim without more. [19]

---

[19] In *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), the Supreme Court held that "a court must give effect to an agency's regulation containing a reasonable interpretation of an ambiguous statute." *Christensen*, 529 U.S. at 586. However, the Supreme Court has distinguished, between – one the one hand – interpretations contained in opinion letters, policy statements, agency manuals, and enforcement guidelines, "all of which lack the force of law," and – on the other hand – interpretations "arrived at after, for example, a formal adjudication or notice-and-comment rulemaking." *Id.* at 587. The former "do not warrant *Chevron*-style deference. Instead, interpretations contained in formats such as opinion letters are 'entitled to respect' under our decision in *Skidmore*[], but only to the extent that those interpretations have the 'power to persuade.'" *Id.* (internal citations omitted).

USDOE, while refusing to provide school districts with a waiver of their obligations under IDEA, issued guidance about how they could comply with the statute in the unprecedented circumstances of the pandemic. USDOE's guidance is clear: "**ensuring compliance with the Individuals with Disabilities Education Act (IDEA), Section 504 of the Rehabilitation Act (Section 504), and Title II of the Americans with Disabilities Act should not prevent any school from offering educational programs through distance instruction.**" (USDOE Fact Sheet at 1 (emphasis original).) In the specific context of the COVID-19 pandemic, the USDOE has clearly embraced an approach of granting schools maximum flexibility to keep their students safe so long as they continue to offer all students a free appropriate public education. (*See generally* USDOE Q&A.)

Moreover, the USDOE expressly endorsed "special education and related services provided through distance instruction provided virtually, online, or telephonically." (*Id.* at 1-2.) Per NYSED, USDOE's Office of Special Education Program ("OSEP") indicated that "online or virtual learning would be considered an alternate mode of instructional delivery." (NYSED Q&A at 5.)

It is impossible to square the USDOE's contemporaneous guidance with Plaintiffs' assertion that the City's switch to remote learning in light of the pandemic constituted a change in placement in and of itself. This Court will not second guess the USDOE. Accordingly, Plaintiffs have failed to sufficiently allege a change in placement that triggers the stay-put provision, and Plaintiffs are not entitled to pendency.

Plaintiffs rely on *Letter to Fisher*, 21 IDELR 992 [OSEP 1994], in which the USDOE's OSEP opined that a "change of placement" has occurred if "the proposed change would

substantially or materially alter the child's educational program." OSEP identified four factors to aid this analysis:

> [1] whether the educational program set out in the child's IEP has been revised; [2] whether the child will be able to be educated with nondisabled children to the same extent; [3] whether the child will have the same opportunities to participate in nonacademic and extracurricular services; and [4] whether the new placement option is the same option on the continuum of alternative placements.

*Cruz v. New York City Dep't of Educ.*, No. 19-cv-856, 2020 WL 1322511, at *9 (S.D.N.Y. Mar. 20, 2020) (quoting *Gore v. D.C.*, 67 F. Supp. 3d 147, 152 n.4 (D.D.C. 2014) (quoting *Letter to Fisher* at 3)).

However, Plaintiffs' reliance on the outdated and generalized guidance in *Letter to Fisher* is completely upended by the more recent guidance provided by USDOE in the specific and unprecedented circumstances of a worldwide pandemic. Indeed, as noted above, the OSEP – the very agency that issued Letter to Fisher back in 1994 – conducted a Joint COVID-19 Webinar with the Council of Administrators of Special Education, Council of Chief State School Officers, and National Association of State Directors of Special Education on March 13, 2020, during which, OSEP "indicated that if online or virtual learning is part of a school closure recommendation, the school district would *not be required to amend students' IEPs* as online or virtual learning would be considered an alternate mode of instructional delivery." (NYSED Q&A at 5 (emphasis added).)

If the USDOE does not consider the provision of remote services to disabled students during a pandemic (which, significantly, is no different than the way services were being provided to abled students), this court will not second guess the agency.

Second, plaintiffs are challenging a system-side administrative decision of general applicability – an order shutting schools to all students (abled and disabled) and all staff during an unprecedented and life-threatening health crisis. There can be no question that the order applied to

the entire school system and that it was of general applicability – that is, it applied equally to abled and disabled students. Such an order does not work a change in pendency.

There is not a great deal of precedent on this point, but the court has read one reasonably close case – *N.D. v. Hawaii Department of Education*, 600 F.3d 1104, 1108, (9th Cir. 2010). In that case, the plaintiffs – disabled minors in Hawaii's public school system – challenged Hawaii's system-wide decision to shut down public schools on seventeen Fridays to alleviate a financial crisis. This decision provided all students – abled and disabled – with seventeen fewer days of instruction than they would otherwise have had. Nonetheless, the Ninth Circuit affirmed the district court's order denying the plaintiffs' motion to enjoin the shutdown, ruling that the shuttering of all the schools in Hawaii did not constitute a change in the educational placement of the disabled children. *Id.* at 1116.

The IDEA does not define "educational placement." Accordingly, the Ninth Circuit considered the purpose of the stay-put provision to interpret the meaning of this undefined term. *See id.* at 1114. "Part of Congress's concern was that 'children were excluded entirely from the public school system and from being educated with their peers.' To alleviate that, disabled children were to have 'access to the general education curriculum in the regular classroom, to the maximum extent possible.'" *Id.* at 1115 (quoting 20 U.S.C. §§ 1400(c)(2)(B), 1400(c)(5)(A)). The Ninth Circuit also found that "When Congress enacted the IDEA, Congress did not intend for the IDEA to apply to system wide administrative decisions" such as Hawaii's Friday shutdowns that "affect all public schools and all students, disabled and non-disabled alike." *Id.* at 1116. The Ninth Circuit continued:

> To allow the stay-put provisions to apply in this instance would be essentially to give the parents of disabled children veto power over a state's decisions regarding the management of its schools. The IDEA did not intend to strip administrative

powers away from local school boards and give them to parents of individual children, and we do not read it as doing so.

*Id.* at 1117.

In this context, the Ninth Circuit ruled that the Friday shutdowns did not constitute a change in students' general education placement. "The children continue to attend the same school, have the same teachers, and stay in the same classes. The educational setting of the disabled children remains the same post-[shutdowns]." *Id.* 1117.[20]

In a case closer to home, if not as closely on point as to the facts, the Second Circuit reversed a district court order preliminarily enjoining a decision to close P.S. 79 for budgetary reasons. *Concerned Parents*, 629 F.2d 751, 752 (2d Cir. 1980). Approximately 185 of the 310 students at P.S. 79 were enrolled in special education classes, part of an "extremely innovative educational program" for students with disabilities. *See id.* P.S. 79 students were transferred to other schools within the district. The district court, concluding that this worked a change in the students' pendency, directed NYCDOE to provide transferred students with disabilities with the broad array of curricular and extra-curricular programs and services that had been available at P.S. 79. *See id.* at 753. The Second Circuit reversed after deciding that the transfer did not constitute a "change in placement" because the transferred students "remain[ed] in the same classification, the same school district, and the same type of educational program special classes in regular schools." *Id.* at 756. The court also noted "that the full notice and hearing requirements of s 1415(b)" – which guarantee parents an opportunity for meaningful input into decisions affecting their child's education – "were limited to certain fundamental decisions regarding the existence and

---

[20] The court additionally concluded that the one-day-a-week shutdowns did not work any change in the students' IEPs, because those IEPs assumed that some school weeks would not be a full five days (due to federal and state holidays). *Id.* at 1117.

classification of a handicap, and the most appropriate type of educational program for assisting a child with such a handicap." *Id.* at 754.

As was the case in both *N.D.* and *Concerned Parents*, the student plaintiffs in this case have not experienced any change in their pendency. They all remain in the same classification, in the same school district, and likely have the same teachers. Plaintiffs' primary issue is that the City unilaterally forced Students home and required remote learning without providing in-person services. But that was true of every student in the district, abled and disabled. And it was the product of (I say it yet again) a health crisis of unprecedented proportions – and an administrative decision made to protect the lives and health of students and staff, which this court is neither equipped nor prepared to second guess.

The two reasons discussed above are dispositive – and, indeed, require dismissal of the Plaintiff Students' pendency claims. However, there is a <u>third</u> reason why entry of a stay put injunction would not be appropriate: the record as it currently exists does not justify it.

Injunctive relief is forward looking, not backward looking. If a condition that would have warranted the entry of an injunction has been cured and it is clear that the condition could not reasonably be expected to recur, then there is no basis to enjoin. *Feltenstein v. City of New Rochelle*, 254 F. Supp. 3d 647, 656 (S.D.N.Y. 2017) (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 190 (2000)).

Many things have changed since plaintiffs first made their motion. In particular, the schools have reopened for in-person instruction in New York City (at least for part time in-person instruction), and it is entirely the parents' choice whether their children (abled or disabled) should attend them or remain at home. But the record is barren of evidence about the 43 plaintiff children's current educational circumstances. This court has no idea whether their parents have chosen to

send their children to school several days a week or to keep them at home full time – or even whether they were given a choice, as the City contends. I do not know whether the children are being offered or are receiving services, either in person or remotely. I do not know whether some of them are enrolled in a District 75 school and are actually attending school full time. Plaintiffs complain that NYCDOE did not provide students with transportation over the summer, but (1) they do not say which students were entitled to transportation but did not get it; (2) it is no longer summer, and (3) no plaintiff has affirmatively indicated that s/he was entitled to transportation services under his/her IEP but is not receiving them now. Plaintiffs controvert none of the City's evidence on these points.

Since the record is curiously and completely devoid of information about what was happening to the plaintiff students on September 24, when Plaintiffs' filed their reply brief – never mind what is happening now, today, in November 2020 – it is hard to see why any sort of injunction to "open the schools" (to use the words used by Plaintiffs) should emanate from this court, since as far as the record shows, the schools are open and the plaintiff students can receive IEP-mandated educational services in person if their parents so desire.

Finally, it bears noting that, if this motion were being assessed using the four principles for obtaining preliminary injunctive relief articulated by the Supreme Court in *Winter v. National Resource Defense Council*, 555 U.S. 7, 24 (2008) – which is not the standard applied in this Circuit to stay-put injunctions, *see Ventura de Paulino v. New York City Dep't of Educ.*, 959 F.3d 519, 529 (2d Cir. 2020) (citing *Zvi D. by Shirley D. v. Ambach*, 694 F.2d 904, 906 (2d Cir. 1982)) – it would also be denied. To obtain an injunction from a district court, movants generally bear the burden of showing that (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor;

and (4) an injunction is in the public interest. *Id.* at 20. In this case, plaintiffs have failed to demonstrate any likelihood of success on the merits of their claim that their pendency has been changed (for the reasons discussed *supra* at pp. 66-74); the balance of equities does not tip in their favor, since there is no evidence that they are being denied a FAPE; and given the continuing (nay, re-escalating) public health crisis, with which City and State officials are trying to deal in the best way they can for all students, abled and disabled, the public interest would not be served by forcing the New York City schools to reopen as fully as at least these Plaintiffs would like.

For all of these reasons, the Plaintiffs' application for a preliminary "stay put" injunction is denied.[21]

## IV.     The NYC Defendants' Motion to Dismiss is Granted

Having disposed of the stay put injunction issue, the court turns finally to the motion to dismiss the Complaint made by the NYC Defendants. (Dkt. No. 137.) For the reasons stated below, the motion is GRANTED as to all claims.

### A.   *Plaintiffs' Denial-of-FAPE Claims are Dismissed Without Prejudice.*

The City argues that Plaintiffs have failed to exhaust their administrative remedies under the IDEA, which, if true, deprives the court of subject matter jurisdiction over their claims of denial of a FAPE. That is correct.

---

[21] I decline to reach the City's alternative argument that each plaintiff child's IEP was changed on consent of the parents. *See Arlington Cent. Sch. Dist. v. L.P.*, 421 F. Supp. 2d 692, 697 (S.D.N.Y. 2006) (citing *Murphy v. Arlington Cent. Sch. Dist. Bd. of Educ.*, 86 F. Supp. 2d 354, 358 (S.D.N.Y. 2000), *aff'd*, 297 F.3d 195 (2d Cir. 2002)). The City's theory is that parents effectively agreed to a change in their child's IEP by deciding whether to send the child back to school part-time this fall ("blended learning") or to continue with full time remote learning. (*See* Defs.' Mem. at 18, Dkt. No. 140.) This argument might prove attractive if the City had provided the court with evidence that the parents of these 43 specific students were in fact consulted and made the affirmative decision to do one or the other. I am not prepared to infer parental consent from a general argument that relies entirely on statistics, without evidence about these specific families. Fortunately for the NYC Defendants, it is not necessary to address this issue. The same will not be true at an administrative hearing or in any subsequent litigation.

A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it. *See* Fed. R. Civ. P. 12(b)(1). The plaintiff bears the burden of proving by a preponderance of the evidence that subject matter jurisdiction exists. *See Malik v. Meissner*, 82 F.3d 560, 562 (2d Cir. 1996).

In reviewing whether it has subject matter jurisdiction, this Court assumes the facts in the Complaint are true, unless contradicted by "more specific allegations or documentary evidence." *Amidax Trading Group v. S.W.I.F.T. SCRL*, 671 F.3d 140, 145 (2d Cir. 2011). In resolving a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), a district court may refer to evidence outside the pleadings. *See Kamen v. American Tel. & Tel. Co.*, 791 F.2d 1006, 1011 (2d Cir. 1986).

As discussed above, the purpose of the IDEA is to provide students with disabilities with a free appropriate public education ("FAPE"). The IDEA "establishes various procedural safeguards that guarantee parents both an opportunity for meaningful input into all decisions affecting their child's education and the right to seek review of any decisions they think inappropriate." *Honig v. Doe*, 484 U.S. 305, 311–12, (1988). Parents may request a due process hearing to present complaints relating to the educational placement of their child, or the provision of a free appropriate education. *Cave v. E. Meadow Union Free Sch. Dist.*, 514 F.3d 240, 245 (2d Cir. 2008) (quoting 20 U.S.C. § 1415(b)(6)(A)).

New York has a two-tier administrative system for review of IEPs: "First, an impartial hearing officer is selected from a list of certified officers and appointed by the local board of education or the competent state agency to conduct the initial hearing and issue a written decision. That decision can then be appealed to a state review officer of the New York Education Department." *Id.*

Each individual student plaintiff must exhaust these administrative procedures before filing an IDEA action in court. *See* 20 U.S.C. § 1415(i)(2)(A). "A plaintiff's failure to exhaust administrative remedies under the IDEA deprives a court of subject matter jurisdiction." *Avaras v. Clarkstown Cent. Sch. Dist.*, No. 18-cv-6964, 2019 WL 4600870, at *9 (S.D.N.Y. Sept. 21, 2019) (quoting *Polera v. Bd. of Educ. of Newburgh Enlarged City Sch. Dist.*, 288 F.3d 478, 483 (2d Cir. 2002)).

The exhaustion requirement applies with equal force to claims under the ADA, the Rehabilitation Act, or other, similar laws when the plaintiff seeks relief for the denial of a FAPE. *See* 20 U.S.C. § 1415(l); *Fry v. Napoleon Cmty. Sch.*, 137 S. Ct. 743, 752 (2017). This requirement also applies to claims arising under the New York State Constitution and state regulations that expressly allege the plaintiff was denied a FAPE. *See Dallas v. Roosevelt Union Free Sch. Dist.*, 644 F. Supp. 2d 287, 293–94 (E.D.N.Y. 2009) (citing *Cave*, 514 F.3d at 247). Additionally, even though compensatory and punitive damages are not available under the IDEA, the Second Circuit has held that plaintiffs are not excused from the exhaustion requirement "merely because in their suit they seek, *inter alia*, pecuniary damages, a remedy unavailable under the IDEA." *Cave*, 514 F.3d at 247. Similarly, the exhaustion requirement applies to claims arising under § 1983 where those claims complain of a denial of FAPE. *See Avaras v. Clarkstown Cent. Sch. Dist.*, No. 18-cv-6964, 2019 WL 4600870, at *18 (S.D.N.Y. Sept. 21, 2019).

To determine "whether a suit indeed 'seeks' relief for such a denial, a court should look to the substance, or gravamen, of the plaintiff's complaint." *Fry*, 137 S. Ct. at 752 The Court provided two hypothetical questions to guide this analysis:

> First, could the plaintiff have brought essentially the same claim if the alleged conduct had occurred at a public facility that was not a school—say, a public theater or library? And second, could an adult at the school—say, an employee or visitor— have pressed essentially the same grievance?

*Id.* at 756. When the answer to those questions is "no," the complaint probably concerns a FAPE, even if it does not explicitly say so. *Id.*

Here, every claim except for Count IV is based on the same violation: Defendants' asserted failure to provide Students with a free appropriate public education. Counts I, II, III, V, VI, VII, VIII, IX, and X all expressly allege that Defendants denied Plaintiffs a "free appropriate public education" or a "FAPE." (*See* Compl. ¶¶ 156, 159, 164, 170, 171, 172, 173, 176, 178, 181, 185, 189.) Count XI refers to "education benefits" rather than a "free appropriate public education." (*See id.* ¶¶ 192-93.)

For each of these ten claims, the answers to the *Fry* questions are "no," and "no." Every claim is inextricably tied to Plaintiffs' chief accusation that Defendants denied Students a FAPE. The facts that support these claims are identical. *See Avaras*, 2019 WL 4600870, at *18. If this Court needed more convincing, Plaintiffs' counsel's own declaration states that "The *gravamen* of the Complaint concerns the improper *unilateral modification and/or denial of special education and related services* of disabled students since mid-March 2020, when schools were closed by state and local officials in response to the COVID-19 pandemic." (Albert OTSC Decl. ¶ 2, Dkt. No. 141 (emphasis added)). Accordingly, all ten claims are subject to the IDEA's exhaustion requirement.

There are three exceptions to the exhaustion requirement:

Exhaustion is not necessary if (1) it would be futile to resort to the IDEA's due process procedures; (2) an agency has adopted a policy or pursued a practice of general applicability that is contrary to the law; or (3) it is improbable that adequate relief can be obtained by pursuing administrative remedies.

*Murphy v. Arlington Cent. Sch. Dist. Bd. of Educ.*, 297 F.3d 195, 199 (2d Cir. 2002). "It is the plaintiffs' burden to prove the applicability of one of these exceptions." *S.W. by J.W. v. Warren*, 528 F. Supp. 2d 282, 293 (S.D.N.Y. 2007) (citing *Murphy*, 297 F.3d at 199).

Plaintiffs do not allege to have exhausted their administrative remedies under the IDEA. And in fact none of them has exhausted because, while some of the plaintiff parents may have requested impartial hearings, there is no evidence that any hearing have been completed, that an IHO has issued a ruling, or that any appeal has been taken to an SRO.

Instead, plaintiffs make two arguments why their claims are not exhausted: (1) they filed a stay-put claim and (2) exhaustion would be futile. Both arguments fail.

Plaintiffs note – correctly – that "an action alleging violation of the stay-put provision falls within one, if not more, of the enumerated exceptions to this jurisdictional prerequisite." *Murphy v. Arlington Cent. Sch. Dist. Bd. of Educ.*, 297 F.3d 195, 199 (2d Cir. 2002). Accordingly, Plaintiffs' need not exhaust their administrative remedies before pursuing Count IV – failure to provide pendency under the IDEA. *See id.* And this court has ruled on the request for pendency relief.

But the exception that applies to a stay-put claim does not excuse Plaintiffs' other, FAPE-based claims from the exhaustion requirement. Plaintiffs assert "conceptually distinct claims: (I) [] denial-of-FAPE claim[s] . . . , *see* 20 U.S.C. § 1412(a)(1); and (II) a stay-put claim . . . , *see* 20 U.S.C. § 1415(j)." *Doe v. E. Lyme Bd. of Educ.*, 790 F.3d 440, 447 (2d Cir. 2015). Other courts in this district have applied the exhaustion requirement claim-by-claim, and have not found that a valid stay-put claim excuses the exhaustion of denial-of-FAPE claims. *See, e.g.*, *Avaras*, 2019 WL 4600870, at *10.

Plaintiffs also attempt to invoke the futility exception. "If a plaintiff has shown that, due to administrative backlog or otherwise, an IHO or SRO has failed to timely issue a decision on a fully briefed due process complaint or appeal, a district court can assume jurisdiction." *J.Z. v. New York City Dep't of Educ.*, 281 F. Supp. 3d 352, 363 (S.D.N.Y. 2017) (quotations and citations omitted). While there is no bright-line rule for when a delay renders a claim futile, "courts have found exhaustion after a delay in cases ranging from two months to two years." *Id.* (citing *M.G. v. New York City Dep't of Educ.*, 15 F. Supp. 3d 296, 303 & n. 44 (S.D.N.Y. 2014) (collecting cases)). In their reply brief, Plaintiffs argue that only a handful of the NYC-Plaintiffs' due process complaints have been assigned to an impartial hearing officer ("IHO"). Thus, they claim that their exhaustion of administrative remedies would be futile.

But futility is not measured by the fact that it takes time to hold hearings. Plaintiffs conveniently do not allege that their impartial hearings have been held, let alone that no decision has been entered on a "fully briefed" due process complaint. I greatly doubt that any complaint has been "fully briefed;" indeed, most of the hearings that have been requested in this case were requested a month or less prior to the date when counsel argued that exhaustion was futile –thereby falling within New York's 30-day resolution period before the City need even hold a due process hearing. *See* 34 C.F.R. § 300.510; *J.Z.*, 281 F. Supp. 3d at 363. (*See* "IHO Emails," Dkt. No. 149-13.) Plaintiffs' futility argument is premature.

Moreover, this court is prepared to make allowances for the fact that the pandemic will inevitably result in delays in the holding of impartial hearings. I am not prepared to divorce this lawsuit from the circumstances that precipitated it.

In sum, Plaintiffs have not come close to demonstrating futility.

### B.  Plaintiffs' Stay-Put Claim is Dismissed

Because the court has concluded that (1) no change in pendency has been worked by the emergency closure of the schools, and (2) plaintiffs cannot complain about an administrative order of general applicability to all students (*see supra* pp. 66-73), Count IV, the count that seeks a stay-put injunction, must also be dismissed, for failure to state a claim on which relief may be granted. Fed. R. Civ. P. 12(b)(6). This dismissal does not preclude individual students from asserting in appropriately commenced lawsuits that something other than the closure of the schools and the provision of remote educational services during the pandemic. worked  a change in pendency.

### C.  Plaintiffs' RICO Claim is Dismissed

For all of the reasons in Part I(A)(2), *supra* pp. 49-23, Plaintiffs lack standing to pursue the RICO claim they outline in their RICO Case Statement (which amends the complaint) and they fail to plead essential elements of a RICO claim. Therefore, any RICO claim asserted against the NYC Defendants is dismissed with prejudice.

## V.    The Claims are Dismissed As Against the New York State Education Department

This leaves New York State.

In August, the New York State Education Department (NYSED) has filed a letter with this court indicating that it had not yet been properly served (it was purportedly served by email) (Docket #32). A review of the docket sheet revealed no proof of service on NYSED, so it has incurred no obligation to respond to anything as yet.

However, the court can *sua sponte* dismiss the claims asserted against NYSED for the reasons discussed above.

It can dismiss Counts I-III and IV-XI for failure to exhaust administrative remedies, which deprives this Court of subject matter jurisdiction. *See supra* fn. 11.

This Court can dismiss Count IV against NYSED *sua sponte* because pendency claims lie against individual school districts, not against the State, which would not be a proper party on any such claim.

And of course the RICO claim, which is fatally deficient in so many respects, must be dismissed against NYSED as well as against every other defendants.

"While dismissing a complaint as to a non-moving defendant is not an ordinary practice, a district court may dismiss claims *sua sponte* for failure to state a claim, at least so long as the plaintiff had notice and an opportunity to be heard on the issue." *Antidote Int'l Films, Inc. v. Bloomsbury Pub., PLC*, 467 F. Supp. 2d 394, 399 (S.D.N.Y. 2006) (quoting *First Capital Asset Mgmt., Inc. v. Brickellbush, Inc.*, 219 F. Supp. 2d 576, 580 (S.D.N.Y. 2002), *aff'd sub nom. First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159 (2d Cir. 2004)). In most cases, the *sua sponte* dismissal of claims against a non-moving defendant arise in circumstances like this one, in which (i) a defendant has not been properly served, and (ii) it is apparent that the same arguments that warranted dismissal against the moving defendants warrant dismissal against the unserved defendant. Here, NYSED submitted a letter on August 26 – prior to the issuance of the stay – asserting both improper service of process (it was purportedly served by email) and that it is not a proper party. (Dkt. No. 32); and the arguments discussed in the preceding 83 pages apply with equal or greater force to NYSED.

Plaintiffs have had many opportunities to be heard on the sufficiency of their Complaint. They have had an opportunity to respond to this Court's Orders to Show Cause via supplemental briefing (Dkt. Nos. 122, 123, 124) and to oppose the NYC Defendants' motion to dismiss – which argued that the Complaint should be dismissed for failure to state a claim (Dkt. No. 150). They have filed a RICO Case Statement (Dkt. No. 121) and were afforded an opportunity to further brief

the sufficiency of their RICO claims (Dkt. No. 194). It would be a waste of judicial resources to allow Plaintiffs' legally defective claims, as to which Plaintiffs have been fully heard, to be pursued against NYSED simply because the State – complying with a court-ordered stay -- has not yet moved to dismiss them. *See Antidote*, 467 F. Supp. 2d at 399.

Plaintiffs assert the same claims, based on the same facts, and the same legal theories against *all* defendants in this case. The reasons stated above for dismissing the Complaint against the NYC Defendants carry no less weight as applied to NYSED.[22]

Accordingly, the Complaint is similarly DISMISSED without prejudice against NYSED.

## CONCLUSION

For the reasons stated above, Plaintiffs' claims against all out-of-state Defendants are DISMISSED without prejudice. The remaining claims against all New York State School Districts outside NYCDOE are SEVERED and DISMISSED without prejudice.

Plaintiffs' application for a preliminary injunction is DENIED, and all claims are DISMISSED as against the NYC Defendants.

The court sua sponte dismisses all claims against the New York State Education Department.

---

[22] NYSED no doubt would raise Eleventh Amendment issues as well, but the court will not litigate on the State's behalf.

The Clerk of Court is directed to close the open motion at Docket Number 137. The motions at Dockets # 74, 92, 94, 96, 98 and 181, which were closed administratively due to the stay imposed by the court, should be closed permanently.

This is a written opinion. It is the opinion and order of the Court.


Dated:  November 13, 2020
        New York, New York

_____
                    Chief Judge

BY ECF TO ALL PARTIES